# No. 26-1133

# In the United States Court of Appeals

# For the Seventh Circuit

---

Mark Brandon Hamman,

*Plaintiff-Appellant,*

v.

City of Carbondale, Illinois, an Illinois Municipal Corporation; Leonard Jamie Snyder, in his individual and official capacities; John Lenzini, in his individual and official capacities,

*Defendants-Appellees*

---

**On Appeal from**
United States District Court for the Southern District of Illinois
3:25-cv-00736-NJR

---

**OPENING BRIEF OF APPELLANT
MARK BRANDON HAMMAN**

---

Geoffrey R. Surtees
AMERICAN CENTER FOR LAW &
JUSTICE
PO Box 60
New Hope, KY 40052
Tel: (502) 827-0951

Nathan J. Moelker
   *Counsel of Record*
Stuart J. Roth
Christina A. Compagnone
Liam R. Harrell
AMERICAN CENTER FOR LAW &
JUSTICE
201 Maryland Avenue, NE
Washington, DC 20002
Tel: (202) 641-9160
Fax: (202) 546-9309
Email: nmoelker@aclj.org
*Attorneys for Plaintiff-Appellant*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As      Clear Form

Appellate Court No: 26-1133

Short Caption: Mark Hamman v. City of Carbondale, Illinois, et al

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐        **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Mark Brandon Hamman

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
The American Center for Law and Justice

(3)      If the party, amicus or intervenor is a corporation:

   i)        Identify all its parent corporations, if any; and

      NA

   ii)       list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      NA

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   NA

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   NA

Attorney's Signature: /s/Nathan J. Moelker            Date: 1/27/26

Attorney's Printed Name: Nathan J. Moelker

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑  No ☐

Address: 201 Maryland Ave NE, Washngton DC 20002

Phone Number: (202) 641-9160                Fax Number: (202) 546-9309

E-Mail Address: nmoelker@aclj.org

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __26-1133__

Short Caption: __Mark Hamman v. City of Carbondale, Illinois, et al__

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
__Mark Brandon Hamman__

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
__American Center for Law and Justice__

(3)   If the party, amicus or intervenor is a corporation:

     i)    Identify all its parent corporations, if any; and

         __NA__

     ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         __NA__

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   __NA__

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   __NA__

Attorney's Signature: __/s/Christina A. Compagnone__    Date: __2/10/26__

Attorney's Printed Name: __Christina A. Compagnone__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: __201 Maryland Ave NE, Washington D.C. 20002__

Phone Number: __(202) 855-1778__    Fax Number: __(202) 546-9309__

E-Mail Address: __ccompagnone@aclj.org__

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1133

Short Caption: Mark Hamman v. City of Carbondale, Illinois, et al

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Mark Brandon Hamman

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
American Center for Law and Justice

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        NA

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        NA

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    NA

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    NA

Attorney's Signature: /s/Liam R. Harrell      Date: 03/19/26

Attorney's Printed Name: Liam R. Harrell

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐   **No** ☑

Address: 201 Maryland Ave NE, Washington D.C. 20002

Phone Number: (202) 855-1778      Fax Number: (202) 546-9309

E-Mail Address: lharrell@aclj.org

rev. 12/19 AK

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1133

Short Caption: Mark Hamman v. City of Carbondale, Illinois, et al

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   ☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Mark Brandon Hamman

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
American Center for Law and Justice

(3)   If the party, amicus or intervenor is a corporation:

    i)   Identify all its parent corporations, if any; and

       NA

    ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

       NA

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   NA

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   NA

Attorney's Signature: /s/Stuart J. Roth     Date: 03/20/26

Attorney's Printed Name: Stuart J. Roth

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: 201 Maryland Ave NE, Washington D.C. 20002

Phone Number: (202) 855-1778     Fax Number: (202) 546-9309

E-Mail Address: sroth@aclj.org

rev. 12/19 AK

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: _26-1133_

Short Caption: _Mark Hamman v. City of Carbondale, Illinois, et al._

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 _Plaintiff-Appellant Mark Hamman_

_____

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 _American Center for Law and Justice_

_____

(3)     If the party, amicus or intervenor is a corporation:

   i)       Identify all its parent corporations, if any; and

   _N/A_

   ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   _N/A_

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   _N/A_

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   _N/A_

Attorney's Signature: _/s/ Geoffrey R. Surtees_          Date: _March 19, 2026_

Attorney's Printed Name: _Geoffrey R. Surtees_

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** [ ]   **No** [✔]

Address: _PO Box 60_

_New Hope, KY 40052_

Phone Number: _(502) 827-0951_          Fax Number: _(502) 549-5252_

E-Mail Address: _gsurtees@aclj.org_

rev. 12/19 AK

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Mark Brandon Hamman respectfully requests oral argument. This appeal presents four independent constitutional questions — vagueness, narrow tailoring, content discrimination, and viewpoint discrimination — each of which turns on the application of First Amendment doctrine to a complicated statutory scheme and fact-intensive record.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ................................................................i

TABLE OF CONTENTS...............................................................................................ii

TABLE OF AUTHORITIES ........................................................................................iv

JURISDICTIONAL STATEMENT ............................................................................ 1

STATEMENT OF THE ISSUES.................................................................................. 2

INTRODUCTION ........................................................................................................ 2

STATEMENT OF THE CASE ..................................................................................... 3

SUMMARY OF THE ARGUMENT ......................................................................... 10

ARGUMENT .............................................................................................................. 13

    I.    STANDARD OF REVIEW.................................................................................. 13

    II.    CARBONDALE'S SIGN ORDINANCE IS UNCONSTITUTIONALLY VAGUE. ........ 14

        A.    The Ordinance Fails to Give Sufficient Notice of Prohibited Conduct. ... 15

            1.  The Ordinance Is Vague Because It Fails to Sufficiently Define the Scope of the Right of Way. ....................................................................................... 16

            2.  The Ordinance Is Vague Because the 20 Feet Rule Results in Further Confusion. .......................................................................................... 21

            3.  The Ordinance Is Vague Because Its Permitting Provision Appears to Authorize What the City Claims It Prohibits. ..................................... 22

            4.  The Ordinance Is Vague Because the Demonstration Exception Is Left Undefined. ......................................................................................... 24

        B.    The Ordinance Vests Arbitrary Discretion in City Officials. ................... 25

    III.    THE ORDINANCE IS AN UNCONSTITUTIONAL RESTRICTION OF SPEECH IN A PUBLIC FORUM. ......................................................................................... 28

        A.    Hamman's Speech Occurred in a Traditional Public Forum.................... 28

        B.    The Ordinance, as Interpreted by the City, Is Not Narrowly Tailored and Cannot Satisfy Scrutiny. ........................................................................ 29

            1.  The Ordinance Is Not Narrowly Tailored............................................ 29

            2.  The Ordinance Burdens More Speech Than Necessary........................ 34

IV.    THE ORDINANCE, AS INTERPRETED, IS CONTENT-BASED. ..........................36

V.    THE ORDINANCE HAS BEEN APPLIED THROUGH A SYSTEM OF VIEWPOINT DISCRIMINATION. .........................................................................................38

VI.    REMAINING PRELIMINARY INJUNCTION FACTORS SUPPORT A PRELIMINARY INJUNCTION. .......................................................................44

CONCLUSION..............................................................................................45

CERTIFICATE OF COMPLIANCE...................................................................46

CERTIFICATE OF SERVICE...........................................................................47

CIRCUIT RULE 30(d) STATEMENT ..............................................................48

REQUIRED SHORT APPENDIX .....................................................................49

# TABLE OF AUTHORITIES

**Cases**                                                     **Page(s)**

*ACLU v. Alvarez,*
679 F.3d 583 (7th Cir. 2012) .................................................................. 45

*Brown v. Kemp,*
86 F.4th 745 (7th Cir. 2023) .................................................................. 14

*Cassell v. Snyders,*
990 F.3d 539 (7th Cir. 2021) .................................................................. 14

*Christian Legal Soc'y v. Walker,*
453 F.3d 853 (7th Cir. 2006) .................................................................. 45

*City of Ladue v. Gilleo,*
512 U.S. 43 (1994) .................................................................. 35

*City of Lakewood v. Plain Dealer Publ'g Co.,*
486 U.S. 750 (1988) .................................................................. 25, 26

*Cleveland Area Bd. of Realtors v. City of Euclid,*
88 F.3d 382 (6th Cir. 1996) .................................................................. 33

*Connally v. General Constr. Co.,*
269 U.S. 385 (1926) .................................................................. 14

*Constr. & Gen. Laborers' Union No. 330 v. Town of Grand Chute,*
915 F.3d 1120 (7th Cir. 2019) .................................................................. 32, 42, 43

*Corley v. United States,*
556 U.S. 303 (2009) .................................................................. 23

*DM Trans, LLC v. Scott,*
38 F.4th 608 (7th Cir. 2022) .................................................................. 13

*EEOC v. Wal-Mart Stores East, L.P.,*
113 F.4th 777 (7th Cir. 2024) .................................................................. 13

*EEOC v. Wal-Mart Stores, Inc.,*
38 F.4th 651 (7th Cir. 2022) .................................................................. 14

*Elrod v. Burns,*
427 U.S. 347 (1976) .................................................................. 44

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) ................................................................. 45

*Frisby v. Schultz,*
  487 U.S. 474 (1988) ............................................................................. 34

*Good News Club v. Milford Cent. Sch. Dist.,*
  533 U.S. 98 (2001) ............................................................................... 38

*Hamman v. City of Carbondale,*
  No. 3:25-CV-00736-NJR (S.D. Ill. Jan. 21, 2026) ................................... 1

*Higher Soc'y of Indiana v. Tippecanoe Cnty.,*
  858 F.3d 1113 (7th Cir. 2017) .............................................................. 45

*Hill v. Colorado,*
  530 U.S. 703 (2000) ............................................................................. 15

*Horina v. City of Granite City,*
  538 F.3d 624 (7th Cir. 2008) ............................................................... 32

*Int'l Soc'y for Krishna Consciousness v. Rochford,*
  585 F.2d 263 (7th Cir. 1978) ................................................... 15, 20, 27

*Johnson v. United States,*
  576 U.S. 591 (2015) ............................................................................. 19

*Kolender v. Lawson,*
  461 U.S. 352 (1983) ............................................................................. 20

*Luce v. Town of Campbell,*
  872 F.3d 512 (7th Cir. 2017) ............................................................... 30

*Lukaszczyk v. Cook Cnty.,*
  47 F.4th 587 (7th Cir. 2022) .......................................................... 13, 14

*Niemotko v. Maryland,*
  340 U.S. 268 (1951) ....................................................................... 25, 26

*Papachristou v. City of Jacksonville,*
  405 U.S. 156 (1972) ............................................................................. 25

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
  460 U.S. 37 (1983) ......................................................................... 28, 29

*Police Dept. of Chicago v. Mosley,*
  408 U.S. 92 (1972) .................................................................... 37

*Rappa v. New Castle County,*
  18 F.3d 1043 (3d Cir. 1994) ...................................................... 29

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ........................................................ 12, 37, 38

*Reno v. Am. Civil Liberties Union,*
  521 U.S. 844 (1997) ............................................................ 14, 15

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
  515 U.S. 819 (1995) .................................................................... 37

*Shuttlesworth v. City of Birmingham,*
  394 U.S. 147 (1969) ............................................................ 25, 27

*Smith v. Goguen,*
  415 U.S. 566 (1974) .................................................................... 17

*Smith v. United States,*
  508 U.S. 223 (1993) .................................................................... 17

*Sorrell v. IMS Health,*
  564 U.S. 552 (2011) .................................................................... 38

*Tucker v. City of Fairfield,*
  398 F.3d 457 (6th Cir. 2005) .................................................. 29, 33

*United States v. Castillo,*
  406 F.3d 806 (7th Cir. 2005) ...................................................... 17

*United States v. Williams,*
  553 U.S. 285 (2008) .................................................................... 25

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977) ............................................................ 41, 43

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ............................................................ 30, 34

**Statutes**

26 U.S.C. § 508 ............................................................................. 5

28 U.S.C. § 1292(a)(1) ........................................................................... 1

28 U.S.C. § 1367(a) ............................................................................... 1

28 U.S.C. § 1331 ................................................................................... 1

28 U.S.C. § 1343 ................................................................................... 1

42 U.S.C. § 1983 ................................................................................... 1

City of Carbondale, Illinois, Code of Ordinances § 15.11.4 .................................... 4, 19

City of Carbondale, Illinois, Code of Ordinances § 15.4.10.8 ............................ *passim*

City of Carbondale, Illinois, Code of Ordinances § 17-12-2 ................................. 4, 19

City of Carbondale, Illinois, Code of Ordinances § 17-1-5 ................................ *passim*

Illinois Religious Freedom Restoration Act, 775 ILCS 35/15 ...................................... 1

**Rules**

Fed. R. App. P. 4(a)(1)(A) .......................................................................... 1

**Other Authorities**

11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995) ......................................................................................... 45

*Public Property*, BLACK'S LAW DICTIONARY (12th ed. 2024) ...................................... 16

*Public Right of Way*, BLACK'S LAW DICTIONARY (12th ed. 2024) ................................ 16

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiff's federal claims arise under the First and Fourteenth Amendments to the United States Constitution, as enforceable through 42 U.S.C. § 1983. The district court had supplemental jurisdiction over Plaintiff's claim under the Illinois Religious Freedom Restoration Act, 775 ILCS 35/15, pursuant to 28 U.S.C. § 1367(a).

This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), which confers appellate jurisdiction over interlocutory orders granting or refusing injunctions. On January 21, 2026, the United States District Court for the Southern District of Illinois, Chief Judge Nancy J. Rosenstengel presiding, entered an order denying Plaintiff's motion for a preliminary injunction. *Hamman v. City of Carbondale*, No. 3:25-CV-00736-NJR (S.D. Ill. Jan. 21, 2026). Appellant's Short Appendix ("SA") SA. 1. That order is an appealable interlocutory order within the meaning of § 1292(a)(1).

Plaintiff filed a timely notice of appeal on January 23, 2026, within 30 days of entry of the order as required by Fed. R. App. P. 4(a)(1)(A). Appellant's Appendix ("A") A. 233.

On January 26, 2026, the district court *sua sponte* stayed all proceedings pending appeal. *See* Doc. 55.

1

**STATEMENT OF THE ISSUES**

Whether the district court abused its discretion in denying Plaintiff's motion for a preliminary injunction where Plaintiff asserted that Carbondale's sign ordinance is unconstitutionally vague, bans a protected medium of expression in a traditional public forum without narrow tailoring or adequate alternatives, discriminates against political and religious speech in favor of commercial activity, and was enforced against a pro-life demonstrator through a process a City officer described — without contradiction — as driven by the City's institutional hostility toward right-wing viewpoints.

**INTRODUCTION**

In April 2025, Mark Brandon Hamman stood on public property outside an abortion clinic in Carbondale, Illinois, doing what he has done for years: sharing his faith, offering counsel, and staking small yard signs in the grass to convey his pro-life message to passersby. Soon thereafter, six City officials mobilized against him, and by the time the encounter ended, three different officials had offered three different interpretations of what the law required, three had separately consulted the City Attorney, and a police sergeant had admitted on the scene that the City discourages speech reflecting "right-wing beliefs." No citation was ever issued. Hamman was forced to remove his signs.

This appeal is about what the First Amendment demands when a city wields a sign ordinance it cannot define, enforces it in ways it cannot justify, and applies it against speakers based on their viewpoint. The constitutional violations here are not

2

subtle. An ordinance whose central prohibition rests on a term left undefined — one that the City's own officials had trouble understanding — fails the most basic requirement of due process. An ordinance interpreted to ban a two-foot yard sign planted twenty feet from a curb while permitting sidewalk restaurants, block parties, and commercial encroachments in the same public space fails the most basic requirements of content neutrality and narrow tailoring. And an enforcement action directed by a City Manager, carried out against a pro-life demonstrator, and explained by the supervising officer on the scene as a product of the City's institutional hostility toward right-wing viewpoints, fails the most fundamental requirement of all: that government treat speakers equally regardless of what they say.

The district court denied a preliminary injunction. That denial was error. The record compiled below contains direct testimony of viewpoint bias from a City officer speaking in his official capacity, an enforcement chronology that defies neutral explanation, a statutory scheme riddled with vagueness, and an absence of any evidence that the City's justifications have any connection to the enforcement action that actually occurred. This Court should reverse.

## STATEMENT OF THE CASE

### A.    The Challenged Ordinance

City of Carbondale, Illinois, Code of Ordinances § 15.4.10.8 ("Temporary Signs Permitted") (hereinafter, the "Ordinance"), regulates the placement of temporary signs throughout Carbondale. *See* SA. 37. Its general prohibition states that "[n]o sign

3

may be erected on, suspended over, or encroach upon the public right of way, except as provided for under section 17-1-5 of this code (dealing with 'encroachments'), or be located so as to obstruct the visual clearance needed for safe vehicle or pedestrian traffic." § 15.4.10.8(A)(1). The Ordinance does not define "public right of way" in this provision or anywhere else in § 15.4.10.

Three different definitions of "right of way" exist elsewhere in the municipal code, each with a different scope and different elements:

- Section 17-1-5(A)(1) (encroachments): "public highway, street, sidewalk, alley, or publicly owned common area." A. 1.

- Section 15.11.4 (zoning): "[a]n area dedicated or purchased by the city for the purpose of providing both vehicular and pedestrian travelways." A. 16.

- Section 17-12-2 (utility easements): "[a]ny street, alley, other land or waterway, dedicated or commonly used for pedestrian or vehicular traffic or other similar purposes, including utility easements, in which the city of Carbondale has the right and authority to authorize, regulate or permit the location of facilities." A. 24.

The Ordinance contains additional provisions that interact with the general prohibition. First, Section 15.4.10.8(A)(3) states that "[n]o temporary sign shall be erected within twenty feet (20') of the curb line of any adjoining street surface. . . ." SA. 37. Second, Section 15.4.10.8(A)(5)(b)(2) guarantees that "[e]ach individual 501(c) not for profit organization will be allowed to display a temporary sign for a period not

4

to exceed thirty (30) consecutive days" upon permit, with "[a] new permit . . . issued each time the temporary sign is to be displayed." SA. 37-38. Third, Section 15.4.10.8(A)(5)(a)(4) provides that certain commercial sign restrictions are "not intended to limit the display of banners, flags or other signage by persons participating in demonstrations, political rallies, and similar events." SA. 37.

