# No. 26-1133

# In the United States Court of Appeals

# For the Seventh Circuit

---

Mark Brandon Hamman,

Plaintiff - Appellant

v.

City of Carbondale, Illinois, an Illinois Municipal Corporation; Leonard Jamie Snyder, in his individual and official capacities; John Lenzini, in his individual and official capacities,

Defendants - Appellees

---

**On Appeal from**
United States District Court for the Southern District of Illinois
3:25-cv-00736-NJR

---

**APPENDIX OF APPELLANT
MARK BRANDON HAMMAN**

---

Geoffrey R. Surtees
AMERICAN CENTER FOR LAW & JUSTICE
PO Box 60
New Hope, KY 40052
Tel: (502) 827-0951

Nathan J. Moelker
   *Counsel of Record*
Stuart J. Roth
Christina A. Compagnone
Liam R. Harrell
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, DC 20002
Tel: (202) 641-9160
Fax: (202) 546-9309
Email: nmoelker@aclj.org
*Attorneys for the Plaintiff-Appellant*

## TABLE OF CONTENTS

| Item | Description | Page |
|------|-------------|------|
| A.1 | City of Carbondale, Illinois, Code of Ordinances § 17-1-5 — Encroachments | A.1 |
| A.2 | City of Carbondale, Illinois, Code of Ordinances § 15.11.4 — Zoning Definitions | A.7 |
| A.3 | City of Carbondale, Illinois, Code of Ordinances § 17-12-2 — Utility Easements | A.22 |
| A.4 | Preliminary Injunction Hearing Transcript (Aug. 11–13, 2025) (Doc. 47-48) (complete, 2 volumes, consecutively paginated) | A.26 |
| A.5 | Notice of Appeal, *Hamman v. City of Carbondale*, No. 3:25-CV-00736-NJR (S.D. Ill. Jan. 23, 2026) (Doc. 51) | A.233 |

**17-1-5: ENCROACHMENTS:**

A. Permit Required:

   1. A person or group of persons may be granted the privilege of encroaching upon any public highway, street, sidewalk, alley, or publicly owned common area (hereinafter referred to as public right of way) of the city by the issuance of an encroachment permit. There shall be four (4) types of encroachment permits:

     a. Continuous Encroachment Permit: That issued for encroachments which, by their nature, are not readily movable and which reflect an intent by the holder of the permit of a permanent or quasi- permanent status.

     b. Temporary Encroachment Permit: That issued for encroachments which may be readily moved and which are intended by the holder of the permit to be of a duration of less than one year.

     c. Sidewalk Restaurant Encroachment Permit: That issued for sidewalk restaurant encroachments which are intended by the holder of the permit for a duration of one year.

     d. Residential Block Party Permit: That issued for encroachments which are social events held within a residential block zoned R1 in which at least fifty percent (50%) of the property is zoned residential and is held for a period less than twenty four (24) hours.

   2. An encroachment permit, either continuous or temporary, shall only be issued for the purpose of public convenience or public necessity. The issuance of the encroachment permit shall grant the person the privilege of using the right of way for the purposes set forth in said permit, subject to the terms and conditions set forth in the permit and this section. This permission to encroach upon public right of way granted by the city is only a license to use the property in question; it is neither an easement nor a conveyance of real property; it may be revoked by the city at any time for any reason without compensation to the permit holder. After notice of the revocation, the permit holder shall immediately remove said encroachment from the city right of way. Prior to being granted an encroachment permit, a person shall make an application on a form provided by the city. The applicant must comply with the requirements of subsection B of this section, unless such compliance is waived by the city council. No continuous encroachment permit shall be issued unless first approved by a majority of the city council members then holding office. No temporary encroachment or sidewalk restaurant encroachment permits shall be issued unless first approved by the city manager.

B. Application For Permit; Fee Required: Any person or group seeking the privilege of encroaching upon any public right of way in the city shall file an application for an encroachment permit, specifying whether the permit sought is continuous or temporary, with the city manager or his designee. The application shall include the following:

   1. A detailed map of the proposed location.

   2. A description of the proposed encroachment including nature of construction, material to be used, the exact dimensions, a drawing of the encroachment, an explanation of any utility requirements and location of such utilities.

   3. The name and address of the person or group that will be responsible for the operation and/or maintenance of the encroachment; if the person or group is a corporation, the applicant shall list the names and addresses of all officers and the registered agent of the corporation.

   4. A certificate of insurance indicating the applicant has purchased and maintains public liability and property damage insurance in an amount acceptable to the city to secure payment for any loss or damage caused by the encroachment. The certificate of insurance shall name the city as an additional insured.

   5. A statement providing that in consideration of receiving the encroachment permit, the applicant will pay any and all expenses, including compensation for damages, caused by the encroachment and that the applicant will indemnify and hold harmless the city from any action, proceeding or claim of liability asserted against the city resulting from the encroachment or from the issuance of the encroachment permit.

   6. The period of time for which the encroachment permit is sought.

   7. If the application is for the continuous encroachment permit, a fee of one hundred dollars ($100.00), except that businesses within the downtown entertainment district as defined by title 2 of this code, such fee shall be waived.

   8. If the application is for the sidewalk restaurant encroachment permit, a fee of one hundred dollars ($100.00) per year shall be paid, except that businesses within the downtown entertainment district such fee shall be waived.

C. Recommendation By City Manager: Upon submission of a complete application and the payment of the fee, the city manager or his designee shall examine the application and investigate the proposed encroachment to determine whether the proposed encroachment is consistent with this code and all other applicable law. With respect to an application for a continuous encroachment permit, the city manager shall make a recommendation to the city council as to whether the permit should be issued or denied.

D. Conditions For Approval: Upon receiving the recommendation of the city manager, the city council may grant a continuous encroachment permit subject to any conditions or terms it deems appropriate to protect the public health, safety, or welfare including, but not limited to, the following:

   1. The encroachment shall be constructed, operated, and maintained in a clean, safe, and sanitary manner, and kept free from trash, weeds or other debris.

**A. 1**

2. The encroachment shall be designed, constructed, and maintained without the presence of any overhead wiring; any and all wiring required or utilities, including electric and telephone wiring, shall be placed underground insofar as it is reasonably possible.

3. The specific time at which the encroachment permit will expire.

4. The prohibition of any relocation or design modification of the encroachment without prior approval of the city.

Any continuous encroachment permit may be amended or revoked by the city council following receipt of a recommendation from the city manager.

E. Temporary Encroachment Permit: The city manager is authorized to issue a temporary encroachment permit for the following events or activities:

1. Banners/Decorations: The city manager may issue a temporary encroachment permit to a person, group or organization for the purpose of displaying banners or other decorations, upon receipt of an application and a nonrefundable application fee in the amount of ten dollars ($10.00).

a. The application shall include the following information:

(1) The applicant shall be a unit of state or local government or a not for profit organization whose primary or secondary purpose is the promotion of the arts, cultural activities or tourism. The design and/or content of the banners or decorations shall be limited to that which promotes the arts or a significant cultural or tourism related activity.

(2) The duration of time which the encroachment shall be in effect, the placement and/or location of the banner or other decoration, and the manner in which the encroachment will promote the arts, cultural activities or tourism.

(3) In addition to the above information, the application shall include all information required under subsections B1 through B6 of this section.

Upon submission of a complete and accurate application, and payment of the application fee, the city manager, or his designee, shall examine the application and investigate the proposed encroachment to determine whether the proposed encroachment is consistent with this code and all other applicable laws. The city manager may grant a temporary encroachment permit subject to any conditions or terms he deems appropriate to protect the public health, safety or welfare.

b. The authorized encroachment of a banner or other decoration shall comply with the following conditions, or be subject to immediate revocation by the city manager:

(1) The applicant shall pay a fee to the city for the installment and removal of banners. This service fee shall be on a per pole or banner/decoration basis and shall be adjusted from time to time to cover the city's cost to perform the service.

(2) The size, design, location and duration of the banners/decorations shall be subject to the approval of the city manager, who shall deny a permit for any banner or decoration that is not in the best interest of the city of Carbondale.

(3) The banners and/or decorations shall meet the following standards at all times during the authorized encroachment:

(A) The banners/decorations shall be designed/constructed to be installed on utility poles or other locations approved by the city and that there shall be no more than two (2) banners/decorations per pole/location;

(B) The surface area of any banner or decoration not to exceed twenty five (25) square feet per banner or decoration;

(C) There shall be a minimum of sixteen feet (16') of clearance between the banner or decoration and the public right of way;

(D) The location of the proposed encroachment shall be within or bounded on at least one side by one of the following zoning districts: SB secondary business; BPL planned business; BWA wholesale and automotive; BPR primary business; LI light industrial; GI general industrial;

(E) The size, design and method of construction, of any banner or decoration shall be approved by the city manager and shall be in accordance with any and all city, state and federal laws and regulations. The banners or decorations shall be picked up by the applicant after removal by the city. The city is not responsible for damages to the banner/decoration and if a banner/decoration requires maintenance or repair, the applicant will be responsible for making the repair. All removal and reinstallation shall be done by the city for which the applicant will be charged a service fee;

(F) Should the city revoke the encroachment permit, the applicant will remove the banner or decoration within three (3) working days or else the city shall remove the banner/decoration at the applicant's expense;

(G) The method of construction, maintenance and replacement of any banner or decoration shall be approved by the city and shall be in accordance with any and all city, state and federal safety laws and regulations.

c. The police chief, fire chief, and development services director shall make or cause to be made sufficient inspections to ensure the permit holder complies with this section and all other provisions of this code.

d. The city manager may deny, amend or revoke a temporary encroachment permit for banners or other decorations if the permit would be inconsistent with the standards set forth herein, or is determined not to be in the best interests of the

A. 2

2.   Sidewalk Sales: The city manager may issue a temporary encroachment permit for a sidewalk sale to a person, group or organization who desires to sell, offer to sell, or display its goods and merchandise upon the public right of way immediately adjacent to its current operated retail business that is located in one of the zoning districts set forth herein. The application shall be made in writing to the city manager at least fourteen (14) days prior to the proposed date(s) of the sidewalk sale. A nonrefundable application fee in the amount of ten dollars ($10.00) shall be submitted along with the application to the city manager.

   a.   The application shall include the following information and meet the following requirements:

      (1)   The applicant's name, address, organization and principal officers, in addition to the manager of the retail business who shall act as the contact person in regard to the application.

      (2)   The applicant shall be a person or entity that desires to sell, offer to sell, or display its goods and merchandise upon the public right of way immediately adjacent to its current operated retail business that is located in one of the following zoning districts:

| SB | - | Secondary business |
|------|---|---------------------|
| BPL | - | Planned business |
| BPR | - | Primary business |
| BWA | - | Wholesale and automotive |

      (3)   In addition to the above information, the application shall include all information required under subsections B1 through B6 of this section.

Upon submission of a complete and accurate application, and payment of the application fee, the city manager, or his designee, shall examine the application and investigate the proposed encroachment to determine whether the proposed encroachment is consistent with this code and all other applicable laws. The city manager may grant a temporary encroachment permit subject to any conditions or terms he deems appropriate to protect the public health, safety or welfare.

   b.   The authorized encroachment permit for a sidewalk sale shall comply with the following conditions, or be subject to immediate revocation by the city manager:

      (1)   Adequate space must be available on private property in front of the business premises in order to conduct a sidewalk sale. A minimum three foot (3') wide passageway shall be left accessible for pedestrians. No merchandise shall be displayed within six feet (6') of the curb line of the street.

      (2)   The sidewalk sale shall be conducted in such a manner as not to create a nuisance or fire hazard.

      (3)   All merchandise displayed or offered for sale shall be displayed in a secure manner so as not to threaten the safety of any pedestrians.

   c.   The police chief, fire chief, and development services director shall make or cause to be made sufficient inspections to ensure the holder of the temporary encroachment permit complies with this section and all other provisions of this code.

   d.   The permit shall be effective from the date indicated on the permit, and shall expire on December 31 of that same year, unless sooner revoked by the city.

   e.   The city manager may deny, amend or revoke a temporary encroachment permit for a sidewalk sale if the permit would be inconsistent with the standards set forth herein, or is determined not to be in the best interests of the citizens of Carbondale.

3.   Nonresidential Business Temporary Encroachments: The city manager may issue a temporary encroachment permit to other businesses located in zoning districts which are not residential in nature. The application shall be made in writing to the city manager. A nonrefundable application fee in the amount of fifty dollars ($50.00) shall be submitted along with the application to the city manager.

   a.   The application shall include the following information and meet the following requirements:

      (1)   The applicant's name, address, organization and principal officers, if applicable.

      (2)   In addition to the above information, the application shall include all information required under subsections B1 through B6 of this section.

Upon submission of a complete and accurate application, and payment of the application fee, the city manager, or his designee, shall examine the application and investigate the proposed encroachment to determine whether the proposed encroachment is consistent with this code and all other applicable laws. The city manager may grant a temporary encroachment permit subject to any conditions or terms he deems appropriate to protect the public health, safety or welfare.

   b.   The authorized encroachment permit for an encroachment as described in this subsection E3 shall comply with the

A. 3

following conditions, or be subject to immediate revocation by the city manager:

(1)   The permit holder shall maintain the encroachment in such a manner as not to create a nuisance or fire hazard.

(2)   The city manager shall enumerate such other terms and conditions for the encroachment as is reasonably necessary to protect the health, safety and welfare of other persons using the right of way.

c.   The police chief, fire chief, and development services director shall make or cause to be made sufficient inspections to ensure the permit holder complies with this section and all other provisions of this code.

d.   The permit shall be effective from the date indicated on the permit, and shall expire on December 31 of that same year, unless sooner revoked by the city.

e.   The city manager may deny, amend or revoke a temporary encroachment permit described in this subsection E3 if the permit would be inconsistent with the standards set forth herein, or is determined not to be in the best interests of the citizens of Carbondale.

F.   Sidewalk Restaurant Permit: The city manager is authorized to issue a sidewalk restaurant encroachment permit as set out below:

1.   Definitions: The following words and phrases shall have the meanings respectively ascribed to them when used in this section:

FOOD SERVICE ESTABLISHMENT: Any public place which is kept, used, maintained, advertised, and held out to the public as a place where meals are sold and served and where meals are actually and regularly served to the public. A food service establishment shall have seating available for patrons as well as adequate and sanitary kitchen and dining room equipment. A food service establishment must have employed therein a sufficient number and kinds of employees to prepare, cook, and serve full meals for its guests. Food service establishments must keep a record of all food items sold such that a determination that the restaurant is serving meals regularly can be made. Food service establishments serving alcohol shall also meet requirements of title 2 of this code applicable to such licensee.

OUTDOOR RESTAURANT: Use of a public sidewalk or plaza area by a food service establishment, for the serving of food and beverages to seated customers.

PERMIT AREA: The sidewalk area designated on the permit specifying the area of operation of the outdoor restaurant.

PERMITTEE: The person or entity operating a food service establishment who has received a permit allowing for the operation of an outdoor restaurant.

2.   Permits Required:

a.   It shall be unlawful for any person to operate an outdoor restaurant on a public sidewalk without a sidewalk restaurant encroachment permit.

b.   The sidewalk restaurant encroachment permit shall allow a food service establishment located in the primary business district (BPR) of the city to operate an outdoor restaurant subject to the requirements of this section.

c.   Any permit issued pursuant to this section may contain such written conditions as the city manager, or his designee, deems warranted to protect the use of adjacent right of way for its intended purpose or to prevent congestion of vehicular or pedestrian traffic flow and to otherwise carry out the purpose and intent of this section and this code.

d.   The permit holder shall, as part of the right granted pursuant to the permit, be entitled to remove or exclude persons from the permit area during hours of business operation. Such permittee is authorized to give notice to any such person to prevent such entry.

e.   The sidewalk restaurant encroachment permit shall expire annually on December 31 of each year. There is an annual permit filing fee of one hundred dollars ($100.00).

f.   Any sidewalk restaurant encroachment permit shall be subject to suspension or revocation as hereafter provided.

3.   Application: Application for a sidewalk restaurant encroachment permit shall be made on forms supplied by the city, and submitted to the city manager or his designee, together with the annual fee and shall at minimum include the following:

a.   The name, address, and telephone number of the owner of the property and the food service establishment related to the permit.

b.   A copy of a valid license issued by the Jackson County health department.

c.   A scaled drawing or sketch depicting the dimensions of the proposed permit area and which shows the location and type of tables, chairs, trash receptacles and other equipment proposed to be used, location of ingress and egress, the city owned equipment facilities in or adjacent to the area proposed which are visible to the eye, including, but not limited to, parking meters, trees, manhole covers and utility poles or openings.

d.   An operations plan specifying the proposed dates, days and hours of operation of the outdoor restaurant, the hours of operation of the adjacent restaurant, scheduled maintenance of the permit area, maximum seating capacity, and method of providing security and maintenance.

A. 4

e. An executed waiver of liability in a form approved by the city attorney.

f. Any other information related to the requirements of this chapter that the city manager may require.

g. All persons, prior to receiving a permit, shall procure and maintain for the duration of the permit, public liability and property damage insurance pertaining to the permit area in a minimum amount of one million dollars ($1,000,000.00) per person and one million dollars ($1,000,000.00) in the aggregate per occurrence and property damage in a minimum amount of one million dollars ($1,000,000.00), naming the city, its officers and employees as additional insured, and the same shall provide that policy shall not terminate or be canceled prior to the expiration date without thirty (30) days' advance written notice to the city. Proof of such insurance issued by an insurance company licensed to do business in the state of Illinois in the form of a certificate of insurance shall be attached to the application.

4. Application Review:

a. No permit shall be granted, pursuant to this section, unless the finance director or his designee shall certify that there are no outstanding fines, fees, taxes, or other charges due and owed to the city by the owners of the real property on which the restaurant is located or the applicant.

b. All applications for sidewalk restaurant encroachment permits shall be reviewed by the city to determine compliance with each of the requirements of this section.

c. No permit shall be issued unless the applicant supplies all information required on or by the application form and is in compliance with the regulations contained in this section.

d. The applicant shall be notified of the status of the application and its approval or the reason for its denial within ten (10) business days of filing the application.

5. Regulations:

a. An outdoor restaurant is permitted only on sidewalks or approved plaza areas. The permit area shall be immediately adjacent to the food service establishment requesting the permit, or a sidewalk contiguous to the sidewalk adjacent to the food service establishment.

b. No permit will be granted if seats or equipment in the outdoor restaurant result in the need for additional restrooms unless such additional restrooms are provided.

c. The hours when service is permitted at the outdoor restaurant shall be between six o'clock (6:00) A.M. and eleven fifty nine o'clock (11:59) P.M.

d. Any person making use of an outdoor restaurant shall do so in a reasonable manner with due regard for the health and safety of persons and property. No permittee shall make any physical alteration to public property. A permittee shall owe a duty to the city of Carbondale and third persons to maintain the permit area in a clean, safe and sanitary condition.

e. The permittee shall keep the permit area free of litter, cans, bottles, and spills at all times. The permittee shall promptly collect and dispose of all litter, trash and other waste materials associated with the outdoor restaurant, including materials in the adjacent public right of way or property originating from the outdoor restaurant. The permittee shall dispose of any such waste in their own trash receptacles only. The permittee shall not dispose of any such waste in public trash receptacles.

f. Upon the expiration or other termination of an outdoor restaurant use permit, the permittee shall immediately remove all tables, chairs, furnishings, equipment and other items of personal property from the permit areas. Any such items remaining upon the public right of way after a reasonable opportunity to remove the same may be removed and disposed of by the city of Carbondale at the sole cost and expense of the permittee.

g. A sidewalk restaurant encroachment permit allows for the temporary placement of tables, chairs, furnishings, equipment, and other items of personal property related to the restaurant. Except for plaza areas, all tables and chairs must be "portable", meaning that no such furniture shall be chained together or bolted together as a unit or affixed to the outdoor wall or ground surface.

h. Umbrellas shall have a maximum diameter of eight feet (8') and a minimum clearance of seven feet (7') above the ground, a weighted base, and be fabric covered. All umbrellas must be made of cloth fabric; vinyl umbrellas are prohibited. Umbrella materials may not have a shiny, synthetic appearance. Signage on umbrellas is prohibited. No lettering, advertising, graphics, and/or logos are allowed on the umbrella face.

i. No signs, banners or other like advertising shall be located in the permit area, unless in accordance with section 15.6.5 of this code, and the restaurant may post a menu detailing food, beverages, or special items.

j. Tables, chairs and umbrellas shall be located so that there remains open, at all times, a longitudinal walking space, the location of which shall be determined by the city, of a minimum of four feet (4') in width, with slopes not to exceed Americans with disabilities act (ADA) requirements.

k. The city manager or his designee may promulgate administrative rules, substantially related to the requirements contained in this section. Such rules shall be attached to the permit and be followed by the permittee.

6. Suspension Or Revocation: The use of a public sidewalk as a sidewalk restaurant shall be subject to temporary suspension or termination at any time by the city in the interest of the public health, safety, welfare and for community

A. 5

events. To the extent that a permit area is needed by the city for the purposes for which it was dedicated, or any other public purpose, the city may immediately suspend or terminate the sidewalk restaurant permit by sending written notice to the permittee and assume full possession and control of the permit area. The permittee shall remove all furniture from the right of way within the time specified by the notice. If the furniture is not removed by the permittee, the city shall be authorized to remove all furniture and other objects of the permittee from the permit area. If such furniture is not reclaimed by the permittee within seven (7) days after removal by the city, the property shall be presumed abandoned and subject to disposal according to law.

7. Public Property: The provisions of this section shall apply only to the locating of outdoor restaurants on public property or public right of way and shall not apply to any private property.

8. Indemnification; Payments For Cleaning Or Damages:

a. As an express condition of the issuance of the permit, each permittee shall agree in writing to indemnify and hold harmless the city against all claims of liability, loss, injury, death, or damage whatsoever in connection with or arising out of the use of the outdoor restaurant by anyone.

b. As an express condition of the issuance of the permit, the permittee shall agree to, within ten (10) days after the billing date, pay to the city all costs associated with damage to the pavement or other city owned facilities located in or adjacent to the permit area caused by operation of the food service establishment, or costs to clean or remove trash from the permit area or adjacent premises occasioned by the failure of the permittee to clean or remove such trash.

G. Residential Block Party Permits: The city manager shall establish policies and procedures for the issuance of residential block party permits, and shall set forth the requirements, fees, limitations, and enforcement of the terms of the permit.

H. Enforcement:

1. The city may inspect the permit area at any time. The city shall mail or deliver the result of the inspections to the permittee.

2. Any violation of the provisions of this section shall be remedied within the time given in the notice or, if not stated in the notice, within ten (10) calendar days from the date of delivery or postmark on the notice.

3. Any permittee violating or failing to comply with the terms or requirements of this section shall be subject to the penalty provisions and procedures set forth in this chapter. (Ord. 2017-05; Ord. 2021-19)

Case: 26-1138   Document: 14   Filed: 03/20/2026   Pages: 236

Case: 26-1133     Document: 14     Filed: 03/20/2026     Pages: 236

**15.11.4: GENERAL DEFINITIONS:**

ABANDONED SIGN: See definition of Sign, Abandoned.

ACCESSORY STRUCTURE: A structure, not expressly prohibited, the use of which is incidental to the principal structure and which is located on the same lot as the principal structure.

ACCESSORY USE: A use, not expressly prohibited, customarily incidental to the principal use and so necessary or commonly to be expected that it cannot be reasonably assumed to be prohibited.

ACTIVE SOLAR COLLECTOR DEVICE: An assembly, structure, equipment or elements used for gathering, concentrating, or absorbing direct or indirect solar energy, and then storing, distributing, or transforming said energy in the form of gases, solids, liquids, electricity, or combinations thereof for subsequent use where the application of energy from an external source of conventional supply is necessary to move the solar derived energy, such as with a pump or fan. Said device does not include distribution equipment that is equally usable in a conventional energy system except for such components as are necessary for meeting the requirements of efficient solar energy utilization.

ADMINISTRATIVE OFFICIAL: The development services director with the approval of the city manager shall designate and authorize an administrative official of the city as provided in section 1-3A-5 of this code (the planning services manager) to administer the provisions of this title.

ADULT DAY CARE CENTER: Day care centers which provide care for less than twenty four (24) hours a day to more than four (4) adults who are not residents of the facility and which provide services and programs designed to meet the individual needs of the persons served.

ADULT ENTERTAINMENT: Live performances by topless and/or bottomless dancers, strippers or similar entertainers, characterized by the display or exposure of specified anatomical areas.

ALLEY: Any public or private way twenty feet (20') or less in width which is set aside as a permanent right of way for public vehicular travel and which serves as a secondary means of access to abutting property.

ALTERATION: Any act or process which changes one or more of the exterior features and/or interior features of a property and/or improvements on the property which is subject to the design standards for the district in which the property is located.

ANTENNA ARRAY: One or more rods, panels, disks or similar devices used for the transmission or reception of radio frequency signals, which may include omnidirectional antenna (rod), directional antenna (panel) and parabolic antenna (disk). The antenna array does not include the "support structure" defined herein.

ARCHITECTURAL SIGNS: See definition of Sign, Architectural.

ATTACHED WIRELESS COMMUNITY FACILITY (ATTACHED WCF): An antenna array that is attached to an existing building or structure, which structures shall include, but not be limited to, utility poles, signs, or water towers, with any accompanying pole or device which attaches the antenna array to the structure, and associated connection cables and an equipment facility.

AUTOMOBILE RENTAL SERVICES: Rental of cars, vans, light trucks and other motor vehicles weighing less than two (2) tons.

AUTOMOBILE SALES LOT: Any place outside a building where two (2) or more vehicles in operating condition are offered for sale or are displayed for sale or advertising purposes.

AUTOMOBILE WRECKING: The dismantling or wrecking of used motor vehicles, trailers, or farm machinery, or the storage, sale, or dumping of dismantled, partially dismantled, obsolete or wrecked vehicles or their parts.

BANNER: A flexible substrate on which copy or graphics is displayed.

BANNER SIGN: See definition of Sign, Banner.

BASE FLOOD: The flood having a one percent (1%) chance of being equaled or exceeded in any given year. The base flood is also known as the 100-year flood.

BASE FLOOD ELEVATION: The elevation in relation to mean sea level of the crest of the base flood. For the purpose of this title, the elevations listed in the flood insurance study, which study is adopted herein, shall be determinative of the base flood elevation at the points listed in said study. For points lying between the points listed in said study, the base flood elevation shall be determined by prorating the difference between the base flood elevation at consecutive points as shown in said study.

BASEMENT: That portion of a building partially underground, but having less than half its clear floor to ceiling height below grade (see definition of Cellar).

BED AND BREAKFAST ESTABLISHMENT: An operator occupied residence providing accommodations for a charge to the public with no more than five (5) guestrooms for rent. Breakfast may be provided to the guests only. Bed and breakfast establishments shall not include motels, hotels, boarding houses, or food service establishments.

BEE LAWN: A lawn planting method developed by the University of Minnesota that mixes low-growing flowers with turfgrasses to balance the look and feel of a traditional lawn with pollinator-supportive flower varieties. Bee lawns are still subject to mowing requirements of 11-4-1.

BILLBOARD: See definition of Sign, Off Premises.

BLOCK: A unit of property entirely surrounded by public highways, streets, railroad rights of way, waterways, or other barriers, or a combination thereof.

BOARDING HOUSE: See definition of Rooming House.

**A. 7**

Case 26-1133 Document 14 Filed 03/20/2026 Pages 236

BUILDING: A roofed structure enclosed within exterior walls which may contain a breezeway, or carport, built, erected, and framed of component structural parts, designed for the housing, shelter, enclosure and support of individuals, animals, or property of any kind. For structure definition, refer to Structure.

BUILDING FACADE: The walls of a building or any other near vertical structural element below the roof surface area(s).

BUILDING FRONTAGE: The length in feet of the ground floor level of a building front and/or sides abutting a public right of way which have a public customer entrance.

BUILDING LINES: The lines nearest and parallel with the lot lines establishing the minimum yards to be provided between the building or structure and the lot lines. For purposes of establishing minimum yards, projections from a building or structure which are not designed for occupancy either above, below or within the projection shall not be considered part of the building or structure. No structural supports of said projections may originate in any required minimum yard. Provided, however, that no part of an active solar collector device shall be allowed to project into any minimum yard. See section 15.2.3.6: "Permitted Projections into Minimum Yards."

BUSINESS DEVELOPMENT: Two (2) or more contiguous lots containing two (2) or more businesses with unifying elements, such as shared parking or access, and a common commercial zoning classification. The area of the development shall be a minimum of five (5) acres. For the purpose of the sign regulations a business development must include lots that do not have frontage on a state or federal highway and the business development shall be limited to one freestanding sign.

CABIN: A facility that is leased on a temporary basis for recreational purposes which may be fully plumbed, served with electrical power, and/or contain a kitchen and bathroom. This may also include a lodge or similar type of facility.

CANNABIS BUSINESS ESTABLISHMENT: A cannabis cultivation center, craft grower, processing organization, infuser organization, dispensing organization, or transporting organization.

CANNABIS CULTIVATION CENTER: A facility operated by an organization or business that is licensed by the Illinois Department of Agriculture to cultivate, process, transport, and perform necessary activities to provide cannabis and cannabis-infused products to licensed cannabis business establishments, per the Cannabis Regulation and Tax Act, (P.A. 101-0027), as it may be amended from time to time, and regulations promulgated thereunder.

CANNABIS DISPENSING ORGANIZATION: A facility operated by an organization or business that is licensed by the Illinois Department of Financial and Professional Regulation to acquire cannabis business establishments for the purpose of selling or dispensing cannabis, cannabis-infused products, cannabis seeds, paraphernalia, or related supplies to purchasers or to qualified registered medical cannabis patients and caregivers, per the Cannabis Regulation and Tax Act, (P.A. 101-0027), as it may be amended from time to time, and regulations promulgated thereunder.

CANNABIS INFUSER ORGANIZATION: A facility operated by an organization or business that is licensed by the Department of Agriculture to directly incorporate cannabis or cannabis concentrate into a product formulation to produce a cannabis-infused product, per the Cannabis Regulation and Tax Act, (P.A. 101-0027), as it may be amended from time to time, and regulations promulgated thereunder.

CANNABIS PROCESSING ORGANIZATION: A facility operated by an organization or business that is licensed by the Department of Agriculture to either extract constituent chemicals or compounds to produce cannabis concentrate or incorporate cannabis or cannabis concentrate into a product formulation to produce a cannabis product, per the Cannabis Regulation and Tax Act, (P.A. 101-0027), as it may be amended from time to time, and regulations promulgated thereunder.

CANNABIS TRANSPORTING ORGANIZATION: An organization or business that is licensed by the Department of Agriculture to transport cannabis or cannabis-infused product on behalf of a cannabis

CAREGIVER: A person, whether paid or unpaid, who provides a senior citizen with live-in assistance in meeting daily living needs.

CELLAR: That portion of a building partially underground, but having half or more of its clear floor to ceiling height below grade (see definition of Basement).

CENTERS OR WORKSHOPS FOR MENTALLY OR PHYSICALLY HANDICAPPED: Day care centers which provide care for less than twenty four (24) hours a day to mentally or physically handicapped persons who are not residents of the facility and which provide services and programs to meet the person's needs for care, protection and training.

CERTIFICATE OF APPROPRIATENESS: A certificate issued by the preservation commission indicating its approval of plans for alteration, construction or demolition on property or improvements in a designated district.

CERTIFICATE OF ECONOMIC HARDSHIP: A certificate issued by the preservation commission authorizing an alteration, construction or demolition of property or improvements even though a certificate of appropriateness has previously been denied.

CHILD CARE CENTERS: Day care centers which receive preschool or school age children, or both, for short term or extended hours of care, or out of school hours of care, or out of school hours, and which provide essential personal care, protection, supervision, training and programs to meet the needs of the children served.

CITY: The city of Carbondale, Illinois.

CITY CLERK: The city clerk of the city of Carbondale, Illinois.

CITY COUNCIL: The city council of the city of Carbondale, Jackson County, Illinois.

COLLOCATION/SITE SHARING: Use of a common WCF, or common site by more than one wireless communication license holder, or by one wireless communication license holder for more than one type of communications technology and/or placement of an antenna array on a structure.

COMMENCEMENT OF CONSTRUCTION: This term shall mean the same as "actual start" as defined in the definition of "start of construction".

A. 8

Case 26-1103    Document 11-4    Filed 03/20/2026    Page 236

COMMERCIAL KITCHEN/CATERING: An establishment in which the principal use is to engage in the preparation and production of prepared food items for off premises consumption and/or sale. The byproducts of which will not result in obnoxious emissions or odors. Typical uses include catering, fruit and vegetable canning, wholesale bakeries, commissary kitchens, and/or specialty food packaging.

COMMISSION: The Carbondale planning commission.

COMMUNITY GARDEN: Those that are developed with the primary purpose of providing space for members of the community to grow plants and/or produce for beautification, education, recreation, food security, and/or community distribution.

COMPREHENSIVE PLAN: The complete plan, or any of its parts, for the development of the city and adjacent jurisdictional areas prepared by the commission and adopted by the council in accordance with the authority conferred by the Illinois municipal code, as amended.

CONCENTRATING SOLAR-THERMAL POWER TECHNOLOGIES: Technologies used to generate electricity by highly focused and concentrated sunlight.

CONDOMINIUM: Ownership in common with others of a parcel of land and certain parts of a building thereon, which would normally be used by all the occupants, including yards, foundations, basements, floors, walls, hallways, stairways, elevators and all other related common elements, together with individual ownership in fee of a particular unit or apartment in such building. It is not confined to ownership of a residential unit such as an apartment, but its use also extends to offices and other types of space in commercial buildings.

CONSTRUCTION: Any act or process which adds an addition onto an existing structure or erects a new principal or accessory structure on a lot which is subject to the design standards for the district in which the property is located.

CONVENIENCE STORE: A retail establishment having a gross floor area of five thousand (5,000) square feet or less which primarily sells food, beverages, and convenience items. The establishment may or may not be in conjunction with other uses such as a gasoline service station or restaurant. The gross floor area of a convenience store shall include area occupied by restrooms, seating areas, video games and vending machines but shall not include areas for restaurant purposes. When a convenience store is in conjunction with a gasoline service station, the principal use shall be considered a gasoline service station for the purpose of determining permitted zoning district.

CORNER LOT: See definition of Lot Types.

COUNTY: The counties of Jackson or Williamson, Illinois.

CROSSWALK: A strip of land dedicated to public use, which is reserved across a block to provide pedestrian access to adjacent areas.

CUL-DE-SAC: A street having one end open to traffic and being permanently terminated by an adequate vehicular turnaround.

DAY CARE CENTER: A facility at which an agency, organization or individual, licensed by the state, provides care for less than twenty four (24) hours per day to more than three (3) persons in a facility other than a family day care home or day care home. The term "day care center" includes facilities commonly called: "child care centers", "day nurseries", "nursery schools", "kindergartens", "playgroups", and "centers/workshops for the mentally/physically handicapped with or without stated educational purposes". The term does not include: a) public or private elementary school systems or secondary level school units or institutions of higher learning; b) facilities operated in connection with a shopping center or service, or other similar facility, where transient children are cared for temporarily while parents or custodians of the children are on the premises, or are in the immediate vicinity and readily available; c) any type of day care center that is conducted on federal government premises; d) special activities programs, including athletics, crafts instruction, and similar activities conducted on an organized and periodic basis by civic, charitable, and governmental organizations, or e) family day care homes, and day care homes I, II and III.

DAY CARE HOME I: A residential structure occupied by the care provider's family and licensed by the state which provides care for more than three (3) up to a maximum of six (6) children for less than twenty four (24) hours per day. The maximum number of six (6) children includes the family's natural, foster or adopted children twelve (12) years of age or under.

DAY CARE HOME II: A residential structure occupied by the care provider's family and licensed by the state which provides care for more than six (6) up to a maximum of twelve (12) children for less than twenty four (24) hours per day. The maximum number of twelve (12) children includes the family's natural, foster or adopted children twelve (12) years of age or under.

DAY CARE HOME III: A residential structure occupied by the care provider's family and licensed by the state which provides care for more than twelve (12) up to a maximum of sixteen (16) children for less than twenty four (24) hours per day. The maximum number of sixteen (16) children includes the family's natural, foster or adopted children twelve (12) years of age or under.

DAY NURSERIES: Day care centers which receive preschool age children for short term or extended hours of care and which provide essential personal care, protection, supervision, training and programs to meet the needs of the individual children served.

DEMOLITION: Any act or process which destroys or removes, in whole or in part, a feature of a property and/or improvement on the property which is subject to the design standards for the district in which the property is located.

DESIGN STANDARDS: The guidelines that regulate alteration, construction and demolition in a designated district.

DESIGNATED HISTORIC DISTRICT: An area within the zoning jurisdiction of the city of Carbondale that has been approved by ordinance of the city council as a landmark, historic district or neighborhood preservation district.

DEVELOPMENT: Any manmade change to improved or unimproved real estate, including, but not limited to, construction of or substantial improvements to buildings or other structures, the placement of mobile homes, mining, dredging, filling, grading, paving, excavation, or drilling operations.

DEVELOPMENT SERVICES DIRECTOR: A department head for the city responsible for planning, building and neighborhood services, housing programs, and development services or such person's designee. If at some time the title does not exist and this definition is not sufficient to identify a similar office, the term shall be construed to mean "city manager or his or her designee".

**A. 9**

Case 26-4183 Document 14 Filed 03/20/2026 Page 336

DORMITORY: A building not open to transients where lodging is provided for ten (10) or more nonfamily persons, and no kitchen facilities other than one central kitchen facility are provided any dwelling unit occupied by persons other than management personnel.

