No. 26-1133

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

————————

Brandon Hamman

Plaintiff-Appellant,

v.

City of Carbondale, John Lenzini, and Leonard Jamie Snyder,

Defendants-Appellees.

————————

Appeal from the United States District Court
for the Southern District of Illinois
Case No. 3:25-cv-00736-NJR
Hon. Nancy J. Rosenstengel, District Judge

————————

**BRIEF OF DEFENDANTS-APPELLEES
CITY OF CARBONDALE, JOHN LENZINI, AND LEONARD JAMIE
SNYDER**

————————

SANDBERG PHOENIX & von GONTARD P.C.

A. Courtney Cox
Philip J. Lading
Stefanie G. Brody
101 W. Vandalia Street, Suite 300
Edwardsville, IL 62025
618-659-9861
618-659-9862 (Fax)
ccox@sandbergphoenix.com
plading@sandbergphoenix.com
sbrody@sandbergphoenix.com

*Attorneys for Defendants-Appellees
City of Carbondale, John Lenzini, and Leonard Jamie Snyder*

# DISCLOSURE STATEMENTS

Save As    Clear Form

Case: 26-1133    Document: 3    Filed: 01/28/2026    Pages: 1

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1133

Short Caption: Mark Hamman v. City of Carbondale, Illinois et al

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
The City of Carbondale, Illinois, Lenoard Jamie Snyder, John Lenzini

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Sandberg Phoenix & von Gontard

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

         NA

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         NA

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

NA

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

NA

Attorney's Signature: /s/ A. Courtney Cox      Date: January 28, 2026

Attorney's Printed Name: A. Courtney Cox

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☑   No ☐

Address: 101 W. Vandalia Street, Suite 300, Edwardsville, IL 62025

Phone Number: 618-927-7841      Fax Number:

E-Mail Address: ccox@sandbergphoenix.com

rev. 12/19 AK

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1133

Short Caption: Mark Hamman v. City of Carbondale, Illinois et al

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
   The City of Carbondale, Illinois, Lenoard Jamie Snyder, John Lenzini

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
   Sandberg Phoenix & von Gontard

(3)   If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and

         NA

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         NA

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   NA

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   NA

Attorney's Signature: /s/ Philip Lading                    Date: January 28, 2026

Attorney's Printed Name:  Philip Lading

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☑  No ☐

Address:  101 W. Vandalia Street, Suite 300, Edwardsville, IL 62025

Phone Number: 618-659-9522                    Fax Number:

E-Mail Address: plading@sandbergphoenix.com

rev. 12/19 AK

iii

Save As      Clear Form

Case: 26-1133    Document: 16    Filed: 04/15/2026    Pages: 1

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1133

Short Caption: Mark Hamman v. City of Carbondale, Illinois et al

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
The City of Carbondale, Illinois, Lenoard Jamie Snyder, John Lenzini

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Sandberg Phoenix & von Gontard

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and

      NA

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      NA

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   NA

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   NA

Attorney's Signature: /s/ Stefanie G. Brody     Date: April 15, 2026

Attorney's Printed Name: Stefanie G. Brody

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐  No ☑

Address: 701 Market Street, Suite 600, St. Louis, MO 63101

Phone Number: 314-231-3332     Fax Number: 314-241-7604

E-Mail Address: sbrody@sandbergphoenix.com

rev. 12/19 AK

## TABLE OF CONTENTS

DISCLOSURE STATEMENTS.................................................................................ii

TABLE OF CONTENTS.................................................................................. v

TABLE OF AUTHORITIES ..........................................................................vii

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ................................. 1

REQUEST FOR ORAL ARGUMENT ............................................................ 1

STATEMENT OF THE CASE........................................................................ 1

SUMMARY OF THE ARGUMENT ............................................................. 14

STANDARD OF REVIEW............................................................................ 16

ARGUMENT ................................................................................................ 17

I.    The District Court did not abuse its discretion in denying Appellant's
preliminary injunction because the city ordinance is not unconstitutionally vague
in that it provides adequate notice and does not invite arbitrary enforcement.... 17

   A.    Appellant does not satisfy the vague-in-all-applications threshold ............ 18

   B.    The Ordinance gives sufficient notice of prohibited conduct....................... 19

   C.    The Ordinance does not invite arbitrary enforcement ............................... 24

II.    The District Court did not abuse its discretion in denying Appellant's
preliminary injunction because the city ordinance is content neutral in that it is a
general prohibition on all temporary signs in the public right of way. ................. 28

III.    The District Court did not abuse its discretion in denying Appellant's
preliminary injunction because the city ordinance was not an unconstitutional
restriction of speech in a public forum in that it was narrowly tailored while
providing ample alternative channels of communication. ................................... 31

   A.    The Ordinance is narrowly tailored............................................................ 32

   B.    The Ordinance provides ample alternative communication channels........ 35

IV.    The District Court did not abuse its discretion in denying Appellant's
preliminary injunction because the City did not engage in viewpoint

discrimination in that the record showed even-handed, content-neutral enforcement rather than selective targeting of Appellant's message....................37

V.      The District Court did not abuse its discretion in denying Appellant's preliminary injunction because Appellant failed to show irreparable harm or that a merged balancing-of-the-equities and public-interest favored him. ...................41

CONCLUSION..............................................................................................42

CERTIFICATE OF COMPLIANCE...........................................................44

CERTIFICATE OF SERVICE.....................................................................45

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6 (7th Cir. 1992)........................ 17, 37

*Adams Outdoor Advert. Ltd. P'ship v. City of Madison, Wisconsin*, 56 F.4th 1111 (7th Cir. 2023) ................................................................... 30, 32, 33, 35, 37

*Anderson v. Bessemer City*, 470 U.S. 564 (1985) ...................................................... 17

*Bevis v. City of Naperville, Illinois*, 85 F.4th 1175 (7th Cir. 2023)................ 16, 41, 42

*Bouie v. City of Columbia*, 378 U.S. 347 n.5 (1964)..................................................... 25

*Cassell v. Snyders*, 990 F.3d 539 (7th Cir. 2021).............................. 16, 17, 37, 41, 42

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61 (2022) .. 29, 30

*Constr. & Gen. Laborers' Union No. 330 v. Town of Grand Chute*, 915 F.3d 1120 (7th Cir. 2019) ....................................................................... 25, 30, 35, 37

*Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012) .. 17, 23, 28, 38

*Disc. Inn, Inc. v. City of Chicago*, 72 F. Supp. 3d 930 (N.D. Ill. 2014)....................... 21

*DM Trans, LLC v. Scott*, 38 F.4th 608 (7th Cir. 2022).................................................. 1

*Doe v. Univ. of S. Indiana*, 43 F.4th 784 (7th Cir. 2022) ........................................... 16

*Dye v. City of Bloomington, Indiana*, 580 F. Supp. 3d 560 (S.D. Ind. 2022) ............. 38

*Estrada-Martinez v. Lynch*, 809 F.3d 886 (7th Cir. 2015) ............................ 17, 24, 42

*F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) .................................... 17

*Frese v. Formella*, 53 F.4th 1 (1st Cir. 2022) ............................................................ 24

*Frese v. MacDonald*, 512 F. Supp. 3d 273 (D.N.H. 2021)........................................... 24

*GEFT Outdoor, LLC v. City of Westfield*, 39 F.4th 821 (7th Cir. 2022) ............... 30, 34

*Hegwood v. City of Eau Claire*, 676 F.3d 600 (7th Cir. 2012) ............................. 20, 24

*Hill v. Colorado*, 530 U.S. 703 (2000) ........................................ 17, 19, 26, 30, 31, 34

*Hoye v. City of Oakland,* 653 F.3d 835 (9th Cir. 2011)............................................... 31

*Int'l Soc. for Krishna Consciousness v. Rochford*, 585 F.2d 263 (7th Cir. 1978) . 22, 25

*Joel v. City of Orlando*, 232 F.3d 1353 (11th Cir. 2000)................................................. 23

*Joelner v. Vill. of Washington Park, Illinois*, 378 F.3d 613 (7th Cir. 2004) .............. 42

*Johnson v. United States*, 576 U.S. 591 (2015)............................................................. 20

*Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019)............................................................. 18

*Luce v. Town of Campbell, Wisconsin*, 872 F.3d 512 (7th Cir. 2017)......................... 33

*Madison Vigil for Life, Inc. v. City of Madison, Wis.*, 1 F. Supp. 3d 892 (W.D. Wis. 2014) ............................................................................................................................... 31

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994)....................................... 40

*Matal v. Tam*, 582 U.S. 218 (2017) ............................................................................... 38

*McClanahan v. City of Tumwater*, 11-CV-5623 RBL, 2012 WL 748299 (W.D. Wash. Mar. 6, 2012) ............................................................................................................... 21

*McCullen v. Coakley*, 573 U.S. 464 n.4 (2015)...................................................... 37, 39

*Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981) ............................... 32, 33

*Missouri Pet Breeders Ass'n v. Cnty. of Cook*, 106 F. Supp. 3d 908 (N.D. Ill. 2015) . 21

*Nat'l Paint & Coatings Ass'n v. City of Chicago*, 803 F. Supp. 135 (N.D. Ill. 1992) . 20

*Niemotko v. State of Md.*, 340 U.S. 268 (1951) ........................................................... 25

*Nken v. Holder*, 556 U.S. 418, 435 (2009) ............................................................ 41, 42

*Orr v. Shicker*, 953 F.3d 490 (7th Cir. 2020) ............................................................ 16

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) .................................................. 29

*Schoenfeld v. Apfel*, 237 F.3d 788 (7th Cir. 2001) ..................................................... 35

*Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147 (1969)............................. 25

*Thayer v. City of Chicago, Illinois*, 110 F.4th 1040 (7th Cir. 2024).............. 20, 21, 23

*United States v. Hathaway*, 882 F.3d 638 (7th Cir. 2018) ........................................ 35

*URI Student Senate v. Town Of Narragansett*, 631 F.3d 1 (1st Cir. 2011) ......... 20, 22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) .............. 40

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982) 18, 19, 23

*Ward v. Rock Against Racism,* 491 U.S. 781 (1989).. 20, 24, 25, 28, 29, 30, 31, 32, 33, 34, 35, 37

*Weinberg v. City of Chicago*, 310 F.3d 1029 (7th Cir. 2002) ......................... 26, 30, 36

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .................................... 16, 41

*Wisconsin Educ. Ass'n Council v. Walker*, 705 F.3d 640 (7th Cir. 2013)................... 41

**Statutes**

28 U.S.C. § 1292(a)(1) ........................................................................................ 1

775 ILCS 35/15.................................................................................................. 2

**Other Authorities**

*Merriam-Webster.com Dictionary*.................................................................... 21

**Rules**

Fed. R. Civ. P. 52(a) ..................................................................................... 17, 37

**United States Constitutional Provisions**

First Amendment................................................2, 12, 13, 14, 17, 26, 28, 37, 38, 41, 42

Fourteenth Amendment ................................................................................... 2

**Ordinances**

§ 15-10-8, Revised Code of the City of Carbondale (2025) ................................... 5, 26

§ 15-11-4, Revised Code of the City of Carbondale (2025) ...................................... 22

§ 15-4-10, Revised Code of the City of Carbondale (2025) .... 1, 3, 4, 5, 7, 8, 10, 11, 20, 27, 29, 32

§ 17-12-2, Revised Code of the City of Carbondale (2025) ................................. 10, 23

§ 17-1-5, Revised Code of the City of Carbondale (2025) ..... 3, 4, 14, 19, 22, 26, 29, 33

## JURISDICTIONAL STATEMENT

Defendants-Appellees City of Carbondale, Illinois (the "City"), John Lenzini ("Lenzini"), and Leonard Jamie Snyder ("Snyder") (collectively "Appellees") adopt Plaintiff-Appellant Brandon Hamman's ("Hamman" or "Appellant") jurisdictional statement, as it is undisputed that this Court has jurisdiction over his interlocutory appeal from the District Court's denial of a preliminary injunction. *See DM Trans, LLC v. Scott*, 38 F.4th 608, 615 (7th Cir. 2022) (citing 28 U.S.C. § 1292(a)(1)).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Appellees adopt Hamman's issues statement.

## REQUEST FOR ORAL ARGUMENT

Appellees agree with Appellant's request for oral argument.

## STATEMENT OF THE CASE

This case arises from a dispute about posting signs in front of a reproductive health clinic located along a four-lane divided highway. City ordinance § 15-4-10-8(A)(1)[1] (the "Ordinance") prohibits erecting temporary signs in the public right of way. (Doc. 57-11.) On April 16, 2025, Hamman wanted to erect signs containing anti-abortion messages in the public right of way in violation of the Ordinance. (Doc. 47 at 16:16–22, 21:11–15, 33:23–25, 35:15–25, 40:9–41:1.) City officials informed Hamman that he was permitted to hold or wear the signs but was not permitted to stake them in the ground. (*Id.* at 43:8–16; Doc. 48[2] at 114:10–115, 128:25–129:5; 153:1–10.)

---

[1] All section references are to the City's Revised Code (2025), unless otherwise noted.
[2] Page number references in Doc. 48 are to the Transcript page number.

Subsequently, Hamman filed a complaint against the City and two of its officials—Snyder, the City Attorney, and Lenzini, the Community Development Manager— alleging the City's enforcement of the Ordinance violated his rights under the First and Fourteenth Amendments and the Illinois Religious Freedom Restoration Act, 775 ILCS 35/15. (Doc. 1.)

Hamman moved for a preliminary injunction to prevent the City from enforcing the Ordinance based on alleged violations of his First Amendment rights on three grounds: (1) the Ordinance was vague, (2) the Ordinance impermissibly restricted speech in a public forum, and (3) the City's enforcement of the Ordinance engaged in impermissible viewpoint discrimination. (Doc. 8.)

Following a two-day evidentiary hearing, the District Court entered an order on January 21, 2026, denying Hamman's motion for a preliminary injunction. (Doc. 49.) The District Court found Hamman did not show a likelihood of success on the merits on his First Amendment claims or irreparable harm. (*Id.*) The District Court further found the balance of equities and public interest favored the City. (*Id.*)

*The Ordinance and Related Provisions*

The Ordinance regulates the placement of temporary signs in the City. The Ordinance is found within the Revised Code section[3] regulating signs for the following purposes:

> A. To preserve, protect and promote the public safety on city streets by limiting the unnecessary distraction of the motorist caused by signs.

---

[3] Specifically, the Ordinance is within Chapter 4 Site Development Standards of Title 15 Planning, Zoning, and Subdivisions.

B. To protect the general public from damage and injury which may be caused by the faulty and uncontrolled construction and use of signs within the city.

C. To create a fair and balanced system of sign regulations recognizing both the needs of the business community and the desires of the citizenry for a reduction of sign confusion.

D. To preserve and protect the property values of the city's residential neighborhoods by protecting these areas' visual character from the blighting effects of uncontrolled signs.

§ 15-4-10-2. (Doc. 57-11.)

Section 15-4-10-8 specifically governs "TEMPORARY SIGNS PERMITTED (EXCEPT IN THE BPR DISTRICT)", which applies to all temporary signs in the City except those within the primary business district ("BPR"), which is the City's downtown. (Doc. 57-11, Doc. 47 at 69:8–9.) It is uncontested that the area at issue on appeal is not within the BPR district. (Doc. 47 at 37:10–39:17, 84:25–85:1; Doc. 49 at 2).

The Ordinance at issue provides:

> ***No sign may be erected on, suspended over, or encroach upon the public right of way***, except as provided for under section 17-1-5 of this code (dealing with "encroachments"), or be located so as to obstruct the visual clearance needed for safe vehicle or pedestrian traffic.

§ 15-4-10-8(A)(1) (emphasis added). (Doc. 57-11.) The referenced § 17-1-5 defines "public right of way" as a "public highway, street, sidewalk, alley, or publicly owned common area." § 17-1-5(A)(1). (Appellant's Appendix ("A.") 1.). The Ordinance reflects a general prohibition against erecting signs in the public right of way except as found in § 17-1-5(A)(1). *See* § 15-4-10-8(A)(1). (Doc. 47 at 85:20–25, 86:23–25, 88:4–8, 96:9–11.) Limited permits for encroaching on the public right of way are available under § 17-1-5(A)(1), but none allow erecting temporary signs on the

3

public right of way.[4] (*Id.* at 86:4–10; Doc. 48 at 186:11–19.).

Temporary signs that are not in the public right of way are also regulated by § 15-4-10-8(A)(3), which provides: "[n]o temporary sign shall be erected within twenty feet (20') of the curb line of any adjoining street surface except those located in the BPR district in which case the temporary sign shall be flush mounted to the building." (Doc. 57-11; Doc. 47 at 86:11–25.)

Regarding temporary ***commercial*** signs "advertis[ing] goods or services for economic gain", § 15-4-10-8(A)(5)(a)(4) prohibits them from being "carried, waved or otherwise displayed by persons either on public rights of way or in a manner visible from public rights of way." (Doc. 57-11.) "This provision is directed toward such displays intended to draw attention for a commercial purpose, and is not intended to limit the display of banners, flags or other signage by persons participating in demonstrations, political rallies, and similar events." *Id.* It is not contested that the signs at issue on appeal are ***not*** commercial signs. (Doc. 47 at 40:7–8).

---

[4] The four permits are:

> a. Continuous Encroachment Permit: That issued for encroachments which, by their nature, are not readily movable and which reflect an intent by the holder of the permit of a permanent or quasi- permanent status.
> b. Temporary Encroachment Permit: That issued for encroachments which may be readily moved and which are intended by the holder of the permit to be of a duration of less than one year.
> c. Sidewalk Restaurant Encroachment Permit: That issued for sidewalk restaurant encroachments which are intended by the holder of the permit for a duration of one year.
> d. Residential Block Party Permit: That issued for encroachments which are social events held within a residential block zoned R1 in which at least fifty percent (50%) of the property is zoned residential and is held for a period less than twenty four (24) hours.

§ 17-1-5(A)(1)(a)–(d). (A.1.)

Additionally, for temporary noncommercial signs outside the BPR district, 501(c)(3) nonprofit organizations may apply for a permit to "display a temporary sign for a period not to exceed thirty (30) consecutive days." § 15-10-8(A)(5)(b)(2). "Each organization is allowed a total of sixty (60) calendar days to display temporary signs. A new permit shall be issued each time the temporary sign is to be displayed." *Id.* This permitting process does not accommodate temporary signs in the public right of way. (Doc. 47 at 88:20–89:23.) The permitting process conditions approval for a 501(c)(3) nonprofit organization's display of a temporary noncommercial sign outside the BPR district on ***private property***. (*Id*; Doc. 57-10 at line 20 of each page.) It is uncontested that the area at issue on appeal is public not private property. (Doc. 47 at 40:22–24, 63:10–12.)