The Ordinance's general prohibition, § 15.4.10.8(A)(1), exempts permitted "encroachments" under § 17-1-5. *Id.* Those encroachments include continuous encroachments, temporary encroachments, sidewalk restaurant encroachments, and residential block party encroachments. A. 1.

## B.     The April 16, 2025, Enforcement Action

Plaintiff Mark Brandon Hamman is a pro-life advocate who exercises his freedom of religion as a sidewalk missionary counselor through Gospel for Life, a non-profit organization operating under the authority of Christ Church Carbondale, a recognized non-profit under the State of Illinois.[1] A. 99-103.[2] In his missionary capacity, Hamman regularly conducts sidewalk outreach at several abortion facilities in Carbondale, including CHOICES Center for Reproductive Health. A. 41, 58. At each location, he posts small signs, shares the gospel, distributes literature, and offers counseling to women entering the clinics. *Id.*

---

[1] Under 26 U.S.C. § 508(c)(1)(A), all "churches, their integrated auxiliaries, and conventions or associations of churches" are "mandatory exceptions" to tax registration and are not required to register as a not-for-profit organization.

[2] The preliminary injunction hearing transcript (two volumes, August 11–13, 2025) is part of the district court record transmitted to this Court. All transcript citations are to the consecutively paginated pages of that transcript, as contained in the Appendix.

5

On April 16, 2025, Hamman was peacefully engaging in First Amendment activity on public property in front of CHOICES. A. 41-42. Defendant John Lenzini, the Community Development Manager for the City of Carbondale, went to the CHOICES location that morning because he "received an e-mail from the City Manager, Stan Reno, that there were signs in front of the CHOICES Clinic that were placed on the right-of-way and an illegal — believed to [be] in an illegal location." A. 137. City Manager Reno is the City's chief executive officer. His direct email to Lenzini, specifically flagging signage at a named abortion clinic as unlawfully placed, is the opening act in an enforcement chain that would ultimately engage six City officials: the City Manager, the Community Development Manager, the City Attorney (consulted separately by three different officers), a sergeant, a lieutenant, and a patrol officer.

At approximately 11:00 a.m., Hamman was approached by Lenzini. A. 48. Lenzini told Hamman that he was in violation of a city ordinance that prohibited commercial signs in the public right of way. A. 139. Lenzini asserted that signs offering "free baby supplies" were not messages protected by the First Amendment. A. 45. Lenzini acted based upon instructions he had received from the City Attorney, Defendant Leonard Jamie Snyder. A. 141.

As established at the preliminary injunction hearing, when Snyder first learned of the April 16 enforcement action, his immediate response was to send a text message to Lenzini asking whether the demonstrators were "Coalition for Life

personnel" — the pro-life organization that had previously sued Carbondale and litigated a challenge over a different ordinance to the Supreme Court. A. 124-25.

Attempting to comply, Hamman retrieved different signs with different wording, such as "We Will Adopt Your Baby" and "Love Your Preborn Neighbor As Yourself," and placed those signs in the ground. A. 46. Those signs were approximately two feet wide and eighteen inches tall, attached to thin metal prongs, typical of a "yard sale" sign. Hamman reiterated his First Amendment right to public demonstrations, stating, "I am demonstrating against abortion, I have a right to do that," to which Lenzini asserted, "No, you don't." SA. 42.

Meanwhile, a commercial sign advertising Freddy's, a restaurant next door to CHOICES, was posted in the grass within plain view of where Lenzini was standing. A. 150. No trees were blocking the sightline, and it was approximately 11:00 a.m. on a clear morning. A. 151. Lenzini removed the Freddy's sign only after Hamman pointed it out to him. A. 150-51.

A police officer, Samuel Tyner, arrived at approximately 11:39 a.m. after being dispatched to the scene. A. 153. He told Hamman the signs could not remain in the right-of-way and offered the option of Hamman carrying them instead. A. 153-54. Tyner called his supervisor, Sergeant Murray, in part because he found the ordinance "confusing" and wanted a senior officer to make the decision. A. 154, 156-57.

Sergeant Mark Murray — a veteran of the Carbondale Police Department — arrived on the scene. A. 177. Murray, who was also unfamiliar with the sign ordinance, contacted City Attorney Snyder for guidance, and Snyder sent him the

7

ordinance provision he believed controlled. A. 177-78. Murray told Hamman the signs had to come out of the ground per the City Attorney's interpretation. A. 178. Hamman responded that a carried sign could be grabbed to strangle him — a real concern given a past history of assault during his outreach — and that staked signs, unlike carried ones, do not blow into traffic on windy days. A. 92-93.

While on scene, Murray had a conversation with Pastor Sparks, Hamman's pastor, who had arrived on the scene, about whether Hamman could obtain a permit. Murray told Sparks the City "would not condone this because ideologically, I would guess they would not allow these here. But you could say something that was completely different, and I'm sure they would be all for it." SA. 14. He further explained later in his testimony: "I think based on the City's priorities and past experience with them that if it's not — I guess to break it down in terms of right and left type things, if it's more of a right-wing belief it's discouraged." A. 183. Murray also stated on the scene, "I'm sure it's viewpoint discrimination." *Id.* No City official offered testimony contradicting Murray's description of the City's priorities.

Lieutenant Theodore Lattan was directed to the scene. A. 187. While still en route, Lattan called City Attorney Snyder himself to understand the ordinance before arriving — the third separate consultation with Snyder during this one enforcement action. *Id.* After consulting with counsel, Hamman removed his signs. A. 189-90. No citation was issued. Lattan described the incident as "a very gray, touchy area." A. 193.

8

In an attempt to end this encounter, Hamman asked the officers if he would be in violation of the Ordinance if he moved his signs twenty feet from the curb, as permitted by § 15.4.10.8(A)(3), and attempted to do so. SA. 44-46. The officers initially concluded that there would be no violation of the Ordinance if he moved the signs. SA. 45-46. After moving the signs, Lenzini approached Hamman and stated that Snyder said that there were to be no signs whatsoever on public property, even if twenty feet from the road. After much confusion, Hamman removed the signs, and no citation was issued. A. 49.

The following day, April 17, 2025, Hamman went to Carbondale City Hall to obtain a permit pursuant to § 15.4.10.8(A)(5)(b)(2). Upon arriving, Hamman again encountered Lenzini, who said that no permits existed for signs on public property. A. 53. Lenzini did not consult the Ordinance's text, did not contact the City Attorney, and did not ask which non-profit organization Hamman represented. *Id.*

## C.    District Court Proceedings

Hamman filed suit challenging Carbondale's sign ordinance as facially unconstitutional and as applied through viewpoint-discriminatory enforcement. Doc. 1. He moved for a preliminary injunction. Doc. 8. The district court conducted an evidentiary hearing on August 11 and 13, 2025, receiving testimony from Hamman, Pastor Sparks, City Attorney Snyder, Community Development Manager John Lenzini, Officer Samuel Tyner, Sergeant Mark Murray, and Lieutenant Theodore Lattan.

On January 21, 2026, the court denied the motion. SA. 1. The district court concluded that Hamman was unlikely to succeed on the merits of his constitutional claims. It held that Carbondale's ordinance prohibiting temporary signs from being placed in the public right of way was not unconstitutionally vague, was a permissible content-neutral time, place, and manner restriction (narrowly tailored to serve the significant government interest of traffic safety, and leaving open ample alternative channels of communication such as carrying signs), and was not enforced in a viewpoint-discriminatory manner against Hamman's pro-life message. The court further found that Hamman had not demonstrated sufficient irreparable harm or a favorable balance of equities to warrant a preliminary injunction.

Hamman timely appealed. A. 233.

## SUMMARY OF THE ARGUMENT

This case presents a straightforward question dressed in a complicated ordinance's text: does the First Amendment allow a city to enforce a sign ordinance so vague that its own officials cannot agree on what it means, interpreted so expansively that it prohibits a two-foot yard sign twenty feet from the nearest road, and applied so selectively that a pro-life demonstrator's signs are removed within forty-five minutes while other signs one block away go untouched for days? The answer is no, on four independent grounds.

First, Carbondale's sign ordinance is unconstitutionally vague. Its central prohibition bans signs in "the public right of way" without defining that term, while the municipal code offers three materially different definitions of "right of way" that

10

produce different outcomes when applied to the same location. The district court acknowledged this problem and declined to resolve it, "assuming without deciding" that the definitions do not conflict. That assumption cannot save the Ordinance. With multiple competing definitions, a citizen standing on a sidewalk with yard signs has no realistic chance of knowing what the law requires. The vagueness is confirmed by the enforcement record: multiple separate consultations with the City Attorney were required to enforce the Ordinance against one demonstrator on one morning, three different officials offered three different interpretations of what was permitted within a forty-minute window, and the senior officer on scene characterized the situation as "a very grey and touchy area." SA. 15. An ordinance that trained law enforcement officers cannot apply without ongoing legal counsel does not provide the fair notice the Constitution demands.

Second, regardless of whether it is based on content, the Ordinance is overbroad. It is not narrowly tailored and burdens far more speech than necessary because its prohibition sweeps within it far more speech than necessary to accomplish any of the City's asserted interests. Hamman was not blocking traffic or obstructing sight lines when he briefly placed small signs on a grassy area twenty feet from the nearest curb, yet the City's sweeping interpretation of its Ordinance treated his peaceful expression exactly the same as it would a large display of a thirty-foot-tall inflatable rat positioned directly in a roadway median. This kind of regulatory overkill is precisely what the narrow tailoring requirement is designed to prevent.

11

Third, the Ordinance, as interpreted by the court below, is an unconstitutional content-based restriction on speech in a traditional public forum. Under *Reed v. Town of Gilbert*, a regulation is content-based if officials must examine the content of a message to determine whether it is permitted. 576 U.S. 155 (2015). As interpreted by the district court, this Ordinance requires exactly that. The district court concluded that the Ordinance's only exception to its blanket prohibition accommodates commercial encroachments: street parties, sidewalk restaurants, and temporary sidewalk sales, activities with commercial signage. Meanwhile, a two-foot yard sign expressing a pro-life message is categorically excluded from the same public space. In other words, some signs are permitted, and some are prohibited, based on their message. A law that accommodates commercial speech while prohibiting core political and religious speech inverts the First Amendment's hierarchy of protected expression. It cannot survive strict scrutiny, and the City has offered no compelling interest that would justify it.

Fourth, the Ordinance was enforced against Hamman because of the viewpoint of his signs. Sergeant Murray, a fifteen-year Carbondale police officer who supervised the enforcement action, testified that "based on the City's priorities and past experience with them that if it's not — I guess to break it down in terms of right and left type things, if it's more of a right-wing belief it's discouraged." A. 183. That statement, based on Murray's direct experience with the City's institutional priorities over a fifteen-year career, is direct evidence of viewpoint discrimination that the district court dismissed as mere "personal opinion." It is not. It is the considered

12

assessment of a veteran officer describing his institution's enforcement practices, made during the enforcement action itself, and left entirely uncontradicted and unrefuted by the City. Combined with a City Manager who proactively directed the enforcement action before he or Lenzini had personally observed anything, shifting legal justifications that collapsed under examination, a mandatory permit denied without explanation, and photographs of signs with different viewpoints left undisturbed one block away, the record establishes viewpoint discrimination that no level of constitutional scrutiny permits.

Because Hamman has demonstrated a strong likelihood of success on at least these four grounds, and because the loss of First Amendment freedoms for even minimal periods constitutes irreparable injury as a matter of law, the balance of equities and the public interest both favor injunctive relief. The district court's denial of Hamman's motion for a preliminary injunction should be reversed.

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court reviews a district court's denial of an injunction for an abuse of discretion. *Lukaszczyk v. Cook Cnty.*, 47 F.4th 587, 598 (7th Cir. 2022); *DM Trans, LLC v. Scott*, 38 F.4th 608, 617 (7th Cir. 2022). In particular, this Court reviews "a district court's denial of injunctive relief for abuse of discretion, its factual determinations for clear error, and its legal conclusions de novo, and [it] give[s] deference to the court's balancing of equitable factors." *EEOC v. Wal-Mart Stores East, L.P.*, 113 F.4th 777, 791 (7th Cir. 2024) (citing *EEOC v. Wal-Mart Stores, Inc.*,

38 F.4th 651, 661 (7th Cir. 2022)). A clear error of fact or an error of law may establish an abuse of discretion. *Lukaszczyk*, 47 F.4th at 598; *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021).

## II.    CARBONDALE'S SIGN ORDINANCE IS UNCONSTITUTIONALLY VAGUE.

The Constitution demands that laws give citizens fair notice of what conduct is prohibited, particularly when those laws punish speech. This principle is at the very core of the Constitution's protections: "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926). Yet Carbondale's sign ordinance fails this fundamental test in a manner so stark that during the hearing itself, the district court expressed confusion over the nature of the Ordinance, commenting, "[o]h, I am glad I'm not the only one confused then." A. 94. Despite recognizing this problem, the district court still erroneously rejected the vagueness challenge, applying a definition that the statute does not use and invoking "common sense" to supply a meaning far from ordinary understanding. SA. 21, 29-30.

"Vague rules are overbroad because their scope is uncertain and . . . they tend to produce large chilling effects." *Brown v. Kemp*, 86 F.4th 745, 771 (7th Cir. 2023). The Supreme Court has emphasized clearly that a potentially vague law that interferes with First Amendment rights deserves greater scrutiny "because of its obvious chilling effect on free speech." *Reno v. Am. Civil Liberties Union*, 521 U.S.

14

844, 871-72 (1997).  A statute can be impermissibly vague where it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

### A.    The Ordinance Fails to Give Sufficient Notice of Prohibited Conduct.

The Ordinance suffers from a basic and fatal flaw: because "public right of way" is undefined, the scope of its prohibition on temporary signs is unknown and unknowable. The law "must give people fair notice of what conduct is prohibited so that they may conduct themselves within the law's bounds." *Brown*, 86 F.4th at 772. In particular, it is "the indeterminacy of what conduct constitutes a violation [that] makes a statute vague." *Id.*

A statute is vague when it leaves core, key terms undefined. For example, in *International Society for Krishna Consciousness v. Rochford*, 585 F.2d 263 (7th Cir. 1978), this Court affirmed a district court's decision to overturn as unconstitutionally vague regulations enforced in Chicago's airports. The core problem in the regulations was language allowing for speech for "persons authorized by law." *Id.* at 268. There, as here, the defendants tried to justify the vague language of the regulation by reference to other laws, claiming that "persons authorized by law are those who take part in protected First Amendment activities." *Id.* But the regulations themselves failed to explain the term. "By not explaining who is 'authorized by law,' the regulations are deficient. Persons of common intelligence would be required to guess at the phrase's meaning and differ as to how the regulations should be enforced." *Id.*

15

This Court rejected that post-hoc governmental gloss because the regulations themselves failed to convey that meaning to ordinary readers. *Id*. That is precisely the problem here.

### 1. The Ordinance Is Vague Because It Fails to Sufficiently Define the Scope of the Right of Way.

At its core, the Ordinance lacks clear definitions for key terms, failing to define "public right of way" in its prohibition against signs "erected on, suspended over, or encroach[ing] upon the public right of way." § 15.4.10.8(A)(1). Carbondale's municipal code contains three different definitions of "right of way," each with a different scope, different elements, and different legal consequences. In reading the text of the Ordinance, the average reader of ordinary intelligence will have no way of knowing what signs are permitted on land owned by the public, because the operative definition of "right of way" is not and cannot be known from the text of the Ordinance itself. The court below acknowledged this problem at the hearing, stating, "I don't see the definition of right-of-way in this ordinance." A. 115.

At the hearing, Lenzini offered the working definition of right-of-way: "any property owned by the City[.]" A. 164. Government-owned property, however, i.e., public property, is far broader in scope than the ordinary usage and meaning associated with a public right of way. Indeed, under common, ordinary definitions, there is a clear legal distinction between a "public right of way" and "public property." "Public right of way" is "[t]he right of passage held by the public in general to travel on roads, freeways, and other thoroughfares," while "public property" more broadly means "State- or community-owned property not restricted to any one individual's

use or possession." BLACK'S LAW DICTIONARY (12th ed. 2024). "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993). But as Hamman learned, an individual cannot rely on the ordinary definition of "public right of way" here; signs over twenty feet from any right of passage were still considered by City officials to be on the "public right of way."

The district court's central holding on the notice prong of the vagueness analysis was that "right of way" and related terms have "commonly understood meanings" that do not require explicit definition, and that the Ordinance therefore provides adequate notice to ordinary citizens. SA. 21. The court's primary support for this proposition is *United States v. Castillo*, 406 F.3d 806, 821 (7th Cir. 2005), which held that commonly understood terms in criminal jury instructions need not be separately defined. But *Castillo* was not a First Amendment case. In a First Amendment case, a heightened standard applies, and it is not enough that terms have a generally accepted meaning in the abstract. *Smith v. Goguen*, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope . . . is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts."). The question is whether the terms provide sufficient definiteness to allow speakers to confidently engage in protected expression without fear of arbitrary enforcement. That is a materially higher bar, and "right of way" does not clear it in this Ordinance.

17

The district court relied primarily on § 17-1-5,[3] stating, "the Ordinance does define a 'public right of way.' Recall that the general prohibition excepts permitted 'encroachments' under section 17-1-5. That section, in turn, defines a 'public right of way' as 'any public highway, street, sidewalk, alley, or publicly owned common area.'" SA. at 21 (quoting Code § 17-1-5(A)(1)). But the cross-reference does not actually supply a definition. The Ordinance states that no sign may be erected in the right of way "except as provided for under section 17-1-5." § 15.4.10.8(A)(1). That clause identifies the circumstances in which encroachments are permitted; it directs the reader to § 17-1-5 to determine what encroachments are allowed, not to determine what "right of way" means. Treating the exception as the source of the definition for the prohibition that references it is not a step an ordinary reader would have reason, or notice, to take. Nothing in the text indicates that the Ordinance incorporates § 17-1-5's definition. Section 17-1-5(A)(1) defines "public right of way" for the specific purpose of governing encroachments, the physical projection of structures and commercial activity into public spaces. That definitional purpose is local to § 17-1-5. Importing it wholesale into a separate sign ordinance in a different chapter of the code stretches the cross-reference well beyond its text and leaves the ordinary reader unable to understand the scope of the prohibition in the Ordinance itself.