DRAINAGE RIGHT OF WAY: The lands required for the installation of stormwater sewers or drainage ditches. They are required along a natural stream or watercourse for preserving the channel and providing for the flow of water therein to safeguard the public against flood damage.

DRIVE-IN RESTAURANT: Any establishment serving food or beverages to customers who remain in or leave and return to their cars for consumption of such food or beverages. Drive-in restaurants include self-service restaurants for takeout food.

DRIVEWAY AREA: For one-, two-, three-, or four-unit dwellings, an off street area (paved with bituminous concrete, portland cement concrete, type A-3 surfacing, stabilized rock, gravel or crushed stone, or the equivalent thereof), provided for use by motor vehicles in gaining access to public streets or as a parking area for four (4) spaces or less. See also subsection 15.4.8.5B of this title.

DWELLING UNIT: One room, or more than one connected rooms, designed as a separate independent housekeeping establishment and containing cooking, bathroom and sleeping facilities.

EASEMENT: A grant by the property owner of the use of a strip of land by the public or a person for specified purposes.

ECONOMIC HARDSHIP: Circumstances affecting a property owner wherein the owner cannot in accordance with the design standards of a designated district maintain, construct, alter, or demolish property without experiencing substantial financial harm or loss of reasonable use of the property. The absence of current or potential profit in the sale, lease or other use of the property without acquisition of a certificate of appropriateness is not, in itself, considered economic hardship.

ECOTOURISM: Offering experiences for visitors through natural and cultural attractions within a rural setting. Typically, enterprises in this category are independently owned and serve as a regional destination.

EMPLOYEE(S): In regard to off street parking requirements, employees means all who work in the enterprise including owners (other than purely stockholders), partners, management, and office personnel.

ENGINEERING ADVISORY COMMITTEE (EAC): An administrative body to act in a technical capacity for the commission, the city manager, and the city council. Said committee shall consist of the following officials or their duly authorized representatives: the development services director (chairperson), the public works director, the fire chief, a planning services designee, a building and neighborhood services designee, and such other persons as may be designated by the city manager. Appropriate county and township government officials and water district officials shall be consulted as individual subdivision circumstances necessitate. It shall be the duty of the EAC to examine and review all proposed street dedications or abandonments, tentative plat maps of subdivision, and to make recommendations to the planning commission, city manager, and city council.

EQUIPMENT FACILITY: Any structure used to contain ancillary equipment for a WCF which includes cabinets, shelters, a build out of an existing structure, pedestals and other similar structures.

EXTENDED STAY UNIT: A hotel or motel unit with accommodations which meets the following requirements:

A. A unit occupied by not more than two (2) occupants shall have a minimum of not less than two hundred twenty (220) square feet. A unit occupied by three (3) occupants shall have a minimum of not less than three hundred twenty (320) square feet. These required areas shall be exclusive of the areas required by subsections B and C of this definition;

B. The unit shall be provided with a kitchen sink, cooking appliance and refrigeration facilities, each have a clear working space of not less than thirty inches (30") in front. Light and ventilation conforming to the requirements of this code; and

C. The unit shall be provided with a separate bathroom containing a water closet, lavatory and bathtub or shower.

EXTERIOR FEATURES: The architectural character, general composition and/or general appearance of an improvement, including, but not limited to, the kind, color and texture of building materials, the type, design and character of windows, doors, light fixtures, signs, fences and appurtenant elements.

FAA: Federal aviation administration.

FCC: Federal communications commission.

FTA: Federal telecommunications act of 1996.

FAMILY: One or more persons each related to the other by blood, marriage or adoption and maintaining a common household. The service dependent population of a group home and the resident staff shall be considered a family plus one person not related to the family.

FAMILY DAY CARE HOME: A residential structure occupied by the care provider's family that provides care for three (3) or fewer children for less than twenty four (24) hours per day not including the family's natural, foster or adopted children. Family day care homes do not need a license from the state and are permitted in all residential zoning districts and most districts in which residential uses are permitted.

FEEDLOT: Any parcel of land, structure, pen or corral wherein cattle, fowl, horses, sheep, goats, or swine are maintained in close quarters for the purpose of fattening.

FESTOON LIGHTS: A group of two (2) or more light bulbs hung or strung overhead which are exposed to persons on a public right of way and which are not shaded, shielded, or hooded to prevent the direct rays of light from being visible from the right of way.

FINAL PLAT: The final map of all or a portion of the subdivision which is presented to the commission for final approval in accordance with these regulations, and which, if approved by the city council, shall be entitled to be filed with the proper county recorder office.

FLOOD FRINGE: That area of the floodplain which is not in the floodway.

FLOOD OR FLOODING: A general and temporary condition of partial or complete inundation of normally dry land areas from the overflow of inland waters, or the unusual and rapid accumulation or runoff of surface waters from any source.

A. 10

FLOODPLAIN: That area including the channel of a watercourse and adjacent land areas below the base flood elevation.

FLOODWAY: That area of floodplain which contains the channel of a watercourse and the adjacent land areas that must be reserved from certain obstructions to discharge the base flood without raising the base flood elevation more than one-tenth foot (0.1') in accordance with state of Illinois regulations. For the purpose of this title the location of the floodway is as shown by the plan view of the flood insurance rate map along with the flood insurance study, Carbondale, Illinois, dated May 2, 2008, which study is adopted herein.

FLOOR AREA (FA): The sum of the areas for residential use on the several floors of a building or buildings, measured from the faces of the exterior walls including, but not limited to:

A. Halls, lobbies, stairways, elevators, utility rooms and residential service rooms; and

B. Basement or lowest story to extent used for residential purposes and for access to residential use; and

C. Relatively closed exterior balconies and other covered open spaces which are ineligible for inclusion in covered open space and therefore are counted as floor area, unless exempted in the next paragraph.

The floor area does not, however, include:

A. Relatively open exterior balconies and other covered open spaces which are eligible for inclusion in covered opened space;

B. Any terrace, patio, atrium, porch or balcony which is not covered;

C. Any area for special purpose for common use of all occupants, such as recreation, library or infirmary;

D. Any garage or carport;

E. Any area used for major mechanical equipment; or

F. Any area used for commercial or other nonresidential purposes.

FLOOR AREA RATIO (FAR): The square foot amount of total floor area (all stories) permitted for each square foot of land area. (FAR = FA/LA or FAR x LA = FA)

FOUR-UNIT DWELLING: A building containing four (4) dwelling units.

FREESTANDING SIGN: See definition of Sign, Freestanding.

FRONT LOT LINE: In the case of an interior lot, a line separating the lot from the street. In the case of a corner lot, a line located adjacent to the front entrance to the principal structure that separates the lot from the street.

FRONT YARD: See definition of Yard, Front.

GRADE: The average of the finished ground level at the center of all walls of a building. In case building walls are parallel to and within five feet (5') of a public sidewalk, said ground level shall be measured at the sidewalk. See section 15.11.3.2 of this chapter.

GROSS ACRES: The total land area of the parcel of land to be subdivided.

GROUP HOME: A single dwelling unit where supervision, food, lodging or other services are provided to a "service dependent population" as herein defined, living and cooking together in a single housekeeping unit, consisting of: a) a basic group of members of a service dependent population; b) additional staff persons provided by a sponsoring agency, either living with the residents on a twenty four (24) hour basis, or present whenever residents with disabilities are present at the dwelling.

GROUP HOME I: A group home with a basic group limited to not more than eight (8) service dependent individuals plus a maximum of two (2) resident (live-in) staff at any given time, subject to a higher number of staff, if required, to meet state or federal regulations. Said home is intended for permanent placements, and shall not be for crises or short term, transitional placements.

GROUP HOME II: A group home with no limits placed on the number of service dependent individuals in the basic group. Two (2) or more resident (live-in) staff or twenty four (24) hour adult supervision is required. Transitional placements are permitted in this category of group home.

GUESTROOM: A sleeping room in a bed and breakfast establishment or inn intended to serve no more than two (2) transient guests per night.

HEIGHT: Permitted building height measured from grade. See section 15.11.3.2 of this chapter.

HISTORIC DISTRICT: An area designated by ordinance of the city council, according to criteria and pursuant to procedures prescribed in section 15.2.5 of this title, which contains within definable geographic boundaries properties or structures, which may or may not be landmarks, which contribute to the overall historic characteristics of the designated area.

HOME MUSEUM: A residential structure that is itself of historic significance and contains exhibits of historic, artistic, or scientific interest and that is open to public visit. The principal use of the structure shall be limited to single-family residence and the viewing of the historic structures, exhibits and grounds by visitors during specified hours of operation. A home museum may include accessory uses such as an office connected to administering the museum activities, meeting room(s), gift shop and overnight boarding accommodations of no more than five (5) consecutive days per guest. Parking accommodations for the museum shall be determined on a case by case basis and approved as part of the special use process.

HOME OCCUPATION: An occupation other than a home office conducted in one or more dwelling units or one or more accessory buildings located on the same lot with one or more dwelling units or partly in one or more dwellings and partly in one or more accessory buildings, as allowed in accordance with section 15.3.4.2 of this title.

HOME OFFICE: A room or other part of a dwelling unit used as an office related to an occupation where the only business related activities conducted on the premises are office activities, as allowed in accordance with section 15.3.4.2 of this title.

A. 11

ILLUMINATED SIGN: See definition of Sign, Illuminated.

IMPROVEMENT: Any building, structure, landscaping, work of art, parking facility, fence, gate, wall or other object constituting a physical addition to real property, or any part of such addition.

INN: An operator occupied establishment which is usually residential in character which provides accommodations, meals and beverages for a charge to the public. An inn shall have no more than twelve (12) guestrooms for rent. Inns shall not include bed and breakfast establishments.

INTENSIVE CARE HOME: See definition of Nursing Home.

INTERIOR FEATURES: The architectural character, general composition and/or general appearance within an improvement, including, but not limited to, the kind, color and texture of building materials, the type, design and character of windows, doors, light fixtures, ornamental plasterwork, moldings, ceiling and wall materials, flooring, stairways and appurtenant elements.

INTERIOR LOT: See definition of Lot Types.

JUNKYARDS: The use of more than seven hundred fifty (750) cubic feet of open storage on any lot, portion of a lot or tract of land for the sale, storage, keeping or abandonment of junk, scrap metals or salvageable materials, or for the abandonment, dismantling, or wrecking of automobiles or other vehicles, machines or parts thereof.

JURISDICTION: The corporate area of the city of Carbondale, Illinois, and the unincorporated area contiguous thereto that is within one and one-half ($1^1/_2$) miles of the corporate limits, as described on the official zoning map of the city.

KENNEL: Any lot, structure or premises where four (4) or more dogs over four (4) months of age or four (4) or more cats over four (4) months of age are kept. In residential structures, this formula shall be applied to each dwelling unit within the structure, rather than the entire lot.

KINDERGARTENS: Day care centers which receive children between the ages of four (4) and six (6) years and which are established and professionally operated primarily to conduct educational programs for early childhood development.

LAND AREA: A. The site for residential use within the property lines.

Land area, however, shall not include:

A.   Area not beneficial to the residential use due to its location or character; or

B.   Area used for commercial or other nonresidential uses including required parking areas for such uses.

LANDMARK: A property or structure designated by ordinance of the city council, according to criteria and pursuant to procedures prescribed in section 15.2.5 of this title, which is worthy of rehabilitation, restoration and preservation because of its historic and/or architectural significance to the city.

LOT: A parcel of land of at least sufficient size to meet minimum applicable zoning requirements for use, coverage and area, and to provide required yards and other required open spaces, and having frontage on an improved public street or an improved private street, and may consist of: a) a single lot of record; b) a combination of complete lots of record or of complete lots of record and portions of lots of record or a combination of portions of lots of record; c) a parcel of land described by metes and bounds, provided that in no case of division or combination shall any residual lot or parcel be created which does not meet the applicable requirements of this title.

LOT FRONTAGE: Any portion, piece, division or parcel of land which abuts a public right of way.

LOT OF RECORD: A lot shown as part of a subdivision by a plat of such subdivision recorded in the appropriate county's recorder's office.

LOT TYPES:

Corner Lot: A lot situated at the intersection of two (2) or more streets which streets have an angle of intersection of not more than one hundred thirty five degrees (135°).

Flag Lot: An interior lot adjacent to a corner lot, the side line of which is contiguous with the rear lot line of the corner lot.

Interior Lot: A lot other than a corner lot with only one frontage on a street.

Through Lot: A lot other than a corner lot with frontage on more than one street; through lots abutting two (2) streets may be referred to as double frontage lots.

**A. 12**

Case: 26-1133   Document: 14   Filed: 03/20/2026   Pages: 236

LOWEST FLOOR: The lowest floor of a structure is the lowest floor of the lowest enclosed area (including basement or cellar). An unfinished or flood resistant enclosure, usable solely for parking of vehicles, building access or storage, in an area other than a basement or cellar area, is not considered a structure's lowest floor, provided that such enclosure is not built so as to render the structure in violation of the applicable nonelevation design requirements of this title.

MAINTENANCE OF SIGN: Any action, involving the painting or repair of a sign that alters less than fifty percent (50%) of any sign surface area and does not otherwise alter the wording, shape, area, material, height or any other element of a sign existing prior to the painting and/or repair of the sign. All other actions, which result in change in the sign surface or elements shall be considered as an erection of a new sign.

MANUFACTURED HOME LOT: A site situated in a manufactured home park and designated for the exclusive use of the occupants of a manufactured home. The term "mobile home lot" as used in this title shall be defined as a "manufactured home lot".

MANUFACTURED HOME/MOBILE HOME:

A.   Manufactured Home: A structure, transportable in one or more sections, which is three hundred twenty (320) or more square feet when erected on site and which is built on a chassis and designed to be used as a dwelling unit with or without a permanent foundation when connected to the required utilities and includes the plumbing, heating, air conditioning and electrical systems contained therein. The term shall include:

1.   Units containing parts that may be folded, collapsed, or telescoped when being towed and that may be expanded to provide additional cubic capacity, and

2.   Units composed of two (2) or more separately towable components designed to be joined into one integral unit capable of being separated again into the components for repeated towing, and

3.   Units commonly called "tip outs" and/or "pullouts" which are specifically designed and manufactured to be assembled with that particular manufactured home, and

4.   Units designed for residential use as specified above regardless of modifications that change their intended use, such as through conversion to a storage unit, or modifications that alter their exterior appearance, including, but not limited to, adding siding, or a framed roof.

B.   Mobile Home: As used in this title shall be defined as those manufactured homes described in subsection A of this definition.

1.   In addition, the term "manufactured home" also includes panelized, sectional or modular units known as "manufactured housing units" which are regulated by the Illinois department of public health. These units are defined as "a building assembly or system of building subassemblies, designed for habitation as a dwelling for one or more persons, including the necessary electrical, plumbing, heating,

**A. 13**

Case 3:24-1133 Document 14 Filed 03/20/2026 Page 236

ventilating and other service systems, which is enclosed or open construction and which is made or assembled by a manufacturer, on or off the building site, for installation, or assembly and installation on the building site with a permanent foundation".

2. For floodplain management purposes only, as required in sections 15.2.6 and 15.2.7 of this title, the term "manufactured home" also includes park trailers, travel trailers, recreational vehicles, motor homes and other similar vehicles placed on a site for greater than one hundred eighty (180) consecutive days. For flood insurance purposes, the term "manufactured home" does not include park trailers, travel trailers and other similar vehicles.

MANUFACTURED HOME PARK: A parcel (or contiguous parcels of land) which has been so designed and improved that it contains three (3) or more manufactured home lots available to the general public for the placement thereon of manufactured homes for occupancy. The term "mobile home park" as used in this title shall be defined as a "manufactured home park".

MANUFACTURING, LOW IMPACT: The process or fabrication of certain materials or products within enclosed structures where no process involved will produce noise, vibration, air pollution, fire hazard, or noxious emission which will disturb or endanger neighboring properties.

MINIWAREHOUSE: A building or group of buildings that contain separate, individual, controlled access compartments, stalls or lockers, which may be of various sizes, for the dead storage of customer's goods or wares. Miniwarehouses do not include the conduct of business activities, other than rental of the storage units themselves by the miniwarehouse management, nor do miniwarehouses include any storage and transfer business where the use of large vehicles on a frequent basis is part of such business.

MOBILE HOME LOT: See definition of Manufactured Home Lot.

MOTORIZED RECREATIONAL VEHICLE USE: Including, but not limited to, go-cart tracks, water bumper boat facilities, etc., such recreational vehicles shall be limited to engines not exceeding ten (10) horsepower and noise levels not exceeding fifty (50) decibels at any property line.

MULTIPLE-UNIT DWELLING: A building containing more than one dwelling unit.

MURAL: A painting or other mixed media work, applied to and made integral with the surface of an exterior wall or fixture such as a fence, usually in an artistic manner. See also, SIGN, MURAL.

NATIVE PLANTING AREA: An area in which native plants are being or have been planted in a well-defined and maintained border with the intention of restoring the traditional regional ecosystem as limited by 11-6-3. Commonly described as "re-wilding". Native planting areas are composed of entirely native species. Native planting areas are denser and larger in scale than gardens or pollinator gardens. Native planting areas are created with intention, care, and management.

NATIVE PLANTS: Grasses, including meadow vegetation, sedges (solid, triangular-stemmed plants resembling grasses), forbs (flowering broadleaf plants), trees, and shrubs that are plant species native to or naturalized to the region of Southern Illinois, excluding prohibited exotic, invasive, and or noxious species as defined by the Illinois Exotic Weed Act.

NEIGHBORHOOD PRESERVATION DISTRICT: An area designated by ordinance of the city council, according to criteria and pursuant to procedures prescribed in section 15.2.5 of this title, which contains within definable geographic boundaries properties or structures which may not necessarily be of historic and/or architectural significance, but which may be considered traditional in character and which may be threatened by inappropriate development that could detract or have a blighting effect on the quality of life in the area.

NET ACRE: The amount of land in the subdivision, exclusive of public rights of way and other public ownership such as schools and parks.

NOMINATION: Property(ies) and/or structure(s) for which an application for a proposed designation as a landmark, historic district or neighborhood preservation district has been filed.

NONCONFORMING BUILDINGS: A lawfully existing building which fails to comply with all applicable zoning regulations.

NONCONFORMING USE: A lawfully existing use which fails to comply with all applicable zoning regulations.

NURSERY SCHOOLS: Day care centers which receive children between the ages of two (2) and six (6) years and which are established and professionally operated primarily for educational purposes to meet the developmental needs of the children.

NURSING HOME: A building or portion thereof for the aged and infirm, chronically ill, or incurable persons in which three (3) or more persons not of the immediate family are provided food and shelter care for compensation, but not including hospitals, clinics, or similar institutions.

OFF PREMISES SIGN: See definition of Sign, Off Premises.

OFF STREET LOADING SPACE: Adequate space (paved with asphaltic concrete, concrete, or the equivalent thereof) situated so as to be accessible at all times to pick up and delivery vehicles and reasonably expected to be used.

OFF STREET PARKING SPACE: An off street space (paved with bituminous concrete, portland cement concrete, type A-3 surfacing, stabilized rock, gravel or crushed stone, or the equivalent thereof) provided for a motor vehicle, having an area not less than the minimum parking stall dimensions established by subsection 15.4.8.6A of this title with access to public streets. See also subsections 15.4.8.5B1 and B2 of this title.

OFFICIAL MAP: An official policy guide adopted by the city government on the location of streets, recreation areas, schools, parks, and other municipal facilities.

OPERATOR OF BED AND BREAKFAST ESTABLISHMENT OR INN: The owner of a bed and breakfast establishment or inn, or the owner's agent. The operator is required to reside in the bed and breakfast establishment or inn, or on contiguous property.

OVERLAY DISTRICT: A zoning district which is applied over one or more previously established zoning districts, establishing additional or exceptional standards or criteria for covered properties in addition to those of the base zoning district. Where conflict results between the

A. 14

Case 26-1133      Document 1-4      Filed 03/20/2026      Pages: 236

regulations of the overlay district and the base district, the provisions of the overlay district shall control.

OWNER OF RECORD: The person, corporation or other legal entity listed as the owner on the records of the county recorder of deeds.

PARCEL OF LAND: A distinct piece of real property which is assigned a separate tax identification number (permanent parcel number).

PARKING STRUCTURE: Any partially or wholly roofed or partially or wholly enclosed structure containing more than four (4) spaces used to park or store motor vehicles including, but not limited to, enclosed, basement, underground and multitier open parking structures except any structure designed and used as an accessory structure to a single- or two-unit dwelling containing four (4) spaces or less.

PERMANENT SIGN: See definition of Sign, Permanent.

PERSON: Any individual, partnership, copartnership, firm, company, corporation (including public utilities), association, joint stock company, trust, estate, political subdivision, state agency, or any other legal entity, its legal representative, agent or assign.

PLAN: A generalized sketch or map of a tract of land used for preliminary study and discussion.

PLAT: A detailed map prepared by a registered engineer or surveyor suitable for filing with the county recorder describing a parcel of land.

PLAYGROUPS: Day care centers which receive preschool or school age children, or both, for relatively short periods of time, not to exceed three (3) hours per day for any child or group of children, and which provide services and programs designed to meet the recreational, physical, emotional, and developmental needs of the individual children served.

POLLINATOR GARDENS: A type of garden with definite boundaries planted predominantly with long- blooming flower varieties that will provide support to pollinator species and beautification to our community.

POLLINATOR-SUPPORTIVE LANDSCAPE: The umbrella term used to reference well-maintained and bounded landscape installed with the intention of supporting pollinator species and providing aesthetic value to our community. Pollinator-supportive landscapes do not use pesticides.

PRELIMINARY PLAT: The drawings and documents described in section 15.8.4.4 of this title, indicating the proposed layout of the subdivision which is submitted to the planning commission for consideration and tentative approval.

PRESERVATION COMMISSION: The Carbondale preservation commission, Jackson County, Illinois.

PRINCIPAL BUILDING: A building in which a principal use is conducted.

PRINCIPAL USE: The main purpose or function that a lot serves or is intended to serve.

PROFESSIONAL OFFICE: The office of a member of a recognized profession maintained for the conduct of business in any of the following related categories: architectural, engineering, planning, law, interior design, accounting, insurance, real estate, travel, medical, dental, optical or any similar type of profession.

PROJECTING SIGN: See definition of Sign, Projecting.

PROPRIETARY INTEREST: The legal or beneficial owner of a lot or any land proposed to be included in a zoning amendment, including the holder of an option or contract to purchase or lease such land.

PUBLIC UTILITY SUBSTATION: A sewage lift station or an area where facilities are provided for the distribution of telephone, radio-television communications, water, gas, or electricity.

RAIN GARDEN/BIOSWALE: Shallow landscape features planted with moisture-loving species, used to manage stormwater run-off by directing and slowing water infiltration while filtering out pollutants.

REAR LOT LINE: A lot line which is opposite and most distant from the front lot line and, in the case of an irregular or triangular shaped lot, a line ten feet (10') in length within the lot, parallel with and at the maximum distance from the front lot line.

REAR YARD: See definition of Yard, Rear.

RECREATIONAL VEHICLES: See subsection 15.3.4.3A of this title.

REDEVELOPMENT OR DEVELOPMENT DISTRICT: An area or areas designated by the city council which has the following characteristics: a) said area shall be not less than two (2) contiguous acres, not including, for purposes of measurement of area only, public streets, public roads and public alleys and public rights of way adjacent to said streets, roads and alleys; b) said area shall consist in whole or part of locations where improved or vacant lands because of the presence of one or more of the following factors are detrimental to the public health, safety, morals and welfare: dilapidation; obsolescence; deterioration; illegal or nonconforming use of existing structures; excessive vacancies; overcrowding of structures and community facilities; lack of adequate ventilation, light or sanitary facilities; inadequate utilities; excessive land coverage; deleterious land use or layout; depreciation of physical maintenance; obsolete platting of land; diversity of ownership of land; and deterioration of structures or site improvements in neighboring areas adjacent to vacant lands.

REDEVELOPMENT OR DEVELOPMENT PROJECT: Any development project encompassing a redevelopment or development project area which is designated by the city council as a project which project furthers the purposes of chapter 9 of this title.

REDEVELOPMENT OR DEVELOPMENT PROJECT AREA: An area of not less than one-half ($^1/_2$) contiguous acre, not including for purposes of measurement of area only, public streets, public roads, public alleys and public rights of way adjacent to said streets, roads and alleys and located wholly within a redevelopment or development district.

RELIGIOUS INSTITUTION: A building, together with its accessory buildings and use, where persons regularly assemble for religious purposes and related social events and which building together with its accessory buildings and uses, is maintained and controlled by a religious body organized to sustain religious ceremonies and purposes.

RIDING STABLE: Any place at which horses, ponies, donkeys, or mules are kept for hire.

A. 15

Case 26-1403 Document 14 Filed 03/20/2026 Page 236

RIGHT OF WAY: An area dedicated to purchased by the city for the purpose of providing both vehicular and pedestrian travelways.

ROOMING HOUSE: For the purposes of this title:

A.   A single-unit dwelling occupied by a permanent resident family and two (2) or more other persons not members of said family; or

B.   A single-unit dwelling occupied by more than two (2) persons who are not related to each other in a family; or

C.   A building containing two (2) or more dwelling units, one or more of which units is occupied by a permanent resident family and two (2) or more persons who are not related to the family; or

D.   A building containing two (2) or more dwelling units, at least one of which is occupied by more than two (2) persons who are not related to each other in a family; or

E.   Residential buildings when a lot contains two (2) or more residential buildings, no more than one of which contains a "dwelling unit" or "units" as defined in this section and the buildings are occupied in sum by a permanent resident family and two (2) or more persons who are not members of said family; or

F.   Residential buildings when a lot contains two (2) or more residential buildings no more than one of which contains a "dwelling unit" or "units" as defined in this section and the buildings are occupied in sum by more than two (2) not related to each other in a family; or

G.   Any portion of a building other than as referred to elsewhere in this definition which is occupied by a permanent family and two (2) or more persons who are not members of the family; or

H.   Any portion of a building other than as referred to elsewhere in this definition which is occupied by more than two (2) persons who are not related to each other in a family.

However, a dormitory, a motel, or hotel shall not be deemed to be a rooming house. For the purposes of this definition, "to occupy" means the use or possession or the right to the use or possession of the premises referred to and "to occupy" includes "to propose to occupy"; and "permanent resident" means any person or persons who occupy or have the right to occupy any portion of a dwelling for at least thirty (30) consecutive days.

SATELLITE BUSINESS: A business which is part of a business development or shopping center but is located in a building separate from the main building.

SATELLITE DISH ANTENNA: The signal receiving component of a satellite receiver system, characteristically shaped like a saucer or dish, designed to receive television broadcasts or other signals from satellites in earth's orbit and other extraterrestrial sources.

SEMITRAILER: Every vehicle without power designed for carrying persons or property and for being drawn by a motor vehicle and so constructed that some part of its weight and that of its load rests upon or is carried by another vehicle.

SENIOR CITIZEN: Any person sixty (60) years or older.

SENIOR CITIZEN HOUSING CONVERSION DEVELOPMENT: A residential building or portion of a nonresidential building which is converted to two (2) or more senior citizen housing conversion units after approval of special use.

SENIOR CITIZEN HOUSING CONVERSION UNIT: A dwelling unit within a senior citizen housing conversion development which is designed for and occupied by a senior citizen(s).

SERVICE DEPENDENT POPULATION: Those persons, who by reason of mental or physical disability, require supervision in a quasi-parental relationship but do not require medical or nursing care on site. A service dependent population shall not include persons for whom such services are a requirement of a sentence upon conviction of a criminal offense or whose need for such service arises during or immediately following a sentence of incarceration of a criminal offense nor for the treatment or rehabilitation of drug or alcohol addiction.

SERVICE STATION: Buildings and premises where gasoline, oil, grease, batteries, tires, and automobile accessories may be supplied and dispensed at retail. Unless permitted in a particular zoning district, uses permissible at a service station do not include major mechanical work, straightening of body parts, painting, welding, storage of automobiles not in operating condition, or other work involving noise, glare, fumes, smoke, or other characteristics to an extent greater than normally found in service stations. A service station is neither a repair garage nor a body shop. "Major mechanical work" is defined as any repair requiring the removal of the engine head, the replacement of the transmission, or work involving the interior of the transmission. Storage of automobiles shall be construed as keeping an automobile on the premises for in excess of seventy two (72) hours.

SHOPPING CENTER: A grouping of two (2) or more business establishments which: a) share a common on site parking lot, and b) occupy a single building or occupy separate buildings which are physically attached.

SIDE LOT LINE: Any lot boundary not a front lot line or a rear lot line.

SIDE YARD: See definition of Yard, Side.

SIGN: An object, graphic display or device or part thereof situated outdoors or directly visible from outdoors which is used to advertise, identify, direct, or attract attention to an object, person, institution, organization, business, product, service, event, or location by any means including words, letters, figures, logos, trademarks, designs, symbols, fixtures, colors, motion, illumination or projected images. The following shall not be considered to be signs:

A.   Flags of nations, an organization of nations, states, cities, fraternal, religious, and civic organizations.

B.   Merchandise, pictures, models or products, or services incorporated in a window display.

C.   Signs not exceeding one square foot in area and bearing only property numbers, post office box numbers, names of occupants of premises, or other identification of premises not having commercial connotations.

D.   Legal notices, informational, or directional signs erected or required by governmental bodies.

A. 16

Case 26-1133     Document 14     Filed: 03/20/2026     Pages: 236

E.  National, state, religious, fraternal, professional, and civic symbols or crests.

F.  Decorations, clearly incidental and customarily and commonly associated with any national, local or religious holiday displayed for a period of not more than sixty (60) consecutive days nor more than sixty (60) days in any one year.

G.  Signs painted on or magnetically affixed to vehicles that do not contain changeable letters or copy; and signs otherwise attached to vehicles that do not contain changeable letters or changeable copy.

SIGN, ABANDONED: A sign which advertises a business no longer being conducted or a product no longer being sold on the premises upon which the sign is located. An abandoned sign is also an obsolete sign.

SIGN, ANIMATED: A sign employing actual motion or the illusion of motion including the following:

Electronic Message Board: Animated signs producing the illusion of movement by means of electronic, electrical or electromechanical input and/or illumination capable of simulating movement through employment of the characteristics of one or both of the classifications noted below:

A.  Flashing: A sign which in total or in part has illumination which changes or intermittently flashes on and off, or gives the appearance of changing, blinking or flashing.

B.  Dynamic Display: Any characteristics of a sign that appear to have movement or that appear to change. This includes a display that incorporates a technology or method allowing the sign face to change the image without having to physically or mechanically replace the sign face or its components. This includes displays that incorporate LED, "digital ink", or any other method of technology that allows the sign face to present a series of images or displays.

Mechanically Activated: Animated signs characterized by repetitive motion and/or rotation activated by a mechanical system powered by electric motors or other mechanically induced means.

SIGN, ARCHITECTURAL: An architectural sign shall include all signs which are mounted on, attached to, or painted on the exterior of a building and have no other supporting members other than those attached to the building. An architectural sign is not a freestanding sign.



SIGN, BANNER: A sign utilizing a banner as its display surface. A banner sign is also a temporary sign.

SIGN, FLASHING: Any illuminated sign on which the lights either blink on and off randomly or in sequence or have intermittent variation in intensity or color.

SIGN, FLUSH WALL: A sign mounted on, attached to, or painted on the exterior of a building where the plane of the sign surface is parallel to and no more than one foot (1') distance from the plane of the building to which it is attached. A flush wall sign is an "architectural sign".

SIGN, FREESTANDING: A sign supported by one or more uprights, poles, or braces placed in or upon the ground; or a sign supported by a structure independent of the building, erected primarily for the display and support of the sign. A freestanding sign is not an architectural sign.

A. 17

Case: 26-1133 · · · Document: 14 · · · Filed: 03/20/2026 · · · Pages: 236



SIGN, ILLUMINATED: A sign which has a light source as an integral part of the sign or which has light directed on the sign from an external position.

SIGN, INFLATABLE: A sign or display which uses air contained within a balloon type device used for the purpose of drawing attention or advertising a product. Inflatable signs are also considered those signs designed to be set into motion with the use of a fan or other device moving air through a fabric tube.

SIGN, MURAL: A painting or other mixed media work, applied to and made integral with the surface of an exterior wall or fixture such as a fence, usually in an artistic manner.

SIGN, NONCOMMERCIAL: A sign that does not direct attention to a business or to a service or commodity for sale, and is of a political, religious, or not for profit nature.

SIGN, OFF PREMISES: A sign not related in its subject matter to the premises on which it is located, or to products, accommodations, services, or activities on the premises. However, for businesses which no longer exist, signs on the premises which would otherwise conform to the provisions of this title shall not be construed to be off premises signs. Off premises signs include signs erected by the outdoor advertising industry, such as billboards.

SIGN, PERMANENT: A sign assembled or built on site. A banner shall not be considered a permanent sign. (Permanent signs include those signs advertising the name of a business, a subdivision, an address, etc.)

SIGN, PORTABLE: Any sign which is not listed below shall be classified as a portable sign:



**A. 18**

A. Any sign which is permanently mounted in the ground.

B. Any sign which is permanently attached to a building.

C. Any sign painted or magnetically affixed to a vehicle, if it conforms to the shape of the vehicle and is not a changeable letter or changeable copy sign. The vehicle must be used in the everyday operation of the business.

SIGN, PROJECTING: A sign which is suspended from or supported solely by a building or a wall of a building, and which projects from the plane of the building to which it is attached.



SIGN, TIME AND TEMPERATURE: A sign whereon the date, time, and/or temperature are indicated by intermittent lighting and is limited to the numerals indicating the date, time and/or temperature. These signs are considered to be freestanding.

SIGN, WINDOW PROMOTIONAL: A temporary sign, viewable from the exterior of a structure, which is attached to a window for the specific purpose of attracting attention of a passerby to a sale, or to promotional items. By temporary it is meant that a window promotional sign is not intended for display for more than sixty (60) days. An electrically operated window promotional sign shall be considered an architectural sign and not a special sign as in section 15.4.10.9 of this title.

**A. 19**

SINGLE-UNIT DWELLING: A building containing only one dwelling unit.

SMALL ANIMAL HOSPITAL OR CLINIC: A facility established to supply examination, diagnosis, and prophylactic services and medical and surgical treatment to dogs, cats, birds, and the like, and equipped to provide housing and nursing care for them during illness and/or convalescence; providing, however, that such hospital or clinic and any treatment rooms, cages, pens, or kennels be maintained within a completely enclosed, soundproof building and that such hospital or clinic be operated in such a way as to project no objectionable odors outside its walls. Small animals may also be boarded at the small animal hospital or clinic if they are not being treated, as long as they are maintained within the building meeting the previously listed requirements.

SPECIAL YARD: See definition of Yard, Special.

START OF CONSTRUCTION: Includes substantial improvement, and means the date the building permit was issued, provided the actual start of construction, repair, reconstruction, placement, or other improvement was within one hundred eighty (180) days of the permit date. The "actual start" means either the first placement of permanent construction of a structure on a site such as the pouring of slab or footings, the installation of piles, the construction of columns, the installation of a pad or foundation for a manufactured home, the erection of temporary forms, or any work beyond the stage of excavation. In all districts except the flood fringe and floodway districts, permanent construction does not include land preparation, such as clearing, grading and filling; nor does it include the installation of streets and/or walkways. In the flood fringe and floodway districts, land preparation such as clearing, grading, filling and installation of streets and/or walkways are included in permanent construction. For those types of construction not requiring a building permit or located outside the building permit jurisdiction of the city of Carbondale, start of construction shall be considered to be the same as the "actual start" as described above.

STORY: That portion of a building between the upper surface of any floor and the upper surface of the floor next above, except that the topmost story shall be that portion of a building included between the upper surface of the topmost floor and the ceiling above. If the finished floor level directly above a basement, cellar, or unused underfloor space is more than six feet (6') above "grade" as defined herein, such basement, cellar, or unused underfloor area shall be considered a story. (See also definitions of Grade and Height, and see section 15.11.3.2 of this chapter.)

STREET CURB LINE: The street curb line shall be located at the farthest extent of the curb structure from the centerline of the street for those streets with a curb structure and the farthest extent of the street surface from the centerline of the street for those streets with no curb structure.

STRUCTURE: An assembly of materials forming a construction for occupancy or use including, among others, buildings, stadiums, gospel and circus tents reviewing stands, platforms, staging, observation towers, radio towers, water tanks, trestles, piers, wharves, open sheds, coal bins, shelters, fences, display signs, mobile homes, canopies, and pump islands. (See also definition of Building.)

SUBDIVIDER: Any person who proposes to or is engaged in developing or improving a tract of land which complies with the definition of "subdivision" as defined in this section.

SUBDIVISION: Except as provided in section 15.8.3.5 of this title, the division of a parcel of land into two (2) or more parts, one of which is smaller than five (5) acres in area.

SUBSTANTIAL IMPROVEMENT: Any repair, reconstruction, or improvement of a structure, the cost of which equals or exceeds fifty percent (50%) of the market value of the structure either before the improvement or repair is started, or if the structure has been damaged and is being restored, before the damage occurred. The term does not, however, include either: a) any project for health, sanitary, or safety code specifications which are solely necessary to assure safe living conditions, or b) any alteration of a structure or site documented as deserving preservation by the Illinois department of conservation or listed on the national register of historic places.

SUPPORT STRUCTURE: A structure designed and constructed specifically to support an antenna array, and may include a monopole, self-supporting (lattice) tower, guywire support tower and other similar structures.

TEMPORARY WIRELESS COMMUNICATION FACILITY (TEMPORARY WCF): A WCF to be placed in use for sixty (60) or fewer days.