Lastly, turning to sign regulation within the BPR district, § 15-4-10-7(K)(1)(c) prohibits temporary commercial signs in the BPR district and notes such provision "is directed toward such displays intended to draw attention for a commercial purpose, and is not intended to limit the display of banners, flags, or other signage by persons participating in demonstrations, political rallies, and similar events." (Doc. 57-11.) Similarly, § 15-4-10-7(K)(2)(b) addresses temporary noncommercial signs in the BPR district and permits a 501(c) nonprofit organization "to display a temporary sign" in the BPR district under certain conditions. (*Id.*) Although Appellant quoted these provisions when speaking with Lenzini, it is uncontested that the area at issue on appeal is not within the BPR district. (Doc. 47 at 84:22–85:1; Doc. 57-16 at 4–5, 37:7–15.)

5

*Evidentiary Hearing Testimony*

The District Court held an evidentiary hearing on August 11 and August 13, 2025. The parties stipulated to the authenticity of certain exhibits (Doc. 38) and adduced the following evidence:

***Hamman's Testimony***

Hamman identifies as a pro-life advocate working as a missionary and sidewalk counselor. (Doc. 1 at ¶ 14; Doc. 47 at 29:24–30:7.) Hamman's primary mission is to go to abortion facilities in the City and try to persuade people not to get an abortion by speaking with them and placing signs in the ground containing anti-abortion messages. (Doc 47 at 14:20–15:5.) Hamman works for the Christ Church of Carbondale ("CCC") and operates through an organization he founded, Gospel for Life, which he testified is a nonprofit ministry. (*Id.* at 31:10–32:15.)[5]

On April 16, 2025, Hamman stood outside the CHOICES Center for Reproductive Health next to Giant City Road—a four-lane divided highway—in the City and placed signs in the ground with anti-abortion messaging "[t]o share the gospel and rescue babies." (*Id.* at 15:8–16:4, 16:16–19, 20:19, 21:7–16, 33:23–25.) The signs displayed messages such as "Babies are Murdered Here," "Love your Preborn Neighbor as Yourself," "We Will Adopt Your Baby," and "Don't Kill Your Baby, abortionpillreversal.com." (*Id.* at 15:6–23; Doc. 57-1 at 1–4; Docs. 57-7 and 57-8.)

---

[5] A CCC pastor testified that it is a registered nonprofit religious organization through the State of Illinois, but the District Court ruled Appellant did not establish that CCC (or Gospel for Life) is a federally recognized 501(c)(3) nonprofit. (Doc. 47 at 76:14–77:8; Doc. 49 at 9 n.7.)

Hamman knew that police had told others they could not post signs at that location. (*Id.* at 35:15–18.) Nevertheless, Hamman believed he could post signs there under an exemption to the Ordinance. *See, e.g.*, §§ 15-4-10-7(K)(1)(c), (2)(b); 15-4-10-8(A)(5)(a)(4), (b)(2). (*Id.* at 35:19–25, 37–39.) Those provisions involve temporary signs in the BPR district, temporary commercial signs, and permits for signs on private property—none of which apply here. (*Id.* at 39:18–40:8.) Hamman understood his signs were not commercial signs and that the Ordinance prohibited putting signs in the ground in the right of way, but he believed he could place signs under an exemption for 501(c)(3) organization and/or because he was on public property and not impeding anyone's travel. (*Id.* at 40:9–41:1.)

Initially, Hamman did not have any signs posted in the ground. (*Id.* at 21:1–7.) Two pro-life advocates who often work with Hamman but are not part of his ministry, "Bob" and "Darlene," had placed signs in the ground, including one saying "Free Baby Supplies." (*Id.* at 45:18–46:7.) The City's Community Development Manager, Lenzini, came and explained the signs had to be removed from the ground. (*Id.* at 46:8–10.) Hamman testified Lenzini gave no reason why the signs had to be removed and did not recall Lenzini explaining it was because they were in the right of way. (*Id.* at 22:3–6, 46:8–12.) However, the District Court credited Lenzini's testimony that he told Hamman, Bob, and Darlene that their signs "could not be out there because they were on the right-of-way." (Doc. 48 at 122:13–17; Doc. 49 at 6.) Hamman produced his own body camera footage of the interaction, which also recorded Lenzini telling Hamman that the signs had to be pulled up because

7

they were in the right of way. (Doc. 57-16 at 2:6–8, 3:1–12.)

After Lenzini explained the signs had to be removed because they were in the right of way, Hamman told Lenzini that the City's ordinances permitted Bob and Darlene's signs to be posted and recited part of § 15-4-10-7(K)(1)(c) (pertaining to commercial signs in the BPR district) and/or § 15-4-10-8(A)(5)(a)(4) (pertaining to commercial signs outside the BPR district) regarding how the prohibition of commercial signs is not intended to limit signage by persons participating in demonstrations. (*Id.* at 4:25–5:6.) Lenzini responded that Bob and Darlene's sign offering free baby supplies was not a demonstration. (*Id.*; Doc. 48 at 121:20–122:1.)

Bob and Darlene removed their signs from the ground and continued protesting by wearing or carrying their signs without City interference. (Doc. 47 at 43:10–44:1l 47:12–48:1.)

At some point after Lenzini arrived, Hamman placed his own signs in the ground. (*Id.* at 20:19–25.) Two police officers came and repeated what Lenzini said, and Hamman testified that City police officers told him the signs "had to be 20 feet from the curb." (*Id.* at 22:14–18, 23:20–24.) Lenzini and the police officers told Hamman that he was allowed to carry or wear his signs. (*Id.* at 48:23–25.) Hamman's signs are made of plastic or foam and do not weigh much. (Doc. 47 at 47:8–16.)

Ultimately, Hamman complied with the request to remove his signs and received no citation. (Doc. 47 at 24:13–16, 49:15–22.) After Hamman removed his signs from the ground, two other members of his ministry carried his signs without

8

interference by the City. (*Id.* at 50:14–51:15.) While Lenzini was present, Hamman continued to approach women and speak with them as well as hand out gospel materials. (*Id.* at 51:18–55:3.) No one from the City made any comments about the content of Hamman's signs or interfered with his interactions with the women. (*Id.* at 55:10–19.)

The next day, on April 17, 2025, Hamman went to City Hall to try to get a permit to place his signs in the same location where the City had just told him the day before that the signs could not be placed. (*Id.* at 58:2–4, 60:14–21.) Hamman believed he could get a permit because churches are 501(c)(3) organizations. (*Id.*) Lenzini told him there was no permit exception to the Ordinance's general prohibition against posting signs in the public right of way. (*Id.* at 61:5–11.) Hamman conceded the permits had conditions for approval that the signs be on private property whereas he wanted a permit to place his sign on public property. (*Id.* at 63:25–65:5; Doc. 57-10;)

A few days later, Hamman photographed other signs in Carbondale. (Doc. 47 at 25:2–27:15; Doc 57-1 at 6–10.) Hamman could not testify to how long the signs had been in the ground at the time he took the photographs or how long they were up after he took the photographs. (Doc. 47 at 56:8–21.)

### *Snyder's Testimony*

Snyder, the City Attorney for Carbondale, testified about the City's position on the Ordinance. (Doc. 47 at 83:12–14.) Snyder testified to the following: The Ordinance applied to Hamman's signs because the location outside CHOICES is not within the BPR district. (*Id.* at 84:19–85:1.) The Ordinance is a general prohibition

9

against temporary signs outside the BPR district, and "[n]o signs are permitted to be erected in the right-of-way", which is defined in § 17-12-2 (*Id.* at 85:24–25, 90:23.) A 501(c)(3) organization may only get a permit to erect temporary signs for certain period of time on ***private*** property. (*Id.* at 89:9–15.) Reason being even a sign for which a permit has been approved must still comply with the Ordinance at issue (§ 15-4-10-8(A)(1)), which prohibits ***all*** signs in the public right of way. (*Id.*) Snyder testified that this has "always" been the City's interpretation of the Ordinance. (*Id.* at 89:16–19.) On April 16, 2025, Snyder provided guidance to Lenzini and the City police officers consistent with this interpretation. (*Id.* at 93:19–94:4).

### *Lenzini's Testimony*

Lenzini, the City's Community Development Manager, manages the City's Planning and Zoning Division and its Code Enforcement Division (the "Division"), which has five neighborhood inspectors. (Doc. 48 at 108:3–20). Part of Lenzini's job is to remove signs improperly placed in the City's public right of way. (*Id.* at 109:7–9.) In enforcing the Ordinance and instructing the inspectors, Lenzini emphasized that the content of a sign's message does not matter; he removes all signs in the public right of way of which he becomes aware without regard to the content of the message conveyed by a non-compliant sign. (*Id.* at 109:15–22, 111:22–24.) Lenzini acknowledged that delays sometimes occur in sign removal because the City cannot patrol every public right of way every day, although he performs such removals "pretty much daily." (*Id.* at 109:10–25.) He estimates that, over the course of a year,

10

the Division removes between 150 and 200 signs, with spikes in volume during campaign season despite preemptive communications with political parties to ensure Ordinance compliance. (*Id.* at 111:11–21.)

Lenzini testified about a subdivision plat of the area at issue, which was introduced into the record at trial and later depicted in the District Court's order. (*Id.* at 145:5–146:2; 147:21–148:1; *Doc.* 49 at 12; Doc 57-15 Defendant's Exhibit 17 – Recorded Plat of Sunny Acres West First Addition reflecting 200 Foot Right of Way for Giant City Road.) The plat showed a 100-foot right of way measured from the center of Giant City Road to the CHOICES property line. (Doc. 57-15; Doc. 48 at 145:5–146:2; 147:21–148:1.) Hamman had placed his signs in the grassy area immediately to the right of Lot 14's property line marked in the plat on the utility easement. (Doc. 48 at 187:2–7.)