Moreover, even accepting arguendo § 17-1-5(A)(1) as the operative definition, the vagueness continues one layer deeper. That section defines right-of-way to

---

[3] This definition of "right of way" was expressly disclaimed by Defendants, who stated on the record, "nor are the provisions in that portion of the code relevant to the instant dispute." Doc. 17 at 3 n.3.

18

include "publicly owned common area" — a phrase the Ordinance does not further define.

The problem does not stop there. The court also declined — in footnote 3 — to choose among three different definitions of the term "right of way" contained in the same municipal code, *see* SA. 3, saying only that "these varying definitions do not appear to conflict with one another — at least not insofar as the issues in this case are concerned." But in actuality, these three code provisions all differ and differ significantly in the scope of their prohibitions, including different areas within the definition of right of way.[4] Ordinary citizens are left where they started, without authoritative guidance on which definition governs their conduct. *See Johnson v. United States*, 576 U.S. 591, 605 (2015) (striking down a law as unconstitutionally vague, relying in significant part on the fact that federal courts had reached inconsistent results and emphasizing "the experience of the federal courts leaves no doubt about the unavoidable uncertainty and arbitrariness of adjudication under the residual clause."). Even the City Attorney could not know the definition of right of way; when asked by the Court to provide the definition of right of way, instead of providing the definition in 17-1-5, he provided section 17-12-2, related to utility

---

[4] For example, Section 17-1-5(A)(1) limits coverage to five enumerated categories. Section 17-12-2 includes certain categories plus "other land or waterway" — an open-ended expansion. Section 17-1-5(A)(1) requires areas (other than highways, streets, sidewalks, and alleys) be "publicly owned." Section 17-12-2 merely requires the City have "the right and authority to authorize, regulate or permit" facilities—the City need not own the property. A utility easement on private land satisfies Section 17-12-2 but not Section 17-1-5(A)(1). Section 15.11.4 requires an area be "dedicated or purchased by the city." Section 17-12-2 allows inclusion of areas "commonly used" for traffic—no dedication or purchase needed. An informal footpath across public land could be a right-of-way under Section 17-12-2 but not under Section 15.11.4. Section 15.11.4 requires an area provide "both vehicular and pedestrian travelways" — a conjunctive requirement. Section 17-12-2 extends to "pedestrian or vehicular traffic" plus "other similar purposes." A pedestrian-only path satisfies Section 17-12-2 but not Section 15.11.4.

19

easements. A. 115, 121-22. The fact that even the City Attorney enforcing the prohibition could not understand its meaning demonstrates the Ordinance's vagueness.

In *International Society for Krishna Consciousness v. Rochford*, the challenged regulations lacked the requisite language for the ordinary reader to understand the scope of the prohibition: "the regulations contain no guidelines to assist either the person who wishes to determine whether he is authorized by law or the official who is charged with the regulations' enforcement." 585 F.2d at 268. The Constitution requires that statutes be set forth with "sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Here, the ordinary reader cannot know what conduct is prohibited by the statute's text.

The textual confusion produced real-world arbitrariness. First, Lenzini demanded the signs' immediate removal, initially indicating that a sign offering "free baby supplies" is "not a demonstration." When Hamman pointed to the Ordinance's provision that demonstrations shall not be limited, Lenzini changed tack: all signs must be removed from the ground. Later, the police arrived and told Hamman that the signs "can't be on the easement," but suggested that moving them twenty feet from the curb might satisfy the Ordinance. Hamman complied, moving his signs back from the street into the grassy area. The officers indicated this was acceptable. Then again, Lenzini contradicted the officers' interpretation: no signs are allowed on "public property" at all, regardless of how far from the street they are placed. Within

20

forty minutes, Hamman received three different interpretations of what the Ordinance requires. Even Lenzini, the Community Development Manager responsible for enforcing sign regulations, consulted with the City Attorney repeatedly on April 16.

This pattern reveals the Ordinance's vagueness. Officials whose job is to enforce this law could not articulate what Hamman was permitted to do without repeated consultation with legal counsel. And no officer, at any point, ever referenced or referred to the definition in § 17-1-5. A definition that the City's own enforcement personnel did not know to apply — and did not apply — does not provide the fair notice the Constitution requires. Police officers interpreted it one way (based on distance from the curb); Lenzini interpreted it another way (based on all public property). To the extent each interpretation seemed reasonable given the Ordinance's text, they could not both be correct. And Hamman, caught between them, could not know which interpretation would prevail. Even after all that consultation, Lieutenant Lattan — the senior police officer on scene — characterized the enforcement situation as "a very gray and touchy area." A. 193. Gray areas are not a feature of constitutional laws regulating First Amendment activity. They are the definition of unconstitutional vagueness.

### 2. The Ordinance Is Vague Because the 20 Feet Rule Results in Further Confusion.

While the "right of way" definition is at the core of the statutory ambiguity here, the Ordinance's vagueness is illustrated by other code provisions. If Section 15.4.10.8(A)(1) bans all signs in the right-of-way as construed by the government,

what purpose does Section 15.4.10.8(A)(3) serve? That provision states: "No temporary sign shall be erected within twenty feet (20') of the curb line of any adjoining street surface. . . ." The City says Section 15.4.10.8(A)(3) applies to private property only. A. 212-13. But the text does not say such a thing. It contains no language stating that the twenty-foot rule applies only on private land. The ordinary reader is left with yet more confusion.

When Snyder testified that a twenty-foot setback referred only to signs on private property, the court interrupted: "How do you get — there isn't anything in there that says anything about private property." A. 115. The Court further observed: "I don't see the definition of right-of-way in this ordinance." *Id.* The district court had no choice but to observe the inherent contradictions and confusions created by these conflicting provisions.

### 3. The Ordinance Is Vague Because Its Permitting Provision Appears to Authorize What the City Claims It Prohibits.

The Ordinance's problems run even deeper. Section 15.4.10.8(A)(5)(b)(2) provides that 501(c)(3) organizations "will be allowed to display a temporary sign" and that permits "shall be issued" for such displays. The City's interpretation of the permit provision, far from resolving the Ordinance's vagueness, multiplies it. The permit provision uses mandatory language — "will" and "shall" — that is unambiguous. But the Ordinance provides no indication of where the permitted "display" may occur, what physical form it may take, or by what standard officials are to evaluate permit applications. The City contends these permits authorize signs only on private property. A. 214. But that reading renders the provision meaningless.

Private property owners already have a separately delineated right to authorize signs on their own land. The only reading that gives the provision operative effect, consistent with the surplusage canon's requirement that courts avoid interpretations that reduce a provision to nullity, *see Corley v. United States*, 556 U.S. 303, 314 (2009) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous."), is that the permit authorizes signs somewhere they would otherwise be prohibited.

A citizen reading the Ordinance has no way to resolve this ambiguity. The Ordinance does not specify where the permit authorizes placement, nor does it state that the permit applies only to private property. And the real-world consequence of that silence was on display when Hamman sought a permit the morning after the April 16 encounter. He presented himself at City Hall, Ordinance in hand, seeking the permit that the law's mandatory language promised him. Lenzini simply declared that "there was no such permit" — despite the unambiguous text of § 15.4.10.8(A)(5)(b)(2) providing otherwise. This is unbridled discretion in its starkest form: a statutory entitlement disappearing at the say-so of a single official, unconstrained by any standard the Ordinance provides.

After working through the relationship between the permit provision and the general prohibition, the court below acknowledged the problem:

> Conspicuously absent from this section is any mention of how it relates to, or modifies, the general prohibition on temporary signs in the public right of way. And the same is true of the general prohibition itself — it does not mention the permitting process for 501(c)(3) organizations. Both sections appear entirely unrelated.

23

SA. 23. That admission is fatal to the Ordinance. If the provisions appear "entirely unrelated" on their face, yet must be read together to determine their legal effect, the Ordinance fails to provide fair notice. This language presents an interpretive puzzle whose solution requires exactly the kind of legal expertise the vagueness doctrine says citizens should not need. The ordinary reader cannot understand how these "entirely unrelated" provisions connect.

### 4.    *The Ordinance Is Vague Because the Demonstration Exception Is Left Undefined.*

Finally, the Ordinance purports to exempt demonstrations from the sign prohibition, stating it is "not intended to limit the display of banners, flags or other signage by persons participating in demonstrations[.]" § 15.4.10.8(A)(5)(a)(4). Yet the Ordinance nowhere defines "demonstration." It does not specify whether the exception applies only to the subsection in which it appears or operates as a general exception to the prohibition in § 15.4.10.8(A)(1). Nor does it specify whether "other signage" includes staked signs or only handheld ones. And it provides no standard by which an official can determine whether a particular activity qualifies as a "demonstration" triggering the exception. On its face, the provision appears to exempt the very activity for which Hamman was punished.

The real-world consequences of this ambiguity were immediate. When Lenzini first confronted Hamman, he declared that a sign offering "free baby supplies" was "not a demonstration" — even though the sign was being displayed as part of an ongoing pro-life advocacy effort at an abortion clinic, the paradigmatic context of a constitutionally protected public demonstration. To reach that conclusion, Lenzini

24

had to read the sign, assess its content, and render a judgment about whether that content qualified for the exception. *That is precisely the kind of content-dependent, standardless enforcement discretion the vagueness doctrine forbids.*

### B.    The Ordinance Vests Arbitrary Discretion in City Officials.

A law must not "vest[] unbridled discretion in a government official over whether to permit or deny expressive activity." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755 (1988). The Constitution forbids a law or ordinance if it "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). *See also Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972) ("Where, as here, there are no standards governing the exercise of the discretion granted by the ordinance, the scheme permits and encourages an arbitrary and discriminatory enforcement of the law."). The Ordinance suffers from this fatal problem, enabling the unfettered discretion of government officials. A "law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969). Section 15.4.10.8(A)(5)(b)(2) allows non-profit organizations to apply for permits to display temporary signs. It fails to articulate, however, any standard whereby permit requests are reviewed and approved.

In *Niemotko v. Maryland*, 340 U.S. 268 (1951), the Supreme Court unanimously reversed the disorderly conduct convictions of individuals who held religious meetings in a public park without permits. *Id.* at 269-70, 273. The Court

25

condemned permit schemes that require prior approval to use public spaces but fail to provide "narrowly drawn, reasonable and definite standards for the officials to follow." *Id.* at 271. In *Niemotko,* no such standards existed: "[n]o standards appear anywhere; no narrowly drawn limitations; no circumscribing of this absolute power; [and] no substantial interest of the community to be served." *Id.* at 272. As a result, "the park was denied because of the City Council's dislike for or disagreement with the Witnesses or their views." *Id.*

The same defect exists here. Although the Ordinance states that "[e]ach individual 501(c) not for profit organization will be allowed to display a temporary sign" through a permitting process, § 15.4.10.8(A)(5)(b)(2), it provides no standards, criteria, or guidelines for evaluating permit applications. Without objective limits, approval depends entirely on the subjective judgment of city officials, creating the very risk of arbitrary or viewpoint-based enforcement that the First Amendment forbids. The facts of this case illustrate this unbridled discretion in practice: when Hamman attempted to obtain the permit explicitly referenced in the Ordinance, Lenzini simply declared that "there was no such permit" and flatly refused to issue one, despite the clear language in § 15.4.10.8(A)(5)(b)(2) allowing for one. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755 (1988) (highlighting the constitutional problem "[w]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity").

In *Rochford,* this Court confronted a similar issue; airport officials were

26

permitted to grant or deny permits based on their own interpretation of who was "authorized by law" to engage in protected activity. 585 F.2d at 268. This Court held that such a scheme failed to provide "narrowly drawn, reasonable, and definite standards" to guide officials and therefore risked operating as a prior restraint on First Amendment rights. *Id.* The same defect exists here. As written, officials are free to decide for themselves what the law means and whether permits are available at all. The Ordinance fails to provide limiting standards to guide officials, as there are no limiting standards.

Below, the district court reasoned that because the Ordinance says permits "shall be issued," there is no room for official discretion and therefore no vagueness problem exists. SA. 25-26. The Supreme Court directly addressed this argument in *Shuttlesworth*, 394 U.S. 147, where a parade ordinance required permits to be issued unless officials found the event would threaten public welfare. The Court did not accept the "shall grant" language as curing the problem; it struck the ordinance down because the conditions for denial, such as "public welfare," "peace," and "decency," were themselves undefined, giving officials "virtually unbridled and absolute power." *Id.* at 150. Mandatory issuance does not cure unbridled discretion if the conditions and scope of what is authorized remain undefined.

The unconstitutional operation of that discretion is not hypothetical here. Hamman experienced it directly. He read the Ordinance, noted the mandatory permit language, and appeared at City Hall to obtain the permit the Ordinance promised him. Defendant Lenzini did not evaluate his application against objective criteria. He

27

simply declared the permit did not exist. No application was provided, no criteria were cited, no denial was issued subject to appeal. The Ordinance's vagueness appears throughout its provisions and was repeatedly confirmed by Defendants' conduct; an ordinary reader cannot understand the prohibition, leaving its meaning to City officials to dictate on the fly in furtherance of their preferred messages.

III. **THE ORDINANCE IS AN UNCONSTITUTIONAL RESTRICTION OF SPEECH IN A PUBLIC FORUM.**

Adopting the district court's interpretive gloss on the Ordinance, that signs are prohibited categorically in any right of way, defined as any "public common area," does not save it. Rather, that broad and expansive interpretation only heightens the constitutional problem. In a traditional public forum, any restriction that is content-based must satisfy strict scrutiny, and even content-neutral regulations must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). The Ordinance, as interpreted by the district court, is vastly overbroad as it is neither narrowly tailored nor sufficient to leave open alternative channels for speech.

**A.     Hamman's Speech Occurred in a Traditional Public Forum.**

The location where Hamman exercised his constitutional rights to engage in pro-life speech, a grassy area owned by the public defined by the district court as a "right of way," was a public forum. A traditional public forum is a place "which by long tradition or by government fiat has been devoted to assembly and debate." *Id*. In fact, "streets and parks which have immemorially been held in trust for the use of

28

the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. In these quintessential public forums, the government may not prohibit all communicative activity." *Id. See also Tucker v. City of Fairfield*, 398 F.3d 457, 463 (6th Cir. 2005) (holding that public right-of-way was traditional public forum and affirming injunction against ban on temporary signs in that forum); *Rappa v. New Castle County*, 18 F.3d 1043, 1070-71 (3d Cir. 1994) (holding that public rights-of-way are properly considered traditional public fora). It was open to the public generally for use, and none of Defendants or their employees ever suggested that it was not generally available as a forum for political, religious, or other expressive activity.

## B. The Ordinance, as Interpreted by the City, Is Not Narrowly Tailored and Cannot Satisfy Scrutiny.

The Ordinance fails to meet the constitutional requirements for a restriction on speech in a public forum, as it is neither narrowly tailored nor does it leave open alternatives for speech.

### 1. The Ordinance Is Not Narrowly Tailored.

In a traditional public forum such as this one, the government may enforce content-neutral time, place, and manner regulations only if they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n*, 460 U.S. at 45. In this context, "the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation," and does not "burden substantially more speech than is necessary to

29

further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) (quotation marks and citations omitted). When a government lacks evidence that temporary signs placed well away from traffic pose any actual harm, yet bans them anyway, it has crossed the constitutional line into unconstitutional suppression of speech. *See Luce v. Town of Campbell*, 872 F.3d 512, 518 (7th Cir. 2017) (Easterbrook, J.) (rejecting a prohibition of signs within 100 feet of the road "which the Town has not even *tried* to justify") (emphasis in original).

The district court never addressed *Luce*'s contrary holding, but it controls here; the City has failed to justify its broad, categorical prohibition of signs on public land. In *Luce*, this Court reversed a grant of summary judgment to a town for a 100-foot buffer zone that had been enacted near overpasses, emphasizing that "it is hard to see why signs off the highway, and too small to cause drivers to react, should be banned." *Id.* at 518. The exact same principle applies here. Hamman's signs are two feet wide, eighteen inches tall, staked at ground level twenty feet from the nearest curb. The proposition that the traffic-safety logic of billboard regulation applies without modification to a yard sign in a grassy buffer strip is not common sense — it is an unsupported leap across a fundamental distinction in size, elevation, permanence, and placement. In *Luce,* a 100-foot zone was unreasonable; here, Defendants proffer a zone of all public land entirely. The district court ignored *Luce*'s holding, even though it provides controlling precedent in this case. In accord with this Court's decision in *Luce,* a small yard sign placed twenty feet from the curb in a grassy setback posed no recorded hazard to any driver and is not an "appropriately targeted

30

evil" under any traffic-safety rationale the City has advanced.

Instead, the district court concluded that the Ordinance is narrowly tailored based on two evidentiary predicates: Hamman's own testimony about hand-held signs blowing into traffic, and common-sense judgments about the relationship between roadside signs and driver distraction. SA. 29. Neither predicate withstands scrutiny, and together they cannot support the sweeping prohibition the City defends.

First, consider the court's use of Hamman's testimony. Hamman testified that he had seen *carried* signs blow into traffic on windy days in Carbondale, and that this was precisely why he preferred to stake his signs in the ground. A. 92. "I have seen signs that have been blown across the street, they blow into traffic. I don't want my signs hitting somebody or something if I am talking to somebody up close or talking to somebody in their vehicle. I don't want that to happen. Again, I don't want it to blow into the road or cause an accident." *Id.* The district court acknowledged this crucial safety concern and then used the testimony as "evidence of a traffic risk created by temporary signs near a roadway," SA. 29, the exact opposite of the point Hamman was making. Repurposing Hamman's safety argument for staking his signs into evidence supporting a ban on staking is not a reasonable inference from the record — it is an inversion of it. The only traffic-safety evidence in this record bearing on staked yard signs is Hamman's unrebutted testimony that they are safer than the alternative the City permits. By reducing (and contorting) this evidence to evidence of a "traffic risk," the district court made a fatal error; the City *currently* allows the carrying of signs, the thing Hamman testified was unsafe and a traffic risk. The

31

undisputed evidence showed that the City's preferred method is more dangerous, by the district court's own reasoning, than the *prohibited* method.