THREE-UNIT DWELLING: A building containing three (3) dwelling units.

THROUGH LOT OR DOUBLE FRONTAGE LOT: See definition of Lot Types.

TOWER AND/OR ANTENNA USE PERMIT (TAUP): A permit issued by the city specifically for the location, construction, use and compliance with the development standards of a proposed WCF.

TOWN SQUARE: That area bounded by Illinois Avenue on the west, Washington Street on the east, Jackson Street on the north, and Main Street on the south. This shall include those properties both within and along this boundary.

TOWNHOUSE DEVELOPMENT: A group of two (2) or more single-unit dwellings, all situated in a recorded subdivision with a distinct, described lot for each of such single-unit dwellings, and each of such single-unit dwellings (townhouse), whether or not a part of a planned development having the following additional characteristics: a) at least two (2) separate exterior entrances; and b) the same is either attached to adjacent dwellings by party walls extending from the footings to the rooflines or, in the alternative, is situated in such close proximity to adjacent dwellings that there is no visible separation between such dwellings from the footings to the rooflines.

Note: The reason for including separate lots in the definition is that each unit is assumed to be a separate unit which can, and may very well be, sold separately. There is a difference between townhouses in this context and certain apartment buildings. Apartment buildings are assumed to be a whole, not likely to be sold as pieces.

TRAILER: Any vehicle without motive power in operation designed for carrying persons or property and for being drawn by a motor vehicle and so constructed that no part of its weight rests upon the towing vehicle.

TRANSIENT GUEST: A person or family who resides at a place other than his or her usual place of residence for no more than twenty nine (29) consecutive days in exchange for compensation.

A. 20

TRAVEL TRAILER: A vehicular, portable unit built on a chassis, designed to be used as a temporary dwelling for travel and recreational purposes.

TRUCK OR EQUIPMENT TERMINAL: Any lot, structure or premises used for the parking or storage of capital equipment such as trucks, trailers over three-fourths ($^3/_4$) ton capacity, or other like equipment.

TURFGRASS: Commercially available cultured grass varieties that are grown to create turf, including bluegrass, fescue, and ryegrass blends, commonly used in regularly cut lawn areas.

TWO-UNIT DWELLING: A building containing two (2) dwelling units.

VACATION RENTAL UNIT: An accommodation for transient guests where a residential dwelling is rented for lodging for a period of time no less than twenty four (24) hours and not to exceed twenty nine (29) consecutive days. Such use may or may not include an on site manager. For the purposes of this definition, a residential dwelling shall include all housing types and shall not include group living or other lodging uses.

VARIANCE: A relaxation of the strict terms of this title through the zoning board of appeals as provided in subsection 15.6.9.1B of this title.

VEHICLE: Every device in, upon or by which any person or property is or may be transported or drawn upon a highway, except devices moved by human power.

WEEDS: Noxious plantings as defined and designated pursuant to the Illinois Exotic Weed Act, the City Manager, or their designee as amended from time to time. Weeds do not include dandelions or clover.

WINDOW PROMOTIONAL SIGN: See definition of Sign, Window Promotional.

WIRELESS COMMUNICATION FACILITY (WCF): Any unstaffed facility for the transmission and/or reception of wireless telecommunications services, usually consisting of an antenna array, connection cables, equipment facility and a support structure to achieve the necessary elevation.

WIRELESS COMMUNICATIONS: Any wireless service as defined in the telecommunications act of 1996, title 47, United States Code, and as it may be amended, including, but not limited to, facilities for the transmission and reception of radio, television, or microwave signals used for communication, cellular phone, personal communication services (PCS), specialized mobile radio (SMR), enhanced specialized mobile radio (ESMR), paging, and any other wireless services licensed by the FCC and unlicensed wireless services.

YARD: A space on the same lot with a principal building, open, unoccupied and unobstructed by structures, excepting as otherwise provided in this title.

YARD, FRONT: A yard extending across the full width of the lot, unoccupied other than by driveways, fences, poles, posts, steps, terraces, walks, walls and other customary yard accessories, ornaments and furniture not exceeding applicable height and vision obstruction limitations of this title. The depth of a front yard is the least distance between the front lot line and the building line. In the case of through lots, unless the prevailing front yard pattern on adjoining lots indicates otherwise, a front yard shall be provided on all frontages. Where one of the front yards which would normally be required on a through lot, is not in keeping with the prevailing yard pattern, the administrative official may waive the requirement which shall not exceed the average of the yards provided on adjacent lots. In the case of corner lots, a front yard of the required depth shall be provided on either front yard, but where possible in accordance with the prevailing yard pattern; and a second front yard of one-half ($^1/_2$) the depth required generally for front yards for the district shall be required on the other frontage. In the case of corner lots with more than two (2) frontages, the administrative official shall determine the front yard requirements, subject to the following requirements: a) at least one front yard shall be provided having the full depth required generally in the district, and b) no other front yard on such lot shall have less than one-half ($^1/_2$) the full depth required generally.

YARD, REAR: A yard extending across the full width of the lot, unoccupied other than by driveways, fences, poles, posts, steps, terraces, walks, walls, and other customary yard accessories, ornaments and furniture not exceeding applicable height and vision obstruction limitations of this title. The depth of a rear yard is the least distance between the rear lot line and the building line.

YARD, SIDE: A yard between the building line and a side lot line, unoccupied other than by driveways, fences, poles, posts, steps, terraces, walks, walls and other customary yard accessories, ornaments and furniture not exceeding applicable height and vision obstruction limitations of this title. The width of a side yard is the least distance between the side lot line and the building line. A side yard extends from the front yard, or from the front lot line where no front yard is required, to the rear yard or to the rear lot line where no rear yard is required.

YARD, SPECIAL: A yard behind any required yard adjacent to a public street, required to perform the same functions as a side or rear yard, but adjacent to a lot line so placed or oriented that neither the term "side yard" nor the term "rear yard" clearly applies. In such cases, the administrative official shall require a yard with minimum dimensions as generally required for a side yard or a rear yard in the district, determining which shall apply by the relation of the portion of the lot on which the yard is to be located to the adjoining lot or lots, with due regard to the orientation and location of structures and buildable areas thereon.

(Ord. 2023-31; Ord. 2023-19; Ord. 2023-18, Ord. 2023-10; Ord. 2022-07; Ord. 2021-25; Ord. 2019-33; Ord. 2017-08; Ord. 2017-03; Ord. 2015-7; Ord. 2014-48; Ord. 2013-31; Ord. 2013-20)

A. 21

Case: 26-1133    Document: 14    Filed: 03/20/2026    Pages: 236

**17-12-2: DEFINITIONS:**

As used in this chapter and unless the context clearly requires otherwise, the words and terms listed shall have the meanings ascribed to them in this section. Any term not defined in this section shall have the meaning ascribed to it in 92 Illinois administrative code section 530.30, unless the context clearly requires otherwise.

AASHTO: American Association Of State Highway And Transportation Officials.

ANSI: American National Standards Institute.

ASTM: American Society For Testing And Materials.

APPLICANT: A person applying for a permit under this chapter.

BACKFILL: The methods or materials for replacing excavated material in a trench or pit.

BORE OR BORING: To excavate an underground cylindrical cavity for the insertion of a pipe or electrical conductor.

CABLE OPERATOR: That term as defined in 47 USC 522(5).

CABLE SERVICE: That term as defined in 47 USC 522(6).

CABLE SYSTEM: That term as defined in 47 USC 522(7).

CARRIER PIPE: The pipe enclosing the liquid, gas or slurry to be transported.

CASING: A structural protective enclosure for transmittal devices such as: carrier pipes, electrical conductors, and fiber optic devices.

CITY: The city of Carbondale.

CLEAR ZONE: The total roadside border area, starting at the edge of the pavement, available for safe use by errant vehicles. This area may consist of a shoulder, a recoverable slope, a nonrecoverable slope, and a clear run out area. The desired width is dependent upon the traffic volumes and speeds, and on the roadside geometry. Distances are specified in the AASHTO "Roadside Design Guide".

COATING: Protective wrapping or mastic cover applied to buried pipe for protection against external corrosion.

CODE: The municipal code of the city of Carbondale.

CONDUCTOR: Wire carrying electrical current.

CONDUIT: A casing or encasement for wires or cables.

CONSTRUCTION OR CONSTRUCT: The installation, repair, maintenance, placement, alteration, enlargement, demolition, modification or abandonment in place of facilities.

COVER: The depth of earth or backfill over buried utility pipe or conductor.

CROSSING FACILITY: A facility that crosses one or more right of way lines of a right of way.

DIRECTOR OF PUBLIC WORKS: The city of Carbondale director of public works or his or her designee.

DISRUPT THE RIGHT OF WAY: For the purposes of this chapter, any work that obstructs the right of way or causes a material adverse effect on the use of the right of way for its intended use. Such work may include, without limitation, the following: excavating or other cutting; placement (whether

**A. 22**

Case: 26-1183          Document: 14          Filed: 03/20/2026          Pages: 236

temporary or permanent) of materials, equipment, devices, or structures; damage to vegetation; and compaction or loosening of the soil, and shall not include the parking of vehicles or equipment in a manner that does not materially obstruct the flow of traffic on a highway.

EMERGENCY: Any immediate maintenance to the facility required for the safety of the public using or in the vicinity of the right of way or immediate maintenance required for the health and safety of the general public served by the utility.

ENCASEMENT: Provision of a protective casing.

ENGINEER: The city of Carbondale city engineer or his or her designee.

EQUIPMENT: Materials, tools, implements, supplies, and/or other items used to facilitate construction of facilities.

EXCAVATION: The making of a hole or cavity by removing material, or laying bare by digging.

EXTRA HEAVY PIPE: Pipe meeting ASTM standards for this pipe designation.

FHWA: Federal highway administration.

FACILITY: All structures, devices, objects, and materials (including, but not limited to, track and rails, wires, ducts, fiber optic cable, antennas, vaults, boxes, equipment enclosures, cabinets, pedestals, poles, conduits, grates, covers, pipes, cables, and appurtenances thereto) located on, over, above, along, upon, under, across, or within rights of way under this chapter. For purposes of this chapter, the term "facility" shall not include any facility owned or operated by the city of Carbondale.

FREESTANDING FACILITY: A facility that is not a crossing facility or a parallel facility, such as an antenna, transformer, pump, or meter station.

FRONTAGE ROAD: Roadway, usually parallel, providing access to land adjacent to the highway where it is precluded by control of access to a highway.

HAZARDOUS MATERIALS: Any substance or material which, due to its quantity, form, concentration, location, or other characteristics, is determined by the city of Carbondale director of public works to pose an unreasonable and imminent risk to the life, health or safety of persons or property or to the ecological balance of the environment, including, but not limited to, explosives, radioactive materials, petroleum or petroleum products or gases, poisons, etiology (biological) agents, flammables, corrosives or any substance determined to be hazardous or toxic under any federal or state law, statute or regulation.

HIGHWAY: A specific type of right of way used for vehicular traffic including rural or urban roads or streets. "Highway" includes all highway land and improvements, including roadways, ditches and embankments, bridges, drainage structures, signs, guardrails, protective structures and appurtenances necessary or convenient for vehicle traffic.

HIGHWAY CODE: The Illinois highway code, 605 Illinois Compiled Statutes 5/1-101 et seq., as amended from time to time.

HOLDER: A person or entity that has received authorization to offer or provide cable or video service from the ICC pursuant to the Illinois cable and video competition law, 220 Illinois Compiled Statutes 5/21-401.

ICC: Illinois commerce commission.

IDOT: Illinois department of transportation.

JULIE: The joint utility locating information for excavators utility notification program.

**A. 23**

Case: 26-1133    Document: 14    Filed: 03/20/2026    Pages: 236

JACKING: Pushing a pipe horizontally under a roadway by mechanical means with or without boring.

JETTING: Pushing a pipe through the earth using water under pressure to create a cavity ahead of the pipe.

JOINT USE: The use of pole lines, trenches or other facilities by two (2) or more utilities.

MUTCD:   FHWA "Manual On Uniform Traffic Control Devices", as amended from time to time.

MAJOR INTERSECTION: The intersection of two (2) or more major arterial highways.

OCCUPANCY: The presence of facilities on, over or under right of way.

PARALLEL FACILITY: A facility that is generally parallel or longitudinal to the centerline of a right of way.

PARKWAY: Any portion of the right of way not improved by street or sidewalk.

PAVEMENT CUT: The removal of an area of pavement for access to facility or for the construction of a facility.

PERMITTEE: That entity to which a permit has been issued pursuant to sections 17-12-4 and 17-12-5 of this chapter.

PETROLEUM PRODUCTS PIPELINES: Pipelines carrying crude or refined liquid petroleum products including, but not limited to, gasoline, distillates, propane, butane, or coal slurry.

PRACTICABLE: That which is performable, feasible or possible, rather than that which is simply convenient.

PRESSURE: The internal force acting radially against the walls of a carrier pipe expressed in pounds per square inch gauge (psig).

PROMPT: That which is done within a period of time specified by the city of Carbondale. If no time period is specified, the period shall be thirty (30) days.

PUBLIC ENTITY: A legal entity that constitutes or is part of the government, whether at local, state or federal level.

RESTORATION: The repair of a right of way, highway, roadway, or other area disrupted by the construction of a facility.

RIGHT OF WAY OR RIGHTS OF WAY: Any street, alley, other land or waterway, dedicated or commonly used for pedestrian or vehicular traffic or other similar purposes, including utility easements, in which the city of Carbondale has the right and authority to authorize, regulate or permit the location of facilities other than those of the city of Carbondale. "Right of way" or "rights of way" shall not include any real or personal city of Carbondale property that is not specifically described in the previous two (2) sentences and shall not include city of Carbondale buildings, fixtures and other structures or improvements, regardless of whether they are situated in the right of way.

ROADWAY: That part of the highway that includes the pavement and shoulders.

SALE OF TELECOMMUNICATIONS AT RETAIL: The transmitting, supplying, or furnishing of telecommunications and all services rendered in connection therewith for a consideration, other than between a parent corporation and its wholly owned subsidiaries or between wholly owned subsidiaries, when the gross charge made by one such corporation to another such corporation is not greater than the gross charge paid to the retailer for their use or consumption and not for sale.

SECURITY FUND: That amount of security required pursuant to section 17-12-10 of this chapter.

A. 24

Case: 26-1133      Document: 14      Filed: 03/20/2026      Pages: 236

SHOULDER: A width of roadway, adjacent to the pavement, providing lateral support to the pavement edge and providing an area for emergency vehicular stops and storage of snow removed from the pavement.

SOUND ENGINEERING JUDGMENT: A decision(s) consistent with generally accepted engineering principles, practices and experience.

TELECOMMUNICATIONS: This term includes, but is not limited to, messages or information transmitted through use of local, toll and wide area telephone service, channel services, telegraph services, teletypewriter service, computer exchange service, private line services, mobile radio services, cellular mobile telecommunications services, stationary two-way radio, paging service and any other form of mobile or portable one-way or two- way communications, and any other transmission of messages or information by electronic or similar means, between or among points by wire, cable, fiber optics, laser, microwave, radio, satellite, or similar facilities. "Private line" means a dedicated nontraffic sensitive service for a single customer that entitles the customer to exclusive or priority use of a communications channel, or a group of such channels, from one or more specified locations to one or more other specified locations. "Telecommunications" shall not include value added services in which computer processing applications are used to act on the form, content, code and protocol of the information for purposes other than transmission. "Telecommunications" shall not include purchase of telecommunications by a telecommunications service provider for use as a component part of the service provided by such provider to the ultimate retail consumer who originates or terminates the end to end communications. "Telecommunications" shall not include the provision of cable services through a cable system as defined in the cable communications act of 1984 (47 USC section 521 and following), as now or hereafter amended, or cable or other programming services subject to an open video system fee payable to the city of Carbondale through an open video system as defined in the rules of the federal communications commission (47 CFR section 76.1500 and following), as now or hereafter amended.

TELECOMMUNICATIONS PROVIDER: Any person that installs, owns, operates or controls facilities in the right of way used or designed to be used to transmit telecommunications in any form.

TELECOMMUNICATIONS RETAILER: Means and includes every person engaged in making sales of telecommunications at retail as defined herein.

TRENCH: A relatively narrow open excavation for the installation of an underground facility.

UTILITY: The individual or entity owning or operating any "facility" as defined in this chapter.

VENT: A pipe to allow the dissipation into the atmosphere of gases or vapors from an underground casing.

VIDEO SERVICE: That term as defined in section 21-201(v) of the Illinois cable and video competition law of 2007, 220 Illinois Compiled Statutes 21-201(v).

WATER LINES: Pipelines carrying raw or potable water.

WET BORING: Boring using water under pressure at the cutting auger to soften the earth and to provide a sluice for the excavated material. (Ord. 2014-1)

**A. 25**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

MARK BRANDON HAMMAN,                    )
                                        )
                Plaintiff,              )
                                        )
v.                                      )  No. 3:25-cv-00736-NJR
                                        )  East St. Louis, Illinois
CITY OF CARBONDALE, ILLINOIS,           )
et al.,                                 )
                                        )  *EVIDENTIARY HEARING*
                Defendants.             )

TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS
**VOLUME I**
BEFORE THE HONORABLE NANCY J. ROSENSTENGEL
UNITED STATES CHIEF DISTRICT JUDGE

AUGUST 11, 2025

Stephanie Rennegarbe, RDR, CRR, CBC
IL CSR #084-003232
750 Missouri Avenue
East St. Louis, IL  62201
618-482-9226
Stephanie_Rennegarbe@ilsd.uscourts.gov

*Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription*

APPEARANCES:

FOR THE PLAINTIFF:    Liam Ross Harrell, Esq.
                      Nathan Jeremiah Moelker, Esq.
                      Kelsey E. McGee, Esq.
                      American Center for Law & Justice
                      201 Maryland Avenue, NE
                      Washington, DC  20002
                      lharrell@aclj.org
                      nmoelker@aclj.org
                      kmcgee@aclj.org


FOR THE DEFENDANTS:   A. Courtney Cox, Esq.
                      Philip J. Lading, Esq.
                      Sandberg Phoenix
                      101 W. Vandalia
                      Suite 300
                      Edwardsville, IL  62025
                      ccox@sandbergphoenix.com
                      plading@sandbergphoenix.com

I N D E X

OPENING STATEMENTS:                                      PAGE

BY MS. MCGEE                                              8
BY MR. COX                                               9


WITNESSES CALLED TO TESTIFY:

MARK BRANDON HAMMAN
DIRECT EXAMINATION BY MS. MCGEE                          12
CROSS EXAMINATION BY MR. COX                             29
REDIRECT EXAMINATION BY MS. MCGEE                        65

JARED SPARKS
DIRECT EXAMINATION BY MS. MCGEE                          72
CROSS EXAMINATION BY MR. COX                             78

LENOARD JAMIE SNYDER
DIRECT EXAMINATION BY MR. COX                            83
CROSS EXAMINATION BY MR. HARRELL                         94

A. 28

(Proceedings began at 1:29 p.m.)

************************

THE COURT:  Good afternoon, everyone.  If we have everybody, it looks like we can go ahead and get started here.

Deana, if you would please call the case.

COURTROOM DEPUTY:  The United States District Court for the Southern District of Illinois is now in session. Chief Judge Nancy Rosenstengel presiding.

The matter of *Hamman v. City of Carbondale, Illinois, et al.*, case #25-cv-736, is called for an Evidentiary Hearing. Participating today we have Liam Harrell, Nathan Moelker, Kelsey McGee, Courtney Cox, and Philip Lading.

THE COURT:  Good afternoon again, everyone.  I know we have Officer Sparks in the waiting room, who will be one of the Plaintiff's witnesses.

And then the City of Carbondale -- Mr. Cox, who do you have here attending the hearing, and then do you have other -- I know your list says you are going to call three police officers.

MR. COX:  Good afternoon, Judge.  I have here with me Jamie Snyder, City Attorney; John Ronzini, as well; and I have three officers here.  That would be Officer Tyner, Sergeant Murray, and Lieutenant Lattan.

THE COURT:  Okay.  So, they will be on the computer that Mr. Snyder is on?

MR. COX:  That's correct, we will just have them switch seats and move right into that spot.

THE COURT:  Okay.  Mr. Snyder, of course, can be present, and Mr. Lenzini, as parties, but the police officers should not be --

MR. COX:  Right, we understand.

THE COURT:  -- sitting in.  Are they in another room or something?

MR. COX:  They are in this room, but I'm going to ask them to move into an adjoining room.

THE COURT:  Ahh, okay.  This is a lot for us to try to do on Zoom, but we are going to do our best today.

I am sorry, did someone say something?

MR. COX:  No, we were just telling the officers they could go to the other room.

THE COURT:  Sounds good.  Well, I have reviewed everything in the case in preparation for the hearing today. I know the case is about temporary signs, which I understand to be yard signs, and this is a First Amendment challenge to the signs.  There was an incident back in April that brought this all about, and Plaintiff is challenging the ordinance as impermissibly ambiguous.

So, I think -- I am, of course, very familiar with the requirements of -- or the elements of a preliminary injunction, and so the purpose today is to receive testimony.

Now, I know we are going to perhaps have some videos and photographs, so I hope everyone is a little more skilled with Zoom than I am.  But then, also, Plaintiff himself will testify, and then he has a witness, Pastor Jared Sparks, and then the individual Defendants intend to testify and then the three police officers.  So, it would be my preference to just go ahead and start with the testimony.

Ms. McGee, will you be the one doing the questioning?

MS. MCGEE:  Yes, Your Honor.  Would you like to do all testimony, foregoing any opening statements, or are we going to go back and forth, you know, do Plaintiff's full case-in-chief, including closing, and then to Defendants' case?  Can you elucidate?  But, then, just to also clarify, my colleague, Liam Harrell, will be cross-examining the witnesses.

THE COURT:  Okay, got it.  Are you prepared to give a brief opening statement concerning your motion?

MS. MCGEE:  Yes, very brief.

THE COURT:  Okay  Mr. Cox, if you have the time of hers to prepare, can you do that?

MR. COX:  Yes, that would be fine.  I do want to advise the Court another person entered the room who's not a witness.  Her name is Lora, L-O-R-A, Judge, J-U-D-G-E, and she's an intern in the legal department here and will not be testifying, other than just observing.

THE COURT:  Okay.  Sounds good.

All right.  Ms. McGee, you can make your opening statement.

COURTROOM DEPUTY:  Judge, may I interrupt briefly?  In the waiting room I also have Assistant City Attorney, Joseph DeMond.  Is he a witness or should he be admitted at this time?

MR. COX:  He's not a witness; just observing.

THE COURT:  Okay.  He's not a witness and he's with the City?

MR. COX:  Yes.

THE COURT:  Okay.  So, he can be admitted, Deana.

COURTROOM DEPUTY:  Thank you.

THE COURT:  It's your motion, so my thought is you can give the opening statement summarizing your arguments, which, again, I have read everything; and then the same with the Defense.  And I thought we would do the Plaintiff witnesses, testify on Direct, the Defendant will Cross, and then the same, they will present their witnesses and the Plaintiff can Cross.

MS. MCGEE:  That sounds great.  Thank you, Your Honor.

One logistical thing for being able to share stuff via Zoom, can the sharing be authorized or admitted to be able to do that so we can kind of jump in real quick?

THE COURT: Yeah, Deana, can you --

MS. MCGEE: I think I can send a request. We will see how that goes.

COURTROOM DEPUTY: I just got the request. That's new; I have never gotten that before. So, I just approved that.

THE COURT: And, so, will Mr. Harrell also need access to share?

MR. HARRELL: During Cross I imagine I would, Your Honor.

THE COURT: Okay.

MS. MCGEE: Okay. Well, I will briefly state, Your Honor, as you said, you are very familiar with the issues in this case. Just to summarize, there are four things at issue; four elements when determining injunctive relief: The likelihood to succeed on the merits, irreparable harm, balance of equities, and public interest. Public interest, balance of equities and irreparable harm strongly weigh in favor of a First Amendment Plaintiff only seeking to have his message heard. The only question really that I assume we will spend the majority of today's hearing on is whether or not Plaintiff is likely to succeed on the merits.

A few points on why Plaintiff is likely to succeed on merits is that the ordinance is void for vagueness in violation of the First Amendment and due process under the

Fourteenth Amendment.  It is overbroad and not narrowly tailored, violating the First Amendment, and the Defendants engaged in viewpoint discrimination on April 16, 2025.  Thank you.

I will leave the rest for my closing argument.

THE COURT:  Okay.  Mr. Cox?

MR. COX:  Thank you, Judge.  This case is, in my view, relatively simple.  Carbondale has an ordinance for signs and that ordinance does not permit any signs to be placed in the City right-of-way.  It cannot be erected; that is, put into the ground.  This was explained to the Plaintiff by Mr. Lenzini and by all the officers who told him, "You can carry them or wear them, but you cannot put them in the ground."  He disputed that and he had an interpretation of the ordinance that was just simply incorrect.  He was citing a part of the ordinance that applied to downtown signs and not to the signs where he was located.  It doesn't matter what's on the sign.  If it's in the right-of-way it gets pulled, it gets taken away.  Sometimes it's there for a couple days before they discover it, but they do remove every sign regardless of what's on the sign.  This was explained to the Plaintiff.

And when you see the videos, you will see that there were other people present there at the scene who had pulled their signs out of the ground when asked and were carrying

A. 34

them and wearing them and getting along just fine and they were not being interfered with.

So, the ordinance applies to every sign. It's neutral, content-neutral completely, and so then we have an aspect of -- And, finally, I will say that after the police came and talked with the Plaintiff and his attorney -- Ms. McGee was also on the phone, as well, and talked with the officers -- They came to an agreement and the Plaintiff did remove his signs from the ground and then there was no citation issued, no arrest made, and he went on about his business. But, it was clear. Over and over he was told, "You can carry them, you can wear them all day long, you just can't put them in the ground." So, that was the issue.

So, then the next day he came -- the Plaintiff came to the city hall, spoke to Mr. Lenzini, and he was requesting a permit. The problem is there are no permits for signs to be put in the ground in the right-of-way. You can't get a permit for that, they have never issued a permit for that. And in fact, Judge, you will see in the evidence here the permit for placing a sign is only for on private property. And so even if he had applied for a permit, which he didn't do, he just inquired about it, he would not have been issued one, because you can't get a sign permit to put it in the right-of-way, period. That's it.

And so that's essentially what happened here.

Fortunately, the officers and Mr. Lenzini were able to talk with the Plaintiff and his attorney and finally convinced them that they could not put the signs there and they let -- and everything was peaceful.

And, so, here we are today, they want the Court to enter an order permitting them to put the signs in the ground, in the right-of-way, which the ordinance clearly does not allow. And so the chances of the Plaintiff prevailing on the merits of the case are not good because of the things I have said, and also it would require Carbondale to violate its own ordinance. So, we would ask the Court to deny the request. Thank you.

THE COURT: Okay. Thank you, Mr. Cox.

Now, I will note we do have an Official Court Reporter here, so there's no recording otherwise, recording or rebroadcasting of these proceedings. And we have established a public access line, but judicial conference regulations say that that is only for non-testimonial proceedings. So, when we are having testimony that line will have to be muted, and then for argument we will open it up again.

So, with that, Ms. McGee, will your client be your first witness?

MS. MCGEE: Yes, Your Honor.

THE COURT: Okay. So, sir, would you pronounce your name for me?

MR. HAMMAN:  Good afternoon, Your Honor.  My name is Mark Brandon Hamman.

THE COURT:  *Hamman*; okay.  Well, good afternoon.  At this time I'm going to ask you to please take an oath.

COURTROOM DEPUTY:  Mr. Hamman, please raise your right hand.

(Plaintiff, Mark Brandon Hamman, sworn)

THE COURT:  You may proceed, Ms. McGee.

MS. MCGEE:  Thank you, Your Honor.


DIRECT EXAMINATION

BY MS. McGEE:

Q.  Mr. Hamman, can you spell your name for the Court Reporter, please?

A.  M-A-R-K, B-R-A-N-D-O-N, H-A-M-M-A-N.

Q.  What name do you go by?

A.  My middle name, Brandon.

Q.  And, Mr. Hamman, where do you live?

A.  I live at 303 Cook Avenue, Jonesboro, Illinois.

Q.  And where is Jonesboro close to?

A.  It borders the town of Anna, Illinois.

Q.  Is it close to Carbondale?

A.  Yes, it is close to Carbondale, about 20 miles or so.

Q.  Mr. Hamman, did you go to college?

A.  Yes, I did.

Q.   Where did you go?

A.   University of Virginia's College at Wise.

Q.   What degree -- or did you obtain a degree?

A.   I did.

Q.   What degree?

A.   I received a Bachelor's of Science in the Administration of Justice.

Q.   What did you do with that degree?

A.   I used it as -- in my prior career as a law enforcement officer.

Q.   How long were you a law enforcement officer?

A.   Just over 14 and a half years.

Q.   And what do you do now?

A.   Currently, I am a local missionary in Carbondale.

Q.   Where do you work?

A.   So, I work in the City of Carbondale, primarily, and I go out and share the gospel.

Q.   What organization do you work for?

A.   I'm employed by Christ Church of Carbondale under the Ministry Gospel for Life.

Q.   And how do you get paid?

A.   It's bimonthly by the church.

Q.   Does the church control your salary?

A.   Yes.

Q.   And is your church, Christ Church of Carbondale, a

not-for-profit organization?

A.   It is.

Q.   Have you seen any documentation to prove that?

A.   Yes, I have seen the Illinois Government website that shows that Christ Church for Carbondale is a not-for-profit.

THE COURT:  Mr. McGee, let me interrupt.  Anyone who isn't speaking, so Mr. Cox and Mr. Snyder, if you could mute your sound, because we are getting a little bit of feedback and that's usually what causes it.

MS. MCGEE:  May I proceed, Your Honor?

THE COURT:  You may.

Q.   (By Ms. McGee) You mentioned Ministry Gospel for Life. What does your ministry do?

A.   So, our mission is to glorify God through the proclamation of gospel and to rescue babies.

Q.   You mentioned you're a missionary.  Do you have a mission field?

A.   Yes.

Q.   Who or what is your mission field?

A.   So, our primary mission field is the abortion facilities in Carbondale, and then our secondary is the City of Carbondale itself, the citizens in and around the City.

Q.   When you are going to an abortion clinic what do you do?

A.   So, I go to an abortion facility, I have a couple of things that I do.  I put signs out, I try to talk to people as

they are going in and out or on the parking lots, so sharing the gospel, trying to persuade them to keep their child. And then for those that are maybe driving by or walking by, I ask -- offer them prayer and try to just spread the information about what happens during an abortion, things of that nature.

Q. You said you take signs with you. What do those signs say?

A. So, I have several signs, one of which says -- It's double-sided. On one side it says, "Babies Are Murdered Here" and "endabortionnow.com." On the flip side of that sign it says, "endabortionnow.com, we will adopt your baby, please do not murder your child."

On another sign -- it's double-sided, as well -- it has the same message on both sides. It says, "Love Your Preborn Neighbor As Yourself." Again, it has three other things at the bottom, one of which is -- calls for criminalization and abolish abortion. Equal protection is also one of the other phrases on that sign.

And then another sign I have says, "Don't Kill Your Baby." It has a website they can go, "choice42.com," and a phone number, and on the flip side of that sign it says, "There May Be Time to Save Your Baby, abortionpillreversal.com."

Q. And how big are these signs?

A. The "Love Your Preborn Neighbor As Yourself" and the

abortionpillreversal sign are, I would say, approximately 12 inches by maybe 16, 18 inches, they are not big.  And then the "Babies Are Murdered Here" sign is a little bit bigger, but maybe two feet by two and a half feet.  It's not much bigger.

Q.  And why do you need your signs when you go to an abortion clinic?

A.  So, I use my signs primarily for two reasons; one, if I am talking to somebody and a mom is going in or going out, the information that she needs to hear, I can't do that while I am praying or talking with somebody else, so that information is for them; and then, two, to raise awareness what's going on inside those facilities.  They get told a lot that people don't know that those are abortion facilities, and so my signs help raise awareness that that's what's going on in those buildings.

Q.  And moving on to why we are all here, April 16, 2025, where were you that morning?

A.  I was outside of CHOICES Center for Reproductive Health in Carbondale.

Q.  And why were you there?

A.  I was performing my mission, sharing the gospel, and trying to help families keep their baby.

Q.  Was anyone else with you that morning?

A.  There were.  Bob and Darlene were both there.

Q.  Are they a part of Gospel for Life?

A.   No, they are -- they do their thing on their own, but we work together when we are out there.

Q.   And did you have your signs with you that morning?

A.   I didn't.  I did not, I had them in my car.

Q.   Were they in the ground at the beginning of that morning?

A.   My signs were not.  Bob and Darlene had some signs out.

Q.   And what were -- What were you doing that morning besides just being there?

A.   So, we had -- I had talked to a gentleman on a motorcycle who was against what we were there for.  I -- Darlene and I had talked to, I believe, one or maybe two moms who we referred to get them some baby supplies for their babies. They weren't -- They saw the signs for free baby supplies and they wanted to know where to get those at.

Q.   And what happened next?

A.   A car had stopped.  A white car had stopped to talk to me, and while I was speaking with him I heard a conversation start up behind me with Darlene.  A gentleman was talking to Darlene.  And when I ended my conversation with the white car, I saw that it was Mr. Lenzini talking to Darlene.

Q.   And, Mr. Hamman, were you wearing a body camera that morning?

A.   I was.

        MS. MCGEE:  Your Honor, we have stipulated to the authenticity of Plaintiff's Exhibit 1.  Permission to show the

Plaintiff what has premarked?

THE COURT:  Sure.  Hopefully this will work.

MS. MCGEE:  Okay.  Your Honor, are you able to see that?

THE COURT:  Yes.

Q.  (By Ms. McGee) Mr. Hamman, are you able to see that?

A.  Yes.

Q.  Do you recognize this?

A.  Yes, I do.

Q.  What is it?

A.  That is the video footage from my body camera.

Q.  From April 16th?

A.  Yes.

Q.  Has it been altered in any way?

A.  It's my understanding it has been altered to take the statements that my camera records and to put them all into one video, and then audio between myself and my attorneys has been redacted.

MS. MCGEE:  And just to preface it for the Court, Your Honor, this was given to us in five increments, forwarded to everybody and admitted into one video.  The Defense has a copy of this, as does the Court.  And with that, Your Honor, we move to enter this as Plaintiff's Exhibit 1 and publish a couple short clips over the next few questions.

THE COURT:  Okay.  I note that this was stipulated as

authentic, so it will be admitted.

Correct, Mr. Cox?

MR. COX:  That's correct, Your Honor.  We have no objection.  We stipulated to it.

THE COURT:  Okay.  You can go ahead and play it, Ms. McGee.

MS. MCGEE:  It's a couple short clips.  It's a long video, but we will do our best here.

Moving the clip forward to about 2:58 seconds -- I will get as close as I can to that.  The time-stamp is 10:03:54.  And, again, just to proffer, the video was an hour off.  I think we also told the Court that in our opening briefs, so I believe the time was 11:03.

(Video clip played for the witness and Court)

Q.  (By Ms. McGee) Mr. Hamman, do you recognize anyone in this video?

A.  Yes.

Q.  Who do you recognize?

A.  You can hear myself talking, Mr. Lenzini, and Darlene is there, who you see now.

Q.  And what else besides -- or, I guess, in the first few minutes did Mr. Lenzini say?

A.  Prior to -- May I get clarification?  Prior to this part of the video?

Q.  Apart from what was said in the video, what else did he

say to you in those first few moments?

A.  So, Mr. Lenzini said that we were not allowed to have the signs out.  I explained to him that the ordinance has an exception for people that are demonstrating, and he told us that free baby supplies, which are one of the signs, were not demonstration signs.  Of course he said that we don't have a right to demonstrate.

Q.  Was he alone?

A.  At that time he was, yes.

MR. COX:  Your Honor, show my objection to the witness stating what's on the video.  The Court can listen to the exact words that were said and I don't believe that last comment was on the video.

THE COURT:  All right.  Well, I will, of course, listen to the entire video, and that's -- and consider what that says in light of Mr. Hamman's testimony.

MR. COX:  Thank you.

Q.  Mr. Hamman, explain what happened next.

A.  After I put those signs in the ground, Mr. Lenzini said that I had I believe it was five minutes to remove the signs or he would call the police.  I told them that he could not waste the time and go ahead and contact the police, which shortly after another gentleman from his department -- I don't know his name -- arrived to bring a ticket book to Mr. Lenzini, who was going to charge me with a violation.

Q.   Just to back up for a second, you said -- And correct me
if I'm wrong.  The signs that Mr. Lenzini initially approached
you about, were those your signs?

A.   The original signs that were in the ground prior to Mr.
Lenzini approaching were not my signs.

Q.   Did you place your signs out on the ground at any point?

A.   Yes.

Q.   And what -- I'm sorry.  Go ahead and finish.

A.   Because he said that the free baby supplies were not
demonstration supplies.

Q.   So, what signs did you place out at that point?

A.   The "Babies Are Murdered Here, We Will Adopt Your Baby"
sign, the double-sided, "Love Your Preborn Neighbor As
Yourself" sign, and the "Don't Kill Your Baby,
abortionpillreversal.com" signs.

Q.   Did Mr. Lenzini give you a reason why he wanted you to
remove those signs?

A.   I believe -- I don't recall exactly at that point what he
said.  If you could replay the video to refresh my memory, I
would appreciate it.

Q.   Replay the last few seconds of this video?

A.   Yeah, it had cut out on my end.

Q.   Certainly.  I will back it up a few seconds here.

        (Video clip played for the witness and Court)

Q.   Mr. Hamman, does that refresh your recollection?  Were you

able to hear it at that time?