On April 16, 2025, Lenzini went to the area around CHOICES after receiving an email from the city manager reporting signs improperly placed in the public right of way. (*Id.* at 111:25–112:7.) On arrival, two anti-abortion protestors, Bob and Darlene, had placed signs in the ground between the sidewalk and roadway. (*Id.* at 112:11–16.) Lenzini asked them and Hamman to remove the signs from the right of way. (*Id.* at 112:24.) In response, Hamman cited § 15-4-10-7(K)(1)(c) and/or § 15-4-10-8(A)(5)(a)(4)—which, quoted in full above, regulate *commercial* signs—to Lenzini to show he was complying with the Ordinance. (Doc. 57-16 at 4:24–5:6.)

Lenzini then helped Bob and Darlene remove the signs, let them keep the signs, and advised them that they could carry or wear the signs instead—which they did,

11

continuing their protest without interference. (Doc. 48 at 112:24–113:14.)

Meanwhile, Hamman retrieved two signs from his car and placed them in the ground near the entry road of Edna Court. (*Id.* at 113:15–114:9.) Lenzini told Hamman the signs could not be placed in the right of way, which he described as extending from the CHOICES property fence to the curb. (*Id.* at 114:10–115:1.) Hamman responded by asserting his First Amendments rights, physically blocking his signs, and telling Lenzini not to touch his signs. (*Id.* at 115:2–10.) Lenzini told Hamman that he could wear or carry the signs. (*Id.* at 115:11–13.) Hamman, however, refused to comply and kept moving the signs further back but still within the public right of way, which Lenzini pointed out to him. (*Id.* at 115:14–24.) Lenzini did not bring a citation book to the scene and had only intended to collect the signs and take evidentiary photographs. (*Id.* at 116:3–7.) Lenzini texted Snyder, who confirmed the signs should be removed and a citation issued. (*Id.* 116:8–21.) Another Division inspector brought Lenzini's citation book, but when Hamman refused to provide identification, Lenzini requested police assistance. (*Id.* at 117:5–23.) Ultimately, Hamman removed the signs himself, no citation was issued, and Lenzini never touched Hamman's signs. (*Id.* at 118:6–15.)

The next day, April 17, 2025, Hamman came to City Hall seeking a sign permit for "various places" for an unspecified 501(c) organization. (*Id.* at 118:16–120:9.) Lenzini told Hamman the City cannot issue a permit to place a sign in the right of way. (*Id.*)

### *City Police Officers' Testimony*

Officers Samuel Tyner, Seargeant Mark Murray, and Lieutenant Theodore

12

Lattan (collectively the "Officers") testified about their interactions with Hamman on April 16, 2025, outside CHOICES. The Officers arrived in order of seniority and in consultation with Lenzini and/or Snyder requested guidance regarding enforcement of the sign Ordinance, as they were not all familiar with it. (*Id.* at 128:15–20; 130:18–25, 151:6–16, 162:13–25.) The Officers explained on the scene that Hamman and the others could not plant signs in the right of way but could instead hold or carry the signs. (*Id.* at 128:25–129:5; 153:1–10, 163:18–164:2.) The Officers testified they were unaware of any instance in which the City removed or targeted signs based on their content rather than their placement in the public right of way. (*Id.* at 159:14–22; 165:7–18.)

When asked to explain some of his comments recorded on April 16, 2025, in which he suggested the City is more "left" leaning, Sgt. Murray elaborated that it would be viewpoint discrimination to grant one thing for certain people and not others, but fair if denied to all across the board. (*Id.*at 158:11–159:3.) Sgt. Murray also elaborated that the recorded remark had been his personal opinion, and he had never seen any discriminatory conduct by the City with respect to their signs in the right of way. (*Id.* at 160:3–11.)

When asked about the recording of speaking with Sgt. Murray, Lt. Lattan testified on cross-examination that what was occurring that day was "a very gray, touchy area", which he explained to him meant that whenever dealing with people exercising their First Amendment rights—whether lawfully or not—he wanted to give them every opportunity to comply rather than rush to enforcement. (*Id.* at

13

168:18–169:12.)

*The District Court's Ruling*

Following the evidentiary hearing, the District Court entered an order on January 21, 2026, denying Hamman's motion for a preliminary injunction. (Doc. 49.) The District Court found Hamman did not show a likelihood of success on the merits on his First Amendment claims or irreparable harm. (*Id.*) The District Court further found the balance of equities and public interest favored the City. (*Id.*) This interlocutory appeal follows.

**SUMMARY OF THE ARGUMENT**

The District Court did not abuse its discretion in denying Hamman's motion for a preliminary injunction because he failed to establish a likelihood of success on the merits for his claim that the City's Ordinance violated his First Amendment rights on any of the three alleged grounds: (1) vagueness, (2) invalid time, place, and manner restrictions as to content neutrality, narrow tailoring, and available alternatives, or (3) viewpoint discrimination.

First, the District Court properly found the Ordinance is not unconstitutionally vague because its general prohibition on temporary signs "erected on, suspended over, or encroach[ing] upon" the public right of way uses commonly understood terms that carry ordinary dictionary meanings, and the Code specifically references § 17-1-5(A)(1) defining "public right of way." Further, the abuse-of-discretion standard establishes deference to the District Court's factual findings that the Ordinance was consistently enforced. Hamman's selective quotations of other parts

14

of the Revised Code do not impact the clear standard prohibiting posting temporary signs in the public right of way.

Second, the District Court correctly applied the law governing valid time, place, and manner restrictions to find the Ordinance is content neutral, narrowly tailored, and offers ample alternative channels of communications. Specifically, the Ordinance is content neutral because it bans posting signs in the public right of way regardless of message. The Ordinance is narrowly tailored to serve the City's significant interest in traffic safety, and it does not prohibit carrying, wearing, or waving signs; indeed, four out of five protesters continued their demonstration on April 16, 2025, by carrying or wearing signs without any interference from the City.

Third, the District Court did not err in finding no viewpoint discrimination, given that the record showed even-handed, content-neutral enforcement rather than selective targeting of Hamman's message. City police officers' subjective, personal opinions were not evidence of City policy, and Hamman's five photographs of other signs in the right of way were unpersuasive to prove viewpoint discrimination, as he conceded he did not know how long the signs had been in place and could not rule out that the City had simply not yet found them.

Finally, Hamman failed to show irreparable harm or that a merged balancing-of-the-equities and public-interest favored him. Because the District Court determined Hamman was unlikely to succeed on the merits, he had a heavier burden to show irreparable harm under this Circuit's sliding-scale approach, which he did not meet. Hamman was and remains free to return to the area and carry his signs protesting

15

abortion because the Ordinance prohibits only staking such signage in the ground within the public right of way. As the Ordinance is constitutional, the District Court did not err in finding the City has a legitimate interest in enforcing it to promote traffic safety and that continued enforcement is in the public interest.

## STANDARD OF REVIEW

The Seventh Circuit applies "a hybrid standard" to a preliminary injunction, "review[ing] the district court's findings of fact for clear error, its legal conclusions *de novo*, and its balancing of the factors for a preliminary injunction for abuse of discretion.'" *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quoting *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022)).

"A preliminary injunction is 'an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'" *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (quoting *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020)); *see also Bevis*, 85 F.4th at 1188 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("[A] preliminary injunction is an extraordinary remedy never awarded as of right.")). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Bevis*, 85 F.4th at 1188 (quoting *Winter*, 555 U.S. at 20).

A district court abuses its discretion in denying a preliminary injunction only by making "a clear error of fact or an error of law." *Cassell*, 990 F.3d at 545 (quoting

*Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992)); *see also* Fed. R. Civ. P. 52(a). Under the clearly erroneous standard, "[a] factual finding must be 'illogical or implausible' or lack 'support in inferences that may be drawn from the facts in the record' for an appellate court to overturn it on clear error review." *Estrada-Martinez v. Lynch*, 809 F.3d 886, 895 (7th Cir. 2015) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 577 (1985)). "Absent such errors, we accord a district court's decisions during the balancing phase of the analysis great deference." *Cassell*, 990 F.3d at 545 (internal quotation omitted).

## ARGUMENT

**I.    The District Court did not abuse its discretion in denying Appellant's preliminary injunction because the city ordinance is not unconstitutionally vague in that it provides adequate notice and does not invite arbitrary enforcement.**

To prevail on a facial vagueness challenge to a municipal ordinance, "a plaintiff must cross a high bar" to prove the ordinance has a "deterrent effect on legitimate expression . . . [that is] both real and substantial" "[e]ven under the heightened standard for the First Amendment[.]" *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 471, 479 (7th Cir. 2012) (internal quotations omitted) (affirming a municipal ordinance's constitutionality). "[T]he void-for-vagueness doctrine protects against the ills of a law that 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Id.* at 478–79 (quoting *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)); *see also Hill v. Colorado*, 530 U.S. 703, 732 (2000) (affirming a municipal ordinance's constitutionality). This

17

Court should uphold the District Court's finding that Hamman did not meet this high bar.

### A.    *Appellant does not satisfy the vague-in-all-applications threshold*

Preliminarily, this Court should decline to consider Appellant's facial challenge because while the Ordinance may reach constitutionally protected activity, Appellant cannot meet the facial-vagueness standard.

A facial challenge requires showing vagueness across **all applications**. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982). "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* If an initial examination of Appellant's conduct demonstrates at least one clear application of the ordinance, then he cannot satisfy the all-applications test. *See id.* at 495 n.7 ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."). In *Hoffman Estates*, the store had ample warning that its drug-related marketing activities required a license, thus the clear application of the licensing ordinance to the store's own conduct entirely foreclosed its attempt to bring a facial challenge. *Id.* at 500. Whether this principle is upheld due to the vague-in-all-applications rule or on an "independent foundation," courts should not "cast aside the longstanding rule that a litigant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge." *Kashem v. Barr*, 941 F.3d 358, 376 (9th Cir. 2019).