In *Horina*, this Court emphasized that "common sense . . . can all-too-easily be used to mask unsupported conjecture." *Horina v. City of Granite City,* 538 F.3d 624, 633 (7th Cir. 2008). Likewise, the government cannot satisfy its evidentiary burden by invoking the reasoning of cases involving larger, more dangerous structures and asserting that the logic carries over without justification to smaller, ground-level temporary signs. The City presented no studies, no accident reports, no expert testimony, and no incident records concerning signs of this type. Under *Horina*, that evidentiary void cannot be filled with common sense alone. The district court failed to recognize that the burden of proof lay on the City to justify its restriction on speech. The necessary evidence simply was not provided.

Instead of evidence, Defendants rely on *Constr. & Gen. Laborers' Union No. 330 v. Town of Grand Chute*, 915 F.3d 1120, 1126 (7th Cir. 2019). While it is true that this Court concluded that an ordinance "was narrowly tailored to meet its stated purpose — the banning of anything on the public right-of-way that might obstruct vision or distract passing drivers," *Id.* the analysis does not end there.

While there is much discussion in *Town of Grand Chute* of whether the large inflatable rodent fit the definition of a "sign," no party contested that the rat was in the "public right of way." The labor union placed the rat on a median on the street. *Id.* at 1121. Those facts are inapplicable here. While Hamman himself was near a street, he was told to remove his signs that were *at least twenty feet from the curb*

32

*line*. At that location, Hamman's small signs were in the middle of a grassy area, well outside of any pedestrian or vehicular pathways, and posed no visual obstruction to traffic. Applying *Grand Chute* to all public land would be as incongruous as applying it to signs on private property.

Fundamentally, Hamman was not blocking traffic or obstructing sight lines when he briefly placed small signs on a grassy area twenty feet from the nearest curb — yet the City's sweeping interpretation of its Ordinance treated his peaceful expression exactly the same as it would a large display of a thirty-foot-tall rat positioned directly in a roadway median. This kind of regulatory overkill is precisely what the narrow tailoring requirement is designed to prevent. When a government can point to no evidence that temporary signs placed well away from traffic pose any actual harm, yet still insists on banning them entirely from any and all public land, it has crossed the line from reasonable regulation into impermissible speech suppression. *See Cleveland Area Bd. of Realtors v. City of Euclid*, 88 F.3d 382, 388 (6th Cir. 1996) (holding unconstitutional ordinances regulating the placement of signs in residential neighborhoods because they burdened "substantially more speech than necessary," despite city's "significant government interest" in aesthetics); *Tucker*, 398 F.3d at 464 ("There is no objective evidence in the record before us suggesting that the temporary placement of the balloon in the public right-of-way has any adverse effects, such as obstruction of pedestrian or automobile traffic.").

The under-inclusiveness of the Ordinance provides independent confirmation that the City's traffic-safety rationale does not drive its enforcement. A narrowly

tailored regulation addresses the specific harm the government identifies with means calibrated to that harm. *Ward,* 491 U.S. at 799. Here, the City's stated interest is preventing traffic distraction and the risk of signs entering the roadway. The Ordinance bans staked signs, which, on the only evidence in the record, are *more* stable than the alternative, while expressly permitting carried signs, which Hamman testified are the ones that blow into traffic. An ordinance that bans the safer method and permits the more dangerous one is not calibrated to reduce the identified harm. It is calibrated to something else. The Supreme Court made clear in *Frisby v. Schultz* that "[a] complete ban can be narrowly tailored but only if each activity within the proscription's scope is an appropriately targeted evil." 487 U.S. 474, 485 (1988).

In short, the onus is on the City to justify its Ordinance and show that it is narrowly tailored to the harm it seeks to address. It presented no empirical evidence to do so, nothing that would purport to refute Hamman's thorough testimony of the specific reasons why placing signs in the ground was necessary. Hamman's unrefuted testimony was that temporarily staked signs were more stable, while carried signs had a risk of blowing into traffic. The Ordinance bans the safer method while allowing the more dangerous one.

### 2.    *The Ordinance Burdens More Speech Than Necessary.*

Moreover, the Ordinance does not leave open ample alternatives for communication. The Ordinance's enforcement prohibits all passive sign placement, regardless of size, distance, or obstruction on any public land whatsoever, effectively requiring speakers to physically bear the burden of their message at all times. The district court dismissed Hamman's alternative-channels argument in a single

paragraph, noting that several people at CHOICES on April 16 carried signs. SA. 31. That assertion misses the point.

The carrying of signs is not an "ample alternative" as required by *Perry*; it is no alternative at all. The Supreme Court addressed the precise question presented here in *City of Ladue v. Gilleo*, 512 U.S. 43 (1994). There, the Court held that an ordinance which prohibited signs placed into the ground did not leave open ample alternative means of communication. The Court was "not persuaded that adequate substitutes exist for the important medium of speech that Ladue has closed off." *Id.* at 56. It held that requiring residents to communicate through other means, e.g., mail, telephone, other media, was not an adequate substitute because placed signs constitute a distinct communicative medium that cannot be replicated by alternatives. Forcing a person to hold a sign for extended periods of time to make their message heard is distinctly different from allowing signs to be, albeit temporarily, laid on or placed in the ground. It also obviously discriminates against those speakers who lack, or have a diminished capacity for, the physical ability to hold signs. As the Supreme Court highlighted, a "yard or window sign may have no practical substitute." *Id.* at 57. The district court did not cite *Gilleo*, let alone distinguish it. Its omission is significant because the holding in *Gilleo* forecloses the court's core reasoning: the fact that Hamman can carry a sign does not establish that carrying a sign is an adequate substitute for placing one in the ground.

The inadequacy of carrying a sign as an alternative is not merely theoretical in this record. Hamman testified that he simultaneously engages in personal

counseling conversations with women outside CHOICES — speaking individually with people as they arrive, walking with them, and attending to their immediate responses. Staked signs allow him to maintain his message's presence for passing drivers and bystanders during those interactions. When he is deep in conversation with one person, his staked signs speak to the others who pass without stopping. A carried sign cannot do that. Requiring Hamman to choose between speaking with individuals and maintaining his public message is not leaving open an ample alternative channel of communication.

## IV.    THE ORDINANCE, AS INTERPRETED, IS CONTENT-BASED.

The Ordinance states that no signs are permitted on the right of way "except as provided for under section 17-1-5[.]" § 15.4.10.8(A)(1). Under the lower court's interpretation, the Ordinance categorically prohibits any sign activity within the right of way, with the only available exception being contained in Section 17-1-5. That Section provides for four kinds of encroachment permits: continuous encroachments, temporary encroachments, sidewalk restaurant encroachments, and residential block party encroachments. These are commercial and social activities of various kinds and scope. And all these activities may involve signs; restaurants may have menu boards, block parties may have directional markers, a store with a sale may get a temporary encroachment permit to advertise a sale. In other words, the City permits commercial and social signs on the "right of way" by permitting these activities.

With this system as the only means of an exception from the Ordinance, it becomes apparent that the Ordinance discriminates based on the identity of the

36

speaker and the content of the message. A commercial sign for a restaurant is accepted and permitted in the right of way, while Hamman was barred from even applying for such a permit himself. A religious message like "We Will Adopt Your Baby" was banned, while a commercial advertisement is permitted at the same location with a different message. Core religious speech is banned where commercial signs are permitted.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995) (citing *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 96 (1972)). While these principles are well established, *Reed* speaks with particular clarity to this case. In *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), the Supreme Court established a straightforward and categorical rule: a regulation is content-based on its face if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 163. If an official must examine the content of a message to determine which regulatory category it falls into, the regulation is content-based. *Id.* at 164. Strict scrutiny applies, and the government must demonstrate that its regulation is narrowly tailored to serve a compelling interest. *Id.* at 171. The Gilbert sign code failed that test because it treated "Temporary Directional Signs" differently from "Ideological Signs" — a distinction that required reading the sign to know which category applied. The same defect is fatal here.

37

Section 17-1-5, as Snyder testified, permits street parties, sidewalk restaurants, and temporary sidewalk sales. Those activities cannot occur without signs: menus, "OPEN" boards, sale banners, and directional placards. The City thus permits, in the same public spaces where Hamman's signs were removed, the full commercial apparatus of a sidewalk sale while categorically prohibiting a two-foot yard sign expressing a religious and political viewpoint. This is not an incidental or accidental distinction. It is a regulatory scheme that "single[s] out specific subject matter for differential treatment." *Reed*, 576 U.S. at 169. Commercial speech is accommodated; core political and religious speech, which sits at the apex of First Amendment protection, is not. That inversion of constitutional hierarchy does not survive strict scrutiny, and the City has offered no compelling interest, let alone a narrowly tailored means of advancing one, that would justify it.

## V.     THE ORDINANCE HAS BEEN APPLIED THROUGH A SYSTEM OF VIEWPOINT DISCRIMINATION.

Finally, viewpoint discrimination is anathema to the First Amendment. It "is a 'more blatant' and 'egregious form of content discrimination.'" *Reed*, 576 U.S. at 156 (citation omitted). A finding of viewpoint discrimination is dispositive in showing that government action is unlawful. *See Sorrell v. IMS Health*, 564 U.S. 552, 571 (2011); *Good News Club v. Milford Cent. Sch. Dist.*, 533 U.S. 98, 106 (2001).

This case presents a rare and powerful record of viewpoint discrimination. Most viewpoint discrimination claims are built on circumstantial evidence — patterns of enforcement, selective application, suspicious timing. Those elements are present here in abundance. But this case also contains something unusual: direct, on-

38

the-record testimony from a City official, made during the enforcement action at issue, that the City of Carbondale discourages speech because of the beliefs it expresses. The district court looked at that testimony and called it a "personal opinion." SA. 33. That was clear error. The evidence of viewpoint discrimination in this record satisfies any standard this Court might apply, and the district court's failure to weigh it correctly requires reversal.

Sergeant Murray told Hamman and Pastor Sparks that City officials "would not condone this because ideologically, I would guess they would not allow these here. But you could say something that was completely different, and I'm sure they would be all for it." SA. 14. The district court acknowledged this and also acknowledged Murray's elaboration at the evidentiary hearing: "based on the City's priorities and past experience with them that if it's not — I guess to break it down in terms of right and left type things, if it's more of a right-wing belief it's discouraged." SA. 14. Murray's statement was not idle speculation about the City's political leanings made in a vacuum. It was the considered assessment of a veteran of the Carbondale Police Department, speaking from direct personal experience with the City's enforcement priorities and practices. He said the City's discouragement of right-wing speech was "based on the City's priorities" — that is, he was describing an institutional practice he had observed over a career of service in that institution. He said it was based on "past experience with them" — meaning he had witnessed a pattern. A witness who testifies that, based on years of experience with the institution, he has observed it systematically disfavor right-wing speech is not offering an uninformed personal

39

opinion — he is offering firsthand observational evidence that courts routinely credit as highly probative of institutional intent. Murray made his statement to Pastor Sparks while he was on duty, in uniform, supervising a City enforcement action, in his official capacity as a supervisor of the officers present. It was not a private conversation overheard by chance. It was an explanation offered to an affected party by the official responsible.

What makes Murray's testimony especially significant is what the City did not do in response to it. No City official testified that Murray was wrong about the City's priorities. No official testified that the City treats all viewpoints equally in its sign enforcement. No official produced evidence of enforcement against left-leaning speech comparable to the enforcement against Hamman. In fact, it was admitted that the City Manager explicitly directed enforcement against these signs in particular. Lieutenant Lattan testified he had never seen the police department remove signs based on content, but Lattan's testimony concerns the police department's conduct, not the conduct of the Community Development Manager and City Manager who initiated this enforcement action. The City's evidence left Murray's description of institutional viewpoint bias entirely uncontradicted.

The district court also overlooked a critical fact. Lenzini testified that he went to CHOICES that morning because he received an email from the City Manager, who had observed signs that he believed were in an "illegal location." A. 137. The City Manager — the chief executive officer of Carbondale's municipal government — was monitoring the situation outside an abortion clinic and directing the City's

40

Community Development Manager to enforce the sign ordinance against the pro-life demonstrators there. The City Manager's email is not in the record; the City did not produce it, but its existence and content were acknowledged by Lenzini on the stand. *Id.* An email from a city manager directing code enforcement against demonstrators at an abortion clinic, sent on the morning of the demonstration, is probative evidence of institutional motivation. That evidence is then significantly bolstered by a text message from the City Attorney, asking whether the demonstrators were "Coalition for Life personnel" — the pro-life organization that had previously sued Carbondale over a different ordinance. A. 124-25. Enforcement officials repeatedly distinguished Plaintiff's speech because of the message.

The normal sequence for code enforcement, as Lenzini described it, is reactive: he or his team observes violations in the course of their regular duties and removes noncompliant signs. The April 16 action was not reactive; it was proactive and directed from the top. That departure from normal practice is strong and powerful evidence that the enforcement was motivated by something other than neutral code enforcement. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.").

The district court dismissed Hamman's photographs of signs left undisturbed near CHOICES as "anecdotal evidence" insufficient to show discriminatory enforcement, reasoning that the signs might have been placed recently enough that the City had not had time to remove them. SA. 33–34. This reasoning is inadequate.

41

One of the photographed signs was not even a block away from CHOICES — within the area Lenzini was actively patrolling on April 16 and the days immediately following. A. 50-52. Lenzini testified that he removes signs "pretty much daily." A. 134. A picture of a sign one block from an abortion clinic where Lenzini had just conducted an enforcement action, left undisturbed in the days that followed, is not adequately explained by a general policy of weekend removal delays. The geographic proximity to Lenzini's active enforcement zone, combined with the content distinction between the undisturbed signs and Hamman's signs, creates an inference of selective enforcement that required a specific explanation the City did not provide.

The *Grand Chute* comparison on which the district court relied is inapposite in a critical respect. In *Grand Chute*, the court credited the code enforcement officer's testimony because it established systematic, documented, content-neutral removal of approximately 150 signs per year, and the union's photos of alleged violations showed only that not every sign had been removed — consistent with a systematic but imperfect enforcement practice. *Town of Grand Chute*, 915 F.3d at 1125–26. Here, the circumstantial pattern is different in a dispositive way: Lenzini was personally present in the enforcement zone, personally alerted by the City Manager to signs he deemed illegal, and personally removed Hamman's signs within minutes of arriving — yet signs of a different viewpoint one block away went unaddressed in the days that followed. For that matter, a sign for Freddy's across the street was not addressed until Hamman himself raised the issue. A. 150. The question in *Grand Chute* was whether the code enforcement officer had gotten to every violation in the City. The

42

question here is why Lenzini got to Hamman's signs in forty-five minutes but did not get to the signs one block away for several days. That question has no neutral answer in this record. The union in *Grand Chute* had no evidence comparable to Sergeant Murray's testimony. It had no City official on the record describing a pattern of institutional bias against pro-labor speech. It had no City Manager email directing enforcement against the union's protest. It had no evidence that enforcement officials had needed to consult the City Attorney multiple times before they could apply what was supposed to be an unambiguous ordinance.

The Supreme Court identified in *Arlington Heights* a set of factors bearing on whether facially neutral governmental action was motivated by discriminatory intent, including "departures from the normal procedural sequence" and "substantive departures . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). The procedural departures here are significant. The normal enforcement sequence, as Lenzini described it, is that he observes noncompliant signs in the course of his daily duties and removes them. The April 16 action departed from that sequence in three respects: it was initiated by an email from the City Manager rather than by Lenzini's independent observation; it involved multiple consultations with the City Attorney during a single encounter rather than straightforward application of a clear rule; and it produced a threatened citation — a formal enforcement action — that was prepared but never issued, suggesting the enforcement was intended to compel compliance

43

rather than document a violation. Each of these departures, under *Arlington Heights*, is probative of a motivation beyond neutral code enforcement. These substantive departures from the neutral enforcement Lenzini described are consistent with Murray's direct testimony about the City's institutional viewpoint bias, and together they form a pattern that *Arlington Heights* recognizes as evidence of discriminatory motivation.

Taking the full record together, the evidence of viewpoint discrimination in this case is substantial. Murray's direct testimony of institutional bias, the City Manager's direction of the enforcement action, the shifting legal justifications, the denial of a mandatory permit, the photographs of undisturbed signs nearby, and the absence of any City evidence directly contradicting Murray's account of institutional priorities establishes that Carbondale enforced the Ordinance against Hamman because of what his signs said and what side they were on. The record thus establishes viewpoint discrimination under the First Amendment, rendering the application of the Ordinance to Hamman's First Amendment activity unconstitutional.

## VI.  REMAINING PRELIMINARY INJUNCTION FACTORS SUPPORT A PRELIMINARY INJUNCTION.

The remaining preliminary injunction factors follow from Hamman's likelihood of success on the merits. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" for purposes of a preliminary injunction. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further

showing of irreparable injury is necessary." *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (quoting 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995)).

The balance of equities favors Hamman because "the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *ACLU v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012). This Court has regularly emphasized that "even short deprivations of First Amendment rights constitute irreparable harm." *Higher Soc'y of Indiana v. Tippecanoe Cnty.*, 858 F.3d 1113, 1116 (7th Cir. 2017). As this Court has regularly emphasized, "injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court, with instructions that the district court enter a preliminary injunction while the case proceeds to the merits.

|  |  |
|---|---|
| | /s/Nathan J. Moelker |
| Geoffrey R. Surtees | Nathan J. Moelker |
| AMERICAN CENTER FOR LAW & JUSTICE | *Counsel of Record* |
| PO Box 60 | Stuart J. Roth |
| New Hope, KY 40052 | Christina A. Compagnone |
| Tel: (502) 827-0951 | Liam R. Harrell |
| | AMERICAN CENTER FOR LAW & JUSTICE |
| | 201 Maryland Avenue, NE |
| | Washington, DC 20002 |
| | Tel: (202) 641-9160 |
| | Fax: (202) 546-9309 |
| | Email: nmoelker@aclj.org |

Attorneys for the Plaintiff-Appellant, Mark Brandon Hamman

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because it contains 11,796 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and Circuit Rule 32(b) because it has been prepared in Microsoft Word using a proportionally spaced typeface, 12-point Century Schoolbook.