A.  I was.  Could you just repeat your questions?

Q.  So, did Mr. Lenzini give you a reason why you needed to remove the signs that you had gone to your truck to bring out and put in the ground?

A.  No.

Q.  Was he the first person to ask you to move your signs?

A.  Yes.

Q.  Did anybody else ask you to remove your signs?

A.  Later on the police, after they arrived.

Q.  Okay.  And just to move on here in a second, but just a note that the clip played and that it time-stamped 10:04:14. What -- And we will get to it in a second and share that again.  But, what else -- Were you told anything else as to why you needed to move your signs?

A.  I don't recall at this time.  I know that they -- the one sergeant shows a section that they had to be 20 feet from the curb.  That's the only other thing I can think of at the moment.

Q.  Okay.

        MS. MCGEE:  So, we will go ahead and show just a couple more short clips, Your Honor.

        I'll move this ahead to 48 minutes and 48 seconds, starting at time-stamp 10:49:41.

        (Video clip played for the witness and Court).

MS. MCGEE:  I will stop at 10:52:54.

Q.  (By Ms. McGee) Mr. Hamman, do you recognize anyone in this video?

A.  Yes.

Q.  Who was in the video?  Can you hear me?

MR. COX:  Ms. McGee, I'm sorry.  We couldn't hear what you were saying.  We could hear the witness.

MS. MCGEE:  Okay.  Let's see.  Sometimes if I stop sharing the screen --

Can you hear me now?

MR. COX:  I can, thank you.

MS. MCGEE:  Okay.  Yeah, sometimes it doesn't allow me to do that.  Thank you for letting me know, Mr. Cox.

Q.  (By Ms. McGee) Just to go back, Mr. Hamman, to reask the question, who was in that video?

A.  My pastor, Jared Sparks, is in that video; Sergeant Murray is in that video.  I don't recall if Officer Tyner was there at the very beginning.  You can't see whether or not he was on-scene at that time.

Q.  And were you asked to move your signs?  Is that why we can see you moving them?

A.  The explanation that the sergeant gave was that he -- you know, 20 feet from the right-of-way, 20 -- you know, and so we moved them back 20 feet from the curb.

Q.  And you moved them 20 feet from the curb.  What happened

then?

A.   I believe shortly after Mr. Lenzini came over and said we couldn't have them there.

Q.   And why was it important to have your signs in the ground that day?

A.   Well, again, it's one of the best ways for me to communicate my message to the City, to the people that are coming in.  I can't be everywhere all at one time and speaking to everybody, and so really to make sure that the message gets out there, that people know what's going on, and it helps me to reach those people that I wouldn't necessarily be able to if they're just driving by.

Q.   And how did that day resolve?

A.   Ultimately, after being told that if I didn't remove my signs I would be cited and they would be confiscated, and upon speaking with my attorneys, I removed the signs.

Q.   And, Mr. Hamman, just one other question.  You are a former law enforcement officer.  Do you care about safety?

A.   Absolutely.

Q.   Is carrying your sign safe?

A.   I believe that me being -- I am a pretty -- You can't really tell from the video, but I am about 250 to 260 pounds. And holding -- I believe myself holding a sign on the corner of the sidewalk would obstruct traffic much more so than my sign just staked in the ground away from the curb.

Q. All right. Moving on to -- Thank you, Mr. Hamman.

Moving on to signs in general, are your signs the only signs you have seen in the City of Carbondale?

A. No.

Q. Have you observed others?

A. Yes.

Q. Where have you observed them?

A. Various locations throughout the City of Carbondale on various -- on main thoroughfares there's other signs not even a block away. There were flags flying just down the street from where we were that day at that time, but also other signs located over by Murdale Shopping Center, Old 13, and over by the Planned Parenthood.

Q. And how do you know what some of those signs say?

A. I saw them and took photos of them.

MS. MCGEE: Your Honor, permission to show the witness what's been identified as Exhibit 2.

THE COURT: All right. Is this another stipulated exhibit?

MS. MCGEE: Yes, Your Honor.

THE COURT: All right.

Q. (By Ms. McGee) Mr. Hamman, is this one of those signs?

A. Yes, it is.

Q. And when did you take this picture?

A. I believe I took that picture two days after the incident,

on the 18th.

Q.   And where did you take this picture?

A.   That picture is located in front of, I believe, some West Town Plaza.  It's right next to the Murdale Shopping Center that I mentioned in the City of Carbondale.

Q.   Is this also the same sign?

A.   Yes, it is.

Q.   And is this also one of the signs that you just spoke of?

A.   Yes.

Q.   And when did you take this picture?

A.   I would have to look at the time-stamp, but I believe it was on the 20th or 21st, the same month.

Q.   Okay.  And is this -- Or, I'm sorry, I apologize.

     And where is this sign?

A.   This is off of Old 13, Old Highway 13, just down the street from the sign you just showed me.

     THE COURT:  Ms. McGee, it might be my eyes, but I can't read what that sign says.  I can read the first one that said *fish fry*.

     MS. MCGEE:  Let's go back and enlarge it.  I apologize, Your Honor.

     THE COURT:  Now, I see it.  *Exterior Cleaning*, yes.

     MS. MCGEE:  And just for record sake, this is page three of Exhibit 2.

     We will move on to page four.

Q.   (By Ms. McGee) Mr. Hamman, is this another sign that you saw?

A.   Yes, it is.

Q.   And where was this sign?

A.   That sign is maybe 50 feet from the -- 50 to a hundred feet from the Planned Parenthood, it's not very far, on the same street.  Forgive me, the name of the road is slipping my mind.

Q.   In what city is this photo taken in?

A.   In the City of Carbondale.

Q.   And is this on page five, a similar picture of the same sign?

A.   Yes.

Q.   And when did you take these photos?

A.   I believe those photos were taken on the 25th of April.

        MS. MCGEE:  Your Honor, I would just move to admit this as Plaintiff's Exhibit 2.

        THE COURT:  It will be admitted.

        MS. MCGEE:  Thank you.

Q.   (By Ms. McGee) All right.  Moving on, was April 16th the last time you spoke to Mr. Lenzini?

A.   No, it was not.

Q.   When did you speak with him?

A.   The following day.

Q.   Where did you talk to him?

A.   I went to the City of Carbondale's town office to obtain a permit.

Q.   When you say "obtain a permit," what do you mean by that?

A.   In that code section there's an exception for 501(c)(3), nonprofits to get an exception and permit of signs.

Q.   And is that what you talked with him about?

A.   Yes.

Q.   And what did he say?

A.   He said that there was no exception.

Q.   What if anything else happened that day?

A.   Because he told me that it was not -- that I was not able to do it, I left without an application or anything for the permit.

Q.   And why did you think you could get a permit?

A.   Because our church is a 501(c)(3), it's a not-for-profit, and I believe that the code section allows for us to get a permit.

Q.   And did you get a permit?

A.   No, I did not.

Q.   Moving on to the ordinance itself, have you read the ordinance that you were accused of violating on April 16th?

A.   Yes.

Q.   And, based on your understanding -- I'm not asking for a legal conclusion, but just what you thought -- how did you interpret following the ordinance on April 16th?

A.    I believe that I was following the ordinance correctly because of the section that says that it does not -- There's a section that talks about not being able to hold signs or otherwise display signs, and then later it says that that does not apply to people that are protesting or demonstrating, for demonstrations, political rallies, and other similar events, which I believe I fell under, and that's why I had my signs out.

Q.    What do you think it means to follow that ordinance now? And, again, just to be very clear, nothing definitively, a legal conclusion, just your understanding.

A.    I truly do not know what I am allowed to do with that ordinance.

Q.    You mentioned Jared Sparks.  How do you know him?

A.    He's one of our elders at Christ Church of Carbondale.

        MS. MCGEE:  Your Honor, nothing further, subject to redirect.

        THE COURT:  Sorry, I had shared my screen.

        Okay.  Mr. Cox, cross-examination?

        MR. COX:  Thank you, Your Honor.


                    CROSS EXAMINATION

BY MR. COX:

Q.    Mr. Hamman, in your complaint on paragraph 14, you allege you are a pro-life advocate who serves as a missionary

spending time as a sidewalk counselor, is that correct?

A. I do not have -- I mean, I don't have my declaration in front of me to know if that's verbatim, but it sounds right.

Q. Well, you are a pro-life advocate and you serve as a missionary and you spend your time as a sidewalk counselor, is that correct?

A. Yes.

MS. MCGEE: Your Honor, I would object. It's a compound question, but --

THE COURT: Overruled.

Q. Do you do that on a full-time basis?

A. I do.

Q. In other words, you don't have a job other than sidewalk counselor, is that right?

A. Yes.

MS. MCGEE: Objection, asked and answered.

THE COURT: Overruled. You know, this is -- this is an evidentiary hearing and I'm the fact-finder.

Q. You said you served as a police officer for 14 or 15 years, is that right?

A. 14 and a half.

Q. Was that in Virginia?

A. Yes, it was.

Q. And why did you leave that job?

A. My wife and I had just decided that we wanted to do

something different and see a different part of the country.

Q.  Okay.  So, had you lived in southern Illinois before?

A.  No.

Q.  How did you choose to come to southern Illinois?

A.  Because I originally intended to move to Indiana, but I had a retired sheriff's captain who I had worked with who lives in southern Illinois, and he invited us to move out here.

Q.  Okay.  Very good.  Well, welcome to southern Illinois.

You said that you are the founder of an organization called Gospel for Life, is that correct?

A.  Yes.

Q.  And when did you found that organization?

A.  We -- Well, it's a ministry of Christ Church.  Just to be clear, it's a ministry of Christ Church of Carbondale.  That ministry was founded or we started the process of getting this going probably in the summer of 2024.  I couldn't give you an exact date, but sometime around the summer of 2024.

Q.  You say in your complaint that this Gospel for Life organization is itself a nonprofit organization, correct?

A.  I do not have the complaint in front of me, but we operate -- the ministry is a ministry of Christ Church of Carbondale.  We are not a separate entity from Christ Church of Carbondale.

Q.  Well, paragraph 34 of your complaint says that Plaintiff is the founder of Gospel for Life, a nonprofit organization.

(Volume I)  08/11/2025  - Page 31

A. 56

So, is it a separate organization from the church?

A.   No, it is not a separate organization from the church.  It is a ministry of the church.

Q.   So, when you were performing this protest on April 16th, you were there as an employee of the church, is that right?

A.   Yes.

Q.   Under the authority of the church, not as part of this Gospel for Life organization?

A.   If I may, the ministry is a part of Christ Church of Carbondale and I was operating in my capacity in that ministry for the church.  It was mistermed in the document.

Q.   Okay.  Well, does this organization you founded, Gospel for Life, have a 501(c) designation?

A.   Again, it's just a ministry of the church.  It falls under the church, 501(c)(3).

Q.   So, Gospel for Life is really a part of the church, it's not separate from the church?

A.   Yes, sir, that's correct.

Q.   And does it have any members?

A.   Does the church have members?

Q.   No, the organization, Gospel for Life, that you founded, does it have any members?

A.   I do not know how to answer that question.  I'm not trying to be --

Q.   Well, it's an organization, right?

A.  Well, it's a ministry of the church, just like a food pantry would be a ministry of a church.  So, this is a ministry of the church.

Q.  I see.

A.  So, I wouldn't say that it has membership.

Q.  Okay.  Other than the location you were present at on April 16th, 2025, did you proclaim the gospel and provide counseling to pregnant women at other locations in Carbondale?

A.  On that specific date, no.

Q.  No.  On any other date?

A.  Oh, yes, sir.

Q.  And what other locations do you do your ministry?

A.  I also go to the Planned Parenthood in Carbondale and then I go to Alamo Women's Clinic.

Q.  And do you make protests there, as well, in those locations?

A.  Yes, I go out and do -- I'm not trying to interrupt you. I apologize.

Q.  That's okay.

A.  I go out to those locations, yes.  I post my signs, I share the gospel and do everything the same that I do at each location.

Q.  So, what was your purpose in being at this particular location near CHOICES on April 16, 2025?

A.  To share the gospel and rescue babies.

Q.   Had you been to that location previously?

A.   Yes.

Q.   Before going to that location on April 16, 2025, did you review the ordinance?

A.   I had reviewed it before, yes.

Q.   Why did you review the ordinance?

A.   Because I had been told by another -- by another church that they had been told that they couldn't have their signs out by the City police.

Q.   I'm sorry.  I want to make sure I understand your answer.

You are saying that other persons who had protested in that location told you that the police told them they could not put their signs out there?  Is that what you said?

A.   Yes, sir.

Q.   So, before you went there to put your signs in the ground, correct?

A.   After I read the ordinance and followed the exception, I believed that I could still go out there and do that.

Q.   So, you knew that the police had previously told others they could not do that, correct?

A.   From what I had been told, yes.

Q.   Who was it that told you that?

A.   Dan, a pastor from Ellis Grove.

Q.   Is that the only other person that told you that?

A.   As far as I can recall, yes.

Q.  And to be specific, they had put signs in the ground at that same location and had been told by the police to remove them, correct?

A.  I was not there when they were told they could have them. So, the exact parameters of everything with their signs, I could not give -- I wouldn't want to give an exact and be in error.

Q.  You understood that they could not -- that they were told they could not put the signs in the ground at that location. You understood that, correct?

MS. MCGEE:  Judge, just for the record sake, I would object to hearsay, just note it for the record.

THE COURT:  Your objection is noted.

A.  Would you repeat the question, please, sir?

Q.  I will.  So, you had been told before April 16th, by someone who had put signs in the ground, the police told them they could not put signs in the ground there?

A.  Yes.

Q.  But, you read the ordinance yourself and decided that you believed you could put signs in the ground there, is that right?

A.  I read the ordinance myself, I saw the exemption and that -- and the other signs that are displayed across the street, right next door that had signs in the ground.  I believe that I fell into that exemption that it was okay.

Q.  I want to talk to you about that exemption.  That exemption is found -- And I am going by the transcript I read where you quoted that section of the ordinance and I found it in Section 15.4.10.7.  Is that where it's located?

A.  It is, but it's also in point 8.

Q.  Well, I see it -- The one I am reading -- I will tell you where it is.  15.4.10.7, and that is in Subsection (K)(1)(c).

MS. MCGEE:  Judge, just a couple of objections.  One, I believe Counsel is testifying at this point.  If he's going to go line by line through the ordinance, if Mr. Hamman has a copy of the ordinance in front of him then we can proceed.  If not, I would ask that Mr. Cox show him the ordinance.

MR. COX:  Well, Your Honor, first of all, I'm an old dog that has trouble learning new tricks and I'm not sure how to put it on the screen.  But I think we have provided them with copies of the exhibits.  This is Exhibit 11.  I think the Court has it, as well.

Does Mr. Hamman not have a copy of the exhibits?

THE COURT:  Mr. Hamman, do you have a copy of the exhibits?

A.  I only have a few of the exhibits that my attorney and I discussed with the signs.

THE COURT:  Do you have a copy of the ordinance?

A.  I can -- I do not have, no.  I could pull it up on the computer or on my phone, but I don't have it in front of me.

THE COURT:  Okay.

MR. COX:  Judge, we are going to try to share the screen.

THE COURT:  Okay.

MR. COX:  Ms. Snyder is younger and smarter than me.

THE COURT:  Well, I am with you, Mr. Cox.  I couldn't do it, either, but I have a copy of the ordinance.  I was trying to follow along.

So, say again the section that you were referencing.

MR. COX:  Yes, Your Honor.  It's 15.4.10.7.

THE COURT:  Okay.  Then you went to K?

MR. COX:  If you turn to the next page, you will see K is temporary signs.

THE COURT:  Okay, got it.  And that's broken down between temporary commercial banners and temporary noncommercial signs?

MR. COX:  That's correct.

THE COURT:  Okay.  We are talking about a noncommercial sign here, correct?

MR. COX:  We are.

THE COURT:  Okay.  Mr. Hamman, were you able to pull up a copy of the ordinance?

A.  I didn't want to do anything without the Court's permission, so I can quickly.

THE COURT:  Okay.  Or, Mr. Cox, do you think you will

be able to share it?

MR. COX:  We will do that now, Your Honor.

THE COURT:  There we go.

MS. MCGEE:  And just to clarify, are we talking about point 7 or point 8 at this point?  We were going back and forth.  I want to make sure I am looking at the same thing you are looking at.

MR. COX:  Point 7, Judge.

THE COURT:  Point 7.

MR. COX:  We are at K(1)(c) under point 7.

Okay.  We have it up on the screen.

THE COURT:  Okay.

Q.  (By Mr. Cox) And my question for Mr. Hamman -- I'm going to put my glasses back on -- for Mr. Hamman was is this the provision that you were discussing with officers at the location that day?

A.  I actually told them that it's listed in two parts of their ordinance; that section that you are in, and then in the following Section 15.4.10.8 it makes the -- it has under (5)(4).

Q.  Okay.  So, if we look at -- Let's look at the first one.  Under point 7 (K)(1)(c), we see the language you talked about here, and I'll just point it out for you.  It says, "This provision is directed toward such displays intended to draw attention for commercial service and is not intended to limit

display of banners, flags, or other signage by persons participating in demonstrations, political rallies, or similar events.

MS. MCGEE:  Your Honor, I would object to using point 7 of the ordinance as we are talking about sign in the BPR district, and the relevant base at issue is the non-BPR district, which is point 8.

MR. COX:  Well, that's my point, Judge.  This section that he was quoting here applies to downtown sign regulations in what they call the BPR and main business area.

MS. MCGEE:  Your Honor, I would object that that's mischaracterizing his testimony.  He said it appears at point 7 and point 8.

MR. COX:  So, now let's go to point 8.

THE COURT:  Yeah, I am trying to follow along.  So, I think this will be helpful and I assume Mr. Cox will tie it up and explain the difference between point 7 and point 8.

Q.  (By Mr. Cox) So, in point 8 we have temporary signs other than in the BPR district.  Do you see that, 15.4.10.8?

A.  Yes, I see that.

Q.  So, I'm looking here for that section again that you quoted to the police officers, and I find it at -- under point 8, paragraph (5)(a)(4).  Is that what you were showing to the officers?

A.  I believe -- Yes, I mean, I don't recall the exact numbers

that you just listed off of there.  This what I can see on the screen looks to be what I was shown.

Q.  If I go above that, in (5)(a), this section that you quoted to them pertains to temporary commercial signs, correct?

A.  (5)(a) does say temporary commercial signs.

Q.  And yours were not commercial signs, were they?

A.  No, they were not.

Q.  But, if we look here at point 8(A)(1), we see that it says, "No sign may be erected on, suspended over, or encroach upon the public right-of-way, except as provided for under Section 17-1-5 of this code dealing with encroachments, or be located so as to obstruct visual clearance needed for safe vehicle or pedestrian traffic."

        So, you read that part of it, as well when you reviewed it, that you cannot put a sign in the right-of-way, correct?

A.  That's on the right of way, yes, it does say that.

Q.  All right.  So, what did you do to determine whether the signs you placed in the ground on April 16th were or were not in the right-of-way?

A.  Well, to determine whether they were or were not in the right-of-way I had viewed the GIS from the county website and believed that they were on, you know, public property.  As far as right of way, I wasn't -- I didn't believe I was impeding

anybody's travel or anything like that.

Q.  Well, it doesn't have to impede travel if it's in the right of way, right?  It just can't be there at all.

MS. MCGEE:  Objection, Your Honor, to Counsel testifying.

THE COURT:  Well, he's cross-examining him about the language of the ordinance.  I will allow it.

A.  I'm not an attorney.  I believe that the right-of-way meant that I couldn't impede their right-of-way, their freedom to move through the area.  I didn't believe that my signs were doing that.

Q.  Well, let's take a look.

If we take a look at this language in 15.4.10.8(A)(1), do you see it says, "No sign may be erected on or suspended over or encroach on the public right-of-way," and then there's an exception, "or be located so as to obstruct visual clearance needed for safe vehicle or pedestrian traffic"?

So, we have one statement or another, correct?  The first statement says you can't put a sign in the right-of-way, correct?

MS. MCGEE:  Your Honor, he's asking the witness for a legal conclusion.  I would object.

THE COURT:  Well, certainly the witness can't give a legal conclusion.  Again, he's cross-examining him about the

language of the ordinance.

A.  In that section it does -- I'm sorry.

        THE COURT:  Go ahead.

A.  It just says that, "No sign may be erected on, suspended over, or encroach upon the public right-of-way."

Q.  Right.  And, in fact, when Mr. Lenzini came there to the scene to talk with you, he told you where the right-of-way was, didn't he?

A.  I don't recall.

Q.  Well, I am reading a transcript, Exhibit 17, page 3.  He says to you where the right-of-way is.  You don't recall that?

A.  I don't recall that.  If I could see it and refresh my memory.

        THE COURT:  Mr. Cox, is this a transcript of the body-cam video?

        MR. COX:  It is, Your Honor.  In fact, it was brought to me by the Plaintiff this weekend and I forwarded a copy marking Exhibit 17 to the Court and to Counsel.  I don't know if the Court has had a chance to see it yet or not.  I sent it to your PDF e-mail.

        THE COURT:  Okay.  I'm sure I have it here with a number of other things.

        MR. COX:  I think the Plaintiff also made it an exhibit.

        Am I right about that, Ms. McGee?

MS. MCGEE: I don't have it in front of me. We just -- Yes, Your Honor, for ease of specifics, it's a little difficult to hear due to the wind. We had it transcribed by a Court Reporter and I believe Mr. Cox is correct, that he sent it to you over the weekend.

THE COURT: Okay. I'm looking for that now, but go ahead.

Q. (By Mr. Cox) So, that would be on page 3, Mr. Hamman, of Exhibit 17 of the transcript. Mr. Blumenstock, who's there, said -- They are talking about Mr. Blumenstock's signs. It says, "He says he's going to take the signs up. I said is this something new?"

You said, "Why is that?"

And Mr. Lenzini said, "They are on the City right-of-way." Do you recall that?

A. I do not recall it, no, I'm sorry.

Q. All right. But, Mr. Lenzini made it clear to you that the signs could not be there because they were in the right-of-way, correct?

MS. MCGEE: Your Honor, the witness said he doesn't recall. I think if we showed him the transcripts that would be, I think at this point, the kind thing to do.

THE COURT: All right. Can you do that, Mr. Cox?

MR. COX: I am sorry. I could not hear what she said, Judge.

THE COURT:  She said that the kind thing to do would be to show the witness the transcript.

MS. MCGEE:  Just to help him -- Mr. Cox, he said he doesn't recall.  If you asked him further questions without objection from me to show him the transcripts, I think, would be helpful.

MR. COX:  All right.  Well, if I show him any more of the transcript, I will be glad to do that.

THE COURT:  And I do have the transcript, so, of course, I can read that for myself.

MR. COX:  Sure.  Yes, Your Honor.

Q.  (By Mr. Cox) Mr. Hamman, let me ask you this question: Did you seek any information or explanation of the ordinance from anyone connected with the City before placing the signs in the ground on April 16th?

A.  No.

Q.  Why didn't you seek guidance from the City about that?

A.  Because I believe -- my understanding of that section where it says, "Commercial signs prohibited includes signs that are carried, waved, or otherwise displayed by persons either on public right-of-way or in a manner visible from public right-of-way" -- and that doesn't apply to those that are participating in demonstrations or similar events -- I believe that the code section allowed me to do that.  It's my understanding that that's what the code section allows.

Q.  I believe that you believed that.  My question was why didn't you seek advice from the City about the interpretation of the ordinance before you went there on April 16th?

MS. MCGEE:  Your Honor, I would just object to asked and answered.

THE COURT:  Overruled.  I don't understand what the answer is.

A.  I see signs posted throughout the city.  And believing that I was falling in line with the ordinance, I didn't think that I needed to seek counsel from the City to do what I was doing.

Q.  Mr. Hamman, when you arrived at this location on April 16th, was Mr. Lenzini already there?

A.  No, sir.

Q.  So, you arrived there before Mr. Lenzini came, is that right?

A.  Yes, sir.

Q.  And at the time Mr. Lenzini came you had not yet put your signs in the ground, correct?

A.  Correct.

Q.  And so when Mr. Lenzini came, there were signs in the ground placed there by someone else, correct?

A.  Correct.

Q.  And who had placed those signs in the ground?

A.  Either Bob or Darlene or both, I couldn't tell you,

because I wasn't there when they put them in.

Q.  So, these other two people, they weren't there with you, part of your organization, correct?

A.  Correct.

Q.  And they were also protesting the signs having to do with anti-abortion messages, correct?

A.  Correct.

Q.  So, did you hear Mr. Lenzini tell them that they had to remove their signs from the ground?

A.  Yes.  I heard him tell Darlene, rather.

Q.  And did you hear him tell her she had to remove them because they were in the right-of-way?

A.  I don't recall if he said "right-of-way."

Q.  All right.  And did Darlene and Bob comply with the City's request that they remove the signs from the ground?

A.  Bob was away from the site at the time, across the street. Darlene started to, but Mr. Lenzini also started removing the signs.

Q.  Okay.  So, Darlene and Mr. Lenzini were both removing signs, correct?

A.  Yes.

        MS. MCGEE:  Your Honor, I would just object to relevance.  Neither are witnesses, neither are parties in this case.

        THE COURT:  Well, Mr. Cox, what is the relevance of

this?

MR. COX:  Well, the relevance of it is twofold, Judge; one, to show that Mr. Hamman, before he placed his signs in the ground, knew the City had requested that the other people that placed signs in the ground removed them and, secondly, to show that those other people took their signs and carried or wore them to continue their protest without interference or objection from the City.

THE COURT:  Okay.  The objection is overruled.

Q.  So, the signs were removed, Mr. Hamman, correct?

A.  Yes.

Q.  And then thereafter Bob and Darlene continued their protest by wearing their signs or carrying them, correct?

A.  I believe so, yes.  I know Darlene for sure.  Bob, I would have to review the video.  I don't recall.

Q.  So, would it be fair to say that they complied with the City's request and were able to continue protests unabated?

MS. MCGEE:  Objection.  It's calling for a legal conclusion based on the ordinance that he's talking about.

THE COURT:  No, overruled.  To the extent that he -- that Mr. Hamman understands based on his interpretation of the ordinance, I will allow it.

A.  Can you repeat the question, sir?  Sorry.

Q.  Yeah.  After they removed the signs they continued to carry or wear them this protest unabated?

A.   Correct.

Q.   Did you observe either Bob or Darlene, while they were carrying or wearing the signs, converse with people that might have stopped in a vehicle?

MS. MCGEE:   Objection, Your Honor, as to relevance.

THE COURT:   Overruled.

A.   I don't recall.

Q.   Have you ever protested at another location on a different date or at this location on a different date by wearing or carrying a sign?

A.   I have carried signs before, yes.

Q.   And they don't weigh much, do they?

A.   No.

Q.   Made of plastic?

A.   And/or foam, depending on the sign.

Q.   Okay.

MS. MCGEE:   Your Honor, I would object to relevance as the weight or size as having to do with the Constitutional violation.

THE COURT:   Well, that's fair, but I think it goes to whether it's feasible to wear them, which is something that's addressed by the ordinance, so I will allow it.

Q.   Did anyone connected with the City tell you on April 16th you were allowed to carry this or wear the sign?

A.   Yes.

Q.   But on that date you wanted to place the sign in the ground rather than carry the sign, as you were told you could and which you had on a previous occasion, correct?

A.   That's correct.  I don't carry the -- The reason I stopped carrying the signs was for a couple different reasons.  That's why it's better to have them in the ground.

Q.   Would it be fair to say that Bob and Darlene were carrying their signs that day and had no problems?

A.   Bob and Darlene do not operate the same way as I do when it comes to talking with people and approaching people and interacting with the community, so they don't -- they may not -- I don't know, because I can't speak for them, but they may not feel the need to -- or they may feel more comfortable holding a sign.

Q.   So, eventually you complied with the request to remove the signs, correct?

A.   Yes, so that I wouldn't get a ticket.

Q.   And you were not given a citation by the City, were you?

A.   I was told that if I removed the signs I would not have a ticket or my signs confiscated.

Q.   And you were -- Neither of those things happened, correct?

A.   That's correct.

Q.   After you removed the signs --

          MR. COX:  And this gets into the transcript, Judge.  We may have to show it.  Do you have that?  Okay.  We are

trying to figure out how to show it, Judge.

THE COURT: Okay.

MR. COX: I think I sent an email to you.

MS. MCGEE: In the interest of expediency, I do have it up right now. If you want to point me to what page so we can --

MR. COX: Thank you, very much. I really appreciate that.

MS. MCGEE: What page, sir?

MR. COX: Page 84.

MS. MCGEE: Does that look good, sir?

MR. COX: Thank you, very much. I have reached the age where I have to take my glasses off.

Q. (By Mr. Cox) Looking down at line 21, Mr. Hamman, you said -- This is after you removed the signs from the ground. You said, "You guys want to hold some signs for a few minutes?" Pastor Sparks said, "I'll hold some signs." And you asked, "Which one?" And then he said, "Yeah, sure, I'll take this" -- if we go to the next page, thank you -- "I'll take this one here."

So, after you removed the signs, Pastor Sparks carried or wore a sign for some period of time, correct?

A. Yes.

Q. Did you also, along with Pastor Sparks, also carry a sign during that time?

A.   No, I did not.

Q.   Just -- So, the only one carrying the sign or wearing it was Pastor Sparks after you removed the signs?

A.   I believe Pastor Andy also held one.

Q.   Who's Pastor Andy?  That's a new name.

A.   He's one of the other gentlemen in the video.  He's one of my elders at church.

Q.   I see.  So, the two of them carried the signs, or did they wear them?

A.   Carried.  My signs don't have straps to wear them.

Q.   Okay.  So, did they -- When they were carrying the signs, did anybody from the City try to stop them --

A.   No.

Q.   -- or interfere with them in any way?

A.   No, not to my knowledge.

     MR. COX:  If we could, Ms. McGee, go to page 32 of that Exhibit 17.  Thank you.

Q.   (By Mr. Cox) I wanted to ask you, Mr. Hamman, about this -- in the transcript it's a little unusual in that you and Pastor Sparks are talking and Mr. Lenzini is there talking, and then at line 7, you began talking to someone else.

     Do you see where it says, "Hey, ma'am?"  Do you see that?

A.   I do.

Q.   Are you talking to somebody that's in a car, or walking?

A.  I don't recall.  I would have to view the video to see whom I was speaking to at that moment.

Q.  But you were speaking to a female person, is that correct?

A.  Yes.

Q.  And then you talked to her about whether she took a pill that day, wanted her to know about a certain place on the internet she could go to about that, correct?

A.  Correct.

Q.  And you said, "We'd love to help you, there's still a chance for your baby to live today, please let us help you, come talk with us, we'd love to pray with you and find a solution that's not taking the life of your innocent child."

Did anybody try to stop you from conveying your message to this woman?

A.  No.

Q.  Did anybody criticize you for conveying this message to this woman?

A.  No.

Q.  Mr. Lenzini was standing right there, wasn't he?

A.  I would have to view the video, because I may have walked away from him at that time, because -- and spoke to that person through the fence, and he wouldn't have necessarily been a part of that conversation.

Q.  Well, you don't remember one way or the other what happened?

A.  I recall at one point walking away and trying to talk to someone on the parking lot, but I couldn't tell you at this moment in time or if it's another moment in time.  So, whether he heard what I had to say or didn't, I could not tell you.

Q.  So, going over to page 34 -- and this is during the time you are still at the location, a short time after you spoke to this lady we just talked about.

I am looking at line 17.  I wanted to ask you about this section.

Now, at line 17 you say, "Well, Jared and I do."  Who were you speaking with at that point.

A.  It looks like I was talking to my wife.

Q.  Okay.  And then at line 21, you say, "Can I give you this?"  Are you speaking to a female who's walking by there?

A.  I believe I was.

Q.  And so what were you attempting to hand this person?

A.  The gospel tracks.

Q.  The lady responded to you, "Oh, I can't have no kids," and then you responded, "No, this is about -- this is not about kids." And then you later said, "It's a gospel track," and apparently she took it from you and thanked you, is that right?

A.  That's correct.

Q.  And this is while Mr. Lenzini is still there, correct?

A.  Yes, but I couldn't tell you where he was.  I would have

to review the video.

Q.   All right.   But you were doing your conversation with this first lady and with this other lady in the view of Mr. Lenzini.   He was in a position nearby, correct?

A.   I don't recall where he was standing.   Whether anything would have been obstructing his view, I truly do not know.   I would have to view the video.

Q.   Because if we go down further on page 35, you see that just a short time after you spoke with this lady Mr. Lenzini is talking to the police officer there at that location.

A.   Excuse me.   Are you saying at the end of 35, verse line 24, into 36, line 1?

Q.   Yeah.

A.   Okay.   It would appear so based on the officer's name being there shortly after.   I imagine, yes, that's who he's talking to in my statement.

Q.   And then did the officer or Mr. Lenzini do anything to try to interfere with you talking to this lady and giving her gospel track?

A.   I don't even know if the officer had gotten out of his car at that point.   I don't know where he was when I talked to that lady and gave her the track.   I would have to look at the video.

Q.   I'm just asking whether either of them at any time during the time that you are there at that location tried to

interfere with you counseling or talking with people there and providing them with information?  Did they do anything?

A.  No, they did not.

Q.  Okay.  Did -- The signs you put out, you have already told us what they said.  The sign about free baby supplies, that was a sign by Bob and Darlene, right?

A.  That's correct.

Q.  But your signs were different?

A.  Yes.

Q.  So, did anyone connected with the City that day on April 16th, with whom you spoke, make any comments about the messages on your sign?

A.  On my sign?

Q.  Yes, sir.

A.  Not on my sign that I recall.

Q.  Did Mr. Lenzini or anyone else connected with the City with whom you spoke express their opinion about the issue of abortion to you?

A.  I don't recall.

Q.  Do you recall any comments about that from anybody connected with the City?

A.  I don't recall.  If you have the transcript or something to refresh my memory of it, I would be happy to answer.

Q.  All right.  Mr. Lenzini asked you for your name, didn't he?

A.  At one point, yes.

Q.  And you refused to provide him with your name, didn't you?

A.  I did.

MS. MCGEE:  Mr. Cox, are you wanting me to share the screen, or are you done with the exhibit?

MR. COX:  I am finished, thank you.  Please take it down, thank you.

Q.  (By Mr. Cox) You have included in your exhibits some photographs of signs that were placed in the ground; one advertised a fish fry, a sign advertising exterior cleaning, and a sign regarding the ever popular Irish Festival in Carbondale, correct?

A.  Yes.

Q.  And you took -- yourself took photos of those three signs?

A.  Yes, I did.

Q.  Do you know how long those signs had been in the ground at the time you took the photograph?

A.  No, I do not.

Q.  Do you know how long it was after you took the photograph until the three signs were removed?

A.  I don't recall at this time.

Q.  Do you know -- Did you ever go back to that same location where those signs were that you photographed to see if they had been removed?

A.  Yes.

Q.  When did you go back?

A.  I don't recall the exact dates.  I would have to look at the other pictures that I had taken, the timestamps.

Q.  Do you know whether the presence of these signs was known to the City at the time you took the photographs?

MS. MCGEE:  Objection, this is speculation.

THE COURT:  Well, he asked if he knows.  So, do you know, Mr. Hamman?

A.  No, ma'am.

Q.  You wore a concealed body cam on April 16th, didn't you?

A.  No, I did not.  It was not concealed.

Q.  Where was it located?

A.  On my hip, on my belt.

Q.  Oh, okay.  What did it look like?

A.  It's about two and a half to three inches tall, two inches wide.  It sticks out off of my belt maybe two inches, kind of hangs out.

Q.  Black?

A.  Black, yes.

Q.  Did you advise any of the persons with whom you were conversing on April 16th that you were recording the conversation?

A.  No.

Q.  Did any of those persons give their consent to you recording their conversation?

A.   No; didn't ask.

Q.   The next day, on April 17th, you went to City Hall to obtain a sign permit, correct?

A.   Yes.

Q.   And at one point you were live-streaming a portion of the conversations on April 16th, weren't you?

A.   I did, yes, for a moment or two, minute or two.

Q.   And what program were you using to live-stream these conversations you were having at the City?

A.   Facebook.

Q.   And were you live-streaming to people who were on some -- a friend on some page, or who were you live-streaming to?

A.   I will be honest, it was my first time doing it.  I don't know exactly how that reaches the audience, so I couldn't tell you.  I was taking a live video.  I don't know how it gets where it gets.  I have not done it before.

Q.   So, when you -- Here's what I want to know, Mr. Hamman: When you went there on April 16th, were you intending to record or live-stream events there at that site?

     MS. MCGEE:  Your Honor, I'm going to object to relevance to all of this line of questioning regarding recording and streaming.

     THE COURT:  No, overruled.  I'll allow it.  I assume he's going to tie this up as to how it is relevant.

A.   May I answer?

THE COURT: You may answer, yes.

A. So, I wear a body camera primarily for my protection. I don't post my body-camera footage on Facebook or anything like that. The reason I carry body cameras is because I have been assaulted, I have had people say things, throw things at me. I had a gentleman brandish a handgun at me, had my sign stolen, so I use the body camera for my protection or in the event a crime takes place against me that I can have video to show the police.

Q. Do you tell the persons who you are recording that you are recording them?

A. No.

Q. Okay. So, you also have this body cam on when you went there on April 17 to City Hall, correct?

A. Correct.

Q. Did you advise anyone at City Hall they were being recorded?

A. No.

Q. Did they consent to it being recorded?

A. No.

Q. So, when you went there you had a conversation with Mr. Lenzini -- This is on April 17, correct?

A. Yes.

Q. Did you tell him your name?

A. I may have. He and I recognized each other, I believe,

the moment we saw each other.