Here, Hamman arrived at the public right of way in front of CHOICES already

knowing that the Ordinance prohibited his intended conduct to stake signs in the ground because he was aware the City had just told others they could not post signs at that location. (Doc 47 at 35:15–18.) He came prepared to argue about the Ordinance with City officials, like Lenzini. Further, on the day in question, Hamman was not the first person to put signs in the public right of way. He observed—and recorded via a body camera—the City explaining to others that the signs erected in the public right of way had to be removed per the Ordinance, to instead be carried or worn, and only then did Hamman erect his signs in the same location. (*Id.* at 43:10–44:1; 46:8–12; Doc. 48 at 122:13–17, 128:25–129:5; Doc. 49 at 6; Doc. 57-16 at 2:6–8, 3:1–12.) Therefore, because Hamman conceded the Ordinance applied to his intended conduct, this Court should find that he had ample warning that his intended conduct was proscribed by the Ordinance such that the clear application to his erecting signs in the public right away bars him from bringing a facial challenge. *See id.* (citing *Hoffman Ests.*, 455 U.S. at 494–95).

### B.      The Ordinance gives sufficient notice of prohibited conduct

If this Court finds Appellant's facial-vagueness challenge should proceed, Appellant cannot prevail under its exacting standard. Deferring to the District Court's factual findings and interpreting *de novo* the Ordinance's plain language, the Ordinance provides a person of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. *See Hill*, 530 U.S. at 732. The Ordinance clearly prohibits posting signs in the ground in the public right of way by stating: "[n]o sign may be erected on, suspended over, or encroach upon the public right of way, except as provided for under section 17-1-5 of this code (dealing with

19

'encroachments'), or be located so as to obstruct the visual clearance needed for safe vehicle or pedestrian traffic." § 15-4-10-8(A)(1) (Doc. 57-10.)

Hamman's argument that the Ordinance is vague for not defining "public right of way" fails because the term is commonly understood, is defined by reference to a provision in the Revised Code, and establishes a standard for nonarbitrary enforcement. *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012). (Appellate Doc. 13 at 15.)

Preliminarily, not all terms must be exhaustively defined to avoid vagueness, as "[t]he due process clause . . . does not demand 'perfect clarity and precise guidance.'" *Id.* (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989)). To the contrary, "'reasonable breadth' in the terms employed by an ordinance does not require that it be invalidated on vagueness grounds." *URI Student Senate v. Town Of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011). "If a statute or rule has a core of ascertainable meaning, it may be applied while people work out the marginal situations one at a time." *Thayer v. City of Chicago, Illinois*, 110 F.4th 1040, 1042 (7th Cir. 2024) (per curiam) (citing *Johnson v. United States*, 576 U.S. 591, 602–04 (2015)) (additional citations omitted). Seventh Circuit District Courts have repeatedly upheld ordinances containing undefined but commonly understood terms like "public right of way." *See, e.g.*, *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 803 F. Supp. 135, 148 (N.D. Ill. 1992) (finding a city's anti-graffiti ordinances were not void for vagueness despite not defining "public way," "possession," "public building," "public facility," and "consent" because none of those terms are "terms of

20

art" but instead have meanings readily understandable to a person of ordinary intelligence); *Disc. Inn, Inc. v. City of Chicago*, 72 F. Supp. 3d 930, 937 (N.D. Ill. 2014), *aff'd*, 803 F.3d 317 (7th Cir. 2015) (finding a city's weed control ordinance was not void for vagueness despite not defining "manage and maintain" because such terms have a clearly understandable ordinary meaning, particularly when read in conjunction with another provision prohibiting property owners from allowing weeds to grow in excess of ten inches).

Here, the Ordinance's general prohibition against posting signs in the "public right of way" is readily understandable. *See Thayer*, 110 F.4th at 1042; *see also, e.g.*, *McClanahan v. City of Tumwater*, 11-CV-5623 RBL, 2012 WL 748299, at *5 (W.D. Wash. Mar. 6, 2012) (finding a local sign ordinance was not vague where "right of way" has a generally accepted meaning). For undefined terms, courts turn to dictionary definitions. *Missouri Pet Breeders Ass'n v. Cnty. of Cook*, 106 F. Supp. 3d 908, 925 (N.D. Ill. 2015). The dictionary's definition of "right of way" includes "the area over which a right-of-way exists", "the strip of land over which is built a public road", and "the land used by a public utility." *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/right-of-way (last visited Apr. 6, 2026). The location at issue is undisputedly on public property, situated next to the four-lane divided highway Giant City Road, and on an easement with underground utilities. (Doc. 47 at 70:4–8; Doc. 48 at 140:8–10, 145:5–146:2; 147:21–148:7, 187:1–17; Doc. 57-15.) Therefore, even if a definition of "public right of way" was not provided, the Ordinance would not be vague.

21

Critically, however, the term is ***not*** left undefined, because the Ordinance explicitly incorporates by reference § 17-1-5, which defines "public right of way" as a "public highway, street, sidewalk, alley, or publicly owned common area." § 17-1-5(A)(1). (A.1.) This definition appears conspicuously at the top of the referenced ordinance and has "reasonable breadth" that does not invalidate its meaning. *See URI Student Senate*, 631 F.3d at 14. Hamman's argument that the Ordinance's explicit reference to § 17-1-5 in the Ordinance is somehow insufficient strains credulity. (Appellate Doc. 13 at 18).

This case is easily distinguishable from *Int'l Soc. for Krishna Consciousness v. Rochford*, 585 F.2d 263, 268 (7th Cir. 1978), which found certain regulations restricting the distribution of literature and solicitation at city airports to "persons authorized by law" were impermissibly vague where there were "no guidelines" whatsoever defining that phrase. Contrastingly, the City's Revised Code offers numerous guidelines for sign regulation throughout different parts of the City; in fact, Hamman's vagueness argument turns on suggesting that there are *too many* guidelines, resulting in confusion. But any confusion is self-introduced by Hamman and ignores the plain text of the relevant Ordinance, which unambiguously prohibits erecting signs in the public right of way without exception.

To the extent other provisions of the Revised Code offer similar (and compatible) but not identical definitions of "right of way," they do not render the phrase "public right of way" in the Ordinance unclear. *See* §§ 15-11-4 (defining right of way as "any area dedicated or purchased by the City for the purpose of providing both vehicular

or pedestrian travelway") and 17-12-2 (defining right of way to include utility easements); *cf. Joel v. City of Orlando*, 232 F.3d 1353, 1360 (11th Cir. 2000) (finding an ordinance was sufficiently specific when read in conjunction with a city handbook interpreting the ordinance). (Doc. 47 at 90:23–91:15; A.1, A.16, A.24.) A plain understanding of public right of way is compatible across all of the Revised Code's explanations, as the location at issue on public property within 100 feet of the center line of Giant Road, which is subject to future expansion as a vehicular travelway, and is on a utility easement with utilities underground. (Doc. 48 at 139:5–9, 145:15–146:6; Doc. 57-15).

Additionally, although Hamman purports to bring a facial challenge, he repeatedly advances as-applied arguments. *See Ctr. for Individual Freedom*, 697 F.3d at 476 (distinguishing facial versus as-applied vagueness challenges and noting facial challenges are disfavored and must avoid going beyond the challenged ordinance's facial requirements to speculate about hypothetical or imaginary cases); *Thayer*, 110 F.4th at 1042 (same). (*See, e.g.*, Appellate Doc. 13 at 15, 21–22, 27–28.) For example, Hamman argues that he learned a person cannot rely on the ordinary definition of "public right of way" because the Ordinance was enforced against him on signs posted over twenty feet from any right of passage. *See Ctr. for Individual Freedom*, 697 F.3d at 479 (quoting *Vill. of Hoffman Ests.*, 455 U.S. at 495 ("A 'plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'")). Neither the Ordinance nor the ordinary dictionary definitions of public right of way set an

arbitrary measurement from a roadway, and the record shows all of Hamman's own signs were initially posted well within twenty feet of the roadway, thus his conduct was clearly proscribed by the Ordinance even under his subjective interpretation of "public right of way." (Doc. 47 at 40:15–41:1; Docs. 57-12, 57-13, 57-14.) After Hamman moved his signs further back, the signs were still proscribed by the Ordinance because they remained in the public right of way, as Lenzini informed him. (Doc. 48 at 114:10–115:1, 116:14–24; 148:23–149:1.)

### C.    The Ordinance does not invite arbitrary enforcement

Hamman's vagueness challenge also fails because the Ordinance establishes a straightforward enforcement standard. *See Hegwood*, 676 F.3d at 603; *see also Ward*, 491 U.S. at 795 ("Even if the language of the guideline were not sufficient on its face to withstand challenge, our ultimate conclusion would be the same, for the city has interpreted the guideline in such a manner as to provide additional guidance to the officials charged with its enforcement.").

The City consistently interprets the Ordinance as a general prohibition on *all* temporary signs posted on or within the public right of way and enforces the Ordinance by removing temporary signs erected in the right of way "pretty much daily." (Doc. 47 at 85:24–25, 90:23; Doc. 48 at 109:10–22.) Appellant has not shown that the District Court clearly erred by finding the City's representatives' testimonies credible on this issue. *See Estrada-Martinez*, 809 F.3d at 895. An individual police officer's subjective confusion is not probative of objective vagueness on the face of the municipal ordinance. *See Frese v. MacDonald*, 512 F. Supp. 3d 273, 292 (D.N.H. 2021), *aff'd sub nom. Frese v. Formella*, 53 F.4th 1 (1st Cir. 2022)

24

(citing *Bouie v. City of Columbia*, 378 U.S. 347, 355 n.5 (1964) (noting "the [vagueness] doctrine's concerns are objective . . . without reference to subjective perceptions or individual sensibilities").