Dated: March 20, 2026

s/ Nathan J. Moelker
Nathan J. Moelker
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

s/ Nathan J. Moelker
Nathan J. Moelker
*Counsel for Plaintiff-Appellant*

47

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), I certify that all material required by Circuit Rule 30(a) and (b) are included in the attached required short appendix and separate appendix filed concurrently with this brief.

s/ Nathan J. Moelker
Nathan J. Moelker
*Counsel for Plaintiff-Appellant*

**REQUIRED SHORT APPENDIX**

**TABLE OF CONTENTS**

| Item | Description | Page |
|------|-------------|------|
| A.1 | District Court Opinion and Order Denying Plaintiff's Motion for Preliminary Injunction, *Hamman v. City of Carbondale*, No. 3:25-CV-00736-NJR (S.D. Ill. Jan. 21, 2026) (Doc. 49) | SA.1 |
| A.2 | City of Carbondale, Illinois, Code of Ordinances § 15.4.10.8 — Temporary Signs Permitted (full text of all subsections), retrieved from https://codelibrary.amlegal.com/codes/carbondaleil/latest/carbondale_il/0-0-0-10222 (City of Carbondale, Ill.) | SA.37 |
| A.3 | Defendants' Exhibit 19 — Transcript of April 16, 2025 Enforcement Encounter (Doc. 57-16) (pages 3-6 and 57-61 only; full exhibit in district court record) | SA.39 |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARK BRANDON HAMMAN,

      Plaintiff,

v.

                              Case No. 3:25-CV-00736-NJR

CITY OF CARBONDALE, ILLINOIS,
LEONARD J. SNYDER, and
JOHN LENZINI,

      Defendants.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

This case is about yard signs. Plaintiff Mark Brandon Hamman claims that the City of

Carbondale ("Carbondale" or the "City") and two of its officials, City Attorney Leonard J.

Snyder and Community Development Manager John Lenzini, violated his rights under the

First and Fourteenth Amendments and under the Illinois Religious Freedom Restoration Act,

775 ILCS 35/15, when they prohibited him from placing yard signs containing anti-abortion

messages in the ground on a public right of way pursuant to Carbondale City Ordinance

§ 15.4.10.8 (the "Ordinance").[1]

Hamman filed a motion for a preliminary injunction to enjoin enforcement of the

Ordinance. (Doc. 8). The Court held a two-day evidentiary hearing in August 2025 where

Hamman, Lenzini, Snyder, and other witnesses testified. The motion is premised on

---

[1] Hamman advances seven claims for relief in this action: violation of his First Amendment Right to Free Speech based on the Ordinance (Count I); as-applied violations of his First Amendment Right to Free Speech based on Defendants' conduct (Counts II and III), violation of his First Amendment Right to Free Exercise of Religion (Count IV); violation of his Due Process rights under the Fourteenth Amendment (Count V); violation of his Right to Equal Protection under the Fourteenth Amendment (Count VI), and violation of the Illinois Religious Freedom Restoration Act, 775 ILCS 35/15 (Count VII). (Doc. 1 (Compl.)).

Defendants' alleged violations of Hamman's First Amendment right to free speech. The

Court thus confines itself to that issue in addressing Hamman's request for injunctive relief.

BACKGROUND

A. <u>The Ordinance</u>

The Ordinance regulates the placement of temporary signs within Carbondale as part

of an effort to address the risks posed by the "uncontrolled construction and use of signs."

City of Carbondale, Illinois, Code of Ordinances (hereinafter the "Code") § 15.4.10(2)(B). It

offers detailed guidance concerning the location, size, and number of temporary signs that

may be placed around the City. And it is part of a larger regulatory framework on signs that

seeks to promote "public safety on city streets by limiting the unnecessary distraction of the

motorist caused by signs," and to "protect the general public from damage and injury which

may be caused by the faulty and uncontrolled construction and use of signs within the city."

*Id.* § 15.4.10.2(A)-(B).

As relevant here, the Ordinance states that "[n]o sign may be erected on, suspended

over, or encroach upon the public right of way, except as provided for under section 17-1-5

of this code (dealing with "encroachments"), or be located so as to obstruct the visual

clearance needed for safe vehicle or pedestrian traffic." *Id.* § 15.4.10.8(A)(1) (the Court will

refer to this provision as the "general prohibition" on signs placed in the public right of way).

This general prohibition applies in all areas of Carbondale *other than* the BPR District (the

events giving rise to this action took place outside of the BPR District).[2] Section 17-1-5(A)(1)

of the Code defines a "public right of way" as a "public highway, street, sidewalk, alley, or

---

[2] The acronym BPR, somewhat counterintuitively, stands for "Primary Business." (Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 69).

Page 2 of 36

SA.2

publicly owned common area."[3] Temporary signs that are *not* subject to the general

prohibition—*i.e.*, signs not in the public right of way—may not be "erected within twenty

feet (20′) of the curb line of any adjoining street surface except those located in the BPR district

in which case the temporary sign shall be flush mounted to the building." *Id.* § 15.4.10.8(A)(3).

Section 17-1-5 modifies the general prohibition by providing a permitting process for

"encroachments" on the public right of way. *Id.* § 17-1-5. There are four types of

"encroachment permits:" (1) continuous encroachment permits for encroachments that are

"not readily movable" and may be "permanent" or "quasi-permanent;" (2) temporary

encroachment permits for encroachments that may be "readily moved" and are intended to

be placed on the public right of way for less than one year; (3) sidewalk restaurant

encroachment permits; and (4) residential block party permits. *Id.* § 17-1-5(A)(1). According

to Snyder, encroachment permits under section 17-1-5 seek to accommodate "specific" events

and activities such as "street parties, sidewalk restaurants, and temporary sidewalk sales."

(Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 86). Encroachment permits, moreover, are *not*

---

[3] The Code also provides at least two other definitions of a "right of way" (without specifying its "public" character). First, under section 15.11.4, a "right of way" is "[a]n area dedicated or purchased by the city for the purpose of providing both vehicular and pedestrian travelways." Second, under section 17-12-2 a "right of way" is defined in more detail as:

> Any street, alley, other land or waterway, dedicated or commonly used for pedestrian or vehicular traffic or other similar purposes, including utility easements, in which the city of Carbondale has the right and authority to authorize, regulate or permit the location of facilities other than those of the city of Carbondale. "Right of way" or "rights of way" shall not include any real or personal city of Carbondale property that is not specifically described in the previous two (2) sentences and shall not include city of Carbondale buildings, fixtures and other structures or improvements, regardless of whether they are situated in the right of way.

Assuming, without deciding, that there is no meaningful difference between a "public right of way" and a "right of way" under the Code, these varying definitions do not appear to conflict with one another—at least not insofar as the issues in this case are concerned. Nor is the "symmetrical construction" of identical statutory terms always essential. *United States v. Cleveland Indians Baseball, Co.*, 532 U.S. 200, 213 (2001). "Although we generally presume that identical words used in different parts of the same act are intended to have the same meaning, the presumption is not rigid, and the meaning of the same words well may vary to meet the purposes of the law." *Id.* (citation modified); *see also Env't Defense v. Duke Energy Corp.*, 549 U.S. 561, 575-76 (2007) ("There is . . . no effectively irrebuttable presumption that the same defined term in different provisions of the same statute must be interpreted identically.").

available for the placement of temporary signs on the public right of way. (*Id.*).

The City interprets the Ordinance as a blanket prohibition on *all* temporary signs on or within the public right of way. (Doc. 48, Aug. 13, 2025 Evid. Hr'g Tr., p. 84). Snyder also testified that the City has "always" interpreted the Ordinance this way and enforced it as a general ban, subject to the exceptions in section 17-1-5. (Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 89).

But the Ordinance does not ban all temporary signs, at all times, and in all places. Outside of the BPR District, the Ordinance accommodates "temporary noncommercial signs" belonging to 501(c)(3) nonprofit organizations by creating a permitting process for their "display." Code § 15.4.10.8(A)(5)(b)(2). Each nonprofit organization, it states in relevant part, "will be allowed to display a temporary sign for a period not to exceed thirty (30) consecutive days. Each organization is allowed a total of sixty (60) calendar days to display temporary signs. A new permit shall be issued each time the temporary sign is to be displayed. Permit fees may be waived with the approval of the administrative official."[4] *Id.*

Finally, the Ordinance prohibits *commercial* signs from being "carried, waved or otherwise displayed by persons either on public rights of way or in a manner visible from public rights of way." *Id.* § 15.4.10.8(A)(5)(a)(4). This restriction applies to "displays intended to draw attention for a commercial purpose." *Id.* It "is *not* intended to limit the display of banners, flags or other signage by persons participating in demonstrations, political rallies, and similar events." *Id.* (emphasis added).

---

[4] A similar permitting process is available for signs in the BPR District. *See* Code § 15.4.10.7(K)(2)(b).

SA.4

B.  Enforcement of the Ordinance against Hamman

   1.  *Mark Hamman's Testimony*

Hamman describes himself as a "pro-life advocate" working as a local missionary in Carbondale. (Doc. 8 (Pl. Mot. for Prel. Inj., p. 1)). He is employed by Christ Church of Carbondale ("CCC"), operating through a non-profit ministry he founded called "Gospel for Life." (*Id.*, p. 1-2; Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 13, 31). Gospel for Life, as Hamman describes it, seeks to "glorify God through the proclamation of gospel and to rescue babies." (*Id.*, p. 14). To that end, Hamman's "primary mission" is to go to abortion facilities in Carbondale to try to persuade people not to get an abortion. (*Id.*, p. 14-15). He does so by placing signs in the ground containing anti-abortion messages and speaking with people. (*Id.*).

Hamman's signs are important to his work. They contain various messages opposing and discouraging abortion, such as "Babies are Murdered Here" and "Love your Preborn Neighbor as Yourself." (*Id.*, p. 15). Hamman uses these and other signs for two main reasons: first, if he is speaking with someone, they convey his message to others who are not part of the conversation; second, they "raise awareness" about "what's going on inside those [abortion] facilities. (*Id.*, p. 16). As he explains it, "I can't be everywhere all at one time and speaking to everybody, and so really to make sure that the message gets out there, that people know what's going on, and it helps me to reach those people that I wouldn't necessarily be able to if they're just driving by." (*Id.*, p. 24).

On April 16, 2025, Hamman went to the CHOICES Center for Reproductive Health ("CHOICES") on Giant City Road in Carbondale to "perform[] [his] mission, sharing the gospel, and [to] try[] to help families keep their baby." (*Id.*, p. 16; Def. Hr'g Ex. 1). He was

with two individuals identified as "Bob" and "Darlene," who often work with him, but are not part of Gospel for Life. (Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 16-17). Bob and Darlene placed their own signs in the ground, including one advertising "Free Baby Supplies."[5] Hamman did not place any signs in the ground initially. (Doc. 48, Aug. 13, 2025 Evid. Hr'g Tr., p. 11).

At around 11:30 a.m., Lenzini showed up and demanded that Hamman, Bob, and Darlene remove the signs that had been placed in the ground.[6] (*Id.*, p. 18; Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 20-21). Lenzini told them that the sign advertising "Free Baby Supplies" was "not [a] demonstration [sign]." (*Id.*, p. 21). Aside from this observation, however, Hamman testified that Lenzini offered no reason why the signs had to be removed. (*Id.*, p. 22). Lenzini, on the other hand, testified that he told Hamman, Bob, and Darlene that their signs "could not be out there because they were on the right-of-way." (Doc. 48, Aug. 13, 2025 Evid. Hr'g Tr., p. 20). Lenzini also testified that his comment about the "free baby supplies" sign not being a demonstration sign was "in response to something they said," and not a separate reason why the Ordinance prohibited it from being placed in the public right of way. (*Id.*). According to a transcript of Lenzini's interaction with Hamman, Lenzini indeed told Hamman that the signs had to be removed because "[t]hey're on the city right-of-away [sic]" *before* discussing the sign advertising free baby supplies. (Def. Hr'g Ex. 19, p. 3). Their discussion about the demonstrative nature of the "free baby supplies" sign only took place

---

[5] The Court infers that these signs belonged to Bob and Darlene because Hamman testified that they "were not [his] signs," and that Bob or Darlene "had placed those signs in the ground." (Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 21, 45).

[6] It is not entirely clear how many signs had been placed in the ground when Lenzini showed up. According to Hamman's body camera footage of the events on April 16, 2025, it appears approximately eight signs had been placed in the ground near the street curb where Hamman, Bob, and Darlene were protesting. (Pl. Hr'g Ex. 1, Time Stamp: 10:02:00-20).

SA.6

after Hamman cited the Ordinance's provision on commercial signs, which is "not intended to limit the display of banners, flags or other signage by persons participating in demonstrations, political rallies, and similar events." (*Id.*, p. 4-5 (discussing Code § 15.4.10.8(A)(5)(a)(4)). At that point, Lenzini told Hamman "Free baby supplies is not a demonstration." (*Id.*, p. 5).

At some point after Lenzini arrived, Hamman placed his own signs in the ground conveying the messages: "Babies Are Murdered Here," "We Will Adopt Your Baby," "Love Your Preborn Neighbor as Yourself," and "Don't Kill Your Baby, abortionpillreversal.com." (Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 22). Lenzini threatened to call the police if Hamman did not remove his signs within five minutes. (*Id.*, p. 20). But Hamman, believing that the Ordinance permitted him to place his signs in the ground, told him that he should call the police right away to sort the issue out. (*Id.*).

During Lenzini's conversation with Hamman and a Pastor Jared Sparks, an "elder" of CCC who had also joined Hamman at CHOICES, Hamman began speaking with a woman who was passing by. (*Id.*, p. 51-52). Hamman told her: "[I]f you took the pill today, I want you to know about abortionpillreversal.com. We'd love to help you. There's still a chance for your baby to live today. Please let us help you. Come talk with us. We'd love to pray with you and find a solution that's not taking the life of your innocent child." (Def. Hr'g Ex. 19, p. 32). Hamman then engaged with a second woman and gave her a "gospel track" after a brief conversation. (Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 53-54). Neither Lenzini nor anyone else from the City attempted to stop or interfere as Hamman spoke with these women. (*Id.*, p. 54-55). Nor did any City official, including Lenzini, comment on the messages that Hamman's signs conveyed. (*Id.*, p. 55).

SA.7

The police eventually showed up and told Hamman that his signs could be placed in the ground but only if they were located 20 feet or more from the curb. (*Id.*, p. 23). Hamman complied with this instruction and moved his signs back from the curb. (*Id.*). Lenzini, however, insisted that the Ordinance prohibited Hamman, Bob, and Darlene from placing *all* signs in the ground, regardless of their distance from the curb. (*Id.*, p. 24, 46).

Darlene eventually removed her signs from the ground and began "carrying" and "wearing" them, while continuing to protest abortion. (Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 47). Bob and Darlene experienced no further interference from Lenzini and other City officials after removing their signs from the ground and they continued their protest "unabated." (*Id.*, p. 47-48). Hamman, for his part, agreed to remove his signs after being told that he would be cited and his signs confiscated if he did not. (*Id.*, p. 24). After he did so, no citation was issued. (*Id.*, p. 49).

Lenzini told Hamman that he was free to do his work holding his signs, rather than placing them in the ground. (*Id.*, p. 48). Indeed, prior to April 16, 2025, Hamman had done exactly that as part of his work at times. (*Id.*). But it had become his preference to put his signs in the ground and, on that day, that was what he wanted to do. (*Id.*, p. 49). Nevertheless, after Hamman removed his signs from the ground, Pastor Sparks and a person identified as "Pastor Andy," another "elder" of CCC, carried the signs to spread their messages. (*Id.*, p. 50-51). As they did so, no one from the City interfered with them. (*Id.*, p. 51).

Hamman justifies his refusal to carry signs, in part, on the basis of traffic safety. As a former law enforcement officer, he believes that carrying signs creates a more significant traffic safety risk than staking them in the ground. (*Id.*, 24). In his words: "If you are ever out on the sidewalk in Carbondale, it can be pretty windy. So[,] I have seen signs that have been

blown across the street, they blow into traffic. I don't want my signs hitting somebody or something if I am talking to somebody up close or talking to somebody in their vehicle. I don't want that to happen. Again, I don't want it to blow into the road or cause an accident." (*Id.*, p. 67).

The following day, April 17, 2025, Hamman went to Carbondale City Hall to get a permit to place his signs in the ground near CHOICES and other abortion clinics in the City. (*Id.*, p. 27-28, 60). As a representative of CCC, which he understood was a 501(c)(3) nonprofit organization,[7] Hamman believed he could obtain a permit under section 15.4.10.8(A)(5)(b)(2) to place his signs in the ground at these locations. (*Id.*, p. 28, 65). At City Hall, he encountered Lenzini again. (*Id.*, p. 27-28). Lenzini told him that "there was no exception" to the ban on temporary signs in the public right of way, so Hamman left without a permit. (*Id.*, p. 28).

Hamman believes he was targeted by the City due to his message opposing abortion. He testified that, within a few days of April 16, 2025, he saw and photographed other temporary signs that were placed in the ground at "various locations" throughout Carbondale, including some that were "not even a block away" from CHOICES. (*Id.*, p. 25-27; Pl. Hr'g Ex. 2 (five photos of three different signs)). These signs shared messages unrelated to abortion. (*Id.*). Hamman admitted, however, that he did not know how long those signs had been in place when he photographed them. (Doc. 47, Aug. 11, 2025 Evid. Hr'g Tr., p. 56).

2. *Leonard J. Snyder's Testimony*

Snyder is the City Attorney for Carbondale. (*Id.*, p. 83). He testified that because CHOICES is not within the BPR District, "[n]o signs are permitted to be erected in the right-

---

[7] CCC, according to testimony from Pastor Sparks, is a registered nonprofit organization "through the state of Illinois." (*Id.*, p. 76-77). It is unclear whether it is a federally recognized 501(c)(3) nonprofit. (*Id.*).