Q. From the day before?

A. Yes.

Q. But you hadn't given him your name the day before. Did you give him your name on the 17th?

A. I don't believe. I don't recall.

Q. All right. You asked him about getting a sign permit and he asked you where you wanted to put the signs, correct?

A. Yes.

Q. But you didn't tell him where those locations were. You just said "different locations"?

A. Yes, and I may have implied that it was the same locations, the abortion facilities.

Q. So, were you wanting a permit when you went there that day to put the signs in the same location you were on April 16th?

A. That location and the other two abortion facilities.

Q. So, you wanted a permit for the same location where they had told you the signs had to be removed the day before at CHOICES?

A. Based on the exemption -- or the permit for 501(c)(3)s, yes.

Q. And so what you wanted to do was to get a permit to put the signs in the ground in the right-of-way, correct?

MS. MCGEE: Objection, Your Honor. It's calling for a legal conclusion on the definition.

THE COURT:  Overruled.  If he can answer.

A.  Because they had told me that I couldn't have the signs, but the code says that it has an exception for 501(c)(3)s, I went there to get one based on the exemption for 501(c)(3)s.

Q.  Did you ask Mr. Lenzini about the exception for the 501(c) exemption?

A.  I mean, I can't quote exact, but I believe I said, "So there's no exception for 501(c)(3)s?"  And he told me there was not.

Q.  Right.  To put it in the right-of-way, correct?

A.  He said there was no exemptions for 501(c)(3)s.

Q.  All right.  Did you tell Mr. Lenzini which 501(c) organization you were referring to?

A.  No, because he told me it didn't matter.  He said that there was no exemption for 501(c)(3)s, so I -- at least I don't believe.

Q.  All right.  Did you ever attempt to apply for a sign permit online?

A.  No.

Q.  All right.  I want to look at Exhibit 10.  And do you have Exhibit 10 there, Mr. Hamman?

A.  I do not, unless it's -- The only exhibit I have, Your Honor, is the signs.

Q.  I see.

MS. MCGEE:  Can you clarify if you are referring to

Plaintiff's or Defendant's Exhibit 10?

MR. COX:  Defendant's Exhibit 10, my question is sign permits.

THE COURT:  It sounds like he does not have that.  Do you have the ability to share, Mr. Cox?

MR. COX:  We are working on that, Judge.

THE COURT:  Okay.

MR. COX:  We are attempting to do that.

THE COURT:  Okay.  I'll tell you what.  While you are attempting to do that let's take just a short, like, five-minute break and then we will resume, say, at 3:11.

MR. COX:  Yes, Your Honor.

MS. MCGEE:  Thank you, Judge.

(Court in recess from 3:06-3:12)

THE COURT:  All right.  If we could get started again, everybody is back.

MR. COX:  Judge, Mr. Snyder has gone to get a thumb drive to -- so we can display the exhibit, Exhibit 10.  He should be here just momentarily.

THE COURT:  Okay.

MR. COX:  And I apologize to the Court, I just don't know how to do it.  I am going to have to get some instruction for next time.

THE COURT:  Are there any other questions you can move on until he comes back?

MR. COX: I can ask him questions. I just have a few.

Let me shut the door. There we go.

Q. (By Mr. Cox) So, I just have a few more questions before we look at Exhibit 10. When you went to ask for the sign permits at City Hall on April 17th, were you seeking a permit to place a sign on any private party property, any private property?

A. I don't believe so, no.

Q. So, what you were speaking for all the locations was to place the sign in a right-of-way, is that correct?

A. I wanted to place it on public property.

Q. Do you know the difference between a right-of-way and public property?

A. My understanding between -- is that a right-of-way is an area of travel, such as like a pedestrian has the right-of-way if they are crossing the street, but that public property is property open to the public.

Q. I see.

MR. COX: Do you have that, Mr. Snyder? Exhibit 10, please.

Q. (By Mr. Cox) Mr. Hamman, can you see this document that Mr. Snyder has put on the screen?

A. Yes.

Q. And what we have here in Exhibit 10 is a collection of

sign permits that have been issued by the City of Carbondale. And if we go down to line 20, you see he's put the cursor there. It says, "Condition of approval." And one of the conditions for approval of the sign permit is that the sign shall be erected entirely on private property.

I'm not going to go through every one of these, but I will tell you that every single one of these has the same condition, okay?

So, but you were seeking a permit to place signs on not private property, but, as you said, public property or right-of-ways, correct?

A. So, I went there seeking the permit for 501(c)(3). They told me there wasn't one, so I have not seen this form before.

Q. All right. But I am just asking you this: The permits you were seeking, could they -- would they have met the condition for approval that they'd be erected entirely on private property?

MS. MCGEE: I'm going to object here, Your Honor. This is not a part of this Form A, the comment made by someone -- obviously whoever has signed this. It's calling for the witness to speculate on what the City will or won't approve.

MR. COX: My question, Judge, was not that; it's whether he could have met that condition for approval for the locations where he wanted to place the signs.

THE COURT: Okay. I will allow that question, Mr. Hamman.

A. Yes, ma'am. Based on that line, I don't think that they would be on -- they would be on public property, so they wouldn't be on private property.

Q. All right. Thank you. That's all I have.

MR. COX: Thank you, Your Honor.

THE COURT: All right. Any Redirect, Ms. McGee?

MS. MCGEE: Yes, Your Honor.

Mr. Snyder or Mr. Cox, can the screen be unshared, please? Thank you.

REDIRECT EXAMINATION

BY MS. McGEE:

Q. Brandon, you were asked a lot of questions today about the ordinance. I just want to clarify a few things and I want to share my screen to the ordinance itself here.

What is the title of this ordinance?

A. "Temporary signs permitted (except in the BPR district)."

Q. What does Subsection A say?

A. "General Provisions For All Temporary Signs."

Q. Does it say "commercial signs"?

A. No.

Q. And what about Section (A)(3) down here? What does this say?

A.   "No temporary signs shall be erected within 20 feet of the curb line of any adjoining street surface, except those located in the BPR district in which case the temporary signs shall be flush mounted to the building.  No signs shall be erected so as to obstruct visual clearance needed for safe vehicular and pedestrian traffic."

Q.   And how do you, in your understanding, understand this part of the ordinance?

A.   The Section 3, that as long as it is outside of 20 feet from the curb line of any adjoining street that it can be posted.

Q.   And I'm not sharing the whole thing here, zoomed in too much, but is there a definition of right-of-way inside of this section or of Section 15.4.10.8?  Do you see that anywhere?

A.   No.

Q.   Did you ever find the definition of right-of-way anywhere in Carbondale City Code?

A.   I don't believe so.

Q.   Turning to Section (A)(5)(b), what is the title of Section (A)(5)(b)?

A.   (5)(b), Temporary Noncommercial Signs.

Q.   And can you remember, too, if this section were in here?

A.   "Each individual 501(c) not-for-profit organization will be allowed to display a temporary sign for a period not to exceed 30 consecutive days.  Each organization is allowed a

total of 60 calendar days to display temporary signs.  A new permit shall be issued each time a temporary sign is to be displayed.  Permit fees may be waived with the approval of the administrative official."

Q.  Do you see the words "private property" anywhere in that section?

A.  No, I do not.

Q.  And moving on to Section 3, what does that say?

A.  "Temporary signs need not be located on the site for which the event is to take place."

Q.  So, it doesn't say that it needs to be on the same land, is that correct?

A.  That is correct.

Q.  I'll go ahead and un-share this.  You testified that you have a few reasons for why it's easier to put signs in the ground than hold them.  What are those reasons?

A.  If you are ever out on the sidewalk in Carbondale, it can be pretty windy.  So I have seen signs that have been blown across the street, they blow into traffic.  I don't want my signs hitting somebody or something if I am talking to somebody up close or talking to somebody in their vehicle.  I don't want that to happen.  Again, I don't want it to blow into the road or cause an accident.

And then I also, in my mission out there, I use my hands a lot.  I use my hands to tell people I am praying for

them, to wave at them, to encourage them to come talk to me, and so holding a sign makes that difficult. And due to the fact that some people get violent, I don't believe that wearing a rope around my neck that they could grab and use to choke me is wise, so I don't wear one.

Q. And you said earlier one, I believe -- And if I am misstating, please correct me -- that you use the signs to amplify your message. Can you tell us what that means?

A. Yeah. So, when someone is driving by and they see me standing there maybe with my back turned talking to somebody, all they see is a man standing there. But, when my signs are there and they are on display, whether I am talking to somebody or not, they get the message, clearly get the message. You know, they see that babies are murdered there, they see that we are offering help, they see that they should love their preborn neighbors as themselves. They get that message that they won't get if I am just standing there.

MR. COX: Your Honor, show my objection. That's pure speculation as to what somebody driving by might see or not see if he's holding or has the signs in the ground. It's pure speculation, so I object.

THE COURT: I'll allow him to answer that.

Q. And, Mr. Hamman, did you comply with the police on April 16th?

A. Yes, I did.

MS. MCGEE:  Nothing further, Your Honor.

THE COURT:  All right.  Mr. Cox, can you explain -- I looked around in this ordinance.  I get BPR refers to some sort of zoning.  Can someone tell me what BPR stands for?

MR. COX:  I'll ask Mr. Snyder to answer your question, Judge.  He's more qualified than I am.

THE COURT:  Okay.

MR. SNYDER:  BPR stands for primary business district, which is our downtown.  I don't know how familiar you are with Carbondale, but it's the corridor that is Illinois 51 North, so that would be what has been called in Carbondale as *The Strip*.

THE COURT:  *The Strip*.  Okay.  That's what I was going to ask.  What does BPR stand for?  Business?

MR. SNYDER:  Primary business.  I didn't design the acronym, but that's what it stands for.

THE COURT:  Primary.  So, it's backwards?

MR. SNYDER:  Yes.

THE COURT:  Okay.  All right.

I'm sorry, I didn't hear that.

MR. SNYDER:  I said it's been in existence for longer than I have, so --

THE COURT:  Oh, I am glad I'm not the only one confused then.

Okay.  And this -- Now, I am generally familiar with

downtown Carbondale, and this is on this -- where this event took place on April 16th, was Giant City Road.  I assume that it's outside of the BPR, is that correct?

MR. SNYDER:  Your Honor, if you want me to answer that, I can.  That is the BPL district.  That is another form of our business district that is located along Giant City Road, which is a four-lane divided highway with a center turn lane.  So, this is across from Kroger's in Carbondale, and Kohl's.

THE COURT:  Okay.  So it is the BPR?

A.  It's BPL.

THE COURT:  Now, what is BPL?

MR. SNYDER:  It's planned business.

THE COURT:  Planned business, okay.

All right.  The Federal Government has a lot of acronyms.  I guess they are everywhere.

MS. MCGEE:  It wouldn't be Government without it, Judge.

THE COURT:  What's that?

MS. MCGEE:  I said it wouldn't be Government without it, Judge.

THE COURT:  Well, that's right.

So, I know the Plaintiff has another witness.  I don't think -- I can only go about another 45 minutes, maybe, because I have another commitment, so I would like to do as

much as I can.  We might have to resume another day.

So, Ms. McGee, can we proceed with your next witness?

MS. MCGEE:  Yes, they are in the waiting room and this will be very brief.

THE COURT:  Okay.  So, this is Pastor Jared Sparks, who I think, Deana, it says "Jordan" on the screen.

MS. MCGEE:  Yes, Your Honor.  I believe it's his wife's name's account.

THE COURT:  Got it, okay.

MS. MCGEE:  Your Honor, one moment.  I told him we were still going, I wasn't sure when it was going to be.  Can I just text him real quick?

THE COURT:  Okay.

PASTOR SPARKS:  Hi, there.  Sorry about that.

THE COURT:  Good afternoon, Pastor Sparks.

PASTOR SPARKS:  Yes, ma'am.

THE COURT:  All right.  You can hear me okay?

PASTOR SPARKS:  I sure can.

THE COURT:  Okay.  I'm going to ask you to take an oath at this time.

COURTROOM DEPUTY:  Please raise your right hand.

(Plaintiff's witness, Jared Sparks, sworn)

COURTROOM DEPUTY:  Would you please state your name for the record?

PASTOR SPARKS:  Jared Sparks.

THE COURT:  Thank you.  You may proceed, Ms. McGee.

DIRECT EXAMINATION

BY MS. McGEE:

Q.  Can you spell your name for the record?

A.  Yes, Jared, J-A-R-E-D, Sparks, S-P-A-R-K-S.

Q.  And, Mr. Sparks -- Or would you prefer *Pastor Sparks*?

A.  Either is fine.

Q.  Pastor Sparks, what do you do?

A.  I'm a clergyman.  I've been pastoring Christ Church of Carbondale for the last nine years.

One second, please.

(Brief interruption in proceedings)

I am sorry for this interruption.  I had everything set up.  I am sorry.

MS. MCGEE:  Back in COVID, with the kids in the background, Judge.

A.  Okay.  I'm a clergyman, and I have been doing that for 17 years.

Q.  (By Ms. McGee) What are your duties with the church?

A.  Pastoral care, preaching, and pastoral visitations, premarital counseling.  I also officiate weddings and funerals.  Typical and historic pastoral work.

Q.  And what kind of ministry does your church engage in on a whole?

A.  All sorts of ministry.  We a do children's ministry, we do outreach ministries, we have a ministry for those that are older in our church, we do youth and children ministries, any sorts of outreach, so basic Protestant Baptist Church.

Q.  And what kind of activities are involved in that?

A.  All sorts of activities; be it Vacation Bible School, then we do youth events, children's events.  Beyond VBS, we also do things like going out to eat with the older folks, they spend time together.  We also do smaller group ministry, which is meeting in people's homes, eating meals together and those sorts of things.  We also do benevolence care for the poor; we have that in our budget.  We do that, and then following up with walking through budgets and helping people to understand income and expenditures and those sorts of things.  So, just a variety of different things.

Q.  Do you know Brandon Hamman?

A.  We do.  He's a friend of mine and a member of our church.

Q.  Is he involved in any of the activities that you previously stated?

A.  Yes, he's staff member of our church and he also is involved with Smart Group Ministry and all sorts of things within the church, and obviously with the Gospel for Life, which is a ministry of our church.  So, he's very involved and has been for several years.

Q.  Does he work for you?

A.  He does.  He works not for me personally, but for Christ Church Carbondale.  Yes, we are on staff together at the same church.

Q.  You said Gospel for Life is his ministry?

A.  That's correct.  Well, he leads that ministry, but it is a ministry of our church.

Q.  And is that ministry, Gospel for Life, under the authority of Christ Church Carbondale?

A.  It is.  So, I am one of four elders, and then our members play a role when it comes to things like budgeting and approval of acquisition of property, certain things like that.  I also approve the budget.  I oversee, as one of the elders, the Ministry of Gospel for Life, so that would be congregational oversight, except for budgetary questions once a year for the approval of budget.  But, our elders oversee Gospel for Life Ministry.

Q.  So, structurally how does that work inside the organization structure of your church?

A.  Well, anything that Brandon has need of when it comes to anything with benevolence-type needs he brings to us, runs through us.  There's a lot of different things that he does for things like throwing baby showers for mothers who don't have anybody to give them anything or take care of anything for them.  Those things go through us.  You know, even though there is a budget like for Youth Ministry or something like

that, that is set aside for Gospel for Life under the umbrella of our Christ Church budget.  We still have oversight there, so he comes to us with those sorts of questions.

Q.  Is Gospel for Life a separate entity?

A.  No, it is not.  It is a part of Christ Church Carbondale, so it is a ministry of our church.

Q.  And in that does Brandon Hamman or can he operate independently outside of the Christ Christ structure that you claim?

A.  Well, insomuch as a youth ministry path, like a youth pastor or a lay minister, they are going to make some decisions, of course, but that's all under the authority of that local church, you know, ecclesiology, and that is the owners of our local church.  So, he is ministering and doing his work under our authority.  So, every decision that he makes we don't have our thumb on him.  He has given authority and parameters in which he needs to do what he needs to do, but he does answer to us.

Q.  And is Christ Church Carbondale a registered not-for-profit?

A.  We are with the State of Illinois, correct.

MS. MCGEE:  And permission to show what's been previously marked Exhibit 3.

THE COURT:  Yes, you may.

MS. MCGEE:  Thank you, Your Honor.

Q.   (By Ms. McGee) Mr. Sparks, do you know what that is?

A.   That is our status as a non-for-profit in the State of Illinois.

Q.   And are you the registered agent?

A.   I am; that is correct.

MS. MCGEE:  And, Your Honor, move to admit -- or, I'm sorry, one more question.

Q.   (By Ms. McGee) Is Christ Church Carbondale, this not-for-profit, is that the organization Brandon works for?

A.   It is.

MS. MCGEE:  Your Honor, move to admit Exhibit 3.  It has been stipulated to.

THE COURT:  Exhibit 3 is admitted.

MR. COX:  Excuse me.  That's -- I didn't mean to interrupt you, but that's an exhibit to which we did not stipulate on the basis that 501(c) organization is confirmed by the Federal Government and this document is a State of Illinois document indicating it's a not-for-profit, but there's nothing and no testimony so far that it's received 501(c) or 501(c)(3) status.

MS. MCGEE:  Your Honor, if I can respond really briefly.

THE COURT:  You may.

MS. MCGEE:  We -- Defense Counsel, we tried to stipulate to this fact that it was a 501(c), maybe not for the

document itself.  I would say also that related organizations are not required to register as 501(c)(3)s, mirror religious organizations do.  But, it does hold a not-for-profit status with the State of Illinois, which should be sufficient, Your Honor.

THE COURT:  So, it's a not-for-profit with the State of Illinois, but not a 501(c)(3) corporation?

MS. MCGEE:  I can ask the witness, Your Honor, if he's aware of that information.

THE COURT:  Okay.

MS. MCGEE:  But I would just still proffer that in case law we have that essentially 501(c)(3)s, Your Honor, when they're churches, are automatic 501(c)(3)s.

Q.  (By Ms. McGee) But, Mr. Sparks, is Christ Church Carbondale a registered 501(c)(3)?

A.  I'm unaware of that information.  I know that we are through the State of Illinois, and that's what I know of.

Q.  Is Christ Church Carbondale a religious organization?

A.  It is.

MS. MCGEE:  Your Honor, I would move to admit Exhibit 3 as the status for the not-for-profit under the State of Illinois's guidance.

THE COURT:  Okay.  Mr. Cox, was there something else you were going to say?

MR. COX:  I'm just going to object on the basis it's

not probative of whether they're a 501(c)(3) and there's been no testimony or evidence that it is, so it's irrelevant and not probative of that issue.

THE COURT:  Well, I will admit that there has been no testimony that it is a 501(c)(3) and, as I sit here right now, I don't know if I have -- if any religious organization is automatically considered 501(c)(3), but I will admit it and that's something I can sort out at a later time.

MR. COX:  Okay.

THE COURT:  Any other questions for this witness, Ms. McGee?

MS. MCGEE:  Nothing further, subject to redirect, Your Honor.

THE COURT:  All right.  Any cross-examination, Mr. Cox?

MR. COX:  I will try to be brief, Your Honor.

CROSS EXAMINATION

BY MR. COX:

Q.  Do you go by *Reverend* or *Pastor*?

A.  *Pastor* is fine.

Q.  *Pastor*?

A.  Yes, sir.

Q.  All right.  Pastor Sparks, you were there present on April 16th, is that right?

A.  Yes, I was.

MS. MCGEE:  Objection, it falls outside the scope of Redirect -- or it's outside the scope of Direct, Your Honor.

THE COURT:  Well, that's interesting.  Mr. Cox, she didn't get into any of the things that went on that day.

MR. COX:  That's true, but I am really not sure what his testimony is -- I mean, he was there that day we know, so I anticipated being able to ask questions about his participation.  But, if not, that's fine.

THE COURT:  Okay.  Well, she didn't get into those events.  I mean, I have the body-cam video and the transcript, of course.

Do you have any cross-examination based on what came out on Direct?

MR. COX:  Nothing about what came out on Direct.  I was going to ask him about evidence that has been admitted regarding his participation there.  But, that's fine, Judge. If not, we don't need to.

THE COURT:  Okay.  All right.  Well, then Pastor Sparks that concludes your testimony.

PASTOR SPARKS:  Thank you, Your Honor, and thank you everybody else.

THE COURT:  All right.  Okay.  We have a little more time.  Ms. McGee, do you have any other witnesses for us?

MS. MCGEE:  I have no witnesses, Your Honor.  Just a

closing argument.

THE COURT:  Okay.  Mr. Cox, do you want to try to get some of your witnesses on today?

MS. MCGEE:  Your Honor, I apologize.  I was looking away from my notes at the moment.  I wanted to admit a few exhibits before the ones that have already been admitted.

Move to admit Plaintiff's Exhibits 6, 7, 8, 9 and 10 that were also Defense Exhibits 2, 3, 4, 8 and 17.

THE COURT:  So, Plaintiff's 6, 7, 8, 9 and 10 are the same as Defendant's Exhibit 2, 3, 4, 8 and 17?

MS. MCGEE:  Yes, Your Honor.

THE COURT:  Okay.  They will be admitted as Plaintiff's Exhibits.

MS. MCGEE:  Thank you, Your Honor.  I officially rest.

THE COURT:  Mr. Cox, do you want to try to get on a witness or two?

MR. COX:  Judge, it seems like you wanted to end your day at 4:00 and you probably have some things to do between now and then, I'm sure, so maybe it would be cleaner to reschedule another time and start fresh with the Defendants.

THE COURT:  Well, so let me ask this:  So, I have time this Wednesday morning, the 13th.  If that would work for everyone we could resume, say, at 9 a.m. on Wednesday.

Ms. McGee, would that work for you?

MS. MCGEE:  I am pulling up my calendar.

THE COURT:  Okay.

MS. MCGEE:  I have no objection to that time, Your Honor.

MR. COX:  Judge, we are going to check with our officers.  I can tell you I have a State Court status hearing at 1:30 that day.  I have an associate who can cover it if I run late, but the morning is open.

THE COURT:  Okay.  I have -- I think maybe just to be safe.  I have another hearing at 1:30 that day, as well.

MR. COX:  Okay.  It will move fast, Judge, I will tell you that.  We will move pretty quickly.

THE COURT:  Mr. Hamman, were you wanting to say something?

MR. HAMMAN:  I was going to ask if I could confer with my attorneys for a moment regarding that time, or do you want me to tell you the conflict that I have?

MS. MCGEE:  Can you put us in the waiting room for two minutes, Judge?

THE COURT:  I can't; I'll see if Deana can do that.

MR. HAMMAN:  Ms. McGee, if you could check your message.

THE COURT:  Yeah, if you text her, maybe that's easier.

And, Mr. Cox, I can go until about 4:15.  If you want

to put on someone that you think will be short, I am happy to spend that time this afternoon.

MR. COX:  Well, I am happy to do that, Judge.  We can start with Mr. Snyder, who's going to talk about the ordinance.

THE COURT:  You don't think it will be long?

MR. COX:  Well, it just depends on how much we get on Cross, but I will try to move very quickly.

THE COURT:  Okay.  All right.

Ms. McGee, do you have something you want to advise the Court?

MS. MCGEE:  I will wait to the end of testimony and get back with you regarding Wednesday morning momentarily.

THE COURT:  Okay.  So, Mr. Cox, do you want to proceed with Mr. Snyder's testimony --

MR. COX:  Yes, Your Honor.

THE COURT:  -- and then let the police officers go?

MR. COX:  Yes.

THE COURT:  And then do you intend to call Mr. Lenzini, as well?

MR. COX:  Yeah, I do.  He will be the second witness. We won't get to him today, probably.

THE COURT:  Okay.  So, Mr. Snyder, I'm going to ask you to take an oath at this time.

COURTROOM DEPUTY:  Please raise your right hand.

(Defense witness, Lenoard Snyder, sworn).

COURTROOM DEPUTY:  Please state your name for the record.

MR. SNYDER:  Lenoard, L-E-N-O-A-R-D, Snyder, S-N-Y-D-E-R.  I go by Jamie, J-A-M-I-E.

THE COURT:  I couldn't hear that.  You go by *what*?

MR. SNYDER:  Jamie, J-A-M-I-E.

THE COURT:  Okay.  Thank you.

DIRECT EXAMINATION

BY MR. COX:

Q.  So, Mr. Snyder, are you the City Attorney for the City of Carbondale?

A.  I am.

Q.  Are you an attorney licensed in the State of Illinois?

A.  I am.

Q.  In your capacity as City Attorney for the City of Carbondale are you familiar with the ordinance regarding signs?

A.  I am.

Q.  And that is marked as Exhibit 11?

A.  That is correct.

MR. COX:  And we will offer Exhibit 11, Judge.  It's the document we have talked about.  I think it's stipulated to.

MR. HARRELL:  That is Defense Exhibit 11, the copy of the ordinance.

MR. COX:  Yes.

MR. HARRELL:  I have no objection, Your Honor.

Q.  (By Mr. Cox) Okay.  Is the sign marked as Exhibit 11 the ordinance in place and in effect on April 16 and 17, 2025?

A.  Yes, it was.

Q.  I would like to direct your attention to a section of the ordinance that's marked 15.4.10.8.

A.  Yes.

MR. COX:  Do we need to bring that up or does everyone have it?

THE COURT:  I have it in front of me.

MR. HARRELL:  I have a copy in front of me, Your Honor.

THE COURT:  Okay.  Mr. Snyder, do you have a copy?

A.  I have a copy of the actual ordinance in front of me.

THE COURT:  Okay.  Go ahead, Mr. Cox.

Q.  (By Mr. Cox) So, it is titled Temporary Signs Permitted (Except in the BPR District).  And we have already talked about what the BPR district is, so I will pass that.

Are you familiar with the location where Plaintiff placed his signs in the ground on April 16, 2025?

A.  Very familiar.

Q.  Is that location in the BPR district?

A.   It is not.

Q.   Is it in the BPL district?

A.   That is correct.

Q.   All right.  Directing your attention to Section 15.4.10.3, this concerns prohibited signs.  Do you see under Prohibited Signs, part G?

A.   Yes.

Q.   And what does that provide?

A.   "Temporary signs, except as allowed by 4.10.8."

Q.   So, in other words, temporary signs except as allowed by 4.10.8 are prohibited?

A.   Right.

Q.   All right.  Were the signs starting to be erected in the right-of-way by Plaintiff considered temporary signs under the ordinance?

A.   Yes, because they are made of a temporary material, they are not intended to be weather-resistant and long-standing signs.  Typically signs that are non-temporary are professionally erected and are made of harder material.

Q.   All right.  So, directing your attention back to 15.4.10.8 -- We will just call it 8 for the sake of brevity.  Section 8(A)(1), are temporary signs allowed to be erected in the City's right-of-way?

A.   No.  No signs are permitted to be erected in the right-of-way.

Q.   Does the term "erected" include placing temporary signs in the ground?

A.   Yes.

Q.   Now, paragraph 1 there, (A)(1), talks about an exception for Section 17-1-5.  What is that exception?

A.   That is specific encroachments, such as having street parties, sidewalk restaurants, and temporary sidewalk sales.

Q.   So would that apply to the signs that the Plaintiff placed in the ground?

A.   No, they would not.

Q.   Okay.  Now, looking at Section 8(A)(3), number 3, what does that provide?

A.   It says, "No temporary sign shall be erected within 20 feet of the curb line of any adjoining street surface except those located in the BPR district, in which case temporary signs shall be flush mounted to the building.  No sign shall be erected so as to obstruct visual clearance needed for safe vehicular and pedestrian traffic."  When I read that, the way I read that is no temporary signs shall be erected 20 feet from the curb line or private property, and I have come to that conclusion because the BPR district is a zero-lot line district.

Q.   So, would it be fair to say that the controlling provision here is that no signs can be placed in the right-of-way?

A.   That is correct.

Q.   And if we go to paragraph 3, where it talks about no temporary signs erected in 20 feet, why do you say that pertains to private property?

A.   Because the way you read an ordinance is you read all of it.  You can't just read one paragraph.  They all modify each other --

Q.   All right.

A.   -- unless there's an "or".

Q.   Going to paragraph 4 under that section, what does that provide?

A.   "If the sign is not communicating a message which is temporary in nature, it shall be required to meet the requirements of 4.10.5, 4.10.6 and 4.10.7," which goes into what a permanent sign is built out of.

Q.   So would any of those exceptions apply here since this is a temporary sign?

A.   No.

Q.   All right.  Let's go to Section 9, under Special Signs. Do signs used by Plaintiff or sought to be used by Plaintiff here fit into the category of special signs?

A.   Not in my interpretation.  They are not real estate signs, they are not temporary construction signs, they are not directional signs, designated historical signs, they're not campaign signs, they're not window promotional signs, directory or office park/industrial park -- those are specific

types of signs that we permit.

Q.  So even if it was a special sign, if we look at Section 9(A)(1), can special signs be placed in the right-of-way?

A.  No, the general rule is no sign may be placed in the right-of-way.

Q.  Okay.  Is there any provision of this ordinance which permits temporary signs to be placed in the city right-of-way?

A.  No.

Q.  Okay.  Let's go to 8 -- Section 8(A)(5)(b).  Under 5, small (b), where it says, "Temporary Noncommercial Signs," do you see that?

A.  Are you talking about (5)(a)(1)?

Q.  (5) -- I'm sorry.  (5) --

A.  (b)?

Q.  (b) --

A.  (1)?

Q.  Right.

A.  "Temporary signs shall be limited to 32 square feet"?  Is that what you are talking about?

Q.  Right.  And under that it talks about the 501(c) not-for-profit corporation?

A.  Correct, this is to allow off-premises signs which are otherwise prohibited in the City code.  If you go back to the very first section -- or one of the very first sections you asked me about, prohibited signs -- Prohibited signs are off-

premises signs. So, this allows entities who are 501(c)s to have off-premises signs advertising events.

Q. Can those temporary signs permitted by -- to a 501(c), can they be placed in the right-of-way?

A. No, because it still has to comply with paragraph (A)(1).

Q. All right. So, is there a permit available to a 501(c) to allow them to put a sign in a right-of-way?

A. No.

Q. So, a permit for this sign -- this temporary sign we are talking about here under 501(c) would have to be placed on private property?

A. That is correct.

Q. And is that why Exhibit 10 that we looked at earlier makes placing the sign on private property a condition of approval?

A. That's correct.

Q. And is that, what you are describing as your interpretation of the ordinance, consistent with the way Carbondale has always interpreted the sign ordinance?

A. Yes.

Q. And if the proposal for a sign ordinance or application for permit were to be for placement on someplace other than private property, would a permit be issued?

A. No.

Q. All right. Looking at 7 -- Let's go back to 7, please.

THE COURT: Mr. Cox, before we go to 7, let me ask

the witness a question. I guess I am not following on Section 8(A)(3) where it says, "No temporary sign shall be erected within 20 feet of the curb line of any adjoining street surface except" -- "No sign shall be erected so as to obstruct the visual clearance needed for safe vehicular and pedestrian traffic." And what I understood Mr. Snyder saying is that that refers to signs on private property?

A. That's correct.

THE COURT: How do you get -- There isn't anything in there that says anything about private property.

A. As a general rule no signs can be erected within the right-of-way. So, it would have to be either private property or some -- I guess you could also locate that on public property that is not right-of-way. Right-of-way is a very specific type of property which is defined within our code.

THE COURT: So, I don't see the definition of right-of-way in this ordinance.

A. Not in this section. It is in another chapter of our code.

THE COURT: Okay. Do you know what section that is?

A. I can, Your Honor.

THE COURT: Okay.

A. The definition of right-of-way is in 17-12-2.

THE COURT: Okay. What is that definition?

A. Let me scroll down to it. This is a very long definition.

"Any street, alley, or other land or waterway dedicated or commonly used for pedestrian, vehicular traffic or other similar purposes, including utility easements, in which the City of Carbondale has the right and authority to authorize, regulate, or permit the location of facilities other than those of the City of Carbondale right-of-way or right-of-ways -- rights-of-way, shall not include any real personal City of Carbondale property that is not specifically described in the previous two sentences and shall not include City of Carbondale buildings, fixtures, and other structures or purposes, regardless of whether they are situated in the right-of-way.

It is also defined in 15.11.4, in a shorter one, any area dedicated or purchased by the City for the purpose of providing both vehicular or pedestrian travelway.

THE COURT:  Okay.  All right.  Thank you.

All right.  Mr. Cox, I think you were going to go back up to Section 7?

MR. COX:  Yes, Your Honor.  We are going here to K(1)(c).

THE COURT:  K(1)(c).  Okay, I am with you.

MR. HARRELL:  I'm sorry, Your Honor.  Are we still on point 10.8(A)(1)(c)?

MR. COX:  I'm sorry.  Point 7.

MR. HARRELL:  Oh, thank you.

THE COURT: Section 7(K)(1)(c).

Q. (By Mr. Cox) This section, Mr. Snyder talks about not limiting signs during demonstrations. But this Section K, is that for temporary signs in the BPR district?

A. (K)(c) is -- applies specifically to BPR district.

Q. So, going down further, that's Section 2 under K, Temporary Noncommercial Signs, do you see that section there under (K)(2)?

A. Yeah, that is a similar provision that is in 8 that allows a 501(c), not-for-profit organization, to obtain a permit for an off-premises site.

Q. And is that also temporary signs in the BPR district?

A. Correct.

THE COURT: And just so I'm clear, when you are talking about off-site signs, that would be something like the sign we saw in one of the exhibits like for a fish fry, so it's posted somewhere that's not the place where the fish fry is going to be?

A. Correct. And those signs that were listed in that exhibit would have been in violation of the code, assuming they were -- The one that we are -- on the roadside of the sidewalk are in the right-of-way. Depending on the road, it may have been beyond the right-of-way, but within that 20 feet of the roadway, so they would have all been in violation.

THE COURT: Okay.

Q.   Going now to Section A --

MR. COX:   And I am almost finished, Judge.

Q.   (By Mr. Cox) Section 8(A)(5), we see a similar provision in 8(5)(a)(4) about not limiting signs used in demonstrations.

A.   That is correct.   And it's very specific in its application.   It includes signs carried or waved or otherwise displayed by persons.

The way I read that means it has to be held by the person in some form or fashion.   This ordinance is to keep the commercial signs of the -- people standing in the right-of-way advertising the closing of a business, 20 percent off, or sign wavers at the local pizza shop and stuff like that.

THE COURT:   I was going to say, this is the Little Caesars guy that stands on the side of the road.

A.   For lack of a better term.

THE COURT:   Okay.

A.   Although it's been in existence longer than the Little Caesars guy.

Q.   So, Mr. Snyder on April 16, were you contacted by Mr. Lenzini and also by one of the police officers or I think two of the police officers to seek guidance from you about the City's interpretation of the ordinance?

A.   Yes.   Mr. Lenzini, Sergeant Murray and Lieutenant Lattan all contacted me about this ordinance.

Q.   And did you give them guidance about the ordinance?

A.  I did provide them guidance.

Q.  And was that guidance you provided in accordance with the City's historical interpretation of the ordinance?

A.  That is correct.

Q.  All right.

        MR. COX:  That's all I have, Your Honor.

        THE COURT:  All right.  Any cross-examination?

        MR. HARRELL:  Yes, Your Honor, thank you.


                        CROSS EXAMINATION

BY MR. HARRELL:

Q.  Mr. Snyder, how's it going?  I just have a few questions. Let's start here.  You mentioned a few times how you read the ordinance, what it means.  I just would want to clarify.  Are you speaking in an official capacity of the City of Carbondale?  Is that your personal reading?

A.  I'm not understanding what you are asking.

Q.  Are those official interpretations by the City of Carbondale or is that just your personal interpretation?

A.  Those are my local opinions.

Q.  Okay.  I understand.  I will move on.  I would like to start -- So, do you still have the copy of the ordinance in front of you?

A.  Yes.

Q.  I would like to go to the Section 8(A)(4) briefly, and

I'll pull up my copy, as well.

A.   You said 8(A)(4)?

Q.   That's right, beginning with, "If the sign is not" --

A.   Correct.

Q.   Okay.  How does the City of Carbondale or you, any officer enforcing the ordinance, how do they determine if a sign is temporary in nature?

A.   I didn't understand that.  I have a hearing deficit, so you have got to really speak up and enunciate.

Q.   I apologize.  Thank you for telling me.  It's not often I get told to speak up.

How does the City determine if a message is temporary in nature?

A.   The structure of the -- You are asking how we determine if a message is not temporary?  So, a business advertising sign is typically -- You know, so like CHOICES sign would be considered a permanent sign or a permanent message.

Q.   Is there any -- What in the message does the City look at to determine that?

A.   It is advertising something that is related to the business or, you know -- So a sign put it in a residential setting, a permanent sign would be like the house numbers.

Q.   Who at the City approves permits?

A.   That would be the Planning Services.  I do believe Planning Services handles it.

Q.   That's a department?

A.   Yes, that is the department that Mr. Lenzini is ahead of.

Q.   Okay.  There was some discussion earlier of permits that they all have the same language regarding private property. Are you are aware of that language on the permits?

A.   Yes.

Q.   Can you tell me where that -- I guess where that language comes from?

A.   Because of the fact that the general provisions of all temporary signs say, "No signs shall be erected or suspended over a public right-of-way."

Q.   Right.  So, I think earlier we mentioned that the ordinance doesn't specifically mention private property, but it does on the permits.  On the permits section it says, "This permit shall not include the ability to put a sign on public property," I believe.

So, is that preprinted on the applications?

A.   It, I believe -- And this is outside the scope of my usage, but you fill out the application online, the application is printed, and then once the Planning Services division creates the permit, it's automatically printed as part of the provisions when they print the permit.

Q.   Okay.  I'll move on to the Ordinance Section 17-12-2. Earlier you cited that -- the City's definition of right-of-way, is that correct?