Importantly, this interpretation of the Ordinance as a complete prohibition on posting any signs in the public right of way leaves **no discretion**—much less a problematic degree of discretion—in the City's enforcement. *See Ward*, 491 U.S. at 793 (internal quotation omitted) (noting "cases permitting facial challenges to regulations that allegedly grant officials unconstrained authority to regulate speech have generally involved licensing schemes that 'ves[t] **unbridled discretion** in a government official over whether to permit or deny expressive activity'") (emphasis added). The lack of discretion afforded by the Ordinance—which straightforwardly prohibits erecting any signs in the public right of way—again distinguishes this case from *Int'l Soc. for Krishna Consciousness*. *See* 585 F.2d at 268 (considering a regulation's wide discretion for when to grant or deny a permit rendered it unconstitutionally vague). Indeed, regarding permits, the evidentiary hearing testimony established **no permits** are available for posting signs in the public right of way, which conclusively distinguishes this case from both *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147 (1969) and *Niemotko v. State of Md.*, 340 U.S. 268 (1951). (Doc. 47 at 89:9–19; Doc. 57-10.) Whether a location is in the City's public right of way is "a testable line, not using unbridled discretion." *See Constr. & Gen. Laborers' Union No. 330 v. Town of Grand Chute*, 915 F.3d 1120, 1126 (7th Cir. 2019). Appellant's argument that arbitrary enforcement results from unrelated

25

permitting processes or unrelated provisions regarding "demonstrations" should not be well taken. (Appellate Doc. 13 at 25–26).

In particular, the Ordinance at issue regulates erecting temporary signs *in the public right of way*, whereas Hamman points to an unrelated ordinance allowing 501(c)(3) nonprofit organization to apply for a permit to "display a temporary sign" outside the BPR (downtown) district. § 15-10-8(A)(5)(b)(2). (Doc. 57-11.) As evident from the lack of mention of "public right of way" in that permitting ordinance, it does not accommodate temporary signs in the public right of way. *See id.* The City adduced evidence from a number of approved permits that enforcement of the Ordinance is nonarbitrary because permits are never issued under § 15-10-8(A)(5)(b)(2) for temporary signs in the public right of way; instead, such permits are only issued on private property. (Doc. 47 at 89:9–19; Doc. 57-10 at line 20 of each page.) This distinction is supported by Lenzini's and Snyder's testimonies, credited by the District Court. (Doc. 47 at 89:3–23; Doc. 48 at 120:2–9.) Additionally, limited permits for *encroaching* on the public right of way are available under § 17-1-5(A)(1), such as for sidewalk restaurant encroachment and residential block parties, but none allow *erecting temporary signs* on the public right of way. (A.1; Doc. 47 at 86:4–10; Doc. 48 at 186:11–19.). Nothing in the Ordinance invites arbitrary or inconsistent enforcement. *See Hill*, 530 U.S. at 732; *Weinberg v. City of Chicago*, 310 F.3d 1029, 1036 (7th Cir. 2002) ("Differential treatment between various forms of expression is permissible if it is done within the strictures of the First Amendment.").

In similar fashion, neither ordinance Appellant identifies mentioning "demonstrations" renders the Ordinance vague, because both clearly apply to a narrow subset of commercial signs that do not modify the Ordinance. First, § 15-4-10-7(K)(1)(c) prohibits temporary commercial signs in the BPR (downtown) district. (Doc. 57-11.) Second, § 15-4-10-8(A)(5)(a)(4) prohibits commercial signs from being "carried, waved or otherwise displayed by persons either on public rights of way or in a manner visible from public rights of way." (*Id.*) Appellant focuses on how these provisions are "directed toward such displays intended to draw attention for a commercial purpose, and [are] not intended to limit the display of banners, flags or other signage by persons participating in demonstrations, political rallies, and similar events." §§ 15-4-10-7(K)(1)(c); 15-4-10-8(A)(5)(a)(4). The fact that both narrow ordinances regulating commercials signs specify they are not intended to regulate demonstrations has no bearing on the broad Ordinance, which is a blanket prohibition applying to *all* temporary signs in the public right of way, whether commercial or noncommercial. This distinction is also supported by the record. (Doc. 47 at 92:2–13.) And as the District Court accurately pieced together from the testimony and body camera transcript, Lenzini's comment that "Free baby supplies is not a demonstration" was not about the Ordinance prohibiting erecting signs in the public right of way but instead in direct response to Hamman's citation to § 15-4-10-7(K)(1)(c); 15-4-10-8(A)(5)(a)(4) regulating commercial signs. (Doc. 48 at 121:20–122:1, Doc. 57-16 at 4:24–5:11, 37:7–15.) Given the structure of the Revised Code provision, whether Bob and Darlene's "free baby supplies" sign was

27

demonstrative had nothing to do with their right to place the sign in the public right of way, but instead allows carrying, waving, or otherwise displaying noncommercial signs on the public right of way, as Lenzini and the Officers repeatedly told Hamman he could do.

Accordingly, the Ordinance facially provides "explicit standards for those who apply them" and is therefore not unconstitutionally vague. *See Ctr. for Individual Freedom*, 697 F.3d at 486.

## II. The District Court did not abuse its discretion in denying Appellant's preliminary injunction because the city ordinance is content neutral in that it is a general prohibition on all temporary signs in the public right of way.

The City may impose reasonable restrictions on the time, place, or manner of protected speech in a public forum. It is uncontested that the Ordinance's regulation of signage in the public right of way regulates speech in a public forum, thereby implicating First Amendment principles. *Ward*, 491 U.S. at 791 (internal quotation omitted). Permissible speech regulations in a public forum must be "justified without reference to the content of the regulated speech, . . . narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *Id.* (internal quotation omitted).

Appellees respond to Appellant's next two points in reverse order because courts traditionally analyze content neutrality (and its relevant scrutiny standard) prior to narrow tailoring and availability of alternative means of communications.

The United States Supreme Court has held that a sign regulation is not automatically content-based merely because enforcing it requires examining a sign's

content. *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (citing *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)). "The government's purpose is the controlling consideration." *Ward*, 491 U.S. at 791. "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* "Government regulation of expressive activity is content neutral so long as it is '*justified* without reference to the content of the regulated speech.'" *Id.* (internal quotation omitted).

The Supreme Court has held that a municipality may enact sign regulations based on any number of neutral criteria, such as "size, building materials, lighting, moving parts, and portability," and "on public property, the [t]own may go a long way toward entirely forbidding the posting of signs, so long as it does so in an evenhanded, content-neutral manner." *Reed*, 576 U.S. at 173. The Ordinance does so here.

The Ordinance is facially content neutral because it applies to all temporary signs in the public right of way, regardless of message: "No sign may be erected on, suspended over, or encroach upon the public right of way, except as provided for under section 17-1-5 of this code (dealing with 'encroachments'), or be located so as to obstruct the visual clearance needed for safe vehicle or pedestrian traffic." § 15-4-10-8(A)(1). (Doc. 57-11.) The Ordinance contains no content-based exceptions. Its only exceptions—certain permitted encroachments in § 17-1-5 but no erections of

29

temporary signs—are based on the manner of display and not the content or viewpoint. This agnosticism to specific messages or viewpoints is even more indicative of constitutionality than "the on-/off-premises distinction" upheld as content neutral for ordinances that "draw[] a regularity line based on *location*, not communicative content." *Adams Outdoor Advert. Ltd. P'ship v. City of Madison, Wisconsin*, 56 F.4th 1111, 1119 (7th Cir. 2023) (citing *City of Austin*, 596 U.S. at 75); *GEFT Outdoor, LLC v. City of Westfield*, 39 F.4th 821, 824 (7th Cir. 2022) (citing *City of Austin*, 596 U.S. at 75).

The Seventh Circuit is clear that "a municipality is entitled to implement a nondiscriminatory ban of *all* private signs from the public roads and rights-of-way." *Grand Chute*, 915 F.3d at 1123. The Seventh Circuit has also held a municipal peddling ordinance that was "a general prohibition on the sale of merchandise" to limit congestion on the sidewalk did not single out a certain message for different treatment and did not require considering the content of the speech, merely its format. *Weinberg*, 310 F.3d at 1037 (quoting *Ward,* 491 U.S. at 791). As in *Grand Chute*, *Weinberg*, and *Hill*, the Ordinance is just such a nondiscriminatory ban of all signs in the public right of way in the City. *See Hill*, 530 U.S. at 731 (noting the challenged ordinance did not ban any particular messages but merely regulated the places where communications may occur).