Page 9 of 36

SA.9

of-way." (*Id.*, p. 85). And while the Ordinance offers a permitting process for 501(c)(3) organizations to erect signs for certain periods of time, Snyder explained that a permit only allows such signs to be placed on *private* property. (*Id.*, p. 89). This is so because even a permitted sign must comply with the general prohibition under section 15.4.10.8(A)(1), which prohibits *all* signs in the public right of way. (*Id.*, p. 89-90). This has "always" been the City's interpretation of the Ordinance. (*Id.*, p. 89). And on April 16, 2025, Snyder provided guidance to Lenzini and officers of the Carbondale Police Department, consistent with this interpretation. (*Id.*, p. 93-94).

       3.   *John Lenzini's Testimony*

As Carbondale's Community Development Manager, Lenzini manages the City's Planning and Zoning Division and its Code Enforcement Division. (Doc. 48, Aug. 13, 2025 Evid. Hr'g Tr., p. 6). Lenzini's job in the Code Enforcement Division includes the removal of signs that are improperly placed in the public right of way. (*Id.*, p. 6-7). He does so "pretty much daily," without regard for the content of the message conveyed by a non-compliant sign. (*Id.*, p. 7). Lenzini estimates that, over the course of a year, the Code Enforcement Division removes between 150 and 200 signs, with spikes in the volume of non-compliant signs during political campaign seasons. (*Id.*, p. 9). Indeed, Lenzini testified that during political campaigns, he and his team preemptively communicate with political parties to ensure compliance with the Ordinance. (*Id.*). But, despite these efforts, the Code Enforcement Division "pull[s] a lot of political signs during campaign seasons." (*Id.*). Lenzini conceded, however, that delays in sign removal can happen—for instance when a sign is placed in the public right of way over the weekend. (*Id.*, p. 8). Non-compliant signs therefore may remain in place for "a couple of days." (*Id.*, p. 7-8).

On April 16, 2025, Lenzini went to the area around CHOICES and noticed signs placed in the public right of way. (*Id.*, p. 10). He determined that these signs were in violation of the Ordinance and asked the owners to remove them (Lenzini believes the owners were Bob and Darlene although they did not identify themselves). (*Id.*). Bob and Darlene removed their signs from the right of way with Lenzini's help and continued their protest by holding and carrying them instead. (*Id.*, p. 10-11). Neither Lenzini nor anyone else from the City interfered with Bob and Darlene's protest after they removed their signs. (*Id.*, p. 11).

While Lenzini spoke with Bob and Darlene, Hamman went to his car to retrieve his signs and placed them in the ground. (*Id.*, p. 11-12). Lenzini told Hamman that he had placed his signs in the public right of way, which covered an area from a fence around CHOICES to Giant City Road. (*Id.*, p. 12). Lenzini asked Hamman to remove his signs, but Hamman refused based on his understanding of his First Amendment rights. (*Id.*, p. 12-13). Like he had done with Bob and Darlene, Lenzini told Hamman that he could carry or wear his signs, but that they could not be in the ground of the public right of way. (*Id.*, p. 13). Hamman refused to remove his signs but moved them back from the curb several times in an attempt to get them out of the public right of way. (*Id.*). Lenzini told him, however, that he "was on the right of way the whole time," and that the signs had to be removed from the ground. (*Id.*).

Because Hamman refused to comply, Lenzini began writing up a citation. (*Id.*, p. 15). Lenzini asked officers of the Carbondale Police Department to help him complete the citation because Hamman refused to identify himself. (*Id.*). At this point, Hamman complied and removed his signs. (*Id.*, p. 16). Lenzini, in turn, did not issue a citation. (*Id.*).

The following day, April 17, 2025, Lenzini encountered Hamman at City Hall. (*Id.*). Their interaction was brief. Hamman told Lenzini that he wanted a permit to place his signs

in "various places," which Lenzini understood to include the area near CHOICES where

Hamman wanted to place them the previous day. (*Id.*, p. 17). Hamman briefly mentioned the

Ordinance's permitting process for 501(c)(3) nonprofit organizations, but did not identify the

organization he purported to represent. (*Id.*). Although Hamman never submitted a permit

application, Lenzini testified that, even if he had, the application would have been denied

because the City is not allowed to issue permits for signs to be placed in the public right of

way. (*Id.*).

Lenzini also introduced a "subdivision plat" to illustrate the location where Hamman

had wanted to place his signs (reproduced in relevant part below):



**SA.12**

(Def. Hr'g Ex. 17). The plat, on the right-hand side, identifies Giant City Road and offers distance markers of 100 feet and 120 feet to its left and right respectively. The area identified as "Giant City Road" includes the area for car traffic, sidewalks, and other areas even though they are not separately identified on the plat. (Doc. 48, Aug. 13, 2025 Evid. Hr'g Tr., p. 46). The thick black line identifying the left edge of Giant City Road is a property line. (*Id.*, p. 43). The public right of way, Lenzini explained, extends all the way to the property line. (*Id.*, p. 43-44). CHOICES is located on Lot 14 of the plat, which borders the area identified as "Giant City Road." (*Id.*, p. 45-46). Immediately to the right of Lot 14's property line is a grassy area, where Hamman had placed his signs. (*Id.*, p. 48).

### 4.   *Officer Samuel Tyner's Testimony*

Officer Samuel Tyner, a patrol officer for the City of Carbondale, was the first police officer to arrive at CHOICES on April 16, 2025. (*Id.*, p. 25-27). He told Hamman and Pastor Sparks that, although he did not know all the details of the Ordinance, "signs were not allowed to be placed on the City's right-of-way and we would like for them to just remove the signs." (*Id.*, p. 27). He also "explained to them they could carry the sign, hold the signs, they just couldn't be planted on the property." (*Id.*).

Although Officer Tyner offered these instructions, he admitted that his understanding of the Ordinance was limited. (*Id.*, p. 29). He also agreed, based on parts of the Ordinance that Hamman had shown him, that it was "poorly written" and that he was "confused" about what it required. (*Id.*, p. 30-31). So, to ensure he was offering accurate information, Officer Tyner asked his supervisor, Sergeant Mark Murray, to come to the scene to "make a final decision." (*Id.*, p. 29). Officer Tyner nevertheless remained in the area until Hamman removed his signs from the ground. (*Id.*, p. 27).

### 5. *Sergeant Mark Murray's Testimony*

Sergeant Murray has served as a Carbondale police officer for over 15 years. (*Id.*, p. 49). By his own admission, he also is not familiar with the Ordinance. (*Id.*, p. 52). Sergeant Murray thus contacted Snyder for guidance and "explained to [Hamman] what I had spoken to the City Attorney about, that he can't place any signs on the city right-of-way, and he believed that he could, and I explained to him that this is the interpretation of the attorney and that's what I would have to proceed with." (*Id.*, p. 51). Snyder had also told Sergeant Murray that Hamman and others were free to carry or wear their signs, which Sergeant Murray also conveyed to Hamman. (*Id.*, p. 52).

As he spoke with Pastor Sparks, Sergeant Murray told him that officials for the City "would not condone this because ideologically, I would guess they would not allow these here. But you could say something that was completely different, and I'm sure they would be all for it." (Pl. Hr'g Ex. 6, Time Stamp: 12:07:15-27). At the evidentiary hearing, Sergeant Murray expounded on this comment: "I think based on the City's priorities and past experience with them that if it's not—I guess to break it down in terms of right and left type things, if it's more of a right-wing belief it's discouraged." (Doc. 48, Aug. 13, 2025 Evid. Hr'g Tr., p. 56). Sergeant Murray admitted, however, that he was not aware of any instance in which the City removed a sign in the public right of way based on the message it conveyed. (*Id.*, p. 57). Indeed, in his experience, Carbondale officials "take everything out of there that's on the City's right-of-way." (*Id.*). He also conceded that his comment to Pastor Sparks about the City objecting to Hamman's message on ideological grounds was his "personal opinion." (*Id.*).

6. *Lieutenant Theodore Lattan's Testimony*

Lieutenant Theodore Lattan is a 15-year veteran of the Carbondale Police Department. (*Id.*, p. 59). On April 16, 2025, he was dispatched to CHOICES along with Sergeant Murray and Officer Tyner. (*Id.*, p. 60-61). On his way there, he spoke with Snyder who explained to him that "the only issue was that they [the signs] were planted into—erected on that right-of-way, and that they could be carried, held, or worn on that day." (*Id.*, p. 61). He explained this to Hamman. (*Id.*, p. 61-62). Hamman, in turn, asked Lieutenant Lattan to speak with his attorney. (*Id.*, p. 62). The attorney asked Lieutenant Lattan if he planned to take Hamman into custody, to which Lieutenant Lattan responded that there would be no need for that or a citation if Hamman voluntarily complied with the City's directive to remove his signs from the ground. (*Id.*).

Lieutenant Lattan also spoke separately with Sergeant Murray and told him that "this is a very grey and touchy area." (Pl. Hr'g Ex. 6, Time Stamp: 12:18:42-48). He was asked about this comment at the hearing and testified that it was meant to ensure he and his fellow officers exercised the proper restraint because they were dealing with Hamman's First Amendment rights. (Doc. 48, Aug. 13, 2025 Evid. Hr'g Tr., p. 66-67). Thus, as Lieutenant Lattan explained it, "knowing that when we were dealing with people who were engaged in public protests that, you know, I want to do everything I can to gain that voluntary compliance other than take some sort of enforcement action." (*Id.*, p. 67). Hamman, for his part, eventually removed his signs based on his attorney's advice. (*Id.*, p. 63).

Lieutenant Lattan, in his experience, has "never seen or been aware of our police department or the City removing signs based on their content other than when they were in violation of the city ordinance." (*Id.*).

Page 15 of 36

SA.15

**LEGAL STANDARD**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "In First Amendment cases, however, the likelihood of success on the merits is usually the decisive factor." *Wisc. Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014). "That is because even short deprivations of First Amendment rights constitute irreparable harm, and 'the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional.'" *Higher Soc. of Ind. v. Tippecanoe Cnty.*, 858 F.3d 1113, 1116 (7th Cir. 2017) (quoting *Am. Civ. Lib. Union of Ill. v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012)). Moreover, when the issue involves an alleged infringement on speech, the burden is on the government to demonstrate the constitutionality of its actions. *Barland*, 751 F.3d at 830.

**DISCUSSION**

A. Likelihood of Success on the Merits

Hamman attacks the Ordinance on several grounds. First, he contends that it is unconstitutionally vague because it fails to explain to people of ordinary intelligence how it is violated and encourages arbitrary and discriminatory enforcement. Second, he argues that the Ordinance impermissibly restricts speech in a public forum. And third, he argues that Defendants engaged in viewpoint discrimination against him based on the anti-abortion messages he sought to convey. The Court will address each of these arguments in turn.

SA.16

    *1. Vagueness*

"A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Hamman believes the Ordinance flunks both of these tests. The Court will examine it accordingly.

    a.  Notice to people of ordinary intelligence

"To survive a vagueness challenge, a . . . statute must give people fair notice of what conduct is prohibited so that they may conduct themselves within the law's bounds." *Brown v. Kemp*, 86 F.4th 745, 772 (7th Cir. 2023). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). In other words, "the indeterminacy of what conduct constitutes a violation makes a statute vague." *Brown*, 86 F.4th at 772.

Hamman fuses two lines of reasoning into his argument that the Ordinance fails to provide people of ordinary intelligence fair notice of what it prohibits. He begins by focusing on Lenzini's *statements*, arguing that vagueness is established by his varying explanations of what the Ordinance prohibited. Second, he argues that the Ordinance is a muddled mess on its face because it fails to define key terms and may (or may not) exempt 501(c)(3) nonprofit organizations, like CCC, from the general prohibition on signs being placed in the public right of way.

Hamman cites three allegedly inconsistent statements from Lenzini as evidence of the Ordinance's vagueness: (1) his indication that the sign advertising "Free Baby Supplies" was

not demonstrative in nature and thus not allowed to be placed in the ground; (2) his subsequent explanation that *no* signs could be placed in the ground on a public right of way; and (3) his indication on April 17, 2025, that no permits were available for signs to be placed in the ground outside of CHOICES, notwithstanding the Ordinance's permitting process for signs belonging to 501(c)(3) nonprofit organizations. In effect, Hamman contends that these statements show a City official broadening the scope of the Ordinance by individual fiat to ensure the removal of messages opposing abortion. A closer look at Lenzini's statements, however, shows that his instructions were consistent with the text of the Ordinance.

Shortly after Lenzini arrived outside of CHOICES, he told Hamman: "Free baby supplies is not a demonstration." Hamman understood this comment as Lenzini's first attempt to explain why he was prohibited from placing his signs in the ground. But this interpretation of Lenzini's comment is doubtful. The *first thing* Lenzini told Hamman after he arrived on the scene was that any signs in the ground, including the "free baby supplies" sign, had to be removed because "[t]hey're on the city right-of-away [sic]." Lenzini and Hamman's conversation about the demonstrative nature of the "free baby supplies" sign took place *after* Lenzini gave this explanation for his demand.

Lenzini testified that his comment about the "free baby supplies" sign was "in response to something they said." This explanation is plausible because it lines up with the recordings of Lenzini's interaction with Hamman. Indeed, *after* Lenzini told Hamman that the signs in the ground had to be removed, Hamman cited Code § 15.4.10.8(A)(5)(a)(4) to show that he was acting in compliance with the Ordinance. That section states in full:

> Commercial signs prohibited: Includes signs that are carried, waved or otherwise displayed by persons either on public rights of way or in a manner visible from public rights of way. This provision is directed toward such

Page 18 of 36

**SA.18**

> displays intended to draw attention for a commercial purpose, and is *not*
> *intended to limit the display of banners, flags or other signage by persons participating*
> *in demonstrations, political rallies, and similar events.* (emphasis added).

Only after Hamman cited this provision of the Ordinance did Lenzini reply: "Free baby supplies is not a demonstration." So, while Lenzini may have disagreed with Hamman's claim that the "free baby supplies" sign was demonstrative under section 15.4.10.8(A)(5)(a)(4), the record does not show that his comment was offered as an independent justification for his demand that the signs be removed. The Court thus disagrees with Hamman that Lenzini's comment is evidence of a malleable justification for the need to remove signs from the public right of way.

Moreover, whether the "free baby supplies" sign was demonstrative or not had nothing to do with Hamman's right to place it in the ground. This is so because section 15.4.10.8(A)(5)(a)(4) prohibits commercial signs from being "carried, waved or otherwise displayed" on a public right of way, while exempting non-commercial signs. So even if the "free baby supplies" sign was demonstrative, as Hamman suggests, section 15.4.10.8(A)(5)(a)(4) would have only allowed him to carry, wave or otherwise display it, not place it in the ground. This limitation matters because nothing in section 15.4.10.8(A)(5)(a)(4) suggests that it modifies the general prohibition on signs "erected on, suspended over, or encroach[ing]" upon a public right of way. Instead, this provision appears to allow exactly what it says: carrying, waving or otherwise displaying noncommercial signs on a public right of way (as Lenzini and the Carbondale police repeatedly told Hamman he could). *See Leibundguth Storage & Van Serv., Inc. v. Village of Downers Grove, Ill.*, 939 F.3d 859, 861 (7th Cir. 2019) (rejecting a textual interpretation of local sign ordinance). Lenzini's comment about the "free baby supplies" sign thus was neither offered as a reason for the City's demand that

Hamman remove his signs from the ground, nor did it have anything to do with Hamman's right to place signs in the ground to begin with. And for those reasons, it does not support Hamman's claim that the Ordinance is unconstitutionally vague.

Lenzini's statements that *no* signs could be placed in the ground on the public right of way and that no permits were available that would have allowed Hamman to do so also do not show vagueness. The Ordinance's general prohibition states that "[n]o sign may be erected on, suspended over, or encroach upon the public right of way, except as provided for under section 17-1-5 of this code (dealing with "encroachments"), or be located so as to obstruct the visual clearance needed for safe vehicle or pedestrian traffic." Code § 15.4.10.8(A)(1). The City interprets this provision as a comprehensive ban on signs being placed in the ground on a public right of way. Indeed, this has "always" been its interpretation of the Ordinance. The only exception is for permitted "encroachments," which Snyder defined as "street parties, sidewalk restaurants, and temporary sidewalk sales." Lenzini's statements that no signs were permitted in the ground on a public right of way and that no permits existed to displace the general prohibition is thus consistent with the text of the Ordinance itself and the City's interpretation of it. *See Leibundguth*, 939 F.3d at 861-62 (deferring to village's "understanding of its own ordinance," absent evidence of discriminatory enforcement).

Hamman's argument that Lenzini offered varying explanations of the Ordinance's scope to censor messages opposing abortion does not stand up to scrutiny. Throughout his encounters with Hamman, Lenzini consistently enforced the Ordinance's general prohibition on signs placed in the public right of way. Thus, the Court disagrees with Hamman that Lenzini's statements support the Ordinance's vagueness. *Cf. Constr. & Gen. Lab. Union No.*

Page 20 of 36

*330 v. Town of Grand Chute*, 915 F.3d 1120, 1124-26 (7th Cir. 2019) (local sign ordinance

constitutional even though municipal officials did not interpret it consistently).

Hamman also faults the Ordinance for failing to define certain terms, including a

"public right of way," and what it means for a sign to be "erected on, suspended over, or

encroach upon the public right of way." This, he contends, shows its vagueness because it

prevents people of ordinary intelligence from determining what is and is not permitted.

Hamman's criticism is inapposite for several reasons. First, he cites no case supporting the

contention that a failure to define these commonly understood terms renders a law

unconstitutionally vague.[8] *Cf. United States v. Castillo*, 406 F.3d 806, 821 (7th Cir. 2005)

(holding that commonly understood terms in jury instructions need not be separately

defined). Second, the Ordinance does define a "public right of way." Recall that the general

prohibition excepts permitted "encroachments" under section 17-1-5. That section, in turn,

defines a "public right of way" as "any public highway, street, sidewalk, alley, or publicly

owned common area." Code § 17-1-5(A)(1). Hamman is thus incorrect to assert that the

Ordinance fails to define a public right of way altogether. Third, the concept of a right of way

has a commonly understood meaning that does not demand exhaustive definition.