A.   I need you to back up.  I can somewhat read your lips and you keep looking down.

Q.   On 17-12-2, you cited that as the City's definition of right-of-way.

A.   Yes, that is one of the definitions of right-of-way.  It's the more robust definition.

Q.   Is that used by the City in the context of the sign ordinance?

A.   Yes.

Q.   Okay.

A.   Construction utilities and facilities of the right-of-way. It defines the whole right-of-way in a more particular manner.

Q.   Okay.  And even though it's in a different section, you would still apply that definition?

A.   Yes, our code actually provides that when not specifically defined it can be otherwise used in other sections.

Q.   So, have you read the complaint in this case?

A.   What?

Q.   Have you read the complaint in this case?

A.   It's been a while; yes.

Q.   Are you aware in the complaint the Plaintiff cited 17-12-2 as a definition of right-of-way?

A.   I'm not aware.

Q.   And you filed a Motion to Dismiss in this case, is that right?

A.  My attorney did, yes.

Q.  Did you look over that Motion to Dismiss before filing it?

A.  I believe I was shared a copy of the Motion to Dismiss.

Q.  Why didn't you cite 17-12-2 in that Motion to Dismiss?

A.  I can't speak for my attorney.  That's a matter of strategy for the attorney to decide.

Q.  I understand.  Are you aware your attorney cited a different definition of right-of-way?

A.  May have.  I don't know.  I don't have the Motion to Dismiss in front of me.

Q.  I guess, do you have any familiarity with Illinois Administrative Code titled 92?

A.  No, I'm not.

Q.  Understood.  Would a Illinois Department of Transportation definition in any way supersede or take control of an ordinance definition?

A.  No, City of Carbondale is a home rule entity, and then any road that's within our jurisdiction would be under our definition.  Illinois 13 and Illinois 51, or U.S. 51, which are Main Street, Walnut Street, Illinois Avenue, and University Avenue, depending on if there's a conflict, the State statute probably would apply in that situation.  But we are not talking about any of those routes.

Q.  Thank you.

        MR. HARRELL:  Your Honor, I would like to show the

witness -- It was -- I marked as Defendant's Exhibit 8, and I believe it was admitted as Plaintiff's Exhibit 9, but it has been stipulated to.

THE COURT:  Okay.  Do you have the ability to show it?

MR. HARRELL:  I do, Your Honor.  One moment.

A.  I might be able to pull it up.  You said Defendant's 9?

Q.  9.

A.  In the Court map?

Q.  It's a collection of text message screen shots.

A.  Okay.  So, it's the text messages.  That would be 8.

Q.  Yes, and I'm looking at page 6.  It has John Lenzini's name at the top.

A.  Mine doesn't list a page number like that.

So, you are saying 6?

Q.  Yes, page 6.

A.  Yes.

Q.  Okay.  Can you go ahead and read the first -- It's in a lighter shade box.  You can go ahead and read that text message.

A.  I asked if it was the Coalition for Life personnel.

Q.  All right.  And who sent that text message?

A.  Message between John Lenzini and myself, I think.  I'm not certain.  It doesn't show my phone number.

Q.  Do you remember sending this text message?

A.  Not off the top of my head.  I would have to go back and look at my text messages.

MR. HARRELL:  Your Honor, the authenticity of this exhibit has been stipulated to.  I would move to admit.

Or, I guess -- I apologize.  It has been admitted, Your Honor.

THE COURT:  Okay, yes.

Q.  (By Mr. Harrell) May I ask why you asked if it was Coalition of Life?

A.  There had been a previous lawsuit between the City of Carbondale and Coalition of Life in which they challenged an ordinance up to the Supreme Court, so I was just curious as to who we were dealing with at this time so that I knew if I needed to make a phone call to an attorney.  I have Coalition Life's attorney's phone number available, so I would have called her directly and talked to her.

Q.  I understand, thank you.

MR. HARRELL:  Brief indulgence, Your Honor.

Nothing further, Your Honor.

MR. COX:  Judge, you are muted.

THE COURT:  Sorry.  Any clarification, Mr. Cox?

MR. COX:  I have none.  Thank you, Your Honor.

THE COURT:  Okay.  Well, with that, then, we will recess until we can resume.

Ms. McGee, can you resume Wednesday morning?

MS. MCGEE:  Yes, Your Honor.  Mr. Hamman will be here partially, but will be able to access.  He has already testified.  We are okay with that if you are.

THE COURT:  Okay.  Well, I appreciate that. Certainly you can apprise him of the hearing.

And, Mr. Cox, that works for you and your witnesses?

MR. COX:  Yes, Your Honor.

THE COURT:  Okay.  So, we will resume -- we will have Mr. Lenzini and then three Carbondale police officers, correct, Mr. Cox?

MR. COX:  That's correct, Your Honor.  What time?

THE COURT:  Does 9:00 a.m. Central Time work for everyone?

MR. COX:  That's fine.

MS. MCGEE:  Yes.

THE COURT:  You are nodding your head?

MS. MCGEE:  Yes, I am writing it down to make sure I have got it.

THE COURT:  Okay.  Well, we will resume Wednesday at 9:00 a.m., again by Zoom, we've managed it pretty well, and then we will have those three witnesses and then I will ask Counsel to be prepared to just give a brief closing argument as to what they think the evidence has shown.

MR. COX:  All right.

THE COURT:  Okay.  Thank you, everyone, for your

time.  Enjoy the rest of the day and I will see you all Wednesday morning.

MR. COX:  Thank you, Your Honor.

MS. MCGEE:  Thank you, Your Honor.

(Proceedings adjourned at 4:14 p.m.)

REPORTER'S CERTIFICATE

*   *   *   *   *   *   *

I, Stephanie K. Rennegarbe, RDR, CRC, Official Court Reporter for the U.S. District Court, Southern District of Illinois, do hereby certify that I reported with mechanical stenography the proceedings contained in pages 1-102; and that the same is a full, true, correct and complete transcript from the record of proceedings in the above-entitled matter.

*/S/ Stephanie K. Rennegarbe,*          10/20/2025
IL CSR, RDR, CRC

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

MARK BRANDON HAMMAN,                )
                                    )
              Plaintiff,            )
                                    )
v.                                  )  No. 3:25-cv-00736-NJR
                                    )  East St. Louis, Illinois
CITY OF CARBONDALE, ILLINOIS,       )
et al.,                             )
                                    )  ***EVIDENTIARY HEARING***
              Defendants.           )

TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS
**VOLUME II**
BEFORE THE HONORABLE NANCY J. ROSENSTENGEL
UNITED STATES CHIEF DISTRICT JUDGE

AUGUST 13, 2025

Stephanie Rennegarbe, RDR, CRR, CBC
IL CSR #084-003232
750 Missouri Avenue
East St. Louis, IL  62201
618-482-9226
Stephanie_Rennegarbe@ilsd.uscourts.gov

*Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription*

APPEARANCES:

FOR THE PLAINTIFF:     Liam Ross Harrell, Esq.
                       Nathan Jeremiah Moelker, Esq.
                       Kelsey E. McGee, Esq.
                       American Center for Law & Justice
                       201 Maryland Avenue, NE
                       Washington, DC  20002
                       lharrell@aclj.org
                       nmoelker@aclj.org
                       kmcgee@aclj.org


FOR THE DEFENDANTS:    A. Courtney Cox, Esq.
                       Philip J. Lading, Esq.
                       Sandberg Phoenix
                       101 W. Vandalia
                       Suite 300
                       Edwardsville, IL  62025
                       ccox@sandbergphoenix.com
                       plading@sandbergphoenix.com

<u>I N D E X</u>

**WITNESSES CALLED TO TESTIFY:**                         **PAGE**

<u>JOHN LENZINI</u>
DIRECT EXAMINATION BY MR. COX                          108
CROSS EXAMINATION BY MR. HARRELL                       120
REDIRECT EXAMINATION BY MR. COX                        134
RECROSS EXAMINATION BY MR. HARRELL                     137
CONTINUED REDIRECT EXAMINATION BY MR. COX              145
CONTINUED DIRECT EXAMINATION BY MR. HARRELL            146

<u>OFFICER SAMUEL TYNER</u>
DIRECT EXAMINATION BY MR. COX                          127
CROSS EXAMINATION BY MR. HARRELL                       130
REDIRECT EXAMINATION BY MR. COX                        133

<u>SGT. MARK MURRAY</u>
DIRECT EXAMINATION BY MR. COX                          151
CROSS EXAMINATION BY MR. HARRELL                       156
REDIRECT EXAMINATION BY MR. COX                        159

<u>LT. THEODORE LATTAN</u>
DIRECT EXAMINATION BY MR. COX                          161
CROSS EXAMINATION BY MR. HARRELL                       168


**CLOSING ARGUMENTS**
BY MS. MCGEE                                           176
BY MR. COX                                             186
BY MS. MCGEE                                           204

(Proceedings began at 9:00 a.m.)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THE COURT:  Good morning, everyone.  It's 9:00 and it looks like we have everyone.  I understand that Mr. Hamman is joining, but will have his camera off and listening to the hearing.

Deana, if you would please go ahead and call the case for the record.

COURTROOM DEPUTY:  The United States District Court for the Southern District of Illinois is now in session.  Chief Judge Nancy Rosenstengel presiding.

The matter of *Hamman v. City of Carbondale, Illinois, et al.*, case 25-cv-736, is called for Day 2 of Evidentiary Hearing.  Participating today on behalf of Plaintiff we have Liam Harrell, Nathan Moelker, and Kelsey McGee.

For Defendants, we have Courtney Cox and Philip Lading.

THE COURT:  Okay.  Well, good morning again, everyone.  We are resuming this hearing from Monday afternoon.  I just again remind everyone that there's no recording or rebroadcasting of these proceedings.  A Court Reporter is present and making the official record pursuant to judicial conference policy; however, testimonial proceedings cannot be broadcast over the public access line, so that will be muted when we are taking testimony.

So, Mr. Cox, are you prepared at this time to call your next witness?

MR. COX:  I am, Your Honor.  Good morning.

THE COURT:  Good morning.

MR. COX:  My next witness will be John Lenzini.

THE COURT:  Okay.  We will -- Is he in a waiting room?

MR. COX:  I believe he is.  He's on the Carbondale witness site, Deana.

THE COURT:  Got it.  Okay.  Mr. Lenzini, can you hear me okay?

MR. LENZINI:  Yes, I can.

THE COURT:  I'm going to ask you to take an oath.

(Defense witness, John Lenzini, sworn)

COURTROOM DEPUTY:  Thank you.  Would you please state your name for the record and spell your last name?

MR. LENZINI:  John Lenzini, L-E-N-Z-I-N-I.

COURTROOM DEPUTY:  Thank you.

THE COURT:  All right.  You may proceed.

Mr. Cox, you may proceed.

MR. COX:  Are you ready for me, Judge?  Okay.  Very good.

THE COURT:  Yes.

DIRECT EXAMINATION

BY MR. COX:

Q.  Mr. Lenzini, are you employed by the City of Carbondale?

A.  Yes, I am.

Q.  What is your position with the City?

A.  I'm the Community Development Manager.

Q.  And how long have you held that position?

A.  About four and a half years.

Q.  Could you give the Court some sense of what your duties and responsibilities are in that job?

A.  Well, I manage two divisions.  One division is basically our Planning and Zoning Division, which we call Development Management; the other division is Code Enforcement, which we call Building and Neighborhood Services.  So, we are over all building code enforcement, all sorts of housing, room inspections, hotels, all sorts of building safety types of things.  In addition to that, we are in charge of site planning, annexations, subdivision planning, signs, automobiles that are abandoned, parking violations, a very wide variety of things.

Q.  So, describe for us, if you would, the staff that you have on the enforcement side of your job.

A.  In the Building and Neighborhood Services Division we have five what we call neighborhood inspectors.  They each have an assigned sector of the City to patrol and to take care of

various issues there in addition to their housing inspection
schedules.  We also employ and have for many years a seasonal
grass and weed inspector for those yards for high violations
and for non-mowing violations, basically, and then there's a
supervisor over that division, as well as an administrative
secretary.

Q.  So, does part of your job include the removal of signs
that have been placed in a right-of-way?

A.  Yes, it does.

Q.  Is it common for you to remove signs erected in the City
of Carbondale right-of-way?

A.  Yes.

Q.  How common is that?

A.  I would say pretty much daily.

Q.  All right.  All right.  Have you instructed the people who
work for you and have talked about in Enforcement, have you
instructed them to remove all signs that are found to be in
the right-of-way?

A.  Yes, we have.

Q.  Does it matter what the content of the messages are on
signs as to whether they are removed?

A.  No.

Q.  All right.  So, are signs sometimes placed in the
right-of-way and there's a delay in removing the sign?

A.  Most definitely, yes.

Q.   Explain that to the Court, please.

A.   Well, we have some people -- Clark Kagy, for instance, we have people that put up like homes -- houses for sale things, and one particular individual puts them up on a utility pole. We have never seen him do that, but somehow he manages to get dozens of signs out, so we assume that he's putting them up on a Saturday night or Sunday night, we will come back and the major corridors of the City are full of them.  So, now, that's one person, even though we try to make contact with this person, tell him not to do it.  That's a very common scenario. They will put them back up at night when they are not being seen, and then it will take us several days to -- Obviously we don't work on the weekends, so it will take us to Monday, and if we have a lot of stuff going on it may take a couple of days to get these dozens of signs all pulled in and taken.

Q.   So, in terms of removal of signs, does that occur when you or one of your people notice a sign in the right-of-way or when there's a complaint, or both?

A.   Both.

Q.   All right.  So if you receive a complaint there's a sign in a right-of-way, do you or people who work for you go there and remove it?

A.   Yes.

Q.   And is it sometimes possible for you or people who work for you to just be driving along and see a sign in the

right-of-way?

A.   Most definitely.

Q.   And when that occurs do you or your people that work for you stop and get the sign and remove it?

A.   If we have time to do it and if we are in a safe position. Sometimes on the one-way streets and things it can be a little tricky, so it depends if you have time to stop, pull over to a safe place and get it, yes.

Q.   All right.  Otherwise you would come back later for it?

A.   Yeah.

Q.   And so could you estimate -- give a possible estimate of the number of right-of-way signs that may be removed in a year?  Could you give us a ballpark figure for that?

A.   I would say it's usually between 150 and 200.  During campaign seasons, despite our attempts to contact Republican Party, Democratic Party, Green Party leaders to tell them, you know, to please make sure -- because a lot of times it's not the candidates themselves that places the signs, sometimes it's party workers -- try to, you know, get ahead of that.  We pull a lot of political signs during campaign seasons, so that causes an uptick.

Q.   All right.  And that removal process applies to every sign that's in the right-of-way?

A.   Yes, it does.

Q.   All right.  Going to April 16, 2025, did you go to a

location near the CHOICES building on Giant City Road?

A. I did.

Q. What caused you to go there that day?

A. I received an e-mail from the City Manager, Stan Reno, that there were signs in front of the CHOICES Clinic that were placed on the right-of-way and an illegal -- believed to in an illegal location.

Q. All right. When you arrived at that location that day were there any signs in the ground that you learned were erected by the Plaintiff at the time you first arrived?

A. No, I saw signs between the sidewalk and the roadway when I initially came onto the site.

Q. We heard testimony that a man named Bob and a lady named Darlene. Were those the people you learned had placed those signs in the right-of-way?

A. Yes.

Q. And when you saw those signs did you talk with Bob and Darlene?

A. I talked with two older Caucasian people. I believe one of them had a White Ash Baptist Church sweatshirt on, so I assume that was Bob and Darlene. I don't believe they ever identified themselves to me.

Q. All right. What did you ask them to do, if anything?

A. I asked them to remove the signs from the right-of-way.

Q. And did they comply?

A.   They did.

Q.   Did you assist them with removing the signs?

A.   I did.

Q.   Did you let them keep the signs?

A.   I did.

Q.   Did you advise them that they could wear or carry the signs?

A.   Yes, I did.

Q.   And did they continue their protest by carrying or wearing the signs?

A.   Yes, they did.

Q.   And did you attempt to interfere or stop them in any way from doing that?

A.   I did not.

Q.   All right.  And at some point after you arrived, did Mr. Hamman go to his car and retrieve some signs?

A.   Yes, he did.

Q.   And we have seen pictures of those signs.  Did he then take those signs and place them in the ground?

A.   He did.

Q.   Was Mr. Hamman there at the time you were telling Bob and Darlene that they had to remove their signs from the ground?

A.   I believe he was, yes.

Q.   And so he went to his car after that, got the signs, and then put them in the ground, is that correct?

A.   That's correct.

MR. HARRELL:  Your Honor, objection; leading.

Q.   All right.

THE COURT:  Well, this is for the Court.  Rephrase your question, Mr. Cox.

Q.   All right.  Did you observe what Mr. Hamman did with the signs when he removed them from his car?

A.   Yes, he placed them somewhat near the entry road, I think that's called Edna Court, placed two signs there.

Q.   Did you advise Mr. Hamman at that time whether the signs were in the right-of-way?

A.   Yes, I did.

Q.   What did you tell him?

A.   I told him he could not put signs in the right-of-way there; no one could.

Q.   Did you describe for him where the right-of-way was located?

A.   Yes, I did.

Q.   And how did you describe that to him?

A.   I basically told him that the right-of-way was back on this side of the fence of CHOICES.

Q.   So, from the fence to the curb is what you described?

A.   Yes, as right-of-way.

Q.   Okay.  And when you told him that did you ask him to remove the signs?

A.   Yes, I did.

Q.   And what was his response?

A.   Basically said, you know, he believed it was his First Amendment right to have the signs displayed out there.

Q.   All right.  Did he place himself physically between you and the signs?

A.   Yes, at one point he did.

Q.   And did he say anything to you when he did that?

A.   He said, "You are not touching my signs or taking my signs," as I recall.

Q.   All right.  Did you inform, at some point, Mr. Hamman that it would be acceptable for him to wear or carry the signs?

A.   Yes, I did.

Q.   And did he make any response to you when you told him that?

A.   He was not compliant.  I can't tell you exactly what his response verbally was.  I know that he removed the signs several times trying to establish if he was still in the right-of-way, and he was moving them, as I recall, north of Edna Court -- I think we have photos and evidence that show that he started off with some signs further south, closer, to move away from Edna Court and some posts, trying to prove that he was moving away from the right-of-way, which he wasn't.  He was on the right-of-way the whole time.

Q.   All right.  When you went to the location on April 16th,

did you go there with the intent to issue a citation or just collect the signs?

A.  I just wanted to collect the signs, take evidence pictures, because the e-mail I got said there were signs on the right-of-way, did not mention any protesters on the scene.

Q.  Did you even have the citation book with you?

A.  No, I did not.

Q.  During the time you were talking to the Plaintiff on April 16th, did you communicate with the City Attorney, Jamie Snyder?

A.  I did.

Q.  And would you tell the Court generally what that conversation was with Mr. Snyder?

A.  Well, I just said -- you know, told him what the situation was, realizing obviously it's somewhat of a sensitive situation, and told him that, you know -- advised him what he wanted me to do, and I believe his first response was, of course, to take the signs, which we always attempt to do, and then, you know, when I texted him back that the Plaintiff was not allowing us to take the signs, then he said to issue a citation, and so we went on and issued a citation.

Q.  Did you send Mr. Snyder by text or by phone a photograph of the signs and where they were located?

        MR. HARRELL:  Objection, leading.

Q.  All right.  Did you later obtain --

THE COURT:  There was an objection for -- that your question was leading, so rephrase your question.

Q.  Okay.  At some point during the process did you obtain your citation book?

A.  Yes, Inspector Berry brought me out a citation book so I could issue a citation.

Q.  Did you start preparing a citation to give to Mr. Hamman?

A.  I did.

Q.  Did you ask Mr. Hamman to tell you his name?

A.  I believe I asked him for an ID, --

Q.  All right.

A.  -- identification.

Q.  Did he provide you with his name or identification?

A.  He did not.

Q.  What was his response, if any, when you asked him to tell you his name?

A.  He said that he would not provide ID, and when we write a citation we always need an ID.

Q.  At some point did you request any assistance from the police?

A.  I did.

Q.  And why did you request that assistance?

A.  Because Mr. Hamman would not give me his ID.

Q.  After talking with the police did Mr. Hamman eventually comply and remove the signs from the ground?

A. 142

MR. HARRELL: Objection, leading.

THE COURT: Overruled. Again, this is for the Court, we don't have a jury, I will allow it. We are going to be here all day. So, you can answer the question or just state your question again, Mr. Cox.

Q. Was there a point in time when the signs were removed from the ground?

A. There was.

Q. And who removed them from the ground?

A. Mr. Hamman removed them.

Q. All right. And did you take control of the signs or did he keep them?

A. I did not touch those signs at any time.

Q. Did you ever issue a citation to Mr. Hamman?

A. I did not.

Q. Going to the next day, April 17th, did you see Mr. Hamman that day?

A. I did.

Q. Where did you see him?

A. In the corridor of the second floor of the City Hall.

Q. Did you talk with him when he came to City Hall?

A. I did.

Q. Did he provide you with his name at that time?

A. No, he did not.

Q. Did Plaintiff indicate what he wanted when he came to City

Hall?

A.  He wanted a permit for his signs.

Q.  And did you ask him where he planned to put the signs?

A.  I did.

Q.  And did he tell you or identify for you the place where he intended to put the signs?

A.  No, not precisely.  He only said various places.

Q.  Based on your experience with the Plaintiff the day before, did you make any assumptions about where he wanted to put the signs?

A.  I assumed that he wanted to put them in the right-of-way there in CHOICES or maybe on an adjacent property because of the high traffic area it is, basically, the location that the -- the juxtaposition, if you will, next to the -- you know, clinic.

Q.  Is the City allowed to issue a permit to place a sign in the right-of-way?

A.  No.

Q.  If he had applied for a permit to erect a sign in the right-of-way would it have been denied?

A.  Yes.

Q.  While talking with you at City Hall did Plaintiff talk about an exception for 501(c) organization?

A.  Sort of, but very briefly.

Q.  Did he identify a particular 501(c) organization to you?

A.  He identified no organization, 501(c) or otherwise.

Q.  All right.  Are sign permits issued to 501(c) organizations to erect signs on private property?

A.  Yes.

Q.  Are they issued to permit signs on the right-of-way?

A.  No.

Q.  Did the Plaintiff ever tell you on April 17th, that he wanted a 501(c) permit to erect a sign on private property?

A.  No.

        MR. COX:  Judge, those are the questions I have. Thank you.

        THE COURT:  All right.  Any cross-examination?

        MR. HARRELL:  Yes, Your Honor, thank you.


                    CROSS EXAMINATION

BY MR. HARRELL:

Q.  Mr. Lenzini, I would like to go back to April 16th.  You mentioned that you had arrived at the CHOICES Clinic there. Approximately what time did you arrive?

A.  I want to say like 11:30 that morning, best of my recollection.

Q.  And you were there to enforce the sign ordinance, is that correct?

A.  Yes.

Q.  And what specifically did you believe -- What about the

signs led you to believe that they violated the ordinance?

A.   They were clearly on the right-of-way.

Q.   Okay.  And was that your initial reasoning or did you have any other theories of why they might violate the ordinance?

A.   Well, that was the initial thing and obviously that is also what it said in the e-mail, so that was the major thing.

Q.   Were the signs -- And when we ask about these signs, are you talking about the signs that were there when you arrived or the signs that Mr. Hamman later put out?

A.   Initially I went there because of the signs involving, whatever her name was, put between the sidewalk and the curb. I'm sure that's what the complaint that's in the e-mail, also, that's what I was responding to.

Q.   Okay.  Were you upset about the content of the signs?

A.   No.

Q.   But it is true that you complained about the content of the signs, isn't that right?

A.   I don't recall complaining about the content of the signs at all.

Q.   Did you complain that the signs were commercial in nature and not demonstrative?

A.   We did have a discussion about the free diaper signs, about, I guess, what the status of them -- were they selling stuff out there, were they giving them away, or what was -- you know, what they were doing there.  But, regardless, it

doesn't matter, they couldn't be on the right-of-way anyway.

Q. But initially you didn't tell them it was because they were in the right-of-way, it was because that free baby supplies is not a demonstration, right?

A. I'm sorry. I couldn't hear what you said, Mr. Harrell.

Q. I apologize. I'll speak up.

Initially you didn't tell them it was because the signs were on the right-of-way. Initially you stated that free baby supplies is not a demonstration, is that right?

A. That was in response to something they said. To be honest with you, I'd have to go back to the day and recall the whole back and forth.

Q. Okay. But is it fair to say you didn't mention the issue of the right-of-way until after the signs were replaced with signs that didn't advertise free goods?

A. No, I'm pretty sure I mentioned it before that; they could not be out there because they were on the right-of-way.

Q. When you were there on that day was anyone belligerent with you?

A. Well, that's probably a matter of opinion. The way I perceive some behavior, yes, I would take it that people were belligerent with me slightly, but I'm kind of used to that.

Q. Did you believe any -- I guess, what's your opinion? Was anyone belligerent?

MR. COX: Asked and answered.

THE COURT: I think he answered that. That's sustained. You don't need to answer.

Q. Who specifically was belligerent?

A. Mr. Hamman.

Q. What about Mr. Hamman was belligerent?

A. Well, when we attempted to do our job by removing the signs, he placed himself quite quickly, quite physically between myself and the signs, and I would say that was what kind of led me to believe that and that's basically what I am basing my perception on.

Q. On that day you speculated Mr. Hamman was a hired gun from outside the city, is that right?

A. I don't recall saying that.

Q. One moment.

MR. HARRELL: Your Honor, I would like to publish -- I believe it's been marked -- originally marked as Defendant's Exhibit 2, now admitted as Plaintiff's Exhibit 6.

THE COURT: And what is this? Remind me.

MR. HARRELL: This is the body cam of Officer Mark Murray.

THE COURT: Okay. So, Deana, can you share the screen with Mr. Harrell?

COURTROOM DEPUTY: Judge, I have given everyone permission to share their screen.

THE COURT: Okay.

MR. HARRELL:  See if this works.  There we go.

Q.  (By Mr. Harrell) All right.  Mr. Lenzini, can you see this video here?  I'm not sure --

A.  Yes.

Q.  Okay.  Good.  I am going to play here -- and I hope you can hear it -- starting at, looks like, 11:57:50.

(Video clip played for the witness and Court)

Q.  I stopped at 11:58:00.  Mr. Lenzini, in that clip you said that they were "probably hired guns from outside the City," is that right?

A.  To be honest with you, the recording was inaudible to me right there.

Q.  Did you hear anything?  I can try to turn up the volume.

I am trying to ask if it was a technological problem or just the quality of the audio.

A.  I don't know, to be honest with you.  It sounded like maybe also the internet was dragging a little bit, but it was inaudible to me.

Q.  Well, I will try to do it one more time here.  I'm going to play from 11:57:37.

(Video clip played for the witness and Court)

Q.  Again, I stopped at 11:58:00.  Did you hear anything at that time?

A.  Yes, I did.

Q.  And did you call someone "probably a hired gun from

outside the City" in that clip?

A.   It does appear I said that.

Q.   All right.  Do you remember making that remark?

A.   No.

Q.   Do you remember what led you to believe that someone may have been a hired gun from outside the City?

A.   To be honest with you, no, I don't.

Q.   All right.

        MR. HARRELL:  Brief indulgence, Your Honor.

        THE COURT:  Of course.

Q.   (By Mr. Harrell) Were any other signs brought to your attention other than the signs outside CHOICES that day, April 16th?

A.   Yes.

Q.   What other signs, if any, do you remember?

A.   The one I recall was at Freddy's next door.

Q.   All right.  And what, if anything, did you do about the Freddy's sign?

A.   Took a picture of it, collected the sign, and put it in my truck.

Q.   Who reported the Freddy's sign?

A.   Mr. Hamman did, I believe.

Q.   Did you see the Freddy's sign before Mr. Hamman brought it to your attention?

A.   I don't recall.  It was a very busy, hectic time out

there; so, no, to be honest with you, I don't believe I did.

Q. Was there anything obscuring your view of the sign?

A. I'm sorry. Could you repeat that, Mr. Harrell?

Q. Was there anything obscuring your view of the Freddy's sign from where you were standing?

A. Not unless it was the people from -- the other older couple, because they were walking on that sidewalk. So, I may not have seen the sign.

Q. There are no trees on that area of grass, isn't that right?

A. I can't recall, to be honest with you. No, I don't know. If there are, there's very few.

Q. And it was 11 a.m., right, and there were no clouds, right?

A. No.

Q. And other than maybe a couple blocking your view -- so I guess my question is did you ignore the Freddy's sign until it was brought to your attention or did you genuinely not see it?

A. I genuinely did not see that. I believe that's what I answered earlier.

Q. All right.

        MR. HARRELL: Nothing further, Your Honor.

        THE COURT: All right. Any redirect, Mr. Cox?

        MR. COX: No, Your Honor, I don't. Thank you.

        THE COURT: All right. Thank you. Call your next

witness.

MR. COX:  Next witness, if we could bring him in, he's in another room, this will be Patrol Officer Samuel Tyner.  Mr. Snyder is going to get him.

Officer Tyner, if you would sit in this chair across from me.  That way you will be seen on Zoom.

THE COURT:  All right.  Good morning, Officer Tyner. Can you hear me?

OFFICER TYNER:  Yes.

THE COURT:  Okay.  At this time I'm going to ask you to take an oath.

COURTROOM DEPUTY:  Please raise your right hand.

(Defense witness, Samuel Tyner, sworn)

COURTROOM DEPUTY:  Would you please state your name for the record and spell your last name?

OFFICER TYNER:  It's Sam Tyner; S-A-M, T-Y-N-E-R.

COURTROOM DEPUTY:  Thank you.

THE COURT:  You may proceed, Mr. Cox.


                    DIRECT EXAMINATION
BY MR. COX:
Q.  Mr. Tyner, are you employed by the City of Carbondale?
A.  I am.
Q.  What is your position with the City?
A.  I'm a patrol officer.

Q.  Were you discharged to a location near Giant City Road on April 16, 2025?

A.  That is correct.

Q.  And looking at Exhibit 1 -- Let me get that for you.

Handing you what's been marked as Exhibit 1, does this include your report of what occurred that day?

A.  That's correct.

Q.  Approximately what time did you arrive at that location? It's --

A.  The exact time?

Q.  -- there on both sides of the paper.

A.  Looks like around 11:39 a.m.

Q.  Were you the first officer on the scene that day?

A.  Yes.

Q.  When you arrived at the scene did you talk with Mr. Lenzini?

A.  I did.

Q.  Please tell the Court about that conversation.

A.  We talked to him, he said he had been sent to the location to enforce an ordinance in regard to signs on the City's right-of-way.

Q.  Did you then talk with persons named Brandon and Jared?

A.  Yes.

Q.  Please tell the Court about that conversation.

A.  I explained to them that there was an ordinance in place

and that I didn't know all the details of the ordinance, but I did know that signs were not allowed to be placed on the City's right-of-way and we would like for them to just remove the signs; explained to them they could carry the sign, hold the signs, they just couldn't be planted on the property.

Q.   All right.  Did a second officer then come to the scene?

A.   Yes.

Q.   And who was that officer?

A.   Sergeant Mark Murray.

Q.   Is he your supervisor?

A.   He is.

Q.   Why did he come to the scene?

A.   I contacted him because, like I said, I wasn't familiar with the ordinance in regard to the signs.  Most of the time when we are involved in protest situations it's not regarding signs on the right-of-way.

Q.   After Sergeant Murray arrived did he then talk with the Plaintiff, Mr. Hamman?

A.   He did.

Q.   And later did Lieutenant Lattan come to the scene?

A.   Yes.

Q.   Did you remain at the scene until the Plaintiff removed the signs from the ground?

A.   Yes.

Q.   All right.

MR. COX:  Those are all the questions I have, Your Honor.

THE COURT:  All right.  Any cross-examination?

MR. HARRELL:  Brief, Your Honor.


CROSS EXAMINATION

BY MR. HARRELL:

Q.  Officer Tyner, you mentioned you weren't super familiar with the sign ordinance.  Did you read the sign ordinance on that day, April 16th?

A.  I believe I looked at the ordinance that one of the individuals, either Jared or Brandon, had pulled up on their phone, and then I also looked at the ordinance that was sent to Sergeant Murray from our city attorney, Mr. Snyder, at the time that Sergeant Murray arrived.

Q.  Okay.  And as an officer, a law enforcement officer, did you believe that the signs were in violation of the ordinance?

A.  I wasn't for sure, because I wasn't -- I wasn't -- I didn't really have the knowledge on like what's considered the right-of-way in different areas of town.  From what I understand, there's different areas that are zoned differently, so there's some areas that the right-of-way would be considered a smaller portion, and there's areas that are larger portions, depending on where they are located in the city.

Q.  I have to ask, I apologize.  It kind of looks like you might be looking down.  Do you have any papers or documents with you right now?

A.  No, I have a police report off to the right, but I'm not looking at it.

Q.  Okay.  I just want to make sure, thank you.

When you did read the sign ordinance you admitted it was poorly written and it could be written better, isn't that right?

A.  There are things that, if you don't do it on an everyday basis, you know, like a codes officer would, there are things that could be confusing.  And that's kind of how I read it, you know, as different parts of the statute that refer to protests or, you know, areas of town.  Like I wasn't aware that, you know, there's different-size city right-of-ways depending on the portion of town that you are in.

Q.  You mentioned that you wouldn't make a final decision that day and that your supervisor would -- or a supervisor would come there and make a final decision, is that right?

A.  Yes.

Q.  And who did you mean when you mentioned a supervisor would come and make a final decision?

A.  An officer that's above me that was a Sergeant or Lieutenant that showed up on-scene.

Q.  And did you need a supervisor because the ordinance was

confusing?

A.   Could you repeat the question, please?  You kind of broke up a little bit.

Q.   Was the reason you needed a supervisor was because the ordinance was confusing?

A.   It was just a situation that I didn't feel comfortable with answering.  I didn't have the experience as far as dealing with ordinance signs and ordinance violations.

Q.   But it was because, you admit, it was poorly written, right?

        MR. COX:  Objection.  He's answered that question.

        THE COURT:  All right.  Well, it is cross-examination.  I will allow it, if you can.

Q.   So, you needed a supervisor to make the decision because the ordinance was poorly written, right?

A.   I wouldn't say that's the only reason that he was there is because I felt it was poorly written.  I wanted somebody who had a better understanding of the ordinance before a decision was made.

Q.   But it was a reason?

A.   That's correct.

Q.   All right.

        MR. HARRELL:  Nothing further, Your Honor.

        THE COURT:  Any redirect, Mr. Cox?

        MR. COX:  Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. COX:

Q. Officer Tyner, have you ever read the entire ordinance?

A. I have not.

Q. Have you ever sat down and studied the ordinance to know what the different provisions are in it?

A. No.

Q. Have you ever reviewed it for the purpose of determining whether it's confusing?

A. No.

Q. Were you confused because you were being shown a portion of the ordinance by Mr. Hamman and not being shown the entire ordinance?

MR. HARRELL: Objection, leading.

THE COURT: Overruled. You can answer that.

A. Yes, I believe that's true.

MR. COX: That's all I have, Your Honor.

THE COURT: All right. Thank you, Officer Tyner.

Mr. Cox, call your next witness.

MR. COX: Your Honor, I realize I have made an error here. I had a question I needed to ask for Mr. Lenzini and I failed to ask it, if I may be allowed to recall him very briefly.

THE COURT: You may. He's still there, I suppose?

MR. COX:  He is.  I will be using Exhibit 5, Your Honor.  Do you have a copy of that or do we need to put it on the screen?

THE COURT:  I'm sure I have a copy, if I could pull it up.  But if you can put it on the screen, that might be helpful for everyone.

MR. COX:  Yeah, I will ask Mr. Snyder, who is much more adept than I am, if he can help me with that, unless Plaintiff has a copy they can put up.

MR. SNYDER:  What were you wanting to put up?

MR. COX:  Exhibit 5.

MR. SNYDER:  There you go.

MR. COX:  All right.

REDIRECT EXAMINATION

BY MR. COX:

Q.  So, Mr. Lenzini, are you familiar with this document?

A.  Yes, I am.

Q.  Is this a document that's kept in the records of your office?

A.  It is.

Q.  And do you rely on such records to make determinations about right-of-way?

A.  We do.

Q.  If you could, for the Court, help explain this to us.

It's a lot of lines and it's rather small. I see in the middle, you see what's marked as Giant City Road. Is that the roadway?

A. That is.

Q. And there are words written on that area. We have to sort of turn our heads and it's just photo 1, 2, 3, and 4. Did you make those markings on this document?

A. Yes, I did.

Q. What do those signify?

A. Those correlate to the photos that I took that day out in the field.

Q. And would those include --

MR. HARRELL: I'm sorry, Your Honor, if I may, can we zoom in or something? I can't see the 1, 2, 3, 4.

THE COURT: Yeah, I can't, either. So, if we can make it bigger.

MR. COX: Mr. Snyder is working on that, Judge.

Is that big enough? There we go, wonderful.

THE COURT: Okay.

Q. (By Mr. Cox) So these photos that you have marked on here, do these show the locations both of the signs placed there by Bob and Darlene and also the signs placed by Mr. Hamman?

A. They do.

Q. Now, can you tell us from this drawing where the property line is of CHOICES and where the right-of-way begins?

A.  It clearly says there mid page, it says "property line," with an arrow.  The property line is marked by a heavier black line than the other lines in the drawing, say compared to the roadway line or the sidewalk line, and the property line is obviously the edge of the right-of-way.

Q.  Now, Mr. Lenzini, when we look at the videos that have been provided in this case, we see in the back, behind the folks who are standing there, a fence.  Can you identify where that fence is located on this drawing?