Hamman's argument against content neutrality also fails because Hamman identifies nothing in the record showing the City adopted the Ordinance "because of disagreement with the message it conveys." *Weinberg*, 310 F.3d at 1037 (quoting

30

*Ward,* 491 U.S. at 791). When enforcing the Ordinance on April 16, 2025, City officials identified the reason the signs had to be removed as because they were in the public right of way. (Doc. 47 at 43:8–44:1; Doc. 48 at 112:24, 114:10–115:1, 122:13–17; Doc. 49 at 6; Doc. 57-16 at 2:6–8, 3:1–12.) Further, "the Supreme Court in *Hill* explicitly **rejected** the theory that 'a statute is "viewpoint based" simply because its enactment was motivated by the conduct of the partisans on one side of a debate.'" *Madison Vigil for Life, Inc. v. City of Madison, Wis.*, 1 F. Supp. 3d 892, 897 (W.D. Wis. 2014) (citing *Hill*, 530 U.S. at 724). The Supreme Court similarly rejected the view that a regulation is content-based merely "because of its application 'to the specific locations where [that] discourse occurs.'" *Id.* (citing *Hill*, 530 U.S. at 724); *see also Hoye v. City of Oakland,* 653 F.3d 835, 846 (9th Cir. 2011) (citing *Hill,* 530 U.S. at 724–25) ("[I]n regulating speech immediately outside reproductive health facilities, disproportionate effect is not of decisive significance to the content-neutral inquiry.") Moreover, facially, as explained in more detail below, the Ordinance identifies traffic safety as the predominant governmental interest.

**III. The District Court did not abuse its discretion in denying Appellant's preliminary injunction because the city ordinance was not an unconstitutional restriction of speech in a public forum in that it was narrowly tailored while providing ample alternative channels of communication.**

As noted above, the City may impose reasonable restrictions on the time, place, or manner of protected speech in a public forum that are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for

31

communication. *Ward*, 491 U.S. at 791; *see also Adams Outdoor Advert. Ltd*, 56 F.4th at 1120.

### A.     The Ordinance is narrowly tailored

The Ordinance identifies the significant governmental interest it serves in regulating temporary signs in the public right of way to prevent "obstruct[ing] the visual clearance needed for safe vehicle or pedestrian traffic." § 15-4-10-8(A)(1). (Doc. 57-11.) The Ordinance is also contextualized within the Revised Code section regulating signs for the following purposes:

> A. To preserve, protect and promote the public safety on city streets by limiting the unnecessary distraction of the motorist caused by signs.
> B. To protect the general public from damage and injury which may be caused by the faulty and uncontrolled construction and use of signs within the city.
> C. To create a fair and balanced system of sign regulations recognizing both the needs of the business community and the desires of the citizenry for a reduction of sign confusion.
> D. To preserve and protect the property values of the city's residential neighborhoods by protecting these areas' visual character from the blighting effects of uncontrolled signs.

§ 15-4-10-2. (Doc. 57-11.) Prohibiting the posting of temporary signs in the public right of way to ensure safe vehicle and pedestrian traffic is a well-established significant governmental interest, as are visual aesthetics. *Adams Outdoor Advert.*, 56 F.4th at 1120 (citing *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–08 (1981).

Courts should defer to the City's reasonable determination "so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest." *Ward*, 491 U.S. at 782–83.

Importantly, however, the City need not select the "least restrictive or least intrusive means" of achieving that interest. *Id.* at 798–99. The City also need not adduce empirical proof of the connection between regulating the posting of temporary signs in the public right of way and traffic safety. *See Adams Outdoor Advert.*, 56 F.4th at 1120; *Luce v. Town of Campbell, Wisconsin*, 872 F.3d 512, 516–17 (7th Cir. 2017) (noting that a plurality of the Supreme Court in *Metromedia* found a government's rationale for an across-the-board ban adequate justified despite the paucity of record evidence).[6] Signs erected in the public right of way undoubtedly divert a driver's attention from the roadway, putting safety at issue. *See Metromedia*, 453 U.S. at 509 (internal citations omitted) (declining to second-guess accumulated, common-sense judgements of local lawmakers and reviewing courts on the connection between sign regulation and traffic safety).

While Hamman focuses on the claimed inconsistency in the encroachment permits in § 17-1-5 for encroachments that are quasi-permanent and thus non-temporary, readily movable, sidewalk restaurants, and residential block parties, the District Court found no merit to his argument that attempted to inject confusion into the across-the-board sign regulation, and this Court should reach the same conclusion. The Seventh Circuit has expressly stated: "[W]e know of no precedent categorically—root and branch—disallowing a municipality from requiring permits for particular activities, including certain forms of speech, to occur within city

---

[6] Appellant's reliance on *Luce* is misplaced, because the case proceeded on a different procedural posture—summary judgment—and involved credibility issues with the city's witness who testified about the enactment of the ordinance. 872 F.3d at 516–17.

limits." *GEFT Outdoor*, 39 F.4th at 825 (remanding for continued proceedings after declining to find that a sign ban ordinance's flag pole exception made the ordinance unconstitutional because it furthered the city's interests in reducing visual clutter that could occur by permitting a broader range of pole signs, including billboards).

Hamman complains of a supposed discrepancy between the Ordinance's larger swath of covered land compared to another provision's prohibition against erecting temporary signs within twenty feet of the curb, but "[w]hen a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal." *Hill*, 530 U.S. at 726.

Other evidence in the record also supports finding the Ordinance is narrowly tailored and does not restrict more speech than is necessary. The District Court found significant that Hamman admitted at the evidentiary hearing that his signs can pose a safety hazard. (Doc. 47 at 67:17–23.) Although Hamman's perspective was that carrying or wearing signs would be more hazardous than posting them in the ground, he still acknowledges that temporary signs near a roadway pose a traffic risk because in windy conditions they can get blown across the street and into traffic, which supports the City's reasonable determination. *See Ward*, 491 U.S. at 782–83. (*Id.*) While lesser restrictions could be available, the City is not required to choose the least restrictive means to accomplish its ends, and the Ordinance is thus narrowly tailored to reduce traffic hazards from signs in the public right of way. *Id.* at 798–99.

### B.    The Ordinance provides ample alternative communication channels

Initially, the District Court's determination that Hamman did not contest this third element of the time, place, and manner analysis means Appellant did not preserve this argument for appellate review. *See Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) (internal quotation omitted) ("We have held time and again that perfunctory and undeveloped arguments (even constitutional ones) are waived.") (Doc. 49 at 31.) Here, because Hamman specifically challenged the other two elements of time, place, and manner restrictions but did not invite the District Court to analyze the availability of alternative channels of communications—perhaps knowing it was not a winner—it appears this was a deliberate, strategic decision that waives review rather than an inadvertent forfeiture. *See United States v. Hathaway*, 882 F.3d 638, 641 (7th Cir. 2018) ("While waiver 'precludes appellate review by extinguishing any error that occurred,' forfeiture allows for plain-error review on appeal.").

Notwithstanding Hamman's waiver of this element, if this Court elects to review it, there can be no serious dispute that the Ordinance leaves open ample alternative channels for communication. *See Grand Chute*, 915 F.3d at 1123 (citing *Ward*, 491 U.S. at 791); *Adams Outdoor Advert. Ltd*, 56 F.4th at 1120. A crucial fact in this case is that the Ordinance prohibits posting temporary signs in the ground in the public right of way but ***permits holding or wearing the same signs in the same place***. (Doc. 57-11.) This available alternative means of communication is

35

uncontested in the record. (Doc. 47 at 47:12–48:1, 48:23–25; Doc. 48 at 112:24–113:14; 128:25–129:5; 154:15–20, 163:18–164:2.)

These alternatives were illustrated by four out of the five demonstrators in front of CHOICES on April 16, 2025, carrying anti-abortion signs without any interference from the City. (Doc. 47 at 47:12–48:1, 50:14–51:15.) Specifically, after Lenzini said Bob and Darlene's signs had to be removed from the ground because they were in the public right of way, Bob and Darlene proceeded to continue protesting by wearing and carrying their signs without interference from the City. (*Id.* at 47:12–48:1; Doc. 48 at 113:4–14; 128:25–129:5; 155:1–9; 163:1–6.) When Hamman was offered the same alternative after being told his signs could not be in the ground in the public right of way, two other members of his ministry carried his signs without City interference. (Doc. 47 at 50:14–51:15; Doc. 48 at 115:11–13; 154:1–18.) As yet another alternative, Hamman continued to approach women, speak with them, and disseminate gospel materials while Lenzini was present without interference. (Doc. 47 at 51:18–55:3.) No one from the City made any comments about the content of Hamman's signs or interfered with his interactions with the women. (*Id.* at 55:10–15.) Although Hamman would prefer to stake his signs in the ground rather than carry or wear them, the signs are not unreasonably heavy, and "[a]n adequate alternative does not have to be the speaker's first choice." *Weinberg*, 310 F.3d at 1041. (Doc. 47 at 47:8–16.)

Accordingly, given that the Ordinance is content neutral, narrowly tailored, and leaves open ample alternative communication channels, the District Court did not

36

err as a matter of law in finding that the Ordinance constitutes a valid time, place, and manner restriction. *See id.*; *see also* Ward, 491 U.S. at 791; *Adams Outdoor Advert. Ltd*, 56 F.4th at 1120.

**IV.    The District Court did not abuse its discretion in denying Appellant's preliminary injunction because the City did not engage in viewpoint discrimination in that the record showed even-handed, content-neutral enforcement rather than selective targeting of Appellant's message.**

Hamman's contention that the City discriminatively enforces the Ordinance is devoid of support in the record, which must be viewed with deference to the District Court's factual findings absent clear error. *See* Fed. R. Civ. P. 52(a); *Cassell*, 990 F.3d at 545 (citing *Abbott Labs.*, 971 F.2d at 13).

While "even a neutral ordinance can violate the First Amendment if it is enforced selectively", *Grand Chute*, 915 F.3d at 1123, "when someone challenges a law as viewpoint discriminatory but it is not clear from the face of the law which speakers will be allowed to speak, he must show that he was prevented from speaking while someone espousing another viewpoint was permitted to do so." *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2015). Just so here, the Ordinance is facially content neutral, thus Appellant bears the burden of showing his pro-life, anti-abortion viewpoint was disallowed under the Ordinance whereas another viewpoint was permitted.