*See McClanahan v. City of Tumwater*, No. 11–cv–5623, 2012 WL 4113383, at *5 (W.D. Wash.

Sept. 19, 2012) (holding that term "right of way" has generally accepted meaning and

rejecting vagueness challenge to local sign ordinance as a result).

Hamman's argument concerning the absence of clear definitions for "*erected on,*

*suspended over, or encroach upon* the public right of way" fares no better. "Absent any statutory

---

[8] Hamman cites *Brown v. Kemp*, 86 F.4th 745, 772 (7th Cir. 2023), in this part of his brief, but only to support the general proposition that people must be able to "know the ordinary meaning of the ordinance or to know what conduct may be prohibited." (Doc. 8 (Pl. Mot. for Prel. Inj., p. 9)).

definition, a term should be given its commonly understood meaning." *United States v. Cooper*, 19 F.3d 1154, 1165 (7th Cir. 1994). To "erect on," "suspend over," and "encroach upon," all have commonly understood meanings, especially in the context of the Ordinance. To "erect" something is to "to fix [it] in an upright position," or "to cause [it] to stand up or stand out." Webster's Collegiate Dictionary 554 (12th ed. 2026). To "suspend" something—as that term is used in the Ordinance—is "to hang so as to be free on all sides except at the point of support." *Id.* at 1587. And to "encroach" upon something is "to enter by gradual steps or by stealth into the possession or rights of another," or "to advance beyond the usual or proper limits." *Id.* at 539. These terms all work to convey a comprehensive prohibition on signs in or over the public right of way. The Ordinance is not unconstitutionally vague because it fails to explicitly define them. *See Hill*, 530 U.S. at 732 (holding that "protest," "education," "counseling," "consent," and "approaching" are not unconstitutionally vague because "[t]he likelihood that anyone would not understand any of those common words seems quite remote"); *Cooper*, 19 F.3d at 1165 (rejecting argument that 'working in furtherance of a continuing criminal enterprise' is unconstitutionally vague because 'in furtherance' has commonly understood meaning).

The Ordinance also states that "[n]o temporary sign shall be erected within twenty feet (20′) of the curb line of any adjoining street surface except those located in the BPR district in which case the temporary sign shall be flush mounted to the building." Code § 15.4.10.8(A)(3). Here, too, Hamman tries to find vagueness where there is none. He reasons that because this provision allows signs to be placed 20 feet or further from a curb line, the City's enforcement of a total ban on signs on "public property" was inconsistent with something the Ordinance affirmatively permitted. The problem with his argument is that

Page 22 of 36

**SA.22**

nothing in section 15.4.10.8(A)(3) purports to modify the general prohibition, which applies to areas designated as a public right of way. Section 15.4.10.8(A)(3), on the other hand, applies all other areas where signs may be placed—*i.e.*, not in the public right of way. Hamman misunderstands the general prohibition on signs in the public right of way as one that extends to all public *property* in Carbondale. Nothing in the Ordinance supports such a broad reading of the general prohibition, nor did any City official testify that it is enforced that way.

Finally, Hamman claims that the Ordinance's permitting process for "temporary noncommercial signs" belonging to 501(c)(3) organizations confuses the public because it suggests that CCC (assuming it is a federally recognized 501(c)(3) nonprofit organization) should be allowed to get a permit to "display" temporary noncommercial signs. The relevant provision under section 15.4.10.8(A)(5)(b)(2) states that "[e]ach individual 501(c) not for profit organization will be allowed to display a temporary sign for a period not to exceed thirty (30) consecutive days. Each organization is allowed a total of sixty (60) calendar days to display temporary signs. A new permit shall be issued each time the temporary sign is to be displayed."

Conspicuously absent from this section is any mention of how it relates to, or modifies, the general prohibition on temporary signs in the public right of way. And the same is true of the general prohibition itself—it does not mention the permitting process for 501(c)(3) organizations. Both sections appear entirely unrelated. This is telling because the general prohibition specifically exempts permitted "encroachments" under section 17-1-5 from its reach. If the City wanted to do the same with "temporary noncommercial signs" belonging to 501(c)(3) nonprofits, it could have said so in the general prohibition. The fact that it did not indicates to people of ordinary intelligence that even a permit for a temporary

noncommercial sign does not allow that sign to be placed in the public right of way.
*See Leibundguth*, 939 F.3d at 861 (exemption of certain signs from permitting requirement under local ordinance did not mean other rules applicable to signs generally did not apply to those signs). So, a plain reading of the Ordinance demonstrates that no permit was available that would have allowed Hamman to place his signs in the public right of way. And for that reason, the permitting process under section 15.4.10.8(A)(5)(b)(2) does not render the Ordinance unconstitutionally vague. *See United States v. Walton*, 36 F.3d 32, 35 (7th Cir. 1994) (holding that statute that "explicitly and clearly forbids" certain conduct was not unconstitutionally vague).

To sum it up, neither Lenzini's statements about the Ordinance, nor the Ordinance itself suggest that its scope is unclear to people of ordinary intelligence. The Ordinance is thus not unconstitutionally vague for that reason.

### b. Authorizing arbitrary or discriminatory enforcement

A law can also be unconstitutionally vague if it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732. "[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). Simply stated, the First Amendment does not tolerate a law "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304.

On this point, Hamman again points to the permitting process for signs belonging to 501(c)(3) nonprofit organizations under section 15.4.10.8(A)(5)(b)(2) as evidence of unbridled discretion being vested in City officials. As he sees it, section 15.4.10.8(A)(5)(b)(2) is a

regulatory free-for-all that allows City officials to approve permits for signs they like and deny permits for ones they don't. This is so, he contends, because section 15.4.10.8(A)(5)(b)(2) lacks any objective criteria guiding a City official's evaluation of a permit application. As noted, section 15.4.10.8(A)(5)(b)(2) states in relevant part that "[e]ach individual 501(c) not for profit organization *will be allowed* to display a temporary sign" for certain periods of time and explains that "[a] new permit *shall be issued* each time the temporary sign is to be displayed" (emphases added).

The first problem with Hamman's argument is that the relevant language of the provision he cites gives City officials *no discretion* to deny temporary sign permits for qualifying "display[s]." So much is clear from the directive that qualifying nonprofit organizations "will be allowed" to display temporary signs and that permits "shall be issued" for compliant "display[s]" of temporary signs. *See Ward v. Rock Against Racism*, 491 U.S. 781, 794–95 (1989) ("By its own terms the city's sound-amplification guideline must be interpreted to forbid city officials purposely to select inadequate sound systems or to vary the sound quality or volume based on the message being delivered by performers."). So, while the First Amendment emphatically prohibits "unbridled" permitting discretion, this concern is not present here because section 15.4.10.8(A)(5)(b)(2) does not appear to grant City officials *any* discretion to permit compliant "display[s]" of temporary signs by 501(c)(3) organizations.

Hamman's argument also rests on the mistaken premise that a permit for a 501(c)(3) nonprofit organization disables the general prohibition on signs in the public right of way. If section 15.4.10.8(A)(5)(b)(2) operated this way, Hamman might have a compelling argument that the City's permitting discretion is too broad. But there is no indication that it works that way. The reason section 15.4.10.8(A)(5)(b)(2) provides no objective permitting standards for

signs to be placed in the public right of way is because the Ordinance prohibits *all* temporary signs from being placed in the public right of way. In other words, while permits "shall be issued" for "display[s]" of temporary noncommercial signs, a permit does not deactivate the general prohibition. "[T]he comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive." *Hill*, 530 U.S. at 731.

The text of the Ordinance supports its complete ban on signs in the public right of way, as does the City's consistent historical interpretation of it. Witness after witness at the evidentiary hearing testified that Carbondale prohibits *all* sings in the public right of way. Lenzini removes signs around Carbondale for this very reason "pretty much daily." Thus, the permitting process for temporary noncommercial signs belonging to 501(c)(3) nonprofit organizations does not support Hamman's vagueness argument. *See Kissick v. Huebsch*, 956 F. Supp. 2d 981, 992-93 (W.D. Wis. 2013) (permitting rules that gave police no discretion to favor one permit application over another did not violate First Amendment).

For these reasons, the Court is satisfied that the Ordinance is not unconstitutionally vague.

2. *Speech in a Public Forum*

Public forums are critical to First Amendment activity because "by long tradition or by government fiat [they] have been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). Public streets are "quintessential public forums" where "the rights of the state to limit expressive activity are sharply circumscribed." *Id.* Here, the City correctly recognizes that the area outside of CHOICES, where Hamman conducted his missionary work and wanted to place signs in the ground, is a public forum. It is a grassy area, owned by the City, that runs parallel to a public street and sidewalk. But

this does not leave the City powerless to regulate speech there. The government may restrict the time, place, and manner of speech in a public forum if the restriction is (1) content-neutral; (2) narrowly tailored to serve a significant government interest; and (3) leaves open ample alternative channels of communication. *Ward*, 491 U.S. at 791.

Content neutrality turns on "whether the government has a adopted a regulation of speech because of disagreement with the message it conveys." *Id.* To be content-neutral, a law may not restrict speech "because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quotation marks omitted). Thus, if a regulation "applies to particular speech because of the topic discussed or the idea or message expressed," it is content based. *Id.*

The text of the Ordinance does not concern itself with content. It states that "*[n]o sign* may be erected on, suspended over, or encroach upon the public right of way, except as provided for under section 17-1-5 of this code (dealing with "encroachments"), or be located so as to obstruct the visual clearance needed for safe vehicle or pedestrian traffic." Code § 15.4.10.8(A)(1) (emphasis added). This is a comprehensive ban of *all* signs in the public right of way. No exception is made for signs displaying a certain message. The Ordinance's general prohibition on signs in the public right of way is thus agnostic to content. *See Weinberg v. City of Chicago*, 310 F.3d 1029, 1037 (7th Cir. 2002).

Of course, the general prohibition on signs in the public right of way is not a ban on everything under the sun. The Ordinance exempts permitted "encroachments" under section 17-1-5 of the Code. And to that end, four types of encroachments may be permitted in a public right of way: (1) continuous encroachments that are "not readily movable" and may be "permanent" or "quasi-permanent;" (2) temporary encroachments that may be "readily

moved" and are intended to be placed in the public right of way for less than one year; (3) sidewalk restaurant encroachments; and (4) residential block party encroachments. *Id.* § 17-1-5(A)(1). A straightforward reading of these encroachment descriptions shows that they have little (if anything) to do with signs or their content. As Snyder explained, the encroachment exception accommodates "specific" events and activities such as "street parties, sidewalk restaurants, and temporary sidewalk sales." None of this suggests a content-based restriction. "Allowing some forms of expression while denying others does not signify a violation of the First Amendment." *Weinberg*, 310 F.3d at 1036. And a comprehensive restriction on a certain type of speech does not transform itself into a content-based one because it exempts a different form of expression. *Id.* The Ordinance is thus content neutral.

The next prong of the time, place, and manner analysis—whether the Ordinance is narrowly tailored to serve a significant government interest—is hotly contested. The Ordinance, in combination with other sign regulations in the Code, seeks to promote "public safety on city streets by limiting the unnecessary distraction of the motorist caused by signs," and to "protect the general public from damage and injury which may be caused by the faulty and uncontrolled construction and use of signs within the city." Code § 15.4.10.2(A)-(B). These regulatory goals reflect significant government interests. *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507-08 (1981).

The more difficult question is whether the Ordinance is narrowly tailored to achieve these interests. "[T]he requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799. Under this standard, the government retains some flexibility as it is not required to choose "the least restrictive method" to achieve its goals.

*Weinberg*, 310 F.3d at 1040. And although there must be some evidence of the problem the government seeks to address, this requirement is "not overwhelming." *DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 829 (7th Cir. 1999).

Here, evidence of how temporary signs create traffic hazards is sparse, but it does exist. Hamman himself acknowledges that his signs can pose a safety hazard. He testified about the risks posed by temporary signs in Carbondale in particular: "If you are ever out on the sidewalk in Carbondale, it can be pretty windy. So[,] I have seen signs that have been blown across the street, they blow into traffic. I don't want my signs hitting somebody or something if I am talking to somebody up close or talking to somebody in their vehicle. I don't want that to happen. Again, I don't want it to blow into the road or cause an accident." Hamman, of course, offered this testimony to support his preference to place signs in the ground, rather than carry them (he deemed this to be the safer alternative). But whatever the reason for Hamman's testimony on this point, it is evidence of a traffic risk created by temporary signs near a roadway—especially his experience "see[ing] signs that have been blown across the street, they blow into traffic."

The problem the Ordinance addresses also is one that exists as a matter of common sense. Of course, common sense *alone* is not enough to carry the government's burden of developing evidence of its need for a speech restriction. *Horina v. City of Granite City*, 538 F.3d 624, 633 (7th Cir. 2008). This is so because governmental justifications for speech restrictions based on common sense "can all-too-easily be used to mask unsupported conjecture." *Id.* But this does not mean that common sense has no role to play here. *Id.; see also Anderson v. Milwaukee Cnty.*, 433 F.3d 975, 978 (7th Cir. 2006) ("Common sense must not be and should not be suspended when judging the constitutionality of a rule or statute."). With these

cautionary principles in mind, it is apparent that the proliferation of temporary signs near vehicular roadways can distract drivers and lead to signs ending up in the street, as the Ordinance's purpose acknowledges. *See Adams Outdoor Advert. Ltd. P'Ship v. City of Madison*, 56 F.4th 1111, 1120 (7th Cir. 2023) (holding in time, place, and manner analysis that "the connection between billboards and traffic safety is too obvious to require empirical proof."); *Luce v. Town of Campbell*, 872 F.3d 512, 517 (7th Cir. 2017) (similar); *cf. Grand Chute*, 915 F.3d at 1126 (affirming district court's finding that local sign ordinance was narrowly tailored to meet stated goal: "the banning of anything on the public right-of-way that might obstruct vision or distract passing drivers."). So, Hamman's recognition of the risks his signs posed, especially in windy conditions, along with the City's commonsense judgments about these risks generally, is evidence of the City's need for the Ordinance. *See Metromedia*, 453 U.S. at 508-09 (deferring to "accumulated, common-sense judgments of local lawmakers" that billboards create traffic hazards notwithstanding "meager record" on this point).

The fact that the City chose to ban the placement of signs in the ground and not people carrying them is a matter of legislative judgment. Hamman questions this judgment because, as he sees it, there is no way his "small signs" obstruct traffic during the "very brief[]" periods when they are displayed. (Doc. 8 (Pl. Mot. for Prel. Inj., p. 13)). Thus, he contends that the Ordinance burdens far more speech than necessary. But "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S. at 800. Here, the City decided to impose a wholesale ban on signs that are "erected on, suspended over, or encroach upon" the public right of way. It did not prohibit people from

carrying signs—as Bob, Darlene, Pastor Sparks, and Pastor Andy did after they were asked to remove theirs from the ground. The Ordinance thus burdens one form of speech, while leaving open another. And for that reason, it is narrowly tailored to reduce traffic hazards from signs in the right of way.

Hamman does not appear to contest the third element of the time, place, and manner analysis: the availability of alternative channels of communication. Lenzini, Officer Tyner, Sergeant Murray, Lieutenant Lattan, and even Hamman himself testified that there was no restriction on his ability to protest abortion while carrying signs. Indeed, of the five people who showed up outside of CHOICES to share messages opposing abortion on April 16, 2025, Hamman was the only one who chose *not* to do so—Bob, Darlene, Pastor Andy, and Pastor Sparks did, and they did so without interference from the City, as Hamman acknowledges. So, not only was an alternative mode of communication offered, several people made use of it on the spot. And while this alternative did not align with Hamman's preferred demonstration method, "[a]n adequate alternative does not have to be the speaker's first choice" to pass constitutional muster. *Weinberg*, 310 F.3d at 1041. Accordingly, the Ordinance left open ample alternative channels of communication. *See Peterson v. Village of Downers Grove*, 150 F. Supp. 3d 910, 923-24 (N.D. Ill. 2015) (local ordinance that prohibited *painted* wall signs but permitted other forms of signs left open ample alternative channels of communication), *aff'd sub nom.*, *Leibundguth Storage & Van Serv., Inc. v. Village of Downers Grove*, 939 F.3d 859 (7th Cir. 2019).

With that, the Court concludes that the Ordinance reflects a permissible time, place, and manner restriction on speech in a public forum consistent with the First Amendment.

### 3.  *Viewpoint Discrimination*

Hamman's final argument advances a theory of viewpoint discrimination based on the City's "policy of inaction" towards signs that share messages other than his. (Doc. 8 (Pl. Mot. for Prel. Inj., p. 15)). He submitted photos of three temporary signs he found throughout Carbondale which, he believes, were placed in the public right of way and not removed the way his were. From there, he contends that the City engaged in a "targeted campaign of enforcement" against his signs based on their anti-abortion messages.

"Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector and Visitors of Univ. of Virginia.*, 515 U.S. 819, 828 (1995). A law that "reflects the Government's disapproval of a subset of messages it finds offensive" is "the essence of viewpoint discrimination." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) (quotation marks omitted). Viewpoint discrimination, in turn, is "an egregious form of content discrimination" under the First Amendment. *Rosenberger*, 515 U.S. at 829. Accordingly, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*

"[E]ven a neutral ordinance can violate the First Amendment if it is enforced selectively, permitting messages of which the Town approves while enforcing the ordinance against unions and other unpopular speakers." *Grand Chute*, 915 F.3d at 1123 (citation modified). So, "when someone challenges a law as viewpoint discriminatory but it is not clear from the face of the law which speakers will be allowed to speak, he must show that he was prevented from speaking while someone espousing another viewpoint was permitted to do so." *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014). The question here is whether Defendants

enforced the Ordinance selectively to prohibit Hamman's message opposing abortion, while, at the same time, taking no action against speakers and signs sharing different messages.