A.  That fence is just inside the property line of CHOICES, so it would be basically just a few inches to the west of their property line.

Q.  So, the area from the property line, as we move to the right of the drawing toward the road, is that the area that is the right-of-way in that location?

A.  Yes, that is all city right-of-way.

Q.  All right.  And you have identified the location of all the photographs you took of the various signs placed there by Mr. Hamman and also by Bob and Darlene.  Are those locations all within the right-of-way?

A.  They are.

Q.  All right.

        MR. COX:  That's all I have, Your Honor.  We offer Exhibit 5.

        THE COURT:  Okay.  5 will be admitted.

Any cross-examination on these questions only?

MR. HARRELL:  Yes, Your Honor, thank you.


RECROSS EXAMINATION

BY MR. HARRELL:

Q.  Mr. Lenzini, can you move the mouse on that screen?  Okay. I wanted to make sure you have control so I can ask a couple of questions about this exhibit.

I think you may have already mentioned this.  Can you put the signs roughly where Mr. Hamman initially put his signs?

A.  Can you repeat that, Mr. Harrell?  I did not hear the last part what you said.

Q.  Understood.  Where Mr. Hamman originally put his signs, roughly where were they?  And I understand --

A.  That should have been Photo 2.

Q.  Photo 2, okay.  Oh, all right.  I see that.  And then where did he place the signs at the end, after he attempted to move them in compliance?

A.  That would have been Photo 3 and 4.

Q.  Okay.  Can you move your mouse there?

A.  To the north.

Q.  Understood.  All right.  I appreciate that.  So, is that dot where you were standing when you took the photos, or is that where the signs were?

A.   Where the signs were.  I have a couple of different angles in photos.

Q.   Okay.  And that was -- I believe Mr. Hamman attempted to pace off about 20 feet.  Is that -- Is that the -- That's the location Photo 3 and 4 shows?  Is that in the same location?

A.   Yes, that's -- I think we entered, if I'm not mistaken, either -- I think you guys call it discovery -- when we turned over evidence, I believe that Photos 3 and 4 have been entered as evidence.  They are in the same location, as I recall. They are just different camera angles to try and assist me in determining location at a later date.

Q.   Okay.  So, that is -- and these docs are -- I believe you called it a field, right?  So these docs are in that field of grass?

A.   Yeah.

Q.   Okay.  On this plat map is there any -- do the words *right-of-way* appear on this plat map at any point?  Take your time if you need to.  I know they are small letters.

A.   Can we zoom in on that, because I believe it's listed on that note.

I don't really see it.  I see a lot of references and measurements -- the measurement of 100 feet from the center of Giant City Road to the property line.

Q.   Well, I will tell you, Mr. Lenzini, I have looked at this plat map, actually, very carefully.  Would it surprise you to

know that the words *right-of-way* are nowhere on this document?

A.   Yeah, this is not actually a plat map, though.   This is a site plan design, just to be more specific.

Q.   What is your understanding of the term *right-of-way*?

A.   Right-of-way is any property owned by the City, basically that, in this case, this right-of-way was purchased probably with the intent of future expansion of Giant City Road. That's what right-of-ways are for; for sidewalks, utilities, future road expansions.

Q.   Understood.  Are you aware that the City ordinance have a different definition of right-of-way?

A.   I'm sorry.  Am I aware of -- Who has a different definition?

Q.   The Carbondale code, the city ordinances, whatever you might call them.

A.   Well, there are several definitions for -- There's one definition in Title 15, one definition in Title 17, but I believe they are quite similar.  In both cases it's property owned by the City.

Q.   All rightie.  Let's go back to this Exhibit 5.  The dot where you placed Photo 3 and 4 shows the one where the signs ultimately were before Mr. Hamman finally complied.  Are those on a street?

A.   No.

Q.   Are they on an alley?

A.   No.

Q.   Are they on this location used for pedestrian traffic?

A.   No.

Q.   Are they on a position used for vehicular traffic or similar purposes?

A.   No.

Q.   Are there any utility poles there?

A.   There's underground utilities there.  I do not -- I don't believe there's utility poles there, but there are definitely underground utilities there.

Q.   Are there any City of Carbondale, I guess, other than what might be underground, fixture, structures, or improvements there?

A.   Not other than what's shown in like the waterline and things like that, yeah.

         I mean, there's -- For instance, there's a transformer which I have labeled and, again, there's a water meter you can see is labeled.  There's a big dug-in 14-inch.  That's a 14-inch water main.  So, I mean, there's definitely utilities there.

Q.   Are there any travel ways there?

A.   That people walk through the yards, yeah.

Q.   Is there a sidewalk near there?

A.   Yeah, there's a sidewalk right there.

Q.   All right.

MR. HARRELL:  What I'm going to do here -- I don't know if you need to stop sharing there -- or, for me to share, but I would like -- Yeah, if you don't mind taking down Exhibit 5, I would like to show him a couple things here.

I apologize, Your Honor.  I should have asked for permission to publish this.

THE COURT:  This is the ordinance?  It has been admitted.

MR. HARRELL:  Carbondale City Ordinance 15.11.4 has not been entered.

THE COURT:  Okay.  Oh, gotcha.

MR. COX:  Your Honor, show my objection. This is beyond the scope of Direct.  I didn't ask him any questions about the ordinance.

MR. HARRELL:  Your Honor, I asked him the meaning of right-of-way and the witness responded with one entitled 15 and one entitled 17, so I just want to go over those two definitions.

THE COURT:  Okay.  I will allow you to do that.

Now, which exhibit is this?

MR. HARRELL:  This has not been identified.  The definition of Title 15 was not offered, but the witness just mentioned it, so I can go ahead -- and I don't know what number -- well, off the top of my head what number Plaintiffs are at.  One moment here.

Your Honor, I guess I don't need to offer this.  You know, I guess we will move on from this and I will stop sharing that.  I apologize.

THE COURT:  Okay.

MR. HARRELL:  Nothing further from us.

THE COURT:  Okay.  Any redirect, Mr. Cox?

MR. COX:  No, Your Honor.

MR. LADING:  Well, Your Honor, this is Phil Lading.  Can Mr. Cox and I confer briefly before we end with this witness?

THE COURT:  Sure.  Do you want us to put you in a break-out room?

MR. LADING:  Yes, if we could, thank you.

THE COURT:  Deana, can you make that happen?

COURTROOM DEPUTY:  Yes, I will.

THE COURT:  Okay.  Let's all take a short break then and we will resume in five minutes.

(Court in recess from 9:59 to 10:05)

THE COURT:  I would like to resume.

COURTROOM DEPUTY:  Judge, I'm going to check and close that room.

THE COURT:  Okay.

All right.  We have Mr. Cox and Mr. Lading back with us.

Mr. Cox, it looks like you are on mute.  Are you

ready to proceed?

MR. COX:  I'm sorry.  I had to get out of what I was doing to get back to this screen.

We have Exhibit 17, which was provided in -- as an exhibit earlier, and Plaintiff has it -- it's the actual plat. Since there were questions by Mr. Harrell about this document, we thought it would be helpful to the Court to show you the actual plat itself rather than a site drawing.  So, we are prepared to show that.  Just a moment, we are getting it downloaded.  And, again, I apologize for taking the Court's time.

Does the Plaintiff have our Exhibit 17 handy?  I don't have it on my computer.

THE COURT:  No, I have Defendant's Exhibit 17 is the body-cam footage, which is also Plaintiff's Exhibit 10.  I want to be sure when we are finished with the testimony today we make sure we have -- everybody is on the same page about what exhibits were admitted and what the numbers are.

MS. McGEE:  Your Honor, if I could jump in for a second.  6, 7, and 8 are the body-camera footage for Plaintiff.  Plaintiff's 9 are the text messages, and Plaintiff's Exhibit 10 is this plat map, which is Defendant's 17.

THE COURT:  Okay.  Maybe what I have is mislabeled. Okay.

MR. HARRELL:  We do have the plat map, Your Honor.

MR. COX:  You do?  Can you put that on the screen?

Mr. Harrell, what did we label that as?

MR. HARRELL:  I do have it as Defendant's 17 and also Plaintiff's 10.

THE COURT:  Okay.  Then my numbers are just off.  Okay.

MR. COX:  This is my fault.  I have numbered the transcript 17 accidentally, and this should have been 17.

THE COURT:  Got it.

MR. COX:  So, I think we should make the transcript, just for the record, to be exhibit Defendant's 19.

THE COURT:  Okay.

MR. COX:  I'm sorry for the confusion.

THE COURT:  I am easily confused.

MR. COX:  Well, I sure am today, Judge.

THE COURT:  Okay.

MR. HARRELL:  So, Mr. Cox, I do have the plat map up.  Do you want me to zoom in on the actual diagram?

MR. COX:  Yes.  Mr. Lenzini is coming back into the room and I am just going to ask him to identify this.

MR. HARRELL:  Okay.  I will zoom in on the actual diagram unless you'd rather I show the whole thing.

MR. COX:  That's fine.

John, if you could take a seat there we want to clear

something up there.


                CONTINUED REDIRECT EXAMINATION

BY MR. COX:

Q.  We have before us on the screen what is Defendant's

Exhibit 17.  This is the plat -- actual plat that's on file

for that area.  Do you need us to zoom in on that for you?

A.  I think I am pretty aware of this exhibit.

Q.  What?

A.  I'm aware of this exhibit.  I'm the one that produced it.

Q.  Yes, you are.  So, if you could identify for the Court on

this --

        MR. COX:  If you could zoom in, Mr. Harrell, I would

appreciate it.  Thank you.

Q.  (By Mr. Cox) So we have been looking previously at the

drawing -- the site plat drawing.

        MR. COX:  If we could zoom it out a little bit,

please, so we can see the numbers.  There we go.

Q.  (By Mr. Cox) Do you see here, this dark line that's on the

left side of Giant City Road, is that the property line as the

dark line in the other exhibit we looked at?

A.  Yes, it appears you will see the measurement of 100 feet

which would also correspond to that other plat.

Q.  So, the drawing on this actual plat is similar to the site

plan within 100 feet right-of-way from the middle of the road

going all the way to the property lines?

A.   Correct.

Q.   All right.  And is this consistent with the drawing that was on the site plan we looked at?

A.   Yes, it is.

Q.   All right.

MR. COX:  That's all I have, Your Honor.  We'd offer Exhibit 17.

THE COURT:  Any objection?

MR. HARRELL:  No, Your Honor.

THE COURT:  Okay.  17 will be admitted.

Any questions, Mr. Harrell, just on this exhibit for the witness?

MR. HARRELL:  Yes, Your Honor, thank you so much.

CONTINUED RECROSS EXAMINATION

BY MR. HARRELL:

Q.   Mr. Lenzini, does this -- Sorry, I want to be correct.  Is this a plat map?

A.   This is a subdivision plat, yes.

Q.   Subdivision plat, okay.  And just for my edification, what was the previous map?  What term would you use to describe that?

A.   That was a site plan design.

Q.   That was a site of the subdivision, thank you.  On this

subdivision plat do the words *right-of-way* appear on this at all?

A.  Well, I mean, I don't see them on this current thing.

Q.  Okay.  Can you tell me here -- and I can actually -- I think I can mark it there.  That says "private road" and "utility easement," and that's off Edna Court, right?

A.  Yeah, actually, you know, in -- the Plaintiff had access to the software that -- the county tax program.  It shows it quite clearly there, as well.

Q.  And then here is a -- and I can't quite read that, there's a line there.  But, it looks to me like a 24-foot wide ingress and egress easement for Lot 1, is that right?

A.  There's some -- I'm sorry, it's too small for me to read, quite honestly.

Q.  I understand.  Which of these numbered lots were the signs on, if any?

A.  It was on -- It was on the right-of-way.  It wasn't on the lot at all, basically.

Q.  Okay.  Then I guess help me understand.  Where on this -- because I think the previous one had your dots, this one doesn't.  So, can you tell me where on this subdivision plat the signs were?  I understand that you can't --

A.  They were in the right-of-way of Giant City Road.  I mean, broadly somewhere between the center line of Giant City Road where that 100-foot mark is over that heavy line that

basically is the property line.

Q.  Okay.

A.  This doesn't show the actual curb or street pavement or sidewalk pavement.

THE COURT:  Okay.  Gentlemen, it's important we don't talk over each other.  So, Mr. Lenzini, let the witness finish -- or let the attorney finish the question, and, Mr. Harrell, let the witness finish his answer.

A.  I'm sorry, Your Honor.

MR. HARRELL:  Thank you, Your Honor.

THE COURT:  I am just trying to keep the Court Reporter happy.

A.  Understand.

Q.  All right.  Let me back up a little.  That was helpful. So, this area labeled *Giant City Road* doesn't actually mark the, I guess, physical structures I would associate with the road asphalt, curb, pavement, is that right?

A.  That's correct.

Q.  This area labeled *Giant City Road*, does it have any descriptors like *right-of-way* or *easement* on it?

A.  Well, we are not looking at the entire page, the plan, Counselor, if --

Q.  I can zoom out.

A.  -- you know what I'm saying?  So, I don't recall. Probably somewhere in there it says "property edge" or

"right-of-way."

Q.  All right.

A.  I think it well distinguishes between the public property and the private property.

        MR. HARRELL:  Brief indulgence, Your Honor.

        MR. COX:  I wasn't clear if Mr. Harrell was finished or not.

        THE COURT:  I don't think so.  I think he's looking for something.

        MR. COX:  Okay, that's fine.

        MS. McGEE:  Yes, I can confirm we are not done here.

        MR. COX:  Okay.

        MR. HARRELL:  Sorry about that, Your Honor.  I guess what I am going to -- Can you see my -- I'm going to zoom in a little on the area of your Lot 14 on Giant City Road.  Can you see my mouse on your screen?

A.  Yes.

Q.  Okay.  Can you help me just -- In your best estimation, tell me where the signs were on this plat?

A.  They are roughly west of your cursor.  It's a bit hard without the other things, like the curb in the sidewalk, to give you an exact location.

Q.  No, I understand the limitation.  So, my understanding is the curb is clearly to the right of this Lot 14 property line, is that right?

A.   That's correct.

Q.   And that grass field, is that also to the right of the Lot 14 property line?

A.   Yes.

Q.   Okay.  And where -- And is the CHOICES Clinic located entirely within Lot 14?

A.   Yes, it is.

MR. HARRELL:  Apologize for that, Your Honor.  I will try to wrap this up.

Q.   (By Mr. Cox) The signs that were placed were similar to the right of this Lot 14 property line.  That would be, I think, east, and on the area labeled Giant City Road?

A.   That's correct.

Q.   All right.

MR. HARRELL:  Nothing further, Your Honor.

THE COURT:  Okay.  Any further questions, Mr. Cox?

MR. COX:  No, Your Honor.  Thank you.

THE COURT:  Okay.  Now call your next witness.

MR. COX:  Our next witness will be Sergeant Mark Murray.  We will get him for you.

THE COURT:  Okay.

MR. COX:  Mr. Harrell, if you don't mind, you can take that exhibit down.  And thank you for showing it.

MR. HARRELL:  Of course.  No problem.

MR. COX:  Your Honor, this is Sergeant Mark Murray.

A. 175

THE COURT:  All right.  Good morning, Sergeant Murray.

SGT. MURRAY:  Good morning.

THE COURT:  Can you hear me okay?

SGT. MURRAY:  Yes, Judge.

THE COURT:  Deana, if you would please swear the witness.

COURTROOM DEPUTY:  Please raise your right hand.

(Defense witness, Mark Murray, sworn)

COURTROOM DEPUTY:  Please state your name for the record and spell your last name.

SGT. MURRAY:  Mark Murray, M-U-R-R-A-Y.

COURTROOM DEPUTY:  Thank you.

DIRECT EXAMINATION

BY MR. COX:

Q.  All right.  Mr. Murray, are you employed by the City of Carbondale?

A.  Yes.

Q.  What's your position with the City?

A.  I'm a patrol sergeant with the City of Carbondale.

Q.  How long have you had that position?

A.  For about two and a half years.  And I have been employed by the City for 15 and a half years as a police officer.

Q.  All right, thank you.  Are you the supervisor of Patrol

Officer Tyner?

A. Yes.

Q. I want to direct your attention to April 16, 2025, in a location near Giant City Road. Were you dispatched to that location?

A. Officer Tyner called me and Deputy Chief Dunning also asked me to go to that location, as well.

Q. All right. Why did you go there?

A. To do a -- assess the situation, and I was told to go there.

Q. All right. Following orders. When you arrived at the scene did you talk with Officer Tyner about the situation?

A. Yes.

Q. What did you talk about?

A. He debriefed me on what had happened thus far about some protesters walking about and they had placed some signs in the ground.

Q. All right. Did you then talk with Plaintiff?

A. Yes.

Q. At some point did you have contact with the City Attorney, Jamie Snyder, for guidance about the ordinance?

A. I did, yes.

Q. Tell me about that.

A. I asked him for guidance on if that was legal. He sent me the statute that he believe it violated that basically stated

that he can't place any signs on the public right-of-way.

Q. All right. Then did you talk with the Plaintiff about that?

A. Yes.

Q. And tell the Court about that, please.

A. I explained to him what I had spoken to the City Attorney about, that he can't place any signs on the city right-of-way, and he believed that he could, and I explained to him that this is the interpretation of the attorney and that's what I would have to proceed with.

Q. So, were you -- had you studied the sign ordinance or reviewed it in any detail before you went there that day?

A. No, I was unfamiliar with it and the only introduction to it was on that day when he sent it to me.

Q. Is that why you sought guidance from Mr. Snyder?

A. Yes, because I'm not familiar with it.

Q. And you say he sent you a copy of the ordinance prohibiting signs on the right-of-way?

A. Yes.

Q. Did you share that with the Plaintiff?

A. I did.

Q. And did he show you any provisions of the ordinance itself?

A. There was a part that he believed would allow him to place signs on the easement or right-of-way, yes.

Q.  All right.  And at some point after you arrived there did you tell Mr. Hamman, the Plaintiff, that he needed to remove the signs?

A.  Yes, I did discuss that with him.  I understood that he believed that he was okay to do so, but after guidance from the city attorney it was clear to me that that's the best information that I had.  I am not familiar with this ordinance, the city attorney is, I am going to rely on his judgment and say that it's not allowed.

Q.  And did you -- When you told Mr. Hamman that he needed to remove the signs, did he comply?

A.  No, not initially.

Q.  At some point did you tell him that he could, if he wanted to, carry or wear the signs without a problem?

A.  Yes, that was an alternative that the city attorney and I discussed.  He said that if signs are carried or worn, something of that nature, where they are not placed on the ground or in the ground, then that's permissible.

Q.  And did you share that with the Plaintiff?

A.  I did.

Q.  And did he agree or disagree about protesting in this manner?

A.  He understood what I was trying to convey, but he said that -- I believe he stated that it was impeding his ability to portray the gospel, is what he said to me.

Q. When you were there, Sergeant, did you see other people present who were protesting by carrying the signs or wearing them?

A. There were two other people there; an older gentlemen and an older woman was there, yes.

Q. And did it appear to you that they were impeded in any way in their protests by the fact they were carrying or wearing their signs?

A. They seemed to be carrying on like normal.

Q. All right. At some point after you arrived did Lieutenant Lattan come to the scene and talk with Plaintiff?

A. Yes.

Q. And while you were present did Plaintiff talk with an attorney?

A. He spoke to a woman on the phone that he claimed was an attorney. I learned later that she was. At that time I didn't know if she was or not.

Q. All right. After speaking with his attorney, did Plaintiff then remove the signs?

A. He ultimately removed the signs from the ground, yes.

Q. All right.

MR. COX: Those are all the questions I have, Judge.

THE COURT: All right. Any cross-examination?

MR. HARRELL: Yes, Your Honor, thank you.

Permission to publish what has been marked and

admitted as Plaintiff's Exhibit 6.  This is Officer Murray's body-worn camera.

THE COURT:  Has this -- This has already been admitted, yes?

MR. HARRELL:  Yes, Your Honor.

THE COURT:  All right.  You may publish.

MR. HARRELL:  Your Honor, I would like to pull it forward here -- I'm going to pull it forward to this point here.

All right.  Your Honor, I'm going to start playing a portion, I'm at 12:06:48.

THE COURT:  Okay.

(Video clip played for the witness and Court)


                    CROSS EXAMINATION
BY MR. HARRELL:

Q.  First, did you hear that all okay?

A.  Did I hear it, yes.

Q.  Okay.  Why did you -- First, who are you talking to in this clip?

A.  Jared and Lieutenant Lattan, it looks like.

Q.  Why did you tell him you were sure he wouldn't get a permit based on what the sign was saying?

A.  I don't know if you can get a permit to display signs or not, but I assume the City grants permits for certain things.

As I explained in that clip he just played, I don't know if that was allowed or not.

Q. And then you said if it was a sign for something else you're sure it would be allowed, right?

A. I was expressing my viewpoint, yes, I did say that.

Q. In your experience does -- So, I guess it sounds like from your experience the City does discriminate based on the content of signs, right?

A. Can you say it again, please?

Q. In your experience -- You expressed to him that the City does discriminate based on the content of signs, right?

A. I --

MR. COX: Show my objection. Is he talking about what was on the video that he expressed that?

THE COURT: Well, that's fair.

Mr. Harrell, if you could clarify your question.

Q. (By Mr. Harrell) On April 16th, you told Jared that you were sure he would not get a permit because of what the sign said, and if it said something else he would. What led you to that opinion?

MR. COX: Show my objection. That's misstating, I think, what's on the video of statements made by Sergeant Murray. He's phrasing it in a way that's inconsistent with what was being said in the video. It's difficult to hear the video, honestly, but if you could point to that place on the

video where Sergeant Murray said such a thing, can you -- I don't -- but I did not hear that.

MR. HARRELL: Your Honor --

THE COURT: Well, certainly the video speaks for itself. Why don't you replay it, and then if you want to ask a question about specifically what he said there at that time or if you have a different question, clarify that.

MR. HARRELL: Thank you, Your Honor. I will start playing from 12:06:58.

(Video clip played for the witness and Court)

Q. (By Mr. Harrell) All right. In that clip you just said, "They would not condone this." What led you to that belief?

A. What led me to that belief is that I think based on the City's priorities and past experience with them that if it's not -- I guess to break it down in terms of right and left type things, if it's more of a right-wing belief it's discouraged.

Q. I will continue playing.

(Video clip played for the witness and the Court)

Q. You said, "I'm sure it's viewpoint discrimination. I'm not saying that." I don't want to parse that too much. What led you to the belief that it was viewpoint discrimination, not that you said that?

A. In the hypothetical situation that we were kind of discussing there, if they are granting it for certain people

and not granting it to other people, then in my mind that would be unfair. But, if they don't grant it to anyone, then I guess that would be fair across the board.

Q. Okay. I'll continue playing, and I'm continuing from 12:07:54.

(Video clip played for the witness and Court)

Q. I will go and stop there at 12:08:43.

MR. HARRELL: Nothing further, Your Honor.

THE COURT: All right. Any redirect, Mr. Cox?

MR. COX: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. COX:

Q. Sergeant Murray, are you aware of any specific occasion when the City based the removal of a sign in the right-of-way on what was the content of that sign?

A. I am not aware of that, no.

Q. And based on your experience, does the City remove signs from the right-of-way regardless of what the sign message is?

A. Yes. I've talked to Building Neighborhood Services about removing signs before, and I guess they take everything out of there that's on the City's right-of-way.

Q. Yeah, exactly. So, what you were expressing there on the video was your own personal opinion?

MR. HARRELL: Objection, leading.

THE COURT: Well, rephrase the question, Mr. Cox.

MR. COX: I will, Your Honor.

Q. (By Mr. Cox) Sergeant Murray, when you expressed what you expressed on the video there, were you expressing the official position of the City of Carbondale or your own personal opinion?

A. No, I was giving my personal opinion.

Q. All right. In your experience, have you ever seen any discriminatory conduct by the City of Carbondale with respect to their signs in the right-of-way?

A. No, I have not.

Q. All right. Thank you.

THE COURT: Thank you.

And you have one more witness for us, Mr. Cox?

MR. COX: I do.

THE COURT: Sergeant Murray, you are excused.

SGT. MURRAY: Thank you, Judge.

THE COURT: Thank you.

MR. COX: Our next witness, Your Honor, is Lieutenant Theodore Lattan, L-A-T-T-A-N.

I apologize for my voice, too much pollen in the air.

Good morning, Lieutenant. If you will take a seat right here.

THE COURT: All right. Lieutenant Lattan, can you hear me okay?

LT. LATTAN:  I can, ma'am.

THE COURT:  Okay.  I'm going to ask you to take an oath at this time.

COURTROOM DEPUTY:  Please raise your right hand.

(Defense witness, Theodore Lattan, sworn)

COURTROOM DEPUTY:  Please state your name for the record and spell your last name.

LT. LATTAN:  It's Theodore Lattan, L-A-T-T-A-N.

COURTROOM DEPUTY:  Thank you.

THE COURT:  You may proceed, Mr. Cox.

MR. COX:  Thank you.

DIRECT EXAMINATION

BY MR. COX:

Q.  Lieutenant, are you employed by the City of Carbondale?

A.  I am.

Q.  What is your position with the City?

A.  I'm a Lieutenant.

Q.  In the police department?

A.  That is correct, with the Carbondale Police Department.

Q.  How long have you been with the Carbondale Police Department?

A.  Just shy of 15 years.

Q.  And your current position is Lieutenant, is that right?

A.  Yeah, I am our Support Services Lieutenant.

A. 186

Q.   On April 16, 2025, did you go to the scene at 600 Giant City Road?

A.   I did.

Q.   All right.  Why did you go there?

A.   I believe it was Deputy Chief Matt Dunning -- I can't recall if he came to my office or called me on the phone, but directed me to go to that location and meet with Officer Tyner and Sergeant Murray in regards to an issue that was happening there.

Q.   All right.  And before going there had you ever talked with the City Attorney, Jamie Snyder, about the sign ordinance?

A.   I did.  While I was en route to the scene I called Mr. Snyder for him to explain to me what the city ordinance was, what the issue was with what was occurring at that location.

Q.   If you would, tell the Court what you and Mr. Snyder talked about with respect to the ordinance and what was occurring.

A.   He had advised me that the city ordinance, the issue that we were going to deal with were people who were conducting some sort of protest and that there were signs that had been planted -- or I believe "erected" was the word used -- in the ground, which is a right-of-way on the city easement, and said that that was the only thing that was in violation at that time.

Q. All right. Did he advise you that it would be appropriate or allowable for them to carry or wear the signs?

A. Yes, that was the interpretation, was that the only issue was that they were planted into -- erected on that right-of-way, and that they could be carried, held, or worn on that day and they had been at that location for some time.

Q. When you arrived were Officer Tyner and Sergeant Murray already there on the scene?

A. They were, sir.

Q. And did they remain there until the conclusion of that discussion with Mr. Hamman?

A. They did.

Q. Did you speak with Mr. Hamman and a person identified as Jared?

A. I did.

Q. Explain to me what you talked about with Jared and Mr. Hamman.

A. Mr. Hamman, when I had arrived, had already spoken, I think at length, with Officer Tyner and Sergeant Murray. He had -- I had spoken to Mr. Snyder briefly about the ordinance and, as he explained it, he showed me a couple of different ordinances on his cell phone. And I basically advised him that the only issue that we had, that I was advised, as the ordinances -- what the ordinance said is that the only issue was that the signs could not be planted into the ground and

that they could be carried, held, or worn, and we would be done with our business.

Q.  Did you at some point see Mr. Hamman talking on the phone with an attorney?

A.  I did.  I saw another individual that had been out there, as well, I believe speak with Mr. Hamman for a moment, and then Mr. Hamman stepped away on a couple different occasions, speaking with somebody who later identified themselves to me as acting capacity as his attorney.

Q.  And did you then speak with the person who was identified as an attorney?

A.  I did.

Q.  Please tell the Court about that conversation.

A.  As I believe Mr. Hamman brought the phone back, he wanted me to speak with that individual.  We had been there for a while.  I was trying to wrap everything up, but I spoke with her briefly.  She had asked me if it was our intent to take her client, Mr. Hamman, into custody.  I said as long I could gain voluntary compliance with the ordinance I saw no reason to issue a citation and had no intention of taking Mr. Hamman into physical custody and as long as we could get him into compliance.  And to do what we had, we would have issued a citation and removed the signs.

Q.  All right.  And at that point did she tell you what she was advising Mr. Hamman to do?

A.   She did.  I believe after another side conversation she came back and whoever she was also with on the phone stated they were going to advise Mr. Hamman to go ahead and remove the signs so that we could get voluntary compliance.

Q.   Were the signs then removed by Mr. Hamman?

A.   They were.

Q.   I wanted to ask you, Lieutenant, in your experience here in Carbondale have you ever seen an instance where the decision to remove a sign from the right-of-way was based on what the consent of the sign was?

A.   Not in my experience.  It's not something that I deal with or we at the police department deal with on a regular basis. When it comes to, you know, prior to this incident, I probably couldn't have found that code unless I looked it up or spoke to Mr. Snyder.  But I have never seen or been aware of our police department or the City removing signs based on their content other than when they were in violation of the city ordinance.

Q.   All right.  Did you see other protesters there who were carrying or wearing signs?

A.   I did.  I believe there was another at least male and female that were there that I believe were wearing a sandwich-board-type sign.

Q.   And did they appear to have any issues or problems with the protesting by the wearing of the signs?

A.   No, that's what they were doing when I arrived.  I think I spoke to one of them briefly for just a moment to introduce myself, and that was all the further contact that I had.  I didn't have any further conversation with them.

Q.  All right.

MR. COX:  Those are the questions I have, Your Honor. Thank you.

THE COURT:  All right, thank you.

Mr. Harrell, any questions?

MR. HARRELL:  Yes, very brief, Your Honor.

I'm going to ask for permission to publish -- it's the same exhibit marked as Defendant's #2, Plaintiff's #6, that's already been admitted.

THE COURT:  Okay.  You may publish.

MR. HARRELL:  I'm going to start playing from 12:18:28.

THE COURT:  All right.

(Video clip played for the witness and Court)

MR. HARRELL:  I stopped that at 12:18:51.

Q.  (By Mr. Harrell) Lieutenant, you said that this --

MR. COX:  Your Honor -- I'm sorry to interrupt, Mr. Harrell.  That sounded to me like it was sped up.  It was so fast I could rarely make out what was being said.  Is there a way to slow that down to a normal speech?

THE COURT:  Yeah, maybe see -- Slow it down.  If that

was normal, maybe slow it down a little bit, because I was getting somebody talking over him, too.

Can you play it again, Mr. Harrell?

MR. HARRELL:  I think I can.  We are getting to the limits of my technical prowess.

THE COURT:  You have been great so far.

MR. COX:  It may be, Mr. Harrell, that if your speakers are on, it may be echoing in some fashion.  I'm not certain.

MR. HARRELL:  I apologize.

All right.  I'm going to play -- This is now playing at half speed, yes.  I'm going to play at 12:18:28.

(Video clip played for the witness and Court)

MR. HARRELL:  Did you hear that?

MR. COX:  I couldn't make out a single word, it was so soft.

THE COURT:  I think that was even worse.

Play it one more time at regular speed, and any -- maybe everybody mute their microphones.  I don't know if we are getting feedback or people in the audio are speaking over each other.

MR. HARRELL:  All right.  I'll do my best.  This is -- So, this is Defense Exhibit -- I don't know if the witness has seen it, but this is video that we received from the City.

THE COURT:  Okay.

MR. HARRELL: I'll start playing -- I'm starting this time at 12:18:30. I hope everyone can hear clearly. And let me make sure I am on regular speed. Yes, I am.

(Video clip played for the witness and Court)

MR. HARRELL: Did you hear that?

MR. COX: No. I had my volume all the way up. I could see he was talking, but I couldn't hear his words.

CROSS EXAMINATION

BY MR. HARRELL:

Q. Well, Lieutenant, what I will tell you is you were discussing with Sergeant Murray the, I guess what was occurring on that day, and you said, "This is a very gray, touchy area." Do you recall making that comment?

A. I can make that out, those words out from the first time you played it, and I have reviewed both mine and Sergeant Murray's body cams, so yes.

Q. What did you mean by, "This is a very gray and touchy area"?

A. I was referring to that any time -- and, you know, from speaking with Sergeant Murray, he had been there for some time, I think he was ready to be done with the incident, we had been there for some time. On the other side of town there had been a structure fire with a loss of life, and I think he was ready to, you know, be done with it and wanted the

citation issued, signs removed, taken as evidence.  And in my thought process was any time we were dealing with people exercising their First Amendment right, you know, either lawfully or in violation, that I want to give them every opportunity to comply.  And basically knowing that when we were dealing with people who were engaged in public protests that, you know, I want to do everything I can to gain that voluntary compliance other than take some sort of enforcement action and was trying to slow the process down, willing to take a little while longer to try and see if we could gain that voluntary compliance.  I think that's what I meant by "This is a touchy area," if that makes sense.

MR. HARRELL:  Nothing further, Your Honor.

THE COURT:  Any redirect, Mr. Cox?

MR. COX:  No, Your Honor, thank you.

THE COURT:  All right.  Thank you, Lieutenant Lattan.  That concludes your testimony.

And that was your last witness, correct, Mr. Cox?

MR. COX:  That's correct, Your Honor.  I just want to make sure we have admitted all the exhibits we needed to, but otherwise that concludes our presentation.

THE COURT:  Okay.  And, Mr. Harrell, Ms. McGee, any rebuttal witnesses?

MS. McGEE:  No, Your Honor, just a closing argument.

THE COURT:  Okay.  Why don't we take about a

five-minute break for Counsel to draw your thoughts. I'll let you do a closing argument. I have some questions, so I might interrupt you if it comes in at a good point.

MR. HARRELL: If I -- Sorry, one thing. Ms. McGee, go ahead.

MS. McGEE: I was going to say I think Mr. Cox wanted to enter in a few exhibits. I think we want to make sure -- I don't know that we actually admitted the site plan, which is Defendant's Exhibit #5 that we talked about extensively. I think that we were conflating Exhibit #5 and Plaintiff's Exhibit #10, which is their 17.

Mr. Cox, are you good with that?

MR. COX: Yeah, if I can have just a few minutes, Judge, to go through our exhibit list and make sure we are --

THE COURT: Okay. Go through that. And I asked Deana -- And Deana can come on and go through with you to make sure they are all straight. It would be very helpful if you just have one -- I mean, it's an exhibit. So, if it's -- By labeling something twice gets very confusing. So, if it's Plaintiff's #1 and Defendant's #10 is the same thing, that's confusing. Let's just give them an exhibit number, make sure we are all on the same page. It doesn't need to be admitted twice. Once it's admitted, anybody can use it.

So, I will take a short break, I'll let you go over those with Deana, and then I will give Counsel a break and

then we will resume with closing arguments.

MR. HARRELL:  Thank you, Your Honor.

MR. COX:  Thank you, Judge.

(Court in recess from 10:54 to 11:03)

THE COURT:  All right.  If everyone is there, let's try to wrap this up.

Ms. McGee, where are we on the exhibits on your end?

MS. McGEE:  I think we decided, along with Ms. Brinkley, to hammer some of it out to make sure we have got the kind of chronological and nothing is double-done after closing arguments.

THE COURT:  Okay.  Deana tells me that we received a flash drive with your motion, but the body-cam videos are not on that.  So we will need another --

MS. McGEE:  The flash of the initial complaint or preliminary injunction?

THE COURT:  Yes.

MS. McGEE:  Okay.  I apologize.  We can get that done maybe via electronic -- We talked to the Clerk's office with having such a big file, so we sent it on a flash drive.  I apologize.  We will get that done day.

THE COURT:  Yeah, I don't know, maybe --

MS. McGEE:  Or is it the body-camera footage from the officers or of our client that he took?

COURTROOM DEPUTY:  I took the flash drive that was

submitted to the Clerk's Office for Document #8, and I had our IT department look at it, as well, and they could not find any video whatsoever contained on the flash drive.

MS. MCGEE: Okay. We'll re-present that today, Your Honor.

THE COURT: All right. Then, Ms. McGee, are you prepared to give a closing argument concerning what the testimony has shown?

MR. COX: Your Honor, not to interrupt you, but I wanted to make sure I offer all the exhibits we wanted to offer into evidence --

THE COURT: Okay.

MR. COX: -- before we begin our close, if that's okay with the Court.

THE COURT: That's fine.

MR. COX: So, we had submitted a list of exhibits, and that's the list we are going to use, just for clarity, for the Court. The first item on our list was the police report, Exhibit 1, and we offered that.

THE COURT: Okay. Let me get there to my -- what came in the proposed docs folder.

Okay. Say that again, Mr. Cox.

MR. COX: Exhibit #1 is the police report I had talked with Officer Tyner about.

THE COURT: Okay. That's Exhibit #1. So, the police

report will be admitted.

MR. COX:  #2, #3 and #4 are the videos from the officers' body cams.  I think the Court should have those from us.  If not, we will get them to you.  But that would be the three videos, and those have been stipulated to.

THE COURT:  Okay.  And I'll need Deana to confirm that we have those.  And I guess what we are missing from Plaintiff is Mr. Hamman's body-cam video.

MS. McGEE:  Yes, Your Honor.

THE COURT:  Okay.  So, what other exhibits?

MR. COX:  Number 5, Judge, is the site plan which we talked about today.  I think that has already been admitted.

Exhibits #6 and #7 are signs -- photographs of signs, which we offer.  I don't think there's an objection to that.  Yeah, there's a stipulation to those photographs.

THE COURT:  Okay.

MS. McGEE:  For the record, we don't have an objection, but I think 7 -- I'm sorry -- the Defendant's 17 has been admitted.  I don't think he moved to offer Exhibit #5, but we don't have any objection, just for the record.

THE COURT:  Okay.  Now I am getting confused again.  So, Defendant's #17 is what?

MS. McGEE:  Is the last map that we saw.  The first map that we saw is their Defendant's Exhibit #5.  I don't think that was moved into evidence, but I do think #17 was.

THE COURT: Okay. So, #17 was the plat map, then?

MS. McGEE: Yes, but the one that had Mr. Lenzini's comments on it, that was Exhibit #5.

THE COURT: Okay. So, #5 will be admitted.

So, 1 through 7 of Defendants exhibits will be admitted and 17 has already been admitted.

MR. COX: Then we have Exhibit #9 is a photograph. That's been stipulated to. Exhibit #10 is the application for permits. #11 is the sign ordinance. I think all that's been stipulated to, as well, the sign ordinance.

THE COURT: Okay. So, 9, 10, and 11 will be admitted.

MR. COX: 14, 15 and 16 are photographs taken by the officers. Those have been stipulated to.

THE COURT: Okay. 14, 15 and 16 will be admitted.

MR. COX: 17 was the plat that we just talked about. I think that's already been admitted.

THE COURT: It has.

MS. McGEE: Is 18 the same as 10?

MR. COX: I think 18 is the same. We won't offer 18. I think it's a duplication of 10.

THE COURT: What is 10?

MR. COX: It's the copies of the sign permits.

THE COURT: Got it. So, no 18. Okay.

MR. COX: Then 19 is not on the list, but it was that

transcript of the video that was provided to us by the Plaintiff.

THE COURT:  Okay.  So, 19 will be admitted.

MR. COX:  And that's all, Your Honor.

THE COURT:  Okay.  Since we are doing that, Ms. McGee, can you go over what you show as the exhibits you admitted so we are all on the same page?

MS. McGEE:  Yesterday we admitted Exhibit 1, the body-camera footage from Mr. Hamman; Plaintiff's Exhibit 2, which was other photos of other signs in the rights-of-way in Carbondale; Exhibit 3 is a not-for-profit status of Christ Church Carbondale; and then 6, 7, 8, 9, and 10 are all Defendants exhibits.  6, 7 and 8 are the same body-camera footage from the officers; 9 is the text messages; and then 10 is the -- I guess we are calling it the site plan, not the plat map.

THE COURT:  Okay.  Anything else?

MS. McGEE:  I don't believe we moved 10 or anything else in.  Let me double-check that.

THE COURT:  Okay.  And I'll just ask Deana.

Deana, does this confirm -- match up with what you have, what Mr. Cox and Ms. McGee have just gone over?

COURTROOM DEPUTY:  Sort of.  I didn't have a lot that were mentioned, but I have got them now.

THE COURT:  Okay.

MS. McGEE:  And we have nothing further, Your Honor.

THE COURT:  Okay.  If we are missing anything, other than we know we are missing the body -- Mr. Hamman's body-cam, we will reach out to Counsel and have you get that to us.

MS. McGEE:  Yes, I'm getting that as we speak, Your Honor.

THE COURT:  Okay.  All right.  Ms. McGee, you may present your closing argument.

MS. McGEE:  Thank you, Your Honor.  I just want to make sure to reserve a little time for rebuttal after Mr. Cox.

THE COURT:  Sure.

MS. McGEE:  We spent the majority of today talking why Plaintiff's claims are going to be successful on the merits.  I'll briefly address those and then conclude with the other three elements for preliminary injunction; irreparable harm, balance of the equities, and public interest.  I want to also first play for the Court a very, very short snippet from Defendant's Exhibit 2 that I don't believe we got into, but it has been admitted into the record.

Permission, Your Honor?

THE COURT:  You may.

(Video clip played for the Court)

MS. MCGEE:  I want to make sure it was audible for the Court.

THE COURT:  Yeah, I could hear it.

MS. MCGEE:  Briefly, Plaintiff will succeed on the merits for three reasons.  First, the ordinance is void for vagueness; second, it's not narrowly tailored; and Defendants engaged in viewpoint discrimination.

So, the first, Your Honor, the ordinance is void for vagueness because they failed to provide adequate notice on how to follow the law.  It encourages arbitrary and discriminatory enforcement.  Plaintiff was given several legal theories, as you saw in these videos over today, as to why his signs weren't wanted.  We have Mr. Lenzini's interpretation, we have Mr. Hamman's and different law enforcement officers who were saying things like, "It could be written better, it's a gray area, it's poorly written."  Key terms like *right-of-way* are not clearly defined.  And while there is a section, 17.12.2, as we have talked about extensively, but it isn't what Defendants have relied on thus far.  What they've relied on is something that is even outside of what 17.12.2 says is acceptable to pivot to if there's any ambiguity inside their own ordinance.  It's not cross -- 17.12.2 isn't cross-referenced.  Citizens are still required to engage in legal research and interpretation in order to determine prohibited areas.  A reasonable person shouldn't have to pull up a plat map or contact the city in order to understand what an ordinance means on its face.

Plaintiff was demonstrating what he believed

permissible according to the ordinance.  As it states, it's not intended to limit essentially what is First Amendment protected speech.  Plaintiff has a right to put signs in the ground per *Reed v. Town of Gilbert* and *City of Ladue*. Citizens have a right to put signs in the ground.  And in both of those cases, scaling down that speech to handheld pamphlets or something of that nature was an impermissible restriction on speech.  Defendants have admitted multiple times in their writings that Plaintiff was demonstrating and these signs were clearly articulated towards a protected First Amendment speech.

THE COURT:  Well, let me interrupt you there.  So, the wording that you just referenced that the ordinance protects the display of banners, flags, or other signage by persons participating in demonstrations, political rallies, and similar events, it seems here that what you are arguing is that it relates to the enforcement of the ordinance, not the wording itself -- the enforcement of the ordinance in this particular situation, because the wording of the ordinance appears to protect your client's speech.  Would you agree?

MS. McGEE:  Your Honor, I would say that it is facially vague in terms of -- It does do that, it is authored as implied challenge, Your Honor, but if what Defendants are saying is correct in this entire section about temporary signs being permitted is a complete deception to citizens if there

are no signs on any public property allowed at all. But, the fact that it does say that there is a permit allowed, that it is intended to protect First Amendment speech, while it may be content initial, Your Honor, it's still vague as to what any of those things means and it requires somebody to still go determine what a right-of-way is, so therefore it's still facially vague.

There are many portions of this ordinance, Your Honor, that the law -- essentially to wrap up that point, Your Honor, is that the law must give fair notice and there's many portions of this ordinance that begs the question of how does an ordinary citizen know if it's not written there. And *private property* isn't written anywhere. A couple points, Your Honor, have said things that this is confusing or something to that end, but it's facially vague, Your Honor.

My second point as to why the ordinance is impermissibly broad, is a violation of the First Amendment, and it is restricting all speech in public forum and it's not narrowly tailored. The Government can only regulate speech with narrowed specificity. An ordinance must be narrowly tailored by significant Government interest and it must leave open alternative forms of communication. Right-of-way and the implied interpretation here is that all public property is a right-of-way, and that is an unknowable term here, too, as to what is requiring somebody to go look up what those things

mean. Dictionary definitions, both for legal dictionaries, as well as common use, like Webster's, points to rights-of-way being tied to paths of travel. There's no path of travel in the middle of a grassy field. Mr. Lenzini called it a field simply because it's next to a road, and that is what Mr. Hamman thought here. As you also heard, just to reiterate again, this was also very clear to the officers.

Second, Your Honor, there's no significant Government interest that can justify the overbroad regulation of these signs; again, pointing to *Reed* and *City of Ladue.* These are small temporary signs. They can't obstruct traffic when they are 20 feet from the road where the easement ends, per Defendants' own evidence. They can't interfere with the aesthetics of the city when they are picked up and carried away after a few hours and they don't leave gaping holes in the ground. Protecting all signs from public property is not a narrowly tailored way to achieve any Government interest.

And, third, Your Honor, it does not leave open any and all terms -- sorry -- doesn't leave open any alternative forms of communication. If that were true, then Plaintiff would have been able to exercise the plain text permit exception, even something you heard Sergeant Murray say was an option. But when Mr. Lenzini was involved the next day, it doesn't exist at all. Nothing in this ordinance states *private property;* nothing in the application does so, either.

The ordinance is unconstitutionally overbroad.

Lastly, on the why Plaintiff should succeed on the merits is that Defendants engaged in viewpoint discrimination. That's, per se, constitutional. It was not given a clear message from beginning to the end of the defense as to why the signs weren't permitted. First it was that they weren't demonstrated, that they were -- they had to be 20 feet from the road, tried that, and it was not on public property at all. The easement on the right-of-way terms were thrown around and conflated with each other, Your Honor. And Defendant's own evidence and testimony shows that Mr. Lenzini didn't see that sign, he didn't pull it, that's not until Mr. Hamman pointed him to it. And we saw on that clip that he clearly had an issue and made light of Plaintiff's sincere Christian virtue. I believe that that speaks for itself, Your Honor. And it was very clear that -- And in looking to other parts of the video, Mr. Lenzini calls this a waste of time, criticized, again, all of his speech, and it appears today this is something that the City has a problem with. The City's priorities, per Defendants' witnesses, don't allow certain types of speech.

And to the ordinance itself, Your Honor, for the first time in this case, as I mentioned earlier, Defendants' witnesses -- I believe Mr. Snyder -- says the only definition they would use is 17-12-2. The problem is that that still

ties rights-of-way to paths of travel exclusively, and in that section it also says that if there's anything not defined there to go to 91 Administrative Code, Section 530.30, but that's not even something that Defendants have cited. They have cited, I think, 92 522.20, which is not an authorized justification per their own law. And to reiterate, public property appears nowhere inside of that sign ordinance, it's not in the definition or any online application. Plaintiff was the victim of viewpoint discrimination on April 16th.

And, briefly, to the other three elements required for preliminary injunction, Plaintiff satisfied those elements, as well.

For imminent and irreparable harm, Seventh Circuit and the Supreme Court have emphasized that short deprivations of minimal periods of time of First Amendment rights caution unquestionably irreparable harm, and nothing -- no other showing is necessary. Here Mr. Hamman's right to speak freely in the most traditional and public forums, the sidewalk and public property, was violated. His right to engage in First Amendment protected activity was chilled by Defendants. Every day this unfiled discretion and enforcement is allowed is another day of irreparable harm.

To the balance of equities, when a Plaintiff credibly alleges that its First Amendment rights have been violated, the fact that Plaintiff has raised here his First Amendment

question compels a finding that the balance of hardship hits sharply in the Plaintiff's favor. Plaintiff has alleged this First Amendment violation here, and I won't belabor that point anymore for the Court.

Public interest of holding constitutional rights serves the public interest and injunction protecting First Amendment freedoms are always in the public interest. And as Your Honor well knows, the right to free speech is a right that lies at the foundation of free Government, and Plaintiff's right to speak in a public place is denying the public interest.

In conclusion, because Plaintiff has shown that injunctive relief is warranted by prevailing on all four elements for preliminary injunction, Plaintiff is entitled to injunctive relief and we would ask the Court to enjoin the unconstitutional ordinance and find that there was discrimination. And I invite any of the Court's questions.

THE COURT: Well, one thing that I wanted to ask you is the Defendant relies heavily on the *Grand Chute* case from the Seventh Circuit. It seems to have a lot of factual similarities with this case. Can you distinguish that case?

MS. McGEE: Yes, Your Honor, the *Grand Chute*, while it is the Seventh Circuit, is not applicable in this situation. The reason -- You are looking at two ordinances and the facts kind of pile those decisions; the 2014

ordinance, which the Defendant in that case, the City of Grand Chute, was able to show nondiscriminatory enforcement. I don't believe any of that type of statistics or the amount of things were ever elicited in testimony or brought up in briefing here. The reason why the 2015 ordinance was found to be moot was because it was highly specific. And I would invite the Court to go look at the difference between those two statutes and show that that's not the statute we have here. This is far more vague. It requires far more scratching of the head in trying to figure out exactly what is and is not permitted inside the bounds of the City of Carbondale.

To an analogous case, Your Honor, *Tucker*, where the right-of-way when we aren't obstructing traffic, the -- there is permissible speech there. I think that's actually a more applicable and factually similar situation in the way the Court dealt with it versus *Grand Chute*.

THE COURT: Okay. And let me just -- I want to make sure I'm clear on this. So, Defendants seem to concede that Mr. Hamman would have been permitted to walk around with his signs. The problem was putting it in the ground. It sounds like Mr. Hamman didn't want to pull the signs, but wanted to put them in the ground. But isn't a limitation on staking a reasonable -- or a permissible time, place, and manner restriction under the First Amendment?

MS. McGEE:  Your Honor, it applies against the very strong holdings of *Reed* and *Ladue* which states that you do have a right to put your signs in the ground.  I think that Mr. Hamman articulated also his safety concerns while carrying them, including the fact that he's been attacked and he doesn't want to have something around his neck in order for someone to be able to strangle him with, and I think that that also is a valid thing.  And I believe he also mentioned if signs blow away they could absolutely cause more damage to traffic than they would if they were staked in the ground.  But, I will say that both in *Reed* and in *Gilbert*, there was not time, place, and manner restrictions of going from signs in the ground to something in a newspaper or a handbill was an inadequate substitute that the Court found, so I would say that this is not a reasonable time, place, and manner restriction.

THE COURT:  Okay.  And then, finally, do you have any evidence of selective enforcement, other than the other signs that Mr. Hamman viewed?  We saw one on the fish fry and something else.

MS. McGEE:  Well, I think those signs point, too, and I also think the fact that there wasn't -- it didn't seem like it was Mr. Lenzini's intent to go remove the sign across the street until it was pointed out to him by Defendant.

I also think that Mr. Lenzini's attitude at the scene

while he called our client belligerent was also quite belligerent himself. And our records looking -- Your Honor, that is not (inaudible) of this case, but that all points -- the Freddy's sign was right there in plain view and that was not what he went after; he went after the signs articulating a message of our client.

THE COURT: Okay. Thank you.

Mr. Cox?

MR. COX: Thank you, Your Honor. May it please the Court.

MR. COX: It's undisputed that Section 8(A)(1) clearly provides that no sign may be erected on, suspended over, or encroach upon a public right-of-way. In 8(A)(1) there is one and only one exception to that rule, and that rule is -- that exception is found in 17-1-5 which pertains to block parties and outdoor restaurants. There's no application here and they concede that. But, that's the one and only exception to the rule that you can't put a sign in a right-of-way.

So, Plaintiff points to section --

THE COURT: Mr. Cox, let me interrupt you. Let me interrupt you.

What do you say to the Plaintiff's argument that nobody under -- that the ordinance doesn't define what right-of-way means?

MR. COX:  Well, we gave a definition of the right-of-way, which Mr. Snyder provided that's in a different part of the code, but it's in the code.  And it's one that's used with reference to the sign code, as well, that included not only roadways and sidewalks for travel, but places to put utilities.  And the evidence we presented to the Court showed that within the grassy area where these signs were placed,it was the right-of-way and it had utilities there.  The definition provided by Mr. Snyder of what a right-of-way is, as set forth in the code, included not only the travel ways, but utility -- places to place utilities, which the City has done.  So, it was clearly in the right-of-way and they have not presented any evidence to actually refute that it's in a right-of-way, as shown on the plat and on the other drawing that we provided to the Court.  So, it's clear -- it's clearly within the right-of-way as the City defined it, because it included utilities and travel, as well.

THE COURT:  Okay.  Go ahead.

MR. COX:  So, Plaintiff points to Section 8(A)(3), Judge, that says no temporary sign shall be erected within 20 feet of the curb line, and he attempts to make this an additional exception to the rule in 8(A)(1) that you can't put signs in a -- in a right-of-way.  And he essentially is trying to turn the section on its head and argue that a sign may be placed in a right-of-way if it's 20 feet from the curb.  If

that was an exception to 8(A)(1) it would have been listed in 8(A)(1), in addition to the exception that's there, and it was not. It's not an exception to the prohibition against signs in the right-of-way, because if it was meant to be it would have been listed. Since it's not identified as an exception to the prohibition of signs in the right-of-way, it can only be referring to signs that are on private property.

THE COURT: Okay. So, you are essentially equating the words -- the phrase *right-of-way* with public property? Is that what you are saying, the two are synonymous?

MR. COX: We are not, Your Honor, because it's very specific in the ordinance that they are referring to the right-of-way. For example, I'm in the City Hall right now. This is property that's owned by the City as public property. It's not in the right-of-way; it's public property. That is very different from a right-of-way which is used in the ordinance and which is defined in another part of the code to include this area and that has been designated the right-of-way by the City that includes, as I said before, utilities and travel. So, we are not equating it to all public property.

THE COURT: Okay. But, you are saying that the ordinance is effectively a total ban on signage on the right-of-way?

MR. COX: With one exception that's listed in

8(A)(1), and it only provides for one exception.  So, it is a total ban for any sign to be erected in the right-of-way, except that one exception.  But what the Plaintiff is attempting to do here is create additional exceptions to that rule that are not listed in 8(A)(1) that only has one exception.  He wants to create new exceptions or additional exceptions to that rule in 8(A)(1).

For example, it would make no sense for the ordinance to say, "You can't erect a sign in the right-of-way, but if you do it must be 20 feet from the curb."  That would be absurd.  I mean, "You can't put it in the right-of-way, but if you do decide to put it in the right-of-way it has to be 20 feet from the curb."  That can only be referring to private property, and that's what is meant.

Likewise, the Plaintiff points to a Section 8(A)(5)(b)(2), which permits a 501(c) organization to obtain a permit for displaying a temporary sign for up to 30 days.  Again, the Plaintiff is trying to make that section another exception to the prohibitions of sign in the right-of-way, although it's not mentioned there.  And since it's not identified as an exception, it cannot be referred to anything but private property, and that's shown that -- the City's interpretation of that is shown by the sign permit applications, Defendant's Exhibit 10, which is consistent with the ability of a 501(c) organization to only obtain a sign

permit for signs on private property. That's consistent, because those permits are not an exception to the general rule. The permit makes it clear as a condition it has to be placed only on private property. There is no provision in the code, in the ordinance for a permit to place signs in the right-of-way. Why not? Because the right-of-way ordinance says you can't -- the ordinance says you cannot put a sign in the right-of-way. So, then Plaintiff attempts to make another exception by pointing to Section 8(A)(5)(a)(4), and that provides that commercial signs are prohibited, include signs that are carried, waved, or otherwise displayed by persons on public rights-of-way and so commercial signs cannot be used. And we have seen these commercial signs of people waving, etcetera.

THE COURT: The Little Caesars guy.

MR. COX: That's it, Your Honor. But then it makes an exception there that signs that are carried and waved can be used if it's part of a demonstration. And this section actually is what permits Mr. Hamman and all the other demonstrators to carry and walk around and wear the signs. This is the section that creates that exception for if you carry, but there is no exception for putting it in the ground. What this section does is permit persons participating in demonstrations to carry, wave -- wave signs in the right-of-way, and that's why we allow them to do that if they

chose to do so.

In his motion, Plaintiff repeatedly used the word *confusion* about the interpretation of the ordinance.

Judge, any confusion about the ordinance was caused by Plaintiff's misinterpreting the ordinance and repeated attempts to create exceptions to the prohibition which don't exist.  I have seen people over my lifetime who will point to some verse in the Bible and say, "It means this," one verse, without reading it in context, and here the ordinance has to be read in context and he can't just point to something and say, "Oh, that's an exception to the general rule," and try to create exceptions where none exist.  They are not exceptions. Any confusion was created by him.

THE COURT:  Okay.  So you are saying under 8 -- I have it here in front of me.  Under Section 8(5)(a)(4), that's where he would have been fine, not in violation of the ordinance if he had carried, waved, or otherwise displayed the sign in the right-of-way, because this was -- he was participating in a demonstration or a similar event?  Do I have that straight?

MR. COX:  That's right.  That's why he was instructed the way he was told to remove the signs.  "You can carry them or wear them, you can do that all day long."  In fact, people did.  So, he was able to transmit his message in that way because the ordinance allows it.

THE COURT: In the right-of-way?

MR. COX: In the right-of-way. And so that's why they were able to walk in the right-of-way all day long and do that, because the ordinance allows it. But what it doesn't allow, very clearly, is for you to erect it, put it in the ground. And, that's what he wanted to do. So, what he wanted to do was in violation of the ordinance, but what he refused to do was not. That's why he couldn't do it.

THE COURT: You have too many negatives there. You said what he refused to do was not in violation of the ordinance?

MR. COX: That is correct. What he refused to do, carry or wear the signs, --

THE COURT: Okay.

MR. COX: -- would not have been a violation of the ordinance.

THE COURT: Got it. Okay. Now, and you introduced those permits that all talk about private property, and it seems you are saying the ordinance only applies to private property. But, where does it say that? Because I note the opening clause of the ordinance says, "It shall extend to all real property located within the corporate city limits of Carbondale, Illinois." So where is that distinction of private property?

MR. COX: It does not use the word "private

property," and this was what Mr. Snyder was explaining, Judge. If you look at 8(A)(1), it sets forth the general rule you cannot put a sign in a right-of-way except in the case of that one exception, which doesn't apply here.

THE COURT:  Okay.

MR. COX:  When you go to read 8(A)(3), about 20 feet from the curb, that would be if you put the 20 feet from the curb in the right-of-way it would be a violation of the general rule set forth in 8(A)(1), so it's not permitted.  The only time you can put a sign 20 feet from the curb is if you are putting it on private property, even though it doesn't use that word.  That's the only place you could put it.

Now, if the ordinance said, "Oh, there is an exception to putting it in the right-of-way under 8(A)(3)," okay, but that wouldn't even make sense, because if you can't put it in the right-of-way how could you put it 20 feet from the curb?

THE COURT:  So, let me -- Maybe that's where I am confused.  And you are all obviously way more familiar with this than I am.

So, was -- And I'll go back and look at the maps that you provided, because it will all probably make more sense when I go back and look at it.  But, are you saying that there was no way -- Well, let me phrase it this way:  Is there a way that Mr. Hamman could have put his sign in the ground?  In

other words, is 8(A)(3) just not applicable here, because we are not talking about a curb line and an adjoining street surface?  Does that make sense, what I am trying to ask?

MR. COX:  Well, Judge, let me answer it this way:  If Mr. Hamman had come to City Hall and said, "I want to get a permit to put a sign on private property," he would have been advised that the sign would have to be on private property. And this section, 8(A)(3) provides that if you put it on private property you have to be 20 feet from the curb. There's a setback.  That's what it's all about, that's why it's there.

THE COURT:  Is there a curb at this site?

MR. COX:  This is a curb.

THE COURT:  Okay.  So, say he wanted -- that would have meant he would have had to get a permit to put it on the private property, say, of the -- of the clinic?

MR. COX:  If the sign were more than 20 feet from the curb and -- and I am sure he would have to get permission from the clinic to put the sign there.  For example, I live on South Main in Benton.  If someone wants to put a sign in my yard they have to get my permission, of course, because it's my property.  But, if a sign is to be placed on private property, it must be 20 feet from the curb.

Here they did not want to place it on private property; they wanted to place it on the right-of-way.  And

whether it's 20 feet from the curb or 50 feet from the curb, whatever it is, it's not permitted. It's only permitted under 8(A)(3) if it would be on private property, because it cannot violate the general rule.

THE COURT: Okay. So, I think I understand what you are saying. 8(A)(3), you're saying, must only apply to private property, because 8(A)(1) very clearly says that no sign may be erected on the public right-of-way?

MR. COX: Exactly right. That's exactly right.

THE COURT: Got it. Okay. Go ahead.

MR. COX: So, in terms of vagueness, one of the -- They didn't make this argument this morning, but they made it in their motion, so I will address it. For example, they say it's vague because there's no definition of *erect* in the ordinance. The word *erect* is a common word that's easily understood by anybody reading an ordinance. They don't, for example, use the word *conclusion* in the ordinance, in other words, that are commonly used. So, that doesn't make it vague just because it doesn't define every word. There's nothing vague about this ordinance, Judge. It clearly says a sign may not be erected in the right-of-way and provides only one exception which doesn't apply here. It's undisputed that the prohibition against signs in the right-of-way is completely content-neutral. Signs are not permitted in the right-of-way regardless of the message on the sign. Now, there were

comments made by Sergeant Murray about that.  But when I asked him about it, he said he's unaware of the City ever basing the removal of a sign for what's in it.  And the testimony is clear from other witnesses that that is not a -- a part of the decision to remove the sign.  They remove signs almost every day that have messages other than about abortion.  And Plaintiff has tried to get around that by saying, "Well, here's a picture of three signs we found that were in the right-of-way that are not anti-abortion signs."  However, as was explained by Mr. Lenzini, sometimes signs are placed in the right-of-way and then not removed immediately by the City because they either don't know about it or it hadn't been brought to their attention or it was placed at a time -- on a weekend when they are not working, but when they do find them or when they do have a complaint about them, they remove them regardless of what the message is and they have done that consistently.

You know, I have to say that I think it's the Plaintiff's burden here to show that signs that had other messages other than theirs were allowed to stay in the -- that there was some policy of the City, "We are going to pull those signs, we will only pull the signs that are anti-abortion."  There's no evidence of that here.  In fact, there's no evidence that Plaintiff was being targeted because of his message.  It is undisputed in the testimony, including

testimony from Mr. Hamman and others, that no one connected with the City made any negative comments to him about what he or others present were protesting or interfered in any way with his counseling of people there.  Nobody -- He admits no one made a negative comment about the message he was conveying.  In fact, they told him, "You can continue to convey your message if you do it in accordance with the ordinance by carrying or wearing," and no one tried to stop him or any of the others who were protesting from getting their message across.

It's important to note, Judge, that on April 16, Mr. Hamman knew it was the City's position that signs cannot be erected in the right-of-way.  He admits he was told this by another minister before that day and no one tried to stop him from conveying his message in the appropriate way.  And, in fact, he saw that the people who were there before him had to remove their signs from the right-of-way.  And knowing that the City's position was you cannot put them in the right-of-way from another minister, from the people that were there, he went ahead and did it anyway.  He got them out of his car, stuck them in the ground in a location that had been identified to him by Mr. Lenzini as in the right-of-way.  No First Amendment rights were violated here, no one denied him the ability to present or convey his message, no one criticized his message in any way.

Also, it's not unusual for people, before they take action, to seek guidance. For example, I had to put a fence on my property one time. I contacted the City and I said, "I would like to put a fence here. What do I need to do? What are the rules? Do I have to have a permit or not?" It's nothing wrong with requiring people to check, and people do that all the time. But here, Plaintiff did not check. He had been informed previously that he could not put them in the right-of-way by another minister, but he didn't seek any guidance from the City or anyone else about the provision of the ordinance. He could have. He simply read it -- or read or misread it what he wanted to do, which was to erect signs in the right-of-way.

THE COURT: Just so that I'm clear again, I want to go back to that. Is there any -- On this site is there anyplace where he could have put the signs in the ground and not violated the ordinance?

MR. COX: There is no place from the fence or property line of CHOICES all the way up to the street where it's not right-of-way and there's no place where he could have put his signs and not be in the right-of-way.

THE COURT: Okay. So, unless he put it -- Like we have talked about a few minutes ago, unless he got permission of CHOICES and he put it on their private property?

MR. COX: Or some other private property owner in the

area, that's correct.

THE COURT:  Okay.

MR. COX:  He could not put it in the ground.

THE COURT:  Okay.  Let me ask you another question. I just want to make sure.

So, we talked about 8(A)(5)(4) that talks about commercial signs, and then 8(A)(5)(b) talks about temporary noncommercial signs.  This is where we talk about the permit.

MR. COX:  Right.

THE COURT:  So, this, again, because of the ban on anything in the right-of-way, this would be if a not-for-profit organization wants to put a sign on private property they have to seek a permit.  And maybe if you could give me an example of that.  I get it says, "Temporary signs need not be located on the site for which the event is to take place."  So, what is that section?  What does that section mean?

MR. COX:  So, we gave an example in Exhibit 10, Judge, of the permits that are being issued, and those are 501(c) -- These are permits issued under this section.  And in these cases one of the requirements in order to get the permit it says, "A sign must be placed on private property."  If the ordinance of 8(A)(1) said one of the exceptions to putting them in the right-of-way is for 501(c) organizations, that would be an exception, but it's not there.  They make no

exception for this and -- But you can put a temporary sign on private property, and the City's position on that is disclosed by the permit itself.

So, if he had come there and said, "I want to put a sign on private property and I'm a 501(c)," he would have been issued -- if it's the right size and so on, he would have been issued a permit for a temporary sign. It's not what he asked for. He never asked for that, and that's really not what he wanted to do. I think his testimony was his intention was to get a permit to put them back in the right-of-way where he was the day before. So, that provision, like 8(A)(3), has to imply logically only to private property, because there is a complete ban, with one exception, on signs in the right-of-way.

THE COURT: Okay. What do you say -- You say that there's no evidence targeting the message. What do you say about the one officer on the body cam -- and I will go back and watch them and look at your transcript -- but who says basically something to the effect of, "Your sign says the wrong thing, it's not going to be allowed"?

MR. COX: Judge, I think we have a problem with our band width here. You are breaking up. I am hearing a word here or there.

THE COURT: Okay. Let me try again. Yeah, you're kind of breaking up, too.

I just wanted you to address one of the officers --
Is that better?

MR. COX:  It is, thank you.

THE COURT:  Okay.  One of the officers did make a comment about the content of the message wouldn't be approved.  What do you say about that?

MR. COX:  First of all, he testified that was his own personal opinion.  It's clear that in his role as a police officer he would not be a person who would be in a position to issue or not issue permits.  He also testified he was not that versed in the -- was not versed in the ordinance itself, and he also testified that he was unaware of any occasion on which the content of a sign made a difference in whether the sign was removed.  And Lieutenant Lattan also testified to that.

So, Judge, and I think you know this, that when officers go to a scene, that can be -- that can be somewhat volatile where there's passion and strong feelings.  It's an officer's job to deescalate.  And I have seen officers really good at it and I have seen officers escalate things.  But, part of what is going on there, when you listen to it, is they are trying to deescalate the situation.  But, at no time did Sergeant Murray have an example of where that's happened, and neither does the Plaintiff.  They have no evidence or example that the content caused their sign to have to be removed and some other sign not be removed, other than their three

pictures, which I don't think prove that at all. The undisputed testimony of Mr. Lenzini is his -- he and his people remove signs from the right-of-way regardless of the message.

Now, so they want to point to this Freddy's sign and apparently Mr. Hamman said to Mr. Lenzini, "Oh, there's a sign over there." Mr. Lenzini said that he had not seen that sign. He was focused on what was before him on that right-of-way, but when it was brought to his attention he went and removed it. He said they remove signs every day that have nothing to do with anti-abortion and there's no evidence whatsoever that whatever Sergeant Murray said about that that is, in fact, what happens in the city.

THE COURT: Okay. Well, let me ask you one last question just, again, so I am trying to wrap my head around this.

So, you say right-of-way is not necessarily synonymous with public property, and I get your example of the City Hall building. Is it possible for someone to come in and get a permit to put a sign on public property that is not a right-of-way? In other words, if I wanted to come in and put some sort of sign in the yard at City Hall, is that possible?

MR. COX: It is. It is, because it's not a right-of-way. And the ordinance clearly defines that it must be in the right-of-way for it to be prohibited.

THE COURT:  Okay.  Anything else, Mr. Cox?

MR. COX:  Yes, Your Honor.  I did want to address the issue about he was unable to determine how to lawfully exercise his rights.  That was repeated -- They repeatedly told him on April 16th, over and over, how he was able to exercise his First Amendment rights.  "Can't put it in the ground, you can walk all day long wearing or carrying them." And that -- a person of reasonable intelligence would have been able to understand that guidance.  I think Mr. Hamman did understand it; he just didn't want to do it, he disagreed with it.

And, so, the other thing is Plaintiff admitted he carried signs in other protests before that day and he didn't indicate he had any issues with those occasions.  And then he -- after he removed his signs he invited his colleagues there to pick up signs and carry them, and they did.  So they continued the protest that way.  His excuse is he was concerned about having a string that he put on the sign to put around your neck, somebody would use it to choke him.  Well, I doubt that's the case, but certainly that's never happened to him on the occasions when he previously carried the signs.

And the undisputed testimony is the City has removed hundreds of signs from the right-of-way regardless of the message.  And on the occasion when he went to the City Hall to ask for a permit, Mr. Lenzini gave him exactly the true

advice.  You cannot have a permit, he assumed it was -- and confirmed by Mr. Hamman he wanted to put them in the right-of-way.  And he said, "You can't, there's no permit for that."

And I do want to point out one other thing and then I will be finished.  Since April the 16th, Judge, there have been 119 days up to today.  On any one of those or all of those 119 days, Plaintiff could have gone to that location and protested.  He could have shown his sign, he could have counseled persons about abortion and the gospel, but he's not protested showing signs or counseled persons at that location for the past 119 days, even though they have the right to do so.  So, we ask the Court to deny the motion for preliminary injunction.  He's failed to produce evidence sufficient to show he would prevail on the merits, he's failed to show that anybody's retaliating against him because of his First Amendment rights, and he's had the opportunity for 119 days to do exactly what he says he wants to do, which is to counsel people and display signs.  Thank you, Judge.

THE COURT:  Thank you, Mr. Cox.

Ms. McGee, I will allow you brief rebuttal.

MS. McGEE:  Yes, Your Honor, I will be very brief since we are now running short on time.

I want to start off by saying first it's Defendants' burden to prove that they're restrictioned on speech.  Passing

Constitutional muster is not the Plaintiff's burden to do so. This is an unknowable statute. Defendants are tap dancing around, saying -- tying themselves into not saying that (A)(1) is the only exception, but then also saying there are other exceptions that exist, but this is an unknowable statute, Your Honor. The Bar -- The Council for Bar examiners said I am minimally competent, my colleagues are the same. None of us can come to an agreement on this, Your Honor, and that really truly, truly shows that this is a vaguely-written statute.

Even in Defendants' justification going to 17-1-5, Your Honor, this section talks about permits, saying how you can get one, but at this point this was not available to Plaintiff even though as a religious organization, exempt from taxes and registration under 28 U.S.C. 508(b)(1)(A), makes him less eligible for a permit in the City of Carbondale, he was denied one. That is text-point-book discrimination.

I also think that it's actually very clear that the City of Carbondale has a viewpoint, a problem on pro-life viewpoints looking back to a very well-known case involving Coalition Life, and that also, Your Honor, that there were derogatory comments made at the scene, as you saw at the beginning of my closing, boils down, Your Honor, that this is something that requires searching through things that are not cross-referenced. If it was cross-referenced it would be in a very different category here.

This is an unknowable statute, Your Honor.  Plaintiff is likely to succeed on the merits, he's proved irreparable harm, and the balance of the equities in public interest weigh in favor of a First Amendment Plaintiff strongly, Your Honor. With that, I have nothing further.

THE COURT:  All right.  Thank you, Ms. McGee.

Well, thank you, everyone, for getting through this. I think it was clear we needed to suspend Monday when we did given that we've gone three hours this morning.

I will take the motion under advisement.  Again, stay on the line for a moment to go over the exhibits with Deana. And if there's anything we don't have, we will reach out.  I want to go back and take a look at everything again, and I will get you an order just as soon as I can.

So, thanks.

Counsel, stay on the line.  Anyone else is free to go, except my Law Clerk will be on, too, to make sure we have everything.

All right.  Have a good afternoon.

MR. COX:  Thank you, Judge.

MR. HARRELL:  Thank you, Your Honor.

(Proceedings adjourned at 12:05 p.m.)

REPORTER'S CERTIFICATE

\* \* \* \* \* \* \*

I, Stephanie K. Rennegarbe, RDR, CRC, Official Court Reporter for the U.S. District Court, Southern District of Illinois, do hereby certify that I reported with mechanical stenography the proceedings contained in pages 103-207; and that the same is a full, true, correct and complete transcript from the record of proceedings in the above-entitled matter.


*/S/ Stephanie K. Rennegarbe,*                10/20/2025
IL CSR, RDR, CRC

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARK BRANDON HAMMAN,<br><br>*Plaintiff,*<br><br>v.<br><br>The CITY OF CARBONDALE, an Illinois municipal corporation, JOHN LENZINI, in his individual and official capacities, and LENOARD JAMIE SNYDER, in his individual and official capacities,<br><br>*Defendants*. | Case No. 3:25-cv-00736-NJR<br><br>**Chief Judge Nancy J. Rosenstengel** |

### PLAINTIFF'S NOTICE OF INTERLOCUTORY APPEAL

Notice is hereby given that the Plaintiff in the above-captioned action, Mark Brandon Hamman, hereby appeals to the United States Court of Appeals for the Seventh Circuit from the memorandum and order of the district court denying Plaintiff's motion for a preliminary injunction and entered in this action on January 21, 2026, at docket entry 49. *See* 28 U.S.C. § 1292(a)(1).

Submitted: January 23, 2026

Respectfully submitted,
*s/ Nathan J. Moelker*
Nathan J. Moelker
Kelsey E. McGee
Christina A. Compagnone
Liam R. Harrell
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, DC 20002
Tel: (202) 641-9160
Fax: (202) 546-9309
Email: nmoelker@aclj.org

*Counsel for Plaintiff*

A. 233

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2026, a true and correct copy of the above and foregoing document was filed electronically with the Clerk of the Court and was served upon all counsel of record via PACER.

*s/ Nathan J. Moelker*
Nathan J. Moelker
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, DC 20002
Tel: (202) 641-9160
Fax: (202) 546-9309
Email: nmoelker@aclj.org

*Counsel for Plaintiff*

A. 234