A district court does not abuse its discretion in denying a preliminary injunction where the plaintiff does not show likelihood of success of the merits on his viewpoint discrimination claim. Although distinct, the viewpoint discrimination issue connects

37

to the vagueness doctrine discussed above, because a clear ordinance helps those enforcing it to avoid doing so in a discriminatory way. *Ctr. for Individual Freedom*, 697 F.3d at 479. Here, the evidence was contrary to Appellant's likely success on his viewpoint discrimination claim, which misses the mark given the Ordinance's general prohibition and its enforcement on all signs erected in the public right of way irrespective of viewpoint.

First and foremost, Appellant conspicuously omits Lenzini's uncontroverted testimony that he removes all signs in the public right of way regardless of their content. Indeed, the Officers gave corroborating testimony that they were unaware of any instance in which the City removed or targeted signs based on their content rather than their placement in the public right of way. (Doc. 48 at 159:14–22; 165:7–18.) In that regard, Hamman ineffectively focuses on Sgt. Murray's personal opinions that the City was left-leaning. (*Id.* at 158:11–159:3.) Regarding the cherry-picked quotations of the Officers who were each relatively unfamiliar with the Ordinance when they were contacted about it on April 16, 2025, "government entities are not prohibited from favoring one viewpoint over another." *Dye v. City of Bloomington, Indiana*, 580 F. Supp. 3d 560, 571 (S.D. Ind. 2022) (quoting *Matal v. Tam*, 582 U.S. 218, 234 (2017) (noting the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others, but "[t]he Free Speech Clause does not require government to maintain viewpoint neutrality when its officers and employees speak about [the government's] venture"). In any event, Sgt. Murray likewise testified that in his

experience the Ordinance was enforced on signs placed in the public right of way regardless of content. (*Id.*) Indeed, Appellant can identify no evidence of left-leaning signs that were permitted in the public right of way as needed to prevail on this viewpoint discrimination claim on appeal. *See McCullen*, 573 U.S. at 485 n.4. To the contrary, Lenzini emphasized that the content of a sign's message does not matter, which he makes clear to his Division inspectors; he removes all signs in the public right of way of which he becomes aware without regard to the content of the message conveyed by a non-compliant sign. (*Id.* at 109:15–22, 111:22–24.) While some delays occur in sign removal, because the City cannot patrol every public right of way every day, Lenzini removes signs in the public right of way "pretty much daily." (*Id.* at 109:10–25.) Hamman's five anecdotal photographs taken sometime after April 16, 2025, attempting to show evidence of signs that were not timely removed, simply failed in their persuasive value given that Hamman could not testify to how long the signs had been in the ground at the time he took the photographs or how long they were up after he took the photographs. (Doc. 47 at 56:8–21.) Lenzini estimates that, over the course of a year, the Division removes between 150 and 200 signs, with spikes in volume during campaign season despite preemptive communications with political parties to ensure Ordinance compliance. (Doc. 48 at 111:11–21.) His arrival at the scene on April 16, 2025, was precipitated not by any agenda against a particular viewpoint but instead by an email from the city manager reporting signs in an illegal location, meaning signs improperly posted in the public right of way. (Doc. 48 at 111:25–112:7.)

39

Further, the enforcement action on April 16, 2025, requiring Hamman and the others to remove their signs from the ground was not a deviation or departure from the norm, because, as stated above, the District Court credited Lenzini's testimony that he removes all signs in the public right of way regardless of content or message. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (Doc. 48 at 109:15–22, 111:22–24.) *Arlington Heights* is also inapposite here because in the context of Appellant's quotation, it was inquiring into whether a refusal to rezone a single-family tract to multi-family was made with invidious, racially discriminatory intent under the "motivating factor" analysis. *Id.* at 267–68. There is no evidence of such invidious intent here, where the four out of five protestors peacefully and without any interference from the City continued protesting by wearing and carrying the same signs regulated by the Ordinance. No one interfered with Hamman's sidewalk counseling of women and handing out gospel materials. (Doc. 47 at 50:14–51:15, 51:18–55:3; Doc. 48 at 115:11–13; 154:1–18.)

It is also worth nothing that not every restriction that happens to fall more heavily on one group than another constitutes impermissible viewpoint discrimination. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 (1994) (finding the fact that the petitioners all shared one abortion viewpoint did not itself demonstrate some invidious content- or viewpoint-based purpose motivated the state injunction but instead "suggests only that those in the group ***whose conduct*** violated the court's order happen[ed] to share the same opinion regarding abortions

40

being performed at the clinic"). In this way, the Ordinance's facially neutral status cannot be deemed a façade for viewpoint discrimination merely due to disparate impact where the record, as here, shows it is enforced evenhandedly. *See id.*; *see also Wisconsin Educ. Ass'n Council v. Walker*, 705 F.3d 640, 648 (7th Cir. 2013).

**V.    The District Court did not abuse its discretion in denying Appellant's preliminary injunction because Appellant failed to show irreparable harm or that a merged balancing-of-the-equities and public-interest favored him.**

Under the Seventh Circuit's hybrid approach to preliminary injunctions, this Court affords a district court's decisions during the balancing phase of the analysis great deference under the abuse-of-discretion standard. *See Bevis*, 85 F.45h at 1188; *Cassell*, 990 F.3d at 545 (internal quotation omitted).

Appellant can isolate no clear error of fact or law in the District Court's analysis. The District Court found that Appellant is unlikely to suffer irreparable harm if denied the temporary injunction and that the merged balance of equities and public interest tips in the City's favor. *See Bevis*, 85 F.4th at 1188 (citing *Winter*, 555 U.S. at 20; *Nken v. Holder*, 556 U.S. 418, 435–36 (2009)).

First, Appellant exaggerates the First Amendment harms at issue here, where the only restriction on his speech is that he must carry or wear his abortion-protest signs when demonstrating in the City's public right of way rather than stake them there in the ground. Nothing in the Ordinance or the City's enforcement history prevents him from returning to the same spot and continuing to use his signs in a manner compliant with the Ordinance to communicate his gospel to passersby. Inasmuch as Hamman has not articulated irreparable harm that would warrant the

41

judicial exercise of the extraordinary and "very far-reaching power" of an injunction, this Court should decline to overturn the District Court's logical and plausible discretionary holding. *See Bevis*, 85 F.4th at 1188; *Cassell*, 990 F.3d at 544; *see also Estrada-Martinez*, 809 F.3d at 895.

Next, Appellant does not concretely identify how the merged balance of the equities and public interest tip the scale in his favor merely because First Amendment principles are implicated in his arguments. *See Nken*, 556 U.S. at 435–36. Appellees maintain that the District Court carefully considered the likely merits of Hamman's success and properly concluded they were low given the plain language of the Ordinance, the surrounding regulatory context, the ample availability of alternative means of communicating the desired messaging, and the absence of any invidious discrimination beneath the City's well-regarded interest in maintaining public safety on its roads and public right of ways. Continued enforcement of the constitutional Ordinance benefits the public interest and disfavors injunction. *See id.*; *see also Joelner v. Vill. of Washington Park, Illinois*, 378 F.3d 613, 627 (7th Cir. 2004).

## CONCLUSION

The City's Ordinance is a general prohibition on placing signs in the public right of way that does not run afoul of the Constitution on any grounds alleged by Appellant, who attempts to inject confusion and complexity where there is none to be found. The City fairly and consistently enforces the Ordinance on all temporary signs in the City's public right of way regardless of content or viewpoint and leaves

42

more than ample minimally burdensome alternatives to display the same exact

signs in the exact same location simply by wearing or carrying them. As such, the

District Court correctly denied the preliminary injunction.

For all the foregoing reasons, the Court should affirm the District Court's Order.

Dated: April 20, 2026          Respectfully submitted,

SANDBERG PHOENIX & von GONTARD P.C.

By:  */s/ A. Courtney Cox*
     A. Courtney Cox, #6182590
     Philip J. Lading, #6271659
     101 W. Vandalia Street, Suite 300
     Edwardsville, IL 62025
     618-659-9861
     618-659-9862 (Fax)
     ccox@sandbergphoenix.com
     plading@sandbergphoenix.com

     Stefanie G. Brody, #70897MO
     701 Market Street, Suite 600
     St. Louis, MO 63101
     314-231-3332
     314-241-7604 (Fax)
     sbrody@sandbergphoenix.com

     *Attorneys for Defendants-Appellees*
     *City of Carbondale, an Illinois municipal*
     *corporation; John Lenzini, in his individual*
     *and official capacities; and Lenoard Jamie*
     *Snyder, in his individual and official*
     *capacities*

43

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the type-volume limitation in Rule 32(c), because it contains 11,277 words. In addition, this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), as well as the style requirements of Fed. R. App. P. 32(a)(6), as modified by Circuit Rule 32(b), because it has been prepared in Century Schoolbook, a proportionally spaced, 12-point serif typeface, using the Microsoft Word program.

Dated: April 20, 2026

/s/ A. Courtney Cox

**CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

The Following participants who are registered CM/ECF users will be served by the CM/ECF system:

Nathan J. Moelker
Stuart J. Roth
Christina A. Compagnone
Liam R. Harrell
American Center for Law & Justice
P.O. Box 90555
Washington, DC 2009-0555
sroth@aclj.org
nmoelker@aclj.org
lharrell@aclj.org
ccompagnone@aclj.org

Geoffrey R. Surtees
American Center for Law & Justice
P.O. Box 60
New Hope, KY  40052
gsurtees@aclj.org


Dated: April 20, 2026

/s/ A. Courtney Cox