Lenzini testified that he removes signs that do not comply with the Ordinance "pretty much daily." He estimates that he and his colleagues remove around 150 to 200 signs per year for that reason; not surprisingly, they are especially busy during political campaign seasons. And he insists that he has *never* removed a sign based on its content or viewpoint. While this may be a self-serving assertion by a named defendant in this litigation, other witnesses corroborated Lenzini's testimony. Lieutenant Lattan testified that, in his experience, he has "never seen or been aware of our police department or the City removing signs based on their content other than when they were in violation of the city ordinance." Sergeant Murray, for his part, suggested that the City may disagree with Hamman's anti-abortion message on "ideological[]" grounds, and that "they [the City] would be all for it" if his message were more "left" leaning. But he acknowledged that this was his "personal opinion," and that, as a matter of practice, City officials "take everything out of there that's on the City's right-of-way."

This testimony must be weighed against Hamman's submission of five photos purportedly showing three different signs (without anti-abortion messages) in the public right of way. Hamman acknowledges that he does not know how long these signs had been in the public right of way when he photographed them. This, then, leaves open the possibility that the City had not had time to remove them—something that, Lenzini explained, can happen from time to time. Surely, if these signs had been placed in the public right of way with the City's permission, or been left there after the City became aware of them, such evidence would support Hamman's claim of selective enforcement. But the record reveals no

such evidence. Hamman's photos are anecdotal evidence of signs in the public right of way, with no indication of how long they had been there. On the other hand, Lenzini and officers of the Carbondale Police Department are likely to be familiar with the City's enforcement practices. They testified consistently that signs are removed when they do not comply with the Ordinance, regardless of their content. The Court credits this testimony as evidence of the City's viewpoint neutral enforcement.

"[A] municipality is entitled to implement a nondiscriminatory ban on *all* private signs from the public roads and rights-of-way." *Id.* (emphasis in original). That is what Carbondale appears to have done here—in word and deed. The Seventh Circuit reached the same conclusion under similar circumstances in *Grand Chute*. There, a labor union was forced to remove a large inflatable rat from a protest site because it was in the public right of way in violation of a local sign ordinance. *Id.* at 1124. The union offered photographs of 90 claimed violations of the ordinance (which had not been addressed), arguing that they showed the town's selective enforcement against its pro-labor message. *Id.* at 1125. The town's code enforcement officer admitted that he may not have removed every non-compliant sign throughout the town but also explained that he had never seen a violation of the sign ordinance and failed to enforce it. *Id.* As a result, the code enforcement officer testified that he removed approximately 150 noncompliant signs per year. *Id.* The district court credited this testimony and found that it supported the town's "even-handed enforcement" of its sign ordinance. *Id.* at 1126. The Seventh Circuit agreed, finding that "no evidence indicated that [the code enforcement officer] was anything but systematic in his enforcement of the . . . [o]rdinance." *Id.*

*Grand Chute* extends comfortably to this case. Lenzini and his team remove hundreds

of signs per year to promote compliance with the Ordinance. Lenzini himself does so "pretty much daily." Sometimes, a sign may remain in the public right of way for up to "a couple of days"—for instance, if it is placed there over the weekend. The three signs Hamman personally observed that may have violated the Ordinance and gone unaddressed do not indicate a discriminatory enforcement practice because there is no evidence that they were placed in the public right of way with the City's permission. Rather, like in *Grand Chute*, the evidence shows "even-handed enforcement." And for that reason, the Court respectfully disagrees with Hamman's argument that Defendants engaged in viewpoint discrimination.

For these reasons, the Court finds that Hamman is not likely to succeed on the merits of his First Amendment claims. Although this is generally dispositive of the need for injunctive relief, *Barland*, 751 F.3d at 830, the Court will briefly address the remaining factors that bear on the preliminary injunction inquiry.

B.  Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable harm." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Although the Court has determined that Hamman is unlikely to succeed on the merits of his First Amendment claims, it must consider the possibility of harm he may suffer from the City's continued enforcement of the Ordinance. The Seventh Circuit employs a "sliding scale" approach in this balancing inquiry: "the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018) (citation modified). Thus, because Hamman is unlikely to succeed on the merits, he must make a strong showing of irreparable harm. The Court is not persuaded that he has done so.

As discussed, Hamman was and remains free to return to the area outside of CHOICES, carry his signs, and protest abortion. Nothing in this Order prevents him from conveying his message in this way. All he is prohibited from doing is placing his signs in the ground. So, while Hamman may experience *some* harm without injunctive relief, he has not shown the kind of irreparable harm that would justify such an extraordinary remedy. *See Weinberg*, 310 F.3d at 1041 (available alternative means of communication does not have to be speaker's "first choice.").

    C.  <u>Balance of Equities & Public Interest</u>

When the government is the responding party, considerations of the balance of equities and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, because Hamman has not shown a likelihood of success on the merits, the balance of equities must tip decisively in his favor. *Cassel v. Snyders*, 458 F. Supp. 3d 981, 1003 (N.D. Ill. 2020). The Court is not convinced that it does. The Ordinance is the product of work done by representatives of the citizens of Carbondale. The City thus has an interest in enforcing it to achieve its stated goals of traffic safety and the avoidance of injuries to members of the public. And because the Ordinance is likely constitutional, its continued enforcement is in the public interest.

CONCLUSION

For these reasons, Hamman's Motion for a Preliminary Injunction (Doc. 8) is **DENIED**.

    **IT IS SO ORDERED.**

    **DATED: January 21, 2026**

                                        **NANCY J. ROSENSTENGEL**
                                        **United States District Judge**

Case: 26-1133     Document: 13     Filed: 03/20/2026     Pages: 111

**15.4.10.8: TEMPORARY SIGNS PERMITTED (EXCEPT IN THE BPR DISTRICT):**

In addition to the signs permitted in each district as established in sections 15.4.10.5, 15.4.10.6, and 15.4.10.7 of this chapter, the following signs are also permitted subject to the conditions established in this section:

A. General Provisions For All Temporary Signs:

1. No sign may be erected on, suspended over, or encroach upon the public right of way, except as provided for under section 17-1-5 of this code (dealing with "encroachments"), or be located so as to obstruct the visual clearance needed for safe vehicle or pedestrian traffic.

2. No sign may be attached to utility poles, trees on private property, trees on public right of way, streetlight poles, street or traffic signs nor fire hydrants.

3. No temporary sign shall be erected within twenty feet (20') of the curb line of any adjoining street surface except those located in the BPR district in which case the temporary sign shall be flush mounted to the building. No sign shall be erected so as to obstruct the visual clearance needed for safe vehicular and pedestrian traffic.

4. If the sign is not communicating a message which is temporary in nature, it shall be required to meet the requirements of sections 15.4.10.5, 15.4.10.6, and 15.4.10.7 of this chapter, permanent signs.

5. Temporary signs shall be regulated subject to the following:

a. Temporary Commercial Signs: To advertise goods or services for economic gain:

(1) Temporary signs shall be limited to thirty two (32) square feet. (Ord. 2017-17)

(2) Each individual business will be allowed to display a temporary sign for a period not to exceed thirty (30) consecutive days. Each business is allowed a total of one hundred (100) calendar days to display temporary signs. A new permit shall be issued each time the temporary sign is to be displayed, unless authorized under the original permit. (Ord. 2014-50)

(3) Maximum height: Six feet (6'), if freestanding.

(4) Commercial signs prohibited: Includes signs that are carried, waved or otherwise displayed by persons either on public rights of way or in a manner visible from public rights of way. This provision is directed toward such displays intended to draw attention for a commercial purpose, and is not intended to limit the display of banners, flags or other signage by persons participating in demonstrations, political rallies, and similar events. (Ord. 2013-31)

(5) Pennants and streamers may be displayed for a maximum of one hundred fifty (150) days per calendar year with a limit of thirty (30) consecutive days per event. (Ord. 2017-08)

(6) No temporary sign may be illuminated.

(7) Banners suspended from a building, with a total square footage of fifty (50) square feet are permitted for periods up to thirty (30) consecutive days per event, with no limit on the number of events.

b. Temporary Noncommercial Signs:

(1) Temporary signs shall be limited to thirty two (32) square feet.

(2) Each individual 501(c) not for profit organization will be allowed to display a temporary sign for a period not to exceed thirty (30) consecutive days. Each organization is allowed a total of sixty (60) calendar days to display temporary signs. A new permit shall be issued each time the

**SA.37**

Case: 26-1133    Document: 13    Filed: 03/30/2026    Pages: 111

temporary sign is to be displayed. Permit fees may be waived with the approval of the administrative official.

        (3)   Temporary signs need not be located on the site for which the event is to take place.

   B.   Removal Of Temporary Signs: If a temporary sign relates to an event, such sign shall be removed within five (5) days after the conclusion of the event. (Ord. 2013-31)

**SA.38**

BODYCAM FOOTAGE

OF

CIVIL RIGHTS EVENT

at CHOICES Carbondale Center for Reproductive Health

600 N. Giant City Rd, Carbondale, IL 62902

Brandon Hamman v. City of Carbondale, et al.

S.D. Il. No. 3:25-cv-00736

Wednesday, April 16, 2025


American Center for Law and Justice

201 Maryland Avenue

Washington, D.C. 20001

(800) 342-2255


Reported by:    Simone Hines

JOB No.: 7522070

Veritext Legal Solutions
346-293-7000

SA.39

MS. BLUMENSTOCK:  Okay.  He says he's going to take the signs up.  I said, "Is this something new?"

MR. HAMMAN:  Why is that?

MR. LENZINI:  They're on the city right-of-away.

MR. HAMMAN:  So they're on the right-of-way?

MR. LENZINI:  Yes.

MR. HAMMAN:  So there's a there's -- there's an ordinance for that -- for signs.  Right?  Is that what you're referring to?

MR. LENZINI:  There's an ordinance for signs.

MR. HAMMAN:  Inside that ordinance there's two sections in there that say (crosstalk) --

MR. LENZINI:  I just checked it.

MR. HAMMAN:  -- that say that if you're demonstrating -- that if you are demonstrating, you're allowed -- that it does not apply to people demonstrating in any way --

MR. LENZINI:  I just talked to the city attorney and --

MR. HAMMAN:  That's fine.

MR. LENZINI:  -- he told me that --

MR. HAMMAN:  Well, they're not my signs.  I'm just telling you, you know --

Page 3

**SA.40**

MR. LENZINI:  I'm going to pull them now.

MR. HAMMAN:  Well, you -- no, they don't belong to me, but they belong -- he's coming back.

MS. BLUMENSTOCK:  I'll -- I'll get -- I'll get their card.

MR. HAMMAN:  Sir?  Sir.  Listen.  Look here. Look.

MR. LENZINI:  Call the city attorney and pull the signs right now (inaudible).

MR. HAMMAN:  Here.  I want to show you something.  I want to show you something.  Before you get upset, I want to show you something.

MR. LENZINI:  I'm not upset, sir.

MR. HAMMAN:  Yeah, you are.  We're trying to have a conversation and you're getting mad and walking off.  I just said they don't belong to me because I'm not the one that put them up.  I'm just explaining to you what the code -- what your own code section says.

MR. LENZINI:  I just talked to the city attorney.  He told me the signs are in violation, and it -- when I pull them -- I'm supposed to pull them.

MR. HAMMAN:  Look here.

MS. BLUMENSTOCK:  I've got his card.

MR. HAMMAN:  "Commercial signs prohibited, including signs that are carried, waved, otherwise

Page 4

displayed" -- so forth and so on.  "This provision is directed towards such displays intended to draw attention for commercial purposes.  Not intended to limit the display of banners, flags, or other signage by persons participating in demonstrations, political rallies, or similar events."

MR. LENZINI:  Free baby supplies is not a demonstration.

MR. HAMMAN:  What's that?

MR. LENZINI:  Free baby supplies is not a demonstration.

MR. HAMMAN:  Yes, it is.  We're absolutely demonstrate -- yes, it is.  Okay, fine.  Here.  I'll put one out for you.  That is a demonstration, then.

Don't touch my sign.  I'm demonstrating against abortion.  I have a right to do that.

MR. LENZINI:  No, you don't.

MR. HAMMAN:  Yes, I do.  I'm demonstrating that babies are murdered in this place.

MR. LENZINI:  You have five minutes to pull the signs or I'm going to have a police officer come out here.

MR. HAMMAN:  You can have the police come on out.  Don't waste the five minutes.

MS. BLUMENSTOCK:  A baby's life is precious.

Page 5

MR. HAMMAN:  Sir, I'm demonstrating against abortion.  This is my First Amendment right to free speech.  Free exercise of religion.  And I absolutely will have these signs up.  I've showed you the code section.

MR. LENZINI:  And so he's (crosstalk) sign.

MR. HAMMAN:  I'm demonstrating against abortion.

MR. LENZINI:  He says he's demonstrating against abortion.  He says he has the right to have the signs on the right-of-way.

MR. HAMMAN:  And I showed you the ordinance that allows that.

MR. LENZINI:  I talked to Jamie, and Jamie assured me that they could not be there.  They pulled some signs up and put two more out.

MS. BLUMENSTOCK:  Take this down.

MR. OWENS:  We had to take ours down.

MS. BLUMENSTOCK:  We had to take ours down. (Inaudible) it had to show demonstration -- a demonstration.  He said ultrasound --

MR. OWENS:  Yeah.

MS. BLUMENSTOCK:  -- wasn't a demonstration.

MR. OWENS:  He's -- he's saying it's First Amendment privilege, is what he's saying.

Page 6

OFFICER MARK:  Is that 20 feet?

MR. HAMMAN:  Okay.  So the first one says no -- that would -- that would obstruct right-of-way the vehicle or pedestrian traffic, which they're not. They're out of -- like, if you read that full number one -- you just read it to me.  "No sign may be erected or suspended over or encroached upon the public right-of-way (crosstalk) -

OFFICER MARK:  Right.

MR. HAMMAN:  -- except as provided --

OFFICER MARK:  "Encroach upon."  Right?

MR. HAMMAN:  -- visual clearance needed for safe vehicle or pedestrian traffic."  So it's not violating pedestrian traffic.

OFFICER MARK:  And he cited those?

MR. HAMMAN:  Yeah.

OFFICER MARK:  Yeah.  And I'm just rattling off what he's saying.

MR. HAMMAN:  Sure.

OFFICER MARK:  And number three, I think seems to fit most clearly.

MR. HAMMAN:  No -- the right to within 25 -- "20 feet of the curb line of adjoining street except those located in the BPR district."  So "No signs shall be erected to obstruct the visual clearance."

Page 57

**SA.44**

So this has to do with vehicle traffic.

MR. LENZINI:  I'm on the board with Southern (inaudible).

MR. HAMMAN:  "If the sign is not communicating a message, it shall be required (inaudible) shall be regulated -- commercial signs."

MR. LENZINI:  Sad.  It's sad.

MR. HAMMAN:  Okay.  So you're saying if I move it 20 feet in, it's safe?  It's fine?

OFFICER MARK:  That would be on their property.

MR. HAMMAN:  No, that's -- that's all right away all the way down through here.

OFFICER MARK:  It is?

MR. HAMMAN:  Yep.  We can walk all the way down through there.  That whole -- that whole section of grass, basically, from the fence to the road. Public.  And they would have to complain.

OFFICER MARK:  And they would.

MR. HAMMAN:  Yeah, but I've been putting them up here by this light.

PASTOR SPARKS:  So you're saying if you put it 20 feet in that way, or it's got to be 20 feet from the -- from the public sidewalk?

OFFICER MARK:  I would say 20 feet

Page 58

(crosstalk) --

PASTOR SPARKS:  From the drive?

OFFICER MARK:  -- from the right-of-way here and the sidewalk.

PASTOR SPARKS:  So basically --

OFFICER MARK:  And then I'm sure they'll still have the problem with it saying that you can't put it there but (inaudible).

MR. HAMMAN:  Basically from the corner, Jared, if we (crosstalk) --

PASTOR SPARKS:  (Inaudible) talking about if we move (inaudible) --

MR. HAMMAN:  Yeah.  Basically, I've got a three-foot stride.

OFFICER MARK:  One, two -- that was probably, what?  Three feet?

PASTOR SPARKS:  That's 20, and then 20 this way.  So we're looking at probably about right here is what we're looking at.  It really is all public.

MR. HAMMAN:  It's all the public right away.

PASTOR SPARKS:  Do you have an aerial?

MR. HAMMAN:  Been out here, what? (crosstalk) --

OFFICER MARK:  No.  I mean, I can look at the Jackson County flat map.

Page 59

PASTOR SPARKS:  Yeah.  You can see it all the way.

MR. HAMMAN:  Sir, I -- just to be frank with you.  And I could even show you.  Well, I don't have the video today.  But I've put them right there at the edge of that fence since the fence fell down so the people inside could see that we'll adopt babies and that they can get abortion pill reversal --

OFFICER MARK:  Okay.

MR. HAMMAN:  -- and they've not called you guys (inaudible).

PASTOR SPARKS:  The reason is because the -- the nature of the songs.  People are okay with signs that, "We'll adopt a baby."  They're not okay with it.

OFFICER MARK:  I guess that's the hill they're willing to die on here.

MR. HAMMAN:  Well, I still would argue that -- and you know, with -- with respect, that -- that we have a -- we have freedom of speech.  And yeah, you may have a sign ordinance but, you know -- you took an oath to the Constitution -- you know that laws and ordinances don't trump the Constitution.

OFFICER MARK:  Okay.

MR. HAMMAN:  Right?  And so, an ordinance that would violate the ability to -- for exercising

Page 60

SA.47

freedom of speech, freedom of religion --

MR. LENZINI:  But --

MR. HAMMAN:  -- then that would be a violation of the Constitution.  Therefore, that law would be unjust to --

OFFICER MARK:  Enforce.

MR. HAMMAN:  -- enforce.  Thank you.  Right.

OFFICER MARK:  I get what you're saying.  I'm not disagreeing with you.  (crosstalk)

MR. LENZINI:  You can't -- you can't (inaudible) right-of-way at all.

MR. HAMMAN:  I know.  I know you're not.

OFFICER MARK:  But here's the problem.  If -- okay.  The city, has an entity, has the right to say, "We're allowing things on our property or not."  Certain things.

MR. HAMMAN:  Sure.

OFFICER MARK:  Obviously, you could -- if you held these and walked around, they can't say anything about it.

MR. HAMMAN:  What's the difference?

OFFICER MARK:  What's the difference?  Because you're planting something on their property, I guess, even though it's temporary.

MR. HAMMAN:  It's temporary.

Page